**Exhibit 4:    Excerpts of Deposition of Glenn Clark**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE MIDDLE DISTRICT OF ALABAMA
 3                      NORTHERN DIVISION
 4
 5
      * * * * * * * * * * * * * * * *
 6                                   *
     HAZEL ROBY, as Administratrix   *
 7   of the Estate of RONALD TYRONE  *
     ROBY, Deceased,                 *
 8                                   *
                  Plaintiff,         *
 9                                   *
     VS.                             * CIVIL ACTION NUMBER
10                                   * 2:05CV494-B
     BENTON EXPRESS, INC., et al.,   *
11                                   *
                  Defendants.        *
12                                   *
      * * * * * * * * * * * * * * * *
13
14
15        The testimony of GLENN E. CLARK, JR.,
16        taken at Bozeman, Jenkins & Matthews, 114
17        East Gregory Street, Pensacola,
18        Florida, on the 5th day of October, 2005,
19        commencing at approximately 2:15, o'clock,
20        p.m.
21
22
23
```

Page 30

1   -- anything about that conversation that made you
2   think that it didn't appear to be the same Craig that
3   normally reports to work?
4   A        No, it was the normal Craig.
5   Q        And that normal Craig, am I right that he
6   -- that normal Craig was a good employee of Benton?
7   A        Yes.
8   Q        Good guy?
9   A        Yes.
10  Q        A guy that you liked?
11  A        Yes.
12  Q        A guy you considered a good employee?
13  A        Yes.
14  Q        A guy that, the best of your knowledge,
15  followed all Benton's policies and procedures?
16  A        Yes.
17  Q        A guy that in your knowledge was a
18  safety-conscious Benton employee?
19  A        Yes.
20  Q        A guy in your opinion who was reliable?
21  A        Yes.
22  Q        A guy in your opinion who was a family
23  man?

Page 31

1   A        Yes.
2   Q        A guy, from what you -- best you know of,
3   was a good family man?
4   A        To the best of my knowledge, yes, sir.
5   Q        And A guy that you would say you
6   personally liked as an employee?
7   A        Yes.
8   Q        And when he left Pensacola, did you have
9   any idea what time he left?
10  A        Approximately 6:00 P.M.
11  Q        Did he have to sign anything in front of
12  you or have anything else to do with you, have
13  anything he had to do with you?  I understand you all
14  spoke generally and pleasantly, but was it anything
15  else he had to do with you that was routine and
16  mandatory?
17  A        He is supposed to sign out.
18  Q        Did he sign out with you or is there just
19  a sign-out sheet that he can sign out on even if
20  you're not there?
21  A        That's correct.  He signs out.  It's just
22  a sign-out sheet.
23  Q        All right.  And that means he could sign

Page 32

1   out if you weren't there or if you are there?
2   A        That's correct.
3   Q        And you're not sitting there verifying he
4   signed out, are you?
5   A        No, sir.
6   Q        Do you play any role in whether or not
7   employees who you manage are randomly drug tested?
8   A        Yes.
9   Q        And what role do you play in that?
10  A        I just get a confidential notification
11  and a time period that I need to get them tested
12  within.
13  Q        And it would tell you who you need to
14  send?
15  A        That's correct.
16  Q        To the best of your knowledge, has Craig
17  ever been randomly drug tested since he was at
18  Benton?
19  A        To the best of my knowledge, no.
20  Q        Any problems prior to this whole
21  weekend?  Let's forget -- any problems that you know
22  of about Craig Stephens prior to 4/8, 11, which was
23  the Friday he left?  Before that day, did you know of

Page 33

1   anything that would have caused you any alarm about
2   Craig Stephens as an employee of Benton Express?
3   A        Nothing whatsoever.
4   Q        And -- and after Craig Stephens left the
5   terminal at approximately 6:00 o'clock -- or do you
6   know whether or not he actually signed out?
7   A        Not for sure.
8   Q        All right.  There was nothing saying that
9   you'd go and check and make sure he signed out that
10  day, was it?
11  A        Do what, sir?  I'm sorry.
12  Q        Was that something you would normally do,
13  go make sure he signed out and look at the form?
14  A        Not normally.
15  Q        All right.  And how long after he left -
16  which you say it was approximately 6:00 - after he
17  left was it that you ultimately left from the
18  terminal?
19  A        Normally I stay till 7:00 or till the
20  job's done.  7:00, 7:30 at the latest -- maybe 8:00
21  at the latest.
22  Q        Do you recall anything about that day to
23  tell me what time you may have left that day?

Page 38

```
1   A      No, sir.
2   Q      You did not?
3   A      No, sir, I did not.
4   Q      Do you have any idea -- what's the reason
5   that you did not follow the procedures that was
6   provided to you?
7   A      Because I was never contacted by anybody
8   that an accident had occurred.
9   Q      You never -- I thought that at some point
10  in time, you were contacted and told that Craig was
11  involved in a wreck?
12  A      Yes, I was contacted by our -- our safety
13  department in Jacksonville.
14  Q      Okay. So, your safety department called
15  you?
16  A      That's correct.
17  Q      And who at your safety department called
18  you?
19  A      Sharon Oakes.
20  Q      And she's in Jacksonville?
21  A      Yes, sir.
22  Q      And when she contacted you, did she give
23  you any specific instructions?
```

Page 39

```
1   A      No. She just wanted to know if I was
2   aware of an accident in Montgomery involving a driver
3   by the name of Stephens, and I said, no, I was
4   unaware of it, but that -- you know, that we were
5   looking for him.
6   Q      Prior to you -- prior to -- had you --
7   and do you call that the corporate office or is that
8   just where the safety office is located?
9   A      That's correct, just the safety office.
10  Q      And prior to her call from the safety
11  office, had you had any other contact with the safety
12  office prior to that?
13  A      With our emergency -- our emergency
14  hotline, yes, I did.
15  Q      And when did you have contact with them?
16  A      Approximately 12:00, 12:30 on Saturday
17  the 9th, I contacted a Mr. David Justice, who is our
18  emergency hotline supervisor for breakdowns and any
19  type of an incident, including an accident.
20  Q      And what did he tell you?
21  A      He took all the information down and, you
22  know, he -- he would have any knowledge of any
23  breakdown information, had a driver called in, and he
```

Page 40

```
1   had none.
2   Q      When you say he took the information
3   down, what kind of information did he take, did you
4   provide him?
