**Exhibit 6:     Excerpts of Deposition of Don Hammonds**

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3       NORTHERN DIVISION
4  CASE NUMBER: 2:05-CV-194-T
5  HAZEL M. ROBY, as Administratrix
6  of the Estate of Ronald Tyrone
7  Roby, Deceased,
8       Plaintiff,
9       vs.
10 BENTON EXPRESS, INC., et al.,
11      Defendants.
12
13      S T I P U L A T I O N
14      IT IS STIPULATED AND AGREED by and
15 between the parties through their respective
16 counsel, that the videotaped deposition of
17 Boyd Don Hammond may be taken before Angela
18 Smith, RPR, CRR, at the offices of Carr,
19 Allison, at 100 Vestavia Parkway, Ste: 200,
20 Birmingham, Alabama 35216, on the 19th day
21 of September, 2005.
22      DEPOSITION OF BOYD DON HAMMOND
23                42643

Page 2

1       IT IS FURTHER STIPULATED AND
2  AGREED that the signature to and the reading
3  of the deposition by the witness is waived,
4  the deposition to have the same force and
5  effect as if full compliance had been had
6  with all laws and rules of Court relating to
7  the taking of depositions.
8       IT IS FURTHER STIPULATED AND
9  AGREED that it shall not be necessary for
10 any objections to be made by counsel to any
11 questions except as to form or leading
12 questions, and that counsel for the parties
13 may make objections and assign grounds at
14 the time of the trial, or at the time said
15 deposition is offered in evidence, or prior
16 thereto.
17      IT IS FURTHER STIPULATED AND
18 AGREED that the notice of filing of the
19 deposition by the Commissioner is waived.
20
21      * * * * * * * * * * * *
22
23

Page 3

1       * * * * * * * * * * * *
2            I N D E X
3            EXAMINATION
4                  PAGE
5  By Mr. Boone ........................ 6
6       PLAINTIFF'S EXHIBITS
7                  PAGE
8  Ex. 1 - Driver Daily Trip Log .... 218
9  Ex. 2 - Note from Mr. Garlin to
10         Mr. Stephens ............ 243
11 Ex. 3 - Driver and Cargo Security
12         Policy .................. 247
13 Ex. 4 - Document of notification
14         to Frontier Adjusters ... 250
15 Ex. 5 - DOT Accident Register ..... 252
16      * * * * * * * * * * * *

Page 4

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3       NORTHERN DIVISION
4  CASE NUMBER: 2:05-CV-194-T
5  HAZEL M. ROBY, as Administratrix
6  of the Estate of Ronald Tyrone
7  Roby, Deceased,
8       Plaintiff,
9       vs.
10 BENTON EXPRESS, INC., et al.,
11      Defendants.
12 BEFORE:
13      ANGELA SMITH, Commissioner.
14 APPEARANCES:
15      LABARRON N. BOONE, ESQUIRE, of
16 BEASLEY, ALLEN, CROW, METHVIN, PORTIS &
17 MILES, 218 Commerce Street, Montgomery,
18 Alabama 36104, appearing on behalf of the
19 Plaintiff.
20      GREGORY A. BROCKWELL, ESQUIRE, of
21 CARR, ALLISON, 100 Vestavia Parkway, Ste:
22 200, Birmingham, Alabama 35216, appearing on
23 behalf of the Defendant.

1 (Pages 1 to 4)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 37

1 that exist around the country.
2      MR. BOONE: I understand. And
3 our normal -- We've agreed to normal
4 stipulations. So object just to form. He
5 just told me he went to a Worker's Comp
6 Seminar and I'm going to ask him what he
7 learned.
8      Q.  Tell me what you learned about
9 what injuries are covered under worker's
10 comp.
11      A.  All injuries, as long as
12 you're operating or working within the scope
13 of your employment, are covered by worker's
14 compensation.
15      Q.  Did they give you any
16 information considered -- defined -- telling
17 you was considered in the scope of your
18 employment?
19      A.  They gave me all of the
20 Florida statutes.
21      Q.  And can you tell me what is
22 considered in the scope of employment?
23      A.  No.