5   A      Just the driver's name.
6   Q      The driver that -- you told him that
7   Craig Stephens was the driver and he had not returned
8   yet?
9   A      That's correct.
10  Q      And you told him that about what time?
11  A      About noon, maybe 12:30, on Saturday, the
12  9th.
13  Q      I mean midday, 12:00 o'clock noontime?
14  A      I'd say between 12:00 and 1:00 o'clock,
15  that -- noontime, you're correct.
16  Q      Other than that call to David Justice,
17  did you ever talk to anybody else in the safety
18  office?
19  A      I talked to David the rest of the day
20  periodically and also the next day.
21  Q      And would that be just simply trying to
22  find out if he had heard anything thereafter?
23  A      Yes, sir, that's correct.
```

Page 41

```
1   Q      And I guess he inquired -- would he have
2   ever called you or would you have been calling him
3   during those occasions?
4   A      If I had knowledge of an incident, I
5   would have been calling him.
6   Q      Okay. And from what I understand, you
7   had no knowledge of an incident?
8   A      Not -- not until 12:00 o'clock Saturday.
9   Q      Right. Right. I'm talking about, but
10  after 12:00 o'clock Saturday, when you was in
11  communication, you said, fairly -- somewhat routine,
12  somewhat regular communication with David?
13  A      Yes.
14  Q      And were you calling him or was he
15  calling you?
16  A      We were calling each other.
17  Q      Okay. Just trying to figure out what
18  the latest was?
19  A      Discussing what could have happened, and
20  he gave me basic instructions on what I needed to do.
21  Q      And what did he tell you you should do?
22  A      He told me that I needed to call the
23  Florida Highway Patrol and report we had a truck
```

11 (Pages 38 to 41)

(205) 458-1360

Page 42

1  missing and a driver.
2  Q       All righty. After hearing -- so, I think
3  what I gathered is Sharon Oakes ultimately called you
4  when they found out about the wreck; is that right?
5  A       To the best of my knowledge, that's
6  correct.
7  Q       You were in somewhat regular contact with
8  David Justice just trying to see what he had found
9  out and him checking on you to see what you had
10 heard?
11 A       That's correct.
12 Q       And I guess on all those occasions,
13 neither one of y'all had turned up anything?
14 A       That's accurate.
15 Q       Would you have been in the same regular
16 communication with him throughout the day on Sunday?
17 A       With who, David?
18 Q       Yes.
19 A       I would not say regular, but I spoke to
20 him, I think, at least once on Sunday.
21 Q       Okay. Anybody else you would have been
22 in communication with on Sunday other than the one
23 communication with David Justice?

Page 43

1  A       I talked to Benny Cadero (phonetic), our
2  senior vice president.
3  Q       And what day would that have been on?
4  A       I'm not real sure.
5  Q       Would it have been multiple occasions or
6  one occasion?
7  A       It would have been a couple of occasions.
8  Q       Do you recall what you would have --
9  would you have called him or would he have called
10 you?
11 A       He was in contact with David, to the best
12 of my knowledge.
13 Q       And did David or somebody tell you you
14 needed to call Benny or did Benny just call you?
15 A       I'm not sure exactly what sequence
16 happened.
17 Q       But you are aware that you talked to him?
18 A       Yes.
19 Q       And during those conversations, do you
20 recall anything you told -- told him about, anything
21 you told him?
22 A       Just that we had a driver overdue.
23 Q       And in any of those conversations, did he

Page 44

1  tell you anything?
2  A       Just -- nothing --
3  Q       Like give you any instructions on what to
4  do? Obviously you told him what the situation was,
5  you had a delayed driver. Did he tell you any
6  specific things to do?
7  A       To keep -- you know, keep on top of it
8  and keep in touch with -- you know, as soon as I
9  found out something, to let him know.
10 Q       And do you know if any of those
11 conversations occurred on Sunday?
12 A       Yes.
13 Q       Okay. Do you know -- let's say -- do you
14 recall -- which probably -- let's try to take it as
15 periodically as we can to figure out essentially what
16 happened. And I know it may have been several calls,
17 but do you recall at least on 8:00 -- at
18 approximately 8:00 o'clock on Sunday talking to
19 Garlin?
20 A       8:00 o'clock when?
21 Q       Sunday morning.
22 A       No.
23 Q       Do you recall talking to Garlin at any

Page 45

1  time about Craig Stephens?
2  A       Yes.
3  Q       And when do you recall talking to him?
4  A       About 6:00 P.M. on Sunday.
5  Q       You recall talking to him at 6:00 P.M.?
6  A       Yes.
7  Q       And on 6:00 P.M. on Sunday, do you recall
8  -- do you have any idea why you were talking to
9  Garlin on Sunday at 6:00 P.M.?
10 A       He had received a -- he had received a
11 call from Craig.
12 Q       And how did you know that?
13 A       He -- that's what Garlin told me.
14 Q       And when did Garlin -- I mean, did you
15 call Garlin and it just so happened he had received a
16 call or did Garlin call you?
17 A       No, Garlin called me.
18 Q       And told you he had received a call from
19 Craig. Did he tell you the content of the call?
20 A       Just that he had talked to Craig and that
21 Craig was in Atlanta, that he was, he used the word,
22 "stuck", he was stuck in Atlanta, and to the best of
23 my knowledge, that's all that he said, and that he

Page 46

1  told him to call me.
2  Q     Do you remember any conversation with
3  anybody else on Sunday? I know you told me about
4  Mr. Cadero was on Sunday, and it was just generally
5  to tell you to stay on top of the situation; is that
6  right?
7  A     That's correct.
8  Q     You think you talked to Garlin at about
9  6:00 P.M. on Sunday; is that right?
10 A     That's correct.
11 Q     Do you know if you talked to anybody on
12 Sunday after you talked to Garlin allegedly on Sunday
13 at 6:00 P.M.?
14 A     On Sunday after 6:00 P.M.?
15 Q     Yeah, you talked to Garlin, I think you
16 just told me, about 6:00 P.M.; is that right?
17 A     Right. To the best of my knowledge.
18 Q     Okay. Anybody else you talked to on that
19 day after you talked to Garlin at about 6:00 P.M.?
20 A     I -- I talked to David Justice and our
21 manager in Atlanta, Bill Jones.
22 Q     So, you would have talked to David
23 Justice and Bill Jones sometime after 6:00 P.M.?

Page 47

1  A     Yes, sir.
2  Q     And would you have told them what Garlin
3  had relayed to you?