Page 38

1      Q.  When they gave them to you,
2 did you review them?
3      A.  There's many, many statutes
4 there. I did glance at them, yes.
5      Q.  And from glancing at it, did
6 you have any idea what's considered in the
7 line and scope of employment?
8      A.  I don't really follow your
9 question.
10      Q.  Yeah. You said worker's comp
11 -- Benton Express paid worker's comp on any
12 injury that occurred in the line and scope
13 of employment. Do you recall that?
14      A.  Yes.
15      Q.  And I'm asking you what's
16 considered in the line and scope of
17 employment, from your experience at the
18 Worker's Comp Seminars?
19      A.  That is determined by the --
20 by Commercial Risk, which is our adjusters,
21 as to whether or not the employee was within
22 the scope of his employment.
23      Q.  Okay. So, you have no role in

Page 39

1 determining that?
2      A.  No.
3      Q.  Do you play any role in
4 handling worker's comp cases?
5      A.  Yes.
6      Q.  What role do you play?
7      A.  I investigate the injury to
8 see how it could be prevented from happening
9 to anyone else. And we do follow-up, as far
10 as modified duty, to get the injured
11 employee back to work.
12      Q.  In this case, we're involved
13 in a case in which a Benton Express
14 employee, Mr. Craig Stephens, am I right
15 about his name?
16      A.  Yes.
17      Q.  Was involved in a wreck, who
18 was killed.
19      A.  Yes.
20      Q.  And in that wreck, Mr. Ronald
21 Tyrone Roby also was killed. Are you
22 familiar with that?
23      A.  Yes.

Page 40

1      Q.  And, now, have you played any
2 role in looking into that case?
3      A.  I have looked into it and
4 reviewed the files on the case, yes, I have.
5      Q.  And I know you told me one of
6 you all's job was to try to be able to
7 prevent injuries once they occur. Do you
8 remember saying that?
9      A.  Yes.
10      Q.  Have you investigated and
11 tried to figure out how you could have
12 prevented the injuries that occurred in this
13 wreck?
14      A.  There was no indication that
15 this particular accident was going to
16 happen. We had no reason to -- to believe
17 that we were going to have an accident.
18      Q.  You mean up until the time you
19 all got information about the wreck, you all
20 had no idea that a wreck was about to occur?
21      A.  No. I did not know one was
22 about to occur.
23      Q.  And you all had no -- And what

10 (Pages 37 to 40)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

FOSHEE & TURNER COURT REPORTERS

Page 41

1  I guess that you're telling me, you all had
2  no reason to even suspect something was
3  going on that could lead to a wreck?
4      A.   That's correct.
5      Q.   All you knew was Mr. Craig
6  Stephens was in a Benton Express truck, he
7  was hauling Benton Express products on that
8  Monday; is that right?
9           MR. BROCKWELL: Object to the
10 form.
11     Q.   Well, let me rephrase it. Did
12 you have any reason to suspect that
13 Mr. Craig Stephens, in the Benton Express
14 truck, was going to have a wreck on that
15 Monday?
16     A.   Going to have a wreck?
17     Q.   Yes.
18     A.   No.
19     Q.   Best you understood, he was
20 doing his work and was going to make it back
21 to Pensacola on Monday, safely?
22          MR. BROCKWELL: Object to the
23 form.

Page 42

1      A.   No. Monday should not have
2  been in the question.
3      Q.   Did you have any reason, then,
4  since Monday shouldn't have been in the
5  question, to expect that a wreck was going
6  to happen?
7      A.   Not to suspect a wreck was
8  going to happen.
9      Q.   So, on that Monday, did you
10 have any reason to suspect a wreck was going
11 to happen?
12     A.   No. Not a wreck, no.
13     Q.   Okay. And you expected
14 Mr. Craig Stephens to arrive at -- in
15 Pensacola with the load, that Monday?
16     A.   No.
17     Q.   Okay. You knew -- Did you
18 know that Craig Stephens had not arrived on
19 Saturday?
20     A.   Yes.
21     Q.   Did you know he had not
22 arrived on Sunday?
23     A.   Yes.