4  A     That's correct.
5  Q     Did Garlin -- did you tell them that
6  Garlin had told you that Craig asked him could he do
7  his Sunday load?
8  A     No.
9  Q     Did Garlin tell you that Craig had asked
10 him to do his Sunday load, could he do his Sunday
11 run?
12 A     Can you repeat that, sir?
13 Q     Did Garlin tell you that Craig had asked
14 him to do his Sunday run because he thought he was
15 not going to be back in time?
16 A     That's what Garlin said.
17 Q     Okay. Did Garlin -- did you tell David
18 Justice and Bill Jones that?
19 A     I don't -- not at that time, no.
20 Q     I'm talking about when you talked to them
21 after the 6:00 P.M. call from Garlin. You said you
22 talked to both of them after that, didn't you?
23 A     Yeah, just that I -- that we had made

Page 48

1  contact with Craig.
2  Q     Okay. But you didn't tell him any
3  details of the conversation?
4  A     Other than that he had been located and
5  that he was stuck in Atlanta and that he would be --
6  to the best of my knowledge, Garlin said that he
7  would be coming back.
8  Q     Okay. So -- so, you would have relayed
9  that to Bill Jones and David Justice; right?
10 A     That's correct, yes, sir.
11 Q     And what I'm gathering -- I'm just trying
12 to piece it all together because I know there's
13 things that we all forget, but it's important I know
14 everything. But so far what I've gathered is
15 sometime after your conversation with Garlin at 6:00
16 P.M. on Sunday, you would have talked to Bill Jones;
17 is that correct?
18 A     Yes.
19 Q     And David Justice?
20 A     Yes.
21 Q     And you would have told both of them that
22 Garlin had been in touch with Craig?
23 A     Yes.

Page 49

1  Q     That Garlin had talked to Craig?
2  A     Yes.
3  Q     And that Garlin had told you that Craig
4  was on his way back?
5  A     Right. That's the information at that
6  time.
7  Q     And I guess at that time, since Garlin
8  had relayed to you that Craig was on his way back,
9  that you -- that you -- were you, would it be fair to
10 say, somewhat relieved knowing that we had located
11 the driver and he had told Garlin he was on his way
12 back?
13 A     Yes, that was -- that was a correct
14 assessment. It was -- at least I knew where he was,
15 or at least I thought I knew where he was.
16 Q     Right. And relieved to know, hey, we
17 finally located him, he's alive; is that right?
18 A     That's correct.
19 Q     No harm had come to him?
20 A     That's correct.
21 Q     And that he was on his way back?
22 A     Yes.
23 Q     So, would it be fair to say, then, that

13 (Pages 46 to 49)

(205) 458-1360

ESQUIRE DEPOSITION SERVICES

Page 50

1  it was really -- now that you had located him and
2  know he's ultimately on his way back, would it have
3  kind of -- no need for you to do anything else, at
4  least in your mind, at that time since we know he
5  said he's on his way back?
6      MR. BROCKWELL: Object to the form.
7  MR. BOONE:
8  Q   Is that a fair assessment of what you may
9  have done the rest of the Sunday?
10 A   Could you repeat that question, please,
11 sir?
12 Q   I was just saying, I'm -- I'm trying to
13 gather -- in light of the fact you told me that you
14 were relieved that you knew where he was now, and
15 allegedly was on his way back, would it be fair to
16 say that you were relieved and as a result, you know,
17 you kind of could take a deep breath and were no
18 longer looking for him?
19     MR. BROCKWELL: Object to form.
20 A   That's not a correct assessment. I still
21 wanted to see him.
22 MR. BOONE:
23 Q   Okay. And I don't mean you didn't want

Page 51

1  to see him, but you were some -- relieved and
2  expecting him to be on his way back?
3  A   Yes.
4  Q   And would it have been anything you would
5  have done after learning that allegedly he was on his
6  way back? Would you have done anything else after
7  that other than talk to --
8  A   I tried -- I tried to call him on his
9  radio. Which I couldn't get him.
10 Q   Okay. Did Garlin tell you that Craig had
11 told him his battery was going dead?
12 A   He -- Garlin mentioned that to me.
13 Q   Okay. So, I guess that was no big
14 surprise to you, because when you called, Garlin had
15 told you -- or when you and Garlin had talked, he
16 told you that Craig said his battery was going dead,
17 so when you called and there was no way to get
18 through to him, I guess you understood that maybe his
19 battery was dead?
20     MR. BROCKWELL: Object to the form.
21     Is that a question?
22 MR. BOONE:
23 Q   Is that fair?

Page 52

1  A   Repeat the question. You got me.
2  Q   I understood Garlin told you that Craig
3  had told him that his battery was going dead; is that
4  right?
5  A   That's correct.
6  Q   So, what I was saying was, so since --
7  when you called him and you got no -- you couldn't
8  get through to him, I would gather that you concluded
9  that his battery is dead?
10     MR. BROCKWELL: Object to the form.
11 A   That could be a possible thought process
12 I had at the time.
13 MR. BOONE:
14 Q   Do you know of anything else you would
15 have concluded in light of the fact that Garlin told
16 you Craig's battery was going dead?
17 A   Well, I knew he had a personal cell
18 phone, also.
19 Q   Did you know that phone number?
20 A   No, sir.
21 Q   Okay. So, you wouldn't have been able to
22 call him on his personal cell phone, would you?
23 A   Right. To the best of my knowledge, I

Page 53

1  would not have.
2  Q   Because at that time you didn't -- well,
3  you didn't have his cell phone number, did you?
4  A   That's correct.
5  Q   And that's correct you did not have it?
6  A   Right.
7  Q   Okay. So, I'm just -- I'm trying to
8  figure out and trying to understand your process,
9  then. You've been told he was on his way back, he
10 was in Atlanta and he was heading back, and I'm
11 trying to figure out -- you tried to call him and
12 realized that Garlin had told you his battery was
13 dead. Was it anything else you tried to do that
14 night?
15 A   Other than call him, try to call him, no.
16 Q   And I guess when you called him, did you
17 conclude that his battery was dead when you tried to
18 call him and couldn't get through to him?
19 A   At that moment, I made no conclusion.
20 Q   Okay. Did you keep trying to call him?
21 A   Possibly two or three times.
22 Q   Okay. It's your recollection you tried
23 to call two or three times or are you just saying

Page 54

1  it's possible you did or are you saying that you
2  recall calling him two or three times?
3  A      I recall trying to call him several
4  times.