Page 43

1      Q.   So, the only other -- The next
2  day he could have arrived, you agree with
3  me, is Monday?
4      A.   Yes.
5      Q.   And any reason you had as of
6  Monday -- You knew he hadn't arrived on
7  Saturday, you knew he hadn't arrived on
8  Sunday; am I right?
9      A.   Correct.
10     Q.   The next day he could have got
11 there, since Saturday and Sunday had passed,
12 is Monday; is that right?
13     A.   Yes.
14     Q.   On that Monday, did you have
15 any reason to suspect that there was going
16 to be a wreck by Mr. Craig Stephens in the
17 Benton Express truck carrying this load?
18     A.   We could not find
19 Mr. Stephens. He could not be located. We
20 had no reason to think that there was going
21 to be a wreck that particular day, at that
22 particular time.
23     Q.   You all -- Did you all expect

Page 44

1  that he would ultimately show up safely with
2  the Benton Express truck and his load?
3      A.   We did not know.
4      Q.   Well, we talked earlier about
5  loads being hijacked. Do you recall that?
6      A.   Yes.
7      Q.   Had y'all figured out whether
8  the load had been hijacked?
9      A.   We had made every effort to
10 find out unsuccessfully.
11     Q.   So, as of Saturday, nor
12 Sunday, you all had no idea whether or not
13 the load had been hijacked?
14     A.   No.
15     Q.   You all had no idea about
16 anything about the load?
17     A.   We had our suspicions because
18 that's the reason that a BOLO report was put
19 out on Saturday, and a Stolen Vehicle Report
20 was reported to the Atlanta Police
21 Department on a Sunday.
22          MR. BOONE: I'm going to
23 object to the form as nonresponsive.

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 113

1  didn't leave a message for Craig Stephens?
2      A.   They attempted to call him. I
3  say they, I know that Glen Clark attempted
4  to call him and he did not get an answer.
5      Q.   And my question is, you told
6  me your phone has -- Well, if I called you
7  and you didn't pick up, I can leave you a
8  message.
9      A.   Right.
10     Q.   Neither one of them told you
11 they left a message for Craig, did they?
12     A.   No.
13     Q.   And I'm asking you, do you
14 know why they didn't leave a message for
15 him?
16     A.   I don't even know if he has a
17 voice mailbox.
18     Q.   Okay. Do you know if anybody
19 -- Is it your understanding is the reason
20 why Glen Clark was calling him was to try to
21 locate him and find out where he was?
22     A.   Because he was overdue.
23     Q.   Right. And he was trying to

Page 114

1  find out where he was?
2      A.   Yes.
3      Q.   And anything else you know of
4  that he was trying to do, other than locate
5  him and find out where he was, and what had
6  been the delay?
7      A.   No.
8      Q.   Truck drivers have delays
9  sometimes; is that correct?
10     A.   Construction delays, accident
11 delays.
12     Q.   Illness delays?
13     A.   The answer is yes.
14     Q.   Illness delays?
15     A.   Illness delays, you need to
16 call in and we get you help.
17     Q.   And I didn't say that -- I
18 wasn't talking about procedures. We'll get
19 to procedures. But I'm saying illness
20 delays happen?
21     A.   Yes.
22     Q.   And if somebody is obviously
23 hijacked, they're going to be delayed?

Page 115

1      A.   True.
2      Q.   And you've said that's
3  happened before.
4      A.   Not an individual -- an
5  individual being hijacked, just cargo.
6      Q.   That's right. And then when
7  cargo is delayed, he can't get it there on
8  time?
9      A.   Right.
10     Q.   If it's hijacked?
11     A.   Right.
12     Q.   And, actually, if it's
13 hijacked, and somebody get away with the
14 load, they don't get there at all?
15     A.   That's true.
16     Q.   So, loads are delayed, and
17 that's not unusual in the trucking industry?
18     A.   It is unusual when you're on a
19 route. When you're on what is called a turn
20 run, a delay is very unusual.
21     Q.   So, is it -- Well, would you
22 agree with me that on a turn route, delays
23 do sometimes happen?