5  Q      Okay. And anything else you would have
6  done on that Sunday night?
7  A      Just -- just anticipated his -- seeing
8  him first thing in the morning.
9  Q      Okay. All right. At that point, in
10 light of the good news Garlin had told you, he had
11 been found and was on his way back, I gather you
12 anticipated that his truck and he would be back in
13 Pensacola on Monday morning?
14 A      That's correct.
15 Q      And I'm sure at that time you were glad
16 to know that one of your employees, who you
17 considered a good, reliable employee, was safe?
18 A      Yes.
19 Q      And you were -- I guess you were glad to
20 know that no harm had come to him, for example, like
21 somebody had tried to rob him or something?
22        MR. BROCKWELL: I object to the form.
23 A      Yes, sir.

Page 55

1         MR. BROCKWELL: Labarron, if -- you
2         keep saying that you guess and then making
3         a statement. If you could please ask
4         questions to --
5         MR. BOONE: That'll be fine.
6  MR. BOONE:
7  Q      Would it be fair to say that you were
8  happy to know that Craig had not been robbed or
9  injured by some attacker?
10 A      Yes.
11 Q      And would it be fair to say that that was
12 at least one of the things that you were possibly
13 worried about, maybe something had happened to Craig?
14 A      Yes.
15 Q      So, would it be fair to say, then, that
16 when you arrived on Monday morning and still no
17 Craig, that you were very alarmed?
18 A      Yes.
19 Q      Did you make any contact with anybody
20 when you arrived? What time did you arrive to work
21 on Monday morning?
22 A      Got there approximately 7:00 A.M.
23 Q      And when you arrived at 7:00 A.M., did

Page 56

1  you call anybody to let them know that -- or did you
2  talk to anybody about Craig when you arrived at 7:00
3  A.M.?
4  A      Yes, I would have called -- I called Bill
5  Jones, to the best of my knowledge, and David
6  Justice.
7  Q      And when you called Bill Jones and David
8  Justice, do you recall if on Monday morning at
9  approximately -- would it be -- would it be safe to
10 say that you would have called sometime around 7:00
11 A.M.?
12 A      That would be correct, 7:00, 7:15, 7:30.
13 Q      Can you tell me what, if anything, either
14 one of them said when you called them on Monday
15 morning?
16 A      Just, you know, I mean, we -- we were
17 looking for him, he wasn't there, we were concerned,
18 and I'd just advise them as soon as I heard from him.
19 Q      And let's go back a little bit. On
20 Saturday, I know you told me you talked to David
21 Justice. Did you talk to Bill Jones on Saturday?
22 A      Yes, I did.
23 Q      And did both of you all work together in

Page 57

1  trying to think about and try to figure out what may
2  have happened and where Craig was?
3  A      Yes, we talked on different occasions as
4  to, you know, what could have happened, where he
5  might be.
6  Q      And let me ask you this here. At any
7  time did Bill Jones give you any directives, like
8  tell you anything specifically to do?
9  A      Could you state that question again?
10 Q      At any time did Bill Jones give you any
11 instructions, like, Glenn, do A, B, C and D, you
12 know? Did he give you any specific instructions of
13 anything to do on Saturday?
14 A      Nothing specifically other than the --
15 you know, I had told him what -- that I had called
16 the FHP and that I had followed their -- their
17 directions for filing a missing vehicle report.
18 Q      Okay.
19 A      Of course, I kept him abreast of that
20 information through the afternoon hours of April the
21 9th.
22 Q      Okay.
23 A      That Saturday.

Page 62

1  that note when you all talked at 6:00 P.M.?
2  A     I don't remember.
3  Q     Did Garlin tell you anything about what
4  caused Craig's delay other than being stuck? I know
5  you said that's a word that stood out in your mind.
6  Did he tell you anything other than -- about why
7  Craig was delayed other than being stuck?
8  A     Other than he'd had an argument with his
9  wife, to the best of my knowledge. He mentioned that
10 to me.
11 Q     Garlin told you that?
12 A     Yes.
13 Q     Tell me all you recall about what Garlin
14 told you about Craig having an argument with his
15 wife.
16 A     That's -- that's all I remember is just,
17 you know, that statement, he -- that he had had an
18 argument with his wife.
19 Q     Okay. Did you inquire any more detail
20 about, you know, how serious it was, what's Craig's
21 state of mind?
22 A     No, I did not.
23 Q     And he gave you no other details other

Page 63

1  than simply let you know that he had heard that Craig
2  had had an argument with his wife?
3  A     Right.
4  Q     Have you had -- did you have any contact
5  with Craig's wife on Saturday?
6  A     Yes.
7  Q     And approximately what time did you have
8  contact with Craig's wife on Saturday?
9  A     12:00 o'clock.
10 Q     12:00 o'clock?
11 A     Yes, sir, approximately 12:00 o'clock.
12 Q     Approximately 12:00 o'clock. And that's
13 12:00 o'clock noon; right?
14 A     Yes.
15 Q     And was it by phone or in person?
16 A     It was by phone.
17 Q     And Craig's wife would have called you at
18 the terminal?
19 A     She was at the terminal.
20 Q     Okay. So, Craig's wife was at the
21 terminal and -- but you didn't see her in person?
22 A     I did not.
23 Q     And how did you -- where was she when you

Page 64

1  talked to her, on the terminal lot?
2  A     That's correct. She was at the terminal
3  on the lot.
4  Q     And did she call you on her cell phone
5  from the lot?
6  A     No.
7  Q     How did she call -- how did you all get
8  on the phone with each other?
9  A     I had a maintenance vendor --
10 Q     Right.
11 A     -- that was doing some maintenance work
12 on one of my trucks and she asked him to call me and
13 that's how I found out she was there.
14 Q     And when you -- and you -- and you
15 eventually talked to her?
16 A     Yes.
17 Q     And do you recall if it was a short
18 conversation or a long one?
19 A     It was short. She was concerned and --
20 her husband was overdue and she wanted to know if I
21 knew anything about it, if he had been delayed for
22 some reason, and I said I did not know of any, but I
23 would have to call and I would call her back.

Page 65

1  Q     And did you ever call her back?
2  A     Yes. After I talked to David Justice to
3  find out if there were any incidences or accidents or
4  anything that had been reported, maintenance
5  breakdowns, he said there were none, then I called
6  her back and said I was unaware of any.