Page 116

1      A.   Minor delays.
2      Q.   Such as maintenance?
3      A.   That's a minor delay.
4      Q.   A breakdown, how long -- Have
5  you never seen a breakdown that's serious
6  that takes more than a few minutes to fix?
7      A.   We have a breakdown network,
8  to where we get a response from the vendor
9  to the driver to fix his vehicle.
10         If the -- If it cannot be
11 fixed, it has to be towed, then the closest
12 terminal, a truck is wreckered to him and he
13 proceeds on his route. So you do have minor
14 delays, but you don't have major delays.
15     Q.   That would take -- From what
16 you just described to me could be -- sounds
17 like to me that could take several hours to
18 do all of that, wouldn't it?
19     A.   It could take a few hours,
20 yes.
21     Q.   For example, where are your
22 terminals where you would have more trucks
23 at, where you could go switch out a truck if

29 (Pages 113 to 116)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 177

1  A.  No discussion of the delay was
2  made. It was simply a fact that he was
3  informed he needed to call Glen Clark
4  because of being drastically overdue.
5       And the reason for his call
6  was to make sure that Garlin took his
7  Tallahassee run because he wasn't going to
8  be back in time to do it.
9  Q.  And -- Well, that's -- You
10 know, you do seem to be agreeing with me,
11 that's conceivable -- If I've been delayed,
12 it is an appropriate thing for an employee
13 to try to notify somebody that I'm not going
14 to be able to pick up my next run?
15      MR. BROCKWELL: Object to the
16 form.
17 Q.  That makes sense, right?
18 A.  There's a lot of difference in
19 two days' delay and a couple hours' delay.
20 Q.  No. But I'm saying, if how
21 many days are delayed for whatever the
22 reason, if I was hijacked or a robber got me
23 or I fell deathly ill, but regardless, if my

Page 178

1  run is going to be -- if I'm going to be
2  delayed and unable to deliver a load, the
3  appropriate thing for me to do would be to
4  contact somebody and let them know I'm going
5  to be delayed and can't deliver my load;
6  right?
7       MR. BROCKWELL: Object to the
8  form.
9  A.  Repeat your question.
10 Q.  Yes. Let's assume I'm
11 delayed. Don't talk about this case. Just
12 ask about a simple delay. Let me get a
13 first answer then we can move to the more
14 specific example.
15      But if an employee is delayed
16 and won't be able to drive and deliver his
17 next load, is the appropriate thing for the
18 employee to do is to call and notify someone
19 of that delay that would prevent him from
20 delivering his next load?
21 A.  Unnecessary, but yes.
22 Q.  Unnecessary, but yes?
23 A.  Uh-huh.

Page 179

1  Q.  You all would want employees
2  to notify you of the information about their
3  whereabouts and the fact that they might not
4  be able to carry their next load, wouldn't
5  you?
6  A.  I don't know if you understand
7  what a turn run is.
8  Q.  No, no. Don't explain that to
9  me yet, because I think I do.
10 A.  You got it?
11 Q.  I'm just asking you, if I'm
12 delayed, would the appropriate thing be --
13 If I'm delayed and not going to be able to
14 carry my next load, would the appropriate
15 thing to do is call somebody and say: Boss
16 man, I'm delayed, I'm not going to be able
17 to carry my next load?
18 A.  Yes.
19 Q.  And Craig Stephens called and
20 -- What's his name, Garlin?
21 A.  Garlin.
22 Q.  -- Garlin answered it, however
23 he called, we don't know, but he answered