7  Q     Of anything that would have delayed him?
8  A     That's correct.
9  Q     And would you have talked to David
10 Justice pretty much fairly immediately after you
11 talked to her?
12 A     I would have -- I would have called him
13 back shortly after I got -- you know, got through.
14 Q     Talking to her?
15 A     Yes.
16 Q     And had you -- would that have been your
17 first contact with David Justice or had you talked to
18 him before that?
19 A     That would have been my first contact
20 with David Justice.
21 Q     So, would it be fair to say that when
22 Craig Stephens' wife came to the terminal to let you
23 know of her concerns of his delay would have been the

Page 66

1  first thing to alarm you and cause you to contact
2  David Justice?
3  A      That's correct.
4  Q      Did you give her any instructions when
5  you called her back about anything she should do?
6  Did you tell her to just keep calling and if you hear
7  from him, call us, or did you tell her anything she
8  should do?
9  A      I don't remember exactly, but I did ask
10 her if she heard anything from him at all, to please
11 let me know and that I would do likewise.
12        (Off the record.)
13        MR. BROCKWELL: Hey. All right. We
14 are all ready, Labarron.
15 MR. BOONE:
16 Q      And when you called David Justice after
17 talking to Mr. Craig Stephens' wife, that's when
18 Mr. Justice told you to report it to the authorities?
19 A      That's correct. And then, of course, I
20 was at home at the time, so I left my home and went
21 to the terminal.
22 Q      Okay. Okay. Well, yeah. When Craig
23 Stephens' wife was at the terminal, you were actually

Page 67

1  not at the terminal at that point?
2  A      That's correct.
3  Q      You were at home? He just called you at
4  your home on your Nextel two-way radio?
5  A      That's correct.
6  Q      Is he an employee of Benton Express or a
7  third party who just do work for y'all?
8  A      That's correct.
9  Q      Third party?
10 A      Third party.
11 Q      Okay. And obviously -- well, did he just
12 so happen to have a Nextel phone, also?
13 A      Yeah. They have Nextel and we have
14 contact with them.
15 Q      Okay. And after you talked to
16 Mrs. Stephens, that would have been what caused you
17 to come to the terminal and then call Mr. Justice?
18 A      That's correct, to call him the second
19 time, second or third time.
20 Q      Right. When was your first time calling
21 him, after you talked to Mrs. Stephens and you came
22 to the terminal, or did you call him before you got
23 to the terminal?

Page 68

1  A      Before I got to the terminal, from my
2  home.
3  Q      Okay. And when you -- and after you
4  talked to David Justice the first time, that's when
5  you called the authorities?
6  A      After -- I called the authorities after I
7  talked to David Justice and then I got cleaned up and
8  drove to the terminal. I actually called them from
9  the terminal.
10 Q      You called the authorities from the
11 terminal?
12 A      That's correct.
13 Q      Okay. Got you.
14        And when you called the terminal -- I
15 mean, when you called the authorities, you would have
16 reported to them that you all -- you had a delayed
17 driver?
18 A      That's correct.
19 Q      And you would have reported to them that
20 you had a delayed driver in a Benton Express truck?
21 A      Yes, sir.
22 Q      And you would have reported to them
23 information concerning the truck's number; would that

Page 69

1  be correct?
2  A      That's correct.
3  Q      And you would have told the authorities
4  that Mr. Craig Stephens was -- when they asked you
5  about Mr. Craig Stephens, you told them that he was a
6  good employee of Benton Express; is that correct?
7  A      Yes.
8  Q      And you would have told the authorities
9  that Mr. Stephens was a reliable employee?
10 A      I don't remember saying that. I don't
11 think -- I was just answering her questions.
12 Q      Right. And I understand you would have
13 done that, but you would have shared with them that
14 he was a good employee of Benton Express and was
15 reliable and it was uncharacteristic of him to be
16 delayed?
17 A      Yes, or words to that effect.
18 Q      And you would have asked them if -- and
19 you would have gave them his truck number so they
20 could try to locate him if they -- if they -- so the
21 police officers could locate them if they saw him?
22 A      Yes, sir.
23 Q      You would have gave them any other

Page 70

1  identification you had on the truck?
2  A     Yes, sir.
3  Q     And you would have asked them to please
4  -- if they spot him, to please have him immediately
5  contact you, his terminal manager?
6  A     That would have been as a result of the
7  report that they were going to send out, yes. They
8  would call me. He would call me.
9  Q     Right. Do you recall if it was discussed
10 that if you all -- if y'all spot Craig Stephens, I'll
11 -- delay him for you, that if you spot him, stop him
12 and have him immediately call?
13 A     I had a report that was to be sent out.
14 They call it a BOLO report, be on the lookout. And I
15 asked her, I said, if you pull him over, what do you
16 do? And the FHP, the Florida Highway Patrol office,
17 said that we will have him call you, we will detain
18 him and have him call you.
19 Q     And is that what -- and isn't that what
20 -- and you wanted that to happen?
21 A     Yes, sir, I did.
22 Q     And you wanted that to happen because you
23 wanted -- you wanted to locate Craig Stephens?

Page 71

1  A     That's correct.
2  Q     And you wanted to find out if he was
3  harmed, injured or whatever the delay was?
4  A     That's correct.
5  Q     You never said anything like Craig
6  Stephens is a bad employee to the authorities, did
7  you?
8  A     I did not.
9  Q     You never told them anything like he had
10 a history of drug abuse or anything like that, did
11 you?
12 A     I did not.
13 Q     Never told them we had any concerns of
14 him being a bad employee who might try to steal our
15 equipment, did you?
16 A     No.
17 Q     And you never told them to arrest him
18 because we think he has stole our equipment, did you?
19 A     No.
20 Q     And that was no? Did you say no? I'm
21 sorry, I didn't hear you.
22 A     No. You're correct, no.
23 Q     And what your concern was is you wanted

Page 72

1  to locate him to make sure he was safe and that he
2  was ultimately going to come back with the Benton
3  Express equipment and the goods?
4  A     That's correct.
5  Q     Have you ever heard of a trucking company
6  called J.B. Hunt?
7  A     Yes, sir, I have.
8  Q     Swift? Swift Trucking?
9  A     Yes, sir.
10 Q     Snyder International?
11 A     Yes, sir.
12 Q     Landstar?
13 A     Yes.
14 Q     Roadway?
15 A     Yes.
16 Q     Yellow?
17 A     Yes.
18 Q     Copps?
19 A     I'm sorry?
20 Q     I think it's C-O-P-P-S. Garlin told me
21 about them.