Page 180

1  it, and he told Garlin he couldn't make his
2  next load and could he carry it for him?
3  A.  Right. But that wasn't all
4  the conversation.
5  Q.  Right. You told us the rest
6  of it, or was there anything you left out
7  earlier?
8  A.  That he was instructed to call
9  his manager.
10 Q.  Okay. And other than the
11 stuff you told me earlier, was there
12 anything you didn't tell me that I need
13 to --
14 A.  No.
15 Q.  Would you agree with me that
16 nobody at Benton Express mandated Craig
17 Stephens to follow a particular route,
18 required him to follow a particular route?
19 A.  The terminal manager,
20 depending on the dedicated route, it's
21 discussed to run the route in the shortest
22 possible way.
23 Q.  Let's be specific this time,

45 (Pages 177 to 180)

FOSHEE & TURNER COURT REPORTERS

Page 225

1  A.  Does it say 0100?
2  Q.  That's what I thought it said.
3  What time -- Do you have any idea what time
4  that's supposed to mean?  Is it supposed to
5  be one a.m., you believe?
6  A.  I believe it to be one o'clock
7  in the afternoon.
8  Q.  In the evening?
9  A.  Would be my guess.
10 Q.  And it looks like to me that's
11 the document, once he got to Atlanta going
12 from Pensacola.  Why don't you take it and
13 see if you can verify that for me.
14 A.  That would be the Atlanta --
15 leaving Atlanta, going back to Pensacola.
16 Q.  Right.  That's right.  He went
17 from Pensacola to Atlanta.  And that would
18 be the document dated or time once he got to
19 Atlanta?
20 A.  Right.  That where he left and
21 went back -- headed back toward Pensacola,
22 supposed to.
23 Q.  And what time do you think

Page 226

1  that is?
2  A.  It looks like 0100.
3  Q.  Do you have any idea what time
4  he's trying to reflect, one a.m. or one
5  p.m.?
6  A.  No, I do not.  The supervisor
7  that approved the loading, Mr. Bill Jones,
8  could get that answer for you.
9  Q.  Is it your understanding, from
10 talking to Bill Jones, that he was loaded --
11 he got there almost midnight?
12 A.  He left the terminal,
13 according to the guard, Eastern Standard
14 Time, about 12:40 a.m., I think it was.
15 Q.  Okay.  So -- That's 12:40 a.m.
16 in the night, meaning nighttime?
17 A.  Meaning -- Right.  Nighttime.
18 Q.  So, would you believe that one
19 -- At least even if that's an error, one
20 probably referring to around one a.m. in the
21 morning?  Or do you think that's one p.m.,
22 possibly?
23 A.  I don't believe it means

Page 227

1  either one.
2  Q.  What you think it means?
3  A.  I think it's a -- whoever
4  entered this entered it incorrectly.
5  Q.  Entered incorrectly?
6  A.  Yes.
7  Q.  Okay.
8  A.  It's dated 4/8/05.  They're
9  loaded out that night.  It can't be one
10 o'clock in the morning, because he left at
11 12:40.  This could be an error by the
12 individual that filled out the form.
13 Q.  And Bill Jones' name is on
14 there?
15 A.  No, Bill Jones does not load
16 the units.
17 Q.  Oh, okay.  Did anybody sign
18 that document you told me a minute ago?
19 A.  Supervisor closing is here
20 (indicating).  And supervisor approved the
21 loading is here (indicating).
22 Q.  And who are they?  What's
23 written there?  Can you tell?

Page 228

1  A.  I can't tell.
2  Q.  Okay.  You can't read it?
3  A.  No.
4  Q.  You can't read it.  And in
5  your investigation, you never found out -- I
6  think, best you recall, he had no contact
7  with anybody.  But it appears that there was
8  a closing supervisor and a loading
9  supervisor that maybe he had contact with
10 who signed this.
11 A.  That means they closed the
12 trailer.
13 Q.  You mean shut the door on it?
14 A.  Shut the door on the trailer,
15 put his dispatcher's manifest in the spot
16 that they would put it.
17 Q.  Okay.
18 A.  And his responsibility would
19 be to come in the gate, drop his trailer, go
20 get his manifest to find out what kind of
21 trailer or which number he was supposed to
22 take back with him, go locate that trailer,
23 hook up, pretrip, and go.

57 (Pages 225 to 228)