22 A     I'm unaware of them.
23 Q     Okay. What about JVL?

Page 73

1  A     I'm unaware of them, also.
2  Q     What about UPS?
3  A     Yes, sir.
4  Q     Federal Express?
5  A     Federal Express, yes.
6  Q     Wilson?
7  A     Yes.
8  Q     Southeastern?
9  A     I'm sorry?
10 Q     Southeastern?
11 A     No. Oh, Southeastern?
12 Q     Yes.
13 A     Yes, I've heard of them.
14 Q     Okay. After this incident where Craig
15 lost his life, have you -- have you -- have you
16 thought about this matter any?
17 A     Yes.
18 Q     And have you thought of any safety
19 equipment or any safety equipment you all could have
20 installed in you all's trucks that could have made a
21 difference?
22 A     No.
23 Q     You don't know of anything that could

19 (Pages 70 to 73)

Page 74

1  have potentially allowed you all to locate Craig
2  Stephens much faster?
3  A      No, sir.
4  Q      Let me ask you about Craig Stephens and
5  his wife. Had you ever talked to her other than on
6  that day that she came to the terminal?
7  A      I don't specifically -- I have talked to
8  her, but I don't remember time period or a specific
9  date.
10 Q      Was it just most likely friendly -- just
11 friendly conversation?
12 A      Yes.
13 Q      Like you said, you and Craig would have
14 been chitchatting on the day he left?
15 A      I'm sorry. Say that again.
16 Q      Would it have been just general chitchat,
17 friendly conversation like you said you had with
18 Craig on that Friday when he left?
19 A      No, I would not have chitchatted with
20 her. She might have been calling at about the time
21 he was leaving to talk to him. She would not have
22 called the terminal that much.
23 Q      Okay. All righty. And, well, after

Page 75

1  Craig passed in this wreck, did you attend his
2  funeral?
3  A      Yes, sir, I did.
4  Q      Do you know if any other Benton Express
5  employees attended his funeral?
6  A      Yes, sir.
7  Q      And who else would have attended?
8  A      There was three or four or five people
9  that attended.
10 Q      Do you remember any of them's name?
11 A      Garlin, myself, my wife, one of our
12 Tallahassee dock workers. I don't remember his name.
13 Q      Okay. So, would it be fair to say that
14 Craig was somebody you cared enough about as a friend
15 that you wanted to attend his funeral and support his
16 wife?
17 A      That's accurate.
18 Q      Do you know after his wreck whether or
19 not he received workers' comp benefits?
20 A      I have no knowledge of that.
21 Q      Would you as his terminal manager had to
22 submit a form to be filled out to put it in the
23 process?

Page 76

1  A      Just his pay records for -- for the
2  period of time that he had worked.
3  Q      Yeah, but as it relates to workers' comp,
4  if an employee is injured on the job, do you have
5  anything to do with -- let's say somebody just falls
6  going up the steps. Do you do anything to -- do you
7  play any role in the process of an employee filing a
8  workers' comp claim?
9  A      I just file the first -- the first
10 report and report it to the State, report it to the
11 safety department, and then basically it's taken over
12 by the safety department.
13 Q      And in this case, did you file a report
14 with the State, first injury report with the State?
15 A      That was done out of our Jacksonville
16 terminal.
17 Q      You didn't file it this time?
18 A      No, sir, I did not.
19 Q      Somebody in the Jacksonville terminal
20 filed it?
21 A      That's -- yes, sir.
22 Q      And had you ever filled out one when an
23 employee of yours had been hurt on the job?

Page 77

1  A      Yes.
2  Q      Do you have any idea why you didn't fill
3  out this one?
4  A      Because it had already -- they had first
5  -- they were advised first of the incident.
6  Q      Do you have any idea how they got aware
7  -- got made aware of the incident?
8  A      Not to the best -- to the best of my
9  knowledge, I don't know. It's just supposition on my
10 part.
11 Q      Okay. And as you sit here today, do you
12 know if Craig Stephens' wife ever received any
13 death-related benefits?
14 A      As of this moment, I -- I'm not sure. I
15 do not know that.
16 Q      At any time did you contact any police or
17 authorities in Alabama or Georgia?
18 A      Yes, sir, I did.
19 Q      And who did you contact in Georgia?
20 A      I contacted the -- when I talked to Angie
21 with FHP, Florida Highway Patrol, in Tallahassee on
22 Saturday afternoon, she gave me the State Trooper's
23 numbers in Georgia and in Alabama and she requested

Page 78

1  that I contact each of those agencies to find out if
2  there were any road closures, accidents, detours,
3  accidents, anything that could have hindered Craig's
4  progress back to Pensacola, and I did that.
5  Q    Do you have any idea how soon after you
6  talked to her that you did that?
7  A    I'd say within the next 15 to 20, 30
8  minutes.
9  Q    And -- and before -- after Craig
10 Stephens' wife came there, you would have -- I think
11 you told me you talked to David Justice; is that
12 right?
13 A    That's correct.
14 Q    When did you find out that he had
15 actually dropped the load off in Atlanta?
16 A    I talked to David -- or I talked to Bill
17 Jones Saturday, as we tried to retrace and make sure
18 that he had actually gotten to Atlanta, and he
19 verified that he arrived at Atlanta and he picked up
20 another trailer and that he had departed Atlanta.
21 Q    Do you have any idea what time it was
22 when you learned that information from Bill Jones?
23 A    I would say sometime after noon Saturday.

Page 79

1  Q    Would it have been before you talked --
2  you contacted the authorities in Florida?
3  A    I don't remember.
4  Q    But it would have been shortly, right
5  around that time frame?
6  A    Yes, sir, because it was all a part of my
7  phone calls trying to find out, you know, where --
8  where he could be.
9  Q    And do you know if you would have talked
10 to Bill Jones -- you may have, but do you know if you
11 would have talked to Bill Jones immediately after
12 talking to David Justice? Would he have told you to
13 contact Bill Jones or anything like that?
14 A    Who? Who would --
15 Q    Would David Justice have told you to
16 contact Bill Jones?
17 A    Probably not.
18 Q    That would have just been something you
19 knew -- you thought of on your own to contact since
20 that's where Craig was going?
21 A    Well, that was -- you know, that was our
22 manager there in Atlanta and I just figured he would
23 be the one to help me try to run down, you know, the

Page 80

1  driver signing in and signing out.
2  Q    When a driver signs in and signs out, as
3  Mr. Jones told you he did in Atlanta, is there a
4  Benton Express employee at the security -- at the
5  security gate signing them in and out or is that a
6  third party hired security agent?
7  A    To my knowledge, it's a third party.
8  Q    And when you talked to either -- when you
9  talked to the -- do you know if you talked to the
10 Atlanta city police or the Georgia state police?
11 A    I talked to the Georgia state police and
12 I talked to the Alabama state police.
13 Q    And when you talked to the Georgia state
14 police, did you essentially relay to them the same
15 information you relayed to the Florida authorities?
16 A    I did.
17 Q    And that was, yes, you would have relayed
18 to them the same thing you relayed to the Florida
19 authorities?
20 A    Yes, sir.
21 Q    And would they have told you, the Florida
22 -- the Georgia state police, for example, would they
23 have told you anything to do?

Page 81

1  A    No, sir. He specifically asked me the
2  route and he said, we have no reports of any
3  accidents, detours, road closures, or anything that
4  would be hindering traffic. The traffic on that lane
5  was open.
6  Q    Tell me how -- did you know Craig
7  Stephens' route at the time you called the Georgia
8  authorities?
9  A    Yes, sir, I did.
10 Q    And how did you know his route?
11 A    He would have gone from Pensacola using
12 U.S. Highway 29, he would have gone to Century and
13 taken Highway 113 North to Interstate 65. He would
14 have got on Interstate 65 at Flomaton, proceeded to
15 Montgomery on 65, where he would have taken
16 Interstate 85 on into Atlanta.
17 Q    And how would you have known that was --
18 that's the route Craig Stephens took?
19 A    That's the most direct route.
20 Q    All right. I guess is it fair to say
21 that you can't -- you can't specifically sit here
22 today and say you know he went that way, but that's
23 the way you assumed he went because that was the most

Page 86

1 car and turned it on, I could use it, couldn't I?
2 A    They wouldn't know you.
3 Q    Right. You mean because it has some kind
4 of voice activation or code I have to put in?
5 A    Yes, sir.
6 Q    Do you know if your wife ever uses it?
7 A    No.
8 Q    Any reason you don't use it?
9 A    Just local -- it's city -- you know, just
10 city use. We don't go any place.
11 Q    Have you ever used it, just tried to
12 experiment and play with it to see how it works?
13 A    No, sir. I haven't. I haven't even read
14 the manual.
15 Q    How long have you had this Saturn?
16 A    Probably two weeks, three weeks.
17 Q    All right. Let's talk about, did you
18 ever undertake any action to try to locate Craig such
19 as get in your car and try to drive the route where
20 you thought he might be?
21 A    Yes, sir, I did.
22 Q    At what time did you do that on Saturday?
23 A    Yes, sir. After -- after I had notified

Page 87

1 the authorities of an overdue truck and driver, I
2 continued to stay in contact with everybody.
3 Sometime later that afternoon, I went home. And I
4 kept in touch with Bill Jones. Bill and I talked. I
5 expressed -- I expressed an interest to him on
6 wanting to do something, and I told him that I was
7 going to start from Pensacola and go the route
8 towards Atlanta as far as I could go. And
9 approximately 8:30 or 9:00 o'clock Saturday evening,
10 I started that procedure.
11 Q    That was about 8:00 to 9:30 P.M.
12 Saturday night?
13 A    Yes, sir.
14 Q    And you would have got in your personal
15 car or company truck?
16 A    I got a company pickup truck.
17 Q    And you would have proceeded -- when you
18 say as far as you can go, what would have limited the
19 distance you could have went?
20 A    I was tired. I had been looking for
21 Craig and had worked in the yard that morning and I
22 had just figured I would go as far as I could
23 physically go and then I would turn around and come

Page 88

1 back.
2 Q    And at about 8:00 to 9:30, you would have
3 left. How far did you go?
4 A    I went all the way to Montgomery. I went
5 past the accident scene, I mean, you know, or I went
6 through there before it had happened. Then I went
7 about, oh, 15, 16, 18 miles towards Atlanta on
8 Interstate 85 and I checked exit ramps, I checked
9 rest stops, truck stops, public rest areas all the
10 way up and down and then I got tired and I turned
11 around and started back towards Pensacola just
12 reversing my -- you know, reversing the procedure and
13 checked everything coming back, and I found nothing.
14 Q    You checked the northbound side of the
15 highway as you were proceeding toward Montgomery and
16 then on the way back you would have been checking all
17 the rest stops which would be on the southbound side
18 traveling back towards Pensacola?
19 A    That's correct. And I -- you know, I was
20 looking on exit ramps, on ramps and off ramps on both
21 sides as I was going up.
22 Q    Right. But you would have stopped only
23 on the side that you were traveling on the way up and

Page 89

1 then on the way back you would have hit all those
2 same spots that would have been on the opposite side
3 of the highway?
4 A    That's correct.
5 Q    And you would have went approximately
6 about 16 miles past Montgomery, outside the city of
7 Montgomery?
8 A    15 to 16, 18, 20 miles, something like
9 that. I don't remember the exit number, but it was
10 some 15, 20 miles to the east.
11 Q    How -- what time would you have got to
12 the furthest point, which would be about 15 to 20
13 miles outside of Montgomery? What time was it that
14 day?
15 A    12:30, maybe 1:00.
16 Q    And you would have headed back and you
17 are now heading back Sunday morning?
18 A    That's correct.
19 Q    Got back to Pensacola approximately what
20 time?
21 A    What time would I have headed back?
22 Q    No, what time you would have got back to
23 Pensacola?

23 (Pages 86 to 89)

Page 90

1  A    To the best of my knowledge, I arrived at
2  my home around 4:00 A.M. Sunday morning.
3  Q    I guess you would have been fairly
4  fatigued and went to sleep at that point?
5  A    That's correct.
6  Q    And do you recall -- being that you went
7  to -- got -- went to bed so late, do you recall what
8  time you may have got back up?
9  A    No, sir. Not --
10 Q    Would it have been after 12:00?
11 A    That would be probably an accurate
12 statement. Yes, that would be correct.
13 Q    And on Sunday, do you have any docket --
14 did you have to stop and get gas anywhere on your
15 route?
16 A    I got gas up in central Alabama. I don't
17 remember the exact -- it was bought on a credit card,
18 company credit card, and I filled up somewhere around
19 Evergreen maybe or maybe a little south of there.
20 Q    Would you have made any other purchases
21 or anything else during your route after getting gas?
22 A    I bought some coffee.
23 Q    And would it have been at that gas stop

Page 91

1  or at a later stop?
2  A    I don't really remember. I know when I
3  bought gas, I bought coffee and I may have stopped
4  again 15 or 20 miles south and bought more coffee.
5  Q    Okay. Would you have put the -- if you
6  bought other coffee, would you have been putting it
7  on the company gas card?
8  A    No, sir. I would have paid cash for
9  that.
10 Q    Anything you would have put on the
11 company card other than the gas?
12 A    No. That's all that's authorized.
13 Q    Would you have been paid overtime for
14 this work?
15 A    No, sir.
16 Q    Would you have been paid just your normal
17 hourly rate, I guess, for this?
18 A    No, sir. I'm on salary --
19 Q    Okay.
20 A    -- and on call 24 hours a day.
21 Q    So, even when you do something like that,
22 you're not getting overtime for that?
23 A    That's correct.

Page 92

1  Q    Okay. At any time in this procedure did
2  you think Craig was ever doing any -- any --
3  conducting any illegal activity such as trying to
4  steal a Benton Express truck?
5  A    No.
6  Q    I guess from talking to you about knowing
7  him, liking him, that all you were worried about is
8  whether something had went wrong, whether he was
9  injured and where he was; is that fair to say?
10 A    That's fair to say.
11 Q    Do you recall if you would have expressed
12 to anybody else whether that you thought Craig was up
13 to illegal activities or trying to steal the truck?
14 A    No.
15 Q    Would you have told everybody you
16 communicated with the same thing you told me and the
17 Florida police, the Georgia police and Alabama
18 police, that he was a good, reliable employee, who,
19 to the best of your knowledge, was happily married
20 and a family man? Would you have told anybody else
21 anything other than that about Craig Stephens?
22 A    Well, those issues would have never come
23 in. I mean, I don't remember any of the agencies

Page 93

1  asking me if he was a good family man.
2  Q    Well, let me tell you why I said that,
3  then. Because I've got the copy of your conversation
4  with the Florida authorities, and I guess you were
5  just giving them background. You told them he was a
6  good employee, reliable, he had never -- you had
7  never had any problems with him, he was -- he was
8  just reliable and, to the best of your knowledge, he
9  was a good family man, is what I recall --
10 A    Okay.
11 Q    -- what you told the police authorities.
12 A    Right. Right. I think she had asked me
13 if there had been any indications or any suspicions
14 maybe that I might have had. Which I was, you know,
15 expressing to her that he was a good family man, good
16 guy and, yes, that's correct.
17 Q    Right, and that's what I was saying.
18 A    Okay.
19 Q    All I was saying was, did you tell
20 anybody else with Benton Express or anybody else
21 anything different about Craig?
22 A    No.
23 Q    Such as, I think he's trying to steal the

24 (Pages 90 to 93)

Page 110

1  communication in some form, wouldn't it?
2         MR. BROCKWELL: Are you talking about
3     Defendant's -- I mean Plaintiff's Exhibit 2
4     now?
5         MR. BOONE: Yeah.
6  MR. BOONE:
7  Q    That document gives some guidance on what
8  may be considered regular communication, doesn't it?
9  A    Yes.
10 Q    And in that case it says every 60
11 minutes, doesn't it?
12 A    Yes.
13 Q    And then above that, if you can recall, I
14 know you said it may be blurred out, but above that
15 it says something to the effect that in case of
16 breakdowns or delays, something like every 15
17 minutes?
18 A    That's delays in making a delivery.
19 Q    Right. But in delays in making a
20 delivery, that also gives some further clarification
21 what type communication a driver should have?
22 A    For city, right.
23 Q    Okay. Any document like that, in your --

Page 111

1  any document like that, in your opinion, that applies
2  to a line-haul driver, that would set out --
3  A    None to my knowledge.
4  Q    Okay. What does -- I've heard and I see
5  the term as it relates to a line-haul driver. I've
6  seen in documents used the term line-haul driver and
7  in some places it says P&D. Does that simply just
8  mean line-haul drivers pick-up and delivery?
9  A    No, it's two different -- two different
10 entities.
11 Q    Okay.
12 A    P&D stands for pick-up and delivery.
13 That's a city operation.
14 Q    Okay. Does line-haul drivers do pick-up
15 and delivery?
16 A    Normally not.
17 Q    And what kind of -- what did Craig
18 Stephens do that day? Did he go and -- did he pick
19 up something in Pensacola?
20 A    He -- he was acting in a line-haul
21 capacity.
22 Q    Okay. And would it be fair or not fair
23 to consider he picked up something in Pensacola and

Page 112

1  delivered it to Atlanta?
2  A    That's -- the P&D for city is different
3  than the P&D that you're using for Craig.
4  Q    Is there any meaning for P&D as it
5  relates to a line-haul driver?
6  A    It would not be used for a line-haul
7  driver.
8  Q    Okay. Was -- did you ever learn Craig's
9  cell phone number, personal cell phone number?
10 A    I don't -- I don't think so. To the best
11 of my knowledge, I -- I may -- it may have been in
12 his personnel file. I don't know.
13 Q    I guess I understand that's fair and did
14 not ask you to guess about something. I don't want
15 to do that.
16        I just want to know, at any time between
17 Friday and Monday, did you ever -- Monday, when you
18 found out about Craig had been in a wreck, did you
19 ever obtain his personal cell phone number and try to
20 call him?
21 A    I may have, but I do not at this point
22 recall making a call to his cell phone. I made
23 numerous calls on his Nextel.

Page 113

1  Q    Okay.
2  A    But I do not remember his personal
3  number.
4  Q    Okay. Do you recall when you were trying
5  to call him on the Nextel two-way radio what type
6  signal you was getting? And when I say signal, not
7  whether it was clear or not, but was it saying
8  anything in particular that alerted you whether or
9  not the battery was dead, whether or not it was out
10 of range, phone was cut off?
11 A    Not that I remember.
12 Q    Do you remember -- on the two-way radio,
13 can you leave a message?
14 A    No.
15 Q    And when you would have tried to contact
16 Craig on his two-way radio, do you know what would
17 have happened? Can you tell me specifically what --
18 what you would have gotten? Would it have been like
19 a phone or busy signal?
20 A    I don't really. It's just -- it just
21 doesn't go through.
22 Q    Does it say anything like line not
23 available? Does it say anything when it doesn't go