**Exhibit 10:   Excerpts of Deposition of Bill Jones**

FOSHEE & TURNER COURT REPORTERS

Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
 2    FOR THE MIDDLE DISTRICT OF ALABAMA
 3            NORTHERN DIVISION
 4
 5  HAZEL M. ROBY, as Administratrix
 6  of the Estate of RONALD TYRONE ROBY,
 7  deceased,
 8        Plaintiff,
 9                          CIVIL ACTION FILE
10  vs.
11                          NO. 2:05CV194-T
12  BENTON EXPRESS, INC., et al.,
13        Defendants.
14
15        VIDEOTAPED DEPOSITION OF
16          GEORGE WILLIAM JONES
17
18          September 26, 2005
19              2:22 p.m.
20
21        1180 West Peachtree Street
22               Suite 900
23            Atlanta, Georgia
24
25  Lisa Fischer, CCR-B-1277, RPR, CRR
```

Page 2

```
 1        APPEARANCES OF COUNSEL
 2
 3  On behalf of the Plaintiff:
 4     LABARRON N. BOONE, Esq.
 5     Beasley, Allen, Crow, Methvin,
 6     Portis & Miles, P.C.
 7     218 Commerce Street
 8     Montgomery, Alabama 36104
 9     334-269-2343
10
11  On behalf of Defendant Benton Express, Inc.:
12     GREGORY A. BROCKWELL, Esq.
13     Carr Allison
14     100 Vestavia Parkway
15     Birmingham, Alabama 35216
16     205-822-2006
17
18  The Videographer: Mike Brown
19
20  Also Present:
21     Boyd Hammonds
22
23              - - -
24
25
```

Page 3

```
 1           (Disclosure pursuant to OCGA 9-11-28
 2  (d): The party taking this deposition will
 3  receive the original and one copy based on our
 4  standard and customary per-page charges.
 5  Copies to other parties will likewise be
 6  furnished at our customary page rate.
 7  Incidental direct expenses of production may be
 8  added to either party where applicable.)
 9
10           (The witness was sworn.)
11           MR. BROCKWELL: Just to start out,
12  I'll state for the record that
13  Mr. Jones is here today to testify
14  as a fact witness as to his
15  involvement in the events leading up
16  to the accident that are the subject
17  of this case. He's not testifying
18  as a corporate representative. Our
19  general corporate representative,
20  Mr. Don Hammonds, has already been
21  deposed. Any opinions that
22  Mr. Jones states are his own and are
23  not those necessarily of the
24  company.
25              - - -
```

Page 4

```
 1           GEORGE WILLIAM JONES,
 2  having been first duly sworn, was examined and
 3  testified as follows:
 4              CROSS-EXAMINATION
 5  BY MR. BOONE:
 6      Q. Sir, can you give us your full name.
 7      A. My full name is George William Jones.
 8      Q. Mr. Jones, where do you live?
 9      A. 8221 Lullwater Court, Jonesboro,
10  30236.
11      Q. 302 --
12      A. -- 36, yes, sir.
13      Q. And how long have you resided in
14  Jonesboro?
15      A. About 20 years.
16      Q. And what county is Jonesboro?
17      A. Clayton.
18      Q. And how long have you been employed
19  with Benton Express?
20      A. Nine years, nine months.
21      Q. And prior to Benton Express, where
22  were you employed?
23      A. Southern Freight, Incorporated.
24      Q. And prior to Southern Freight,
25  Incorporated, where were you?
```

1 (Pages 1 to 4)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 13

1  A. If anything unusual arose, they would.
2  Q. Something unusual, you said?
3  A. Yes, sir.
4  Q. What about anything standard? Any
5  standard procedure to contact the dispatcher or
6  terminal manager every hour?
7  A. No.
8  Q. What about -- so at Benton you started
9  in 1996. Are you in operations and sales at
10 Benton also?
11 A. Yes, sir.
12 Q. And has your position changed any
13 since you got to Benton? Have you always had
14 the same title?
15 A. No.
16 Q. What was your first title?
17 A. Sales.
18 Q. You were in sales at first, and
19 eventually at some point you moved to
20 operations?
21 A. Yes.
22 Q. And are you considered like an
23 operations manager, or what's your specific
24 title?
25 A. Regional manager, Georgia.

Page 14

1  Q. And does that title, regional manager,
2  include sales, or do you have another title
3  that also says regional manager --
4  A. It includes sales.
5  Q. It includes sales. Got you.
6      Have you ever given a deposition
7  before?
8  A. Yes.
9  Q. And would it have related to a Benton
10 Express matter?
11 A. No, sir.
12 Q. Would it have been a personal matter?
13 A. Yes, sir.
14 Q. Like a family --
15 A. Accident.
16 Q. Accident?
17 A. Yes, sir.
18 Q. You was in a car accident?
19 A. No. I witnessed one.
20 Q. And it wasn't related to -- was it
21 related to any company you worked for?
22 A. No, sir.
23 Q. Was it personal, just a witness?
24 A. Yes.
25 Q. You saw a wreck?

Page 15

1  A. Yes.
2  Q. Did it involve a tractor-trailer?
3  A. No, sir.
4  Q. Tell me, have you ever had a CDL
5  license?
6  A. No, sir.
7  Q. Do you have a valid driver's license?
8  A. Yes, sir.
9  Q. What's your driver's license number?
10 A. I'd have to look and see.
11 Q. Would you also need to look at
12 something for your Social Security number?
13 A. No. I can tell you that. Which one
14 do you want first?
15 Q. Driver's license would be fine.
16 A. 051704418.
17 Q. And Social Security number?
18 A. 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.
19 Q. And have you ever been convicted
20 of -- have you ever been arrested or convicted
21 of a crime?
22 A. Yes.
23 Q. And which one? Arrested --
24 A. Arrested.
25 Q. -- and convicted?

Page 16

1  A. No, sir.
2  Q. Arrested for what?
3  A. DUI.
4  Q. And have you been arrested on any
5  other occasion other than DUI?
6  A. No, sir.
7  Q. And when did the DUI occur?
8  A. When I was 18 years old, which was
9  nineteen -- 18.
10 Q. Any other incidents where you may have
11 been arrested or convicted of a crime by --
12 A. No, sir.
13 Q. In your time as an operations manager,
14 have you ever had a driver that was delayed?
15 A. Yes.
16 Q. Do you have any written rules or
17 policies that apply to your drivers in telling
18 them how much of a delay before they should
19 communicate with you or somebody at the
20 terminal?
21 A. Concerning line haul or city?
22 Q. Yeah, line haul.
23 A. Just if something out of the ordinary
24 occurs.
25 Q. What's considered "out of the

4 (Pages 13 to 16)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

FOSHEE & TURNER COURT REPORTERS

Page 57

1  Q. No. You're doing fine. I understand
2  your inability to answer that.
3      At any time in any Saturday
4  conversation you had with Glenn Clark, did
5  you-all think Craig Stephens was doing anything
6  that would be illegal such as stealing the
7  truck?
8      MR. BROCKWELL: And if I can state
9      that you asked him what you-all
10     thought.
11     And so I'm saying if you know
12     what other people thought, tell us.
13     But if you know what you thought,
14     tell us that as well.
15     THE WITNESS: Well, I don't know
16     exactly what Glenn was thinking, but
17     there were a couple things going
18     through my mind, was that we had
19     obviously a driver that we didn't
20     know where he was with a tractor and
21     a trailer and cargo that we didn't
22     know where it was. And my main
23     objective was to find everything.
24  Q. (By Mr. Boone) The driver and the
25  cargo?

Page 58

1  A. Yes.
2  Q. Did Glenn Clark tell you anything
3  specific such as he thought the cargo may --
4  Craig may be attempting a theft of the cargo,
5  for example? I'm just making up --
6  A. No, not that I remember.
7  Q. Did he tell you anything like
8  Craig Stephens is a drug addict, and I'm
9  worried about what he may do; he might run off
10 and try to sell the cargo?
11 A. No, I don't recall any of that.
12 Q. Did he tell you anything negative
13 about Craig Stephens that would make you think
14 he might try to steal the cargo?
15 A. I don't recall anything.
16 Q. Did he tell you anything other than
17 what you told me so far, that he was considered
18 a good employee of Benton Express?
19 A. I do remember that.
20 Q. Anything else you remember negative
21 about his character?
22 A. No, sir.
23    (Discussion ensued off the record.)
24 Q. (By Mr. Boone) At any point did you
25 talk to Mr. Glenn Clark on Sunday?

Page 59

1  A. Yes.
2  Q. And do you recall about what time on
3  Sunday you talked to him?
4  A. As early as 9:00 a.m. It might have
5  been even earlier than that.
6  Q. And do you recall if you talked to him
7  on multiple occasions on Sunday?
8  A. Yes.
9  Q. And would it have been more than two
10 or three?
11 A. Yes.
12 Q. And did Mr. Glenn Clark tell you
13 anything different about Craig Stephens on
14 Sunday that would be contrary to him being a
15 good, reliable employee?
16 A. I don't recall anything, no.
17 Q. Anything negative you learned about
18 Craig Stephens' character on Sunday as it
19 relates to his employment at Benton Express?
20 A. No, sir.
21 Q. Did any events happen on Sunday that
22 caused you to change your approach to locating
23 a missing vehicle, such as learning something
24 about him, for example, we've heard he stole a
25 truck before, or anything on Sunday change your

Page 60

1  approach on trying to locate him?
2  A. No.
3  Q. For example -- and I'm trying to give
4  you some thoughts to try to make sure I'm
5  giving you a clear picture -- let's say you
6  hear on Sunday that somewhere along the
7  highway, a tractor-trailer was involved in a
8  wreck where somebody was killed. For example,
9  that might make you think, man, that could be
10 the guy we're looking for.
11    Do you follow what I mean?
12 A. I do.
13 Q. Did anything like that happen?
14 A. No, sir.
15 Q. Did you-all change your approach or
16 decide to do anything different on Sunday?
17 A. Reported the equipment stolen.
18 Q. Even though you told me nothing had
19 really changed different any, can you tell me
20 why on Sunday -- was it you who reported the
21 equipment stolen?
22    MR. BROCKWELL: Object to the form.
23    THE WITNESS: Originally.
24 Q. (By Mr. Boone) Was it you who
25 reported the equipment stolen?

15 (Pages 57 to 60)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 61

1  A. Yes.
2  Q. And what made you decide on Sunday to
3  report it stolen?
4  A. Well, on Saturday the Florida State
5  Patrol, who supposedly had gotten in contact
6  with Georgia and Alabama State Patrol, had not
7  turned our equipment or driver up by that time.
8  I felt it was time to do something else, if
9  they couldn't --
10  Q. Let me ask you, nothing had turned up,
11  so you figured that some more different
12  measures needed to be taken?
13  A. Yes.
14  Q. Let me ask you this here: Do you know
15  if anybody did call or notify the Georgia or
16  Alabama police?
17  A. Do I know?
18  Q. Yes.
19  A. I know Glenn notified someone who I
20  thought was Florida State Patrol, who, in turn,
21  was going to notify the state patrols in the
22  two states.
23  Q. That's why I wanted to ask that. Who
24  told you that the Florida Patrol said they
25  would notify Georgia and Alabama?

Page 62

1  A. I don't recall if it was Glenn or if
2  one of my phone calls to the Georgia State
3  Patrol they told me they were aware of it. I
4  believe it might have been Glenn that said that
5  Florida State Patrol would tell the other two.
6  Q. Have you ever listened to any tape or
7  anything that made you realize that did not
8  occur?
9  A. No, sir.
10  Q. Have you heard or seen anything or
11  read anything where the Florida police told
12  Glenn to call Georgia and Alabama?
13  A. No, sir.
14  Q. Nobody ever told you that?
15  A. No, sir.
16  Q. Is it -- based on your understanding
17  of what Glenn Clark should have done, should he
18  have called Georgia and Alabama?
19      MR. BROCKWELL: Object to the form.
20      THE WITNESS: You want my
21  opinion?
22  Q. (By Mr. Boone) Yes.
23      MR. BROCKWELL: If you're aware of
24  anything that would have required
25  Glenn to call those two states.

Page 63

1      THE WITNESS: I would think
2  Florida would have been responsible
3  for doing that, in my opinion.
4  Q. (By Mr. Boone) And when did you
5  become aware -- and I know some things you
6  could have learned later, after with your
7  attorneys. I just need you to try to separate
8  them for me.
9      But on Saturday, did you know whether
10  or not Glenn Clark had called the authorities?
11  A. On Saturday?
12  Q. Yes.
13  A. Other than Glenn Clark telling me that
14  he had.
15  Q. And on Saturday, he told you he did do
16  that?
17  A. Yes.
18  Q. Any reason -- if on Saturday he told
19  you he had called the authorities, who you
20  thought would call Georgia and Alabama, why did
21  you call on Sunday?
22  A. Just to see if they knew anything.
23  Q. And you did that, right?
24  A. Yes.
25  Q. And they didn't know anything?

Page 64

1  A. No.
2  Q. But you told me not only you did that,
3  but you said you reported the vehicle missing
4  or stolen?
5  A. Yes.
6  Q. And why did you do that, if it was
7  your understanding Glenn had already did it?
8  A. Because that was the State Patrol, and
9  the State Patrol told me I had to report it to
10  the Atlanta Police.
11  Q. And what I'm trying to figure out,
12  wasn't it your understanding that Glenn had
13  already did that?
14  A. No, sir.
15  Q. What did you understand Glenn had
16  already did?
17  A. Reported it to the Florida State
18  Patrol.
19  Q. And you wanted to report it to the
20  Georgia State Police, or what did you say you
21  wanted to do?
22  A. The Atlanta Police.
23  Q. The Atlanta Police.
24  A. That's what the Georgia State
25  Patrol --

16 (Pages 61 to 64)

Page 65

1  Q. -- told you to do?
2  A. -- told me to do, yes, sir.
3  Q. And they told you to do that on your
4  contact with them on Sunday?
5  A. Yes.
6  Q. Any reason you didn't do that on
7  Saturday?
8  A. Well, we had the Georgia, the Florida,
9  the Alabama State Patrol out looking for him.
10 I expected some results.
11 Q. And that's my understanding. Why did
12 you go and do the additional report?
13 A. Because nothing had happened yet.
14 Q. Anybody else you talked to other than
15 Glenn Clark and David Justice, other than the
16 authorities you said you called, within Benton
17 Express?
18 A. Other than my boss, who I just kept
19 informed of what was going on.
20 Q. Who is your boss?
21 A. Bennie Cordero.
22 Q. Did Bennie play any role on decisions
23 on what to do?
24 A. No, sir.
25 Q. You just updated him?

Page 66

1  A. Yes.
2  Q. And do you recall when you started
3  updating him?
4  A. Saturday afternoon.
5  Q. And did Bennie ever say, for example,
6  report it stolen? Is that why you did it?
7  A. No, sir.
8  Q. And I know you told me, and since you
9  can't remember, it's going to be a little more
10 difficult for us to do this, other than me
11 needing to ask a general question, but anything
12 else you and Glenn Clark talked about on Sunday
13 that you hadn't related to me yet?
14 A. Do you mean outside the fact that we
15 were looking for the unit and the driver?
16 Q. Right. You-all had talked. And from
17 what you told me so far is on Sunday, you-all
18 talked maybe to say, have you found him, or he
19 called you, have you found him, and the answer
20 was obviously no, right?
21 A. Yes.
22 Q. And you-all kept at it hoping to
23 ultimately hear something?
24 A. What do you mean?
25 Q. Hopefully to locate your driver.

Page 67

1  A. Yes.
2  Q. And what I'm trying to say is: Did
3  you-all talk about anything more specific or
4  anything that you can tell me more specific
5  about what to do? Like did you-all jointly
6  make decisions on, hey, if we don't find him by
7  blank time, you report it stolen; at blank
8  time, you do A, B, C, and D?
9  A. No. No, we didn't make any decisions,
10 but we were in contact all evening.
11 Q. And did you-all ever make any decision
12 jointly? Because I understand that you may
13 have went -- had somebody or you went out and
14 looked for him.
15 A. Yes.
16 Q. And did you have somebody, or did you
17 do it yourself personally?
18 A. No, I did it.
19 Q. And was that a decision that
20 Glenn Clark called you and said, you need to go
21 look for him?
22 A. No.
23 Q. Was that a decision you made on your
24 own?
25 A. Yes.

Page 68

1  Q. Did you immediately notify Glenn Clark
2  that you was going to do this or something you
3  just did?
4  A. No. We were in communications. He
5  knew what I was doing.
6  Q. And you said at some point on Sunday
7  that, I was going to go physically look for
8  him?
9  A. Sunday morning, yes.
10 Q. On Sunday morning, you recall saying
11 that?
12 A. Yes.
13 Q. About what time?
14 A. Probably before noon.
15 Q. Sometime before noon?
16 A. Uh-huh (affirmative).
17 Q. Before noon, you had related to
18 Glenn Clark you was going to go look for him?
19 A. Correct.
20 Q. What time did you actually go out and
21 start looking?
22 A. Probably 1:30, 2:00, 3 o'clock,
23 somewhere in that area.
24 Q. Somewhere between 1:30 and 3:00?
25 A. Yes.

17 (Pages 65 to 68)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

FOSHEE & TURNER COURT REPORTERS

Page 69

1  Q. And where did you go and look?
2  A. The roadways or the -- I'm not sure I
3  understand that question. I want to make sure
4  I understand what you're asking me.
5  Q. What I need you to do is tell me
6  specifically each and every spot you went.
7  A. First went to the terminal in Atlanta.
8  Q. And the purpose? Why did you do that?
9  A. Looked on the yard, talked to the
10 guards, tried to locate the tractor or trailer
11 on the yard, physically look to make sure that
12 the driver wasn't on the yard.
13     And then from there, we went to -- I
14 went to the truck stop about a mile and a half
15 from the terminal.
16 Q. What was the name of that stop?
17 A. I believe it's TA. It is TA,
18 Truckstops of America, I believe, Transport
19 America.
20 Q. Okay.
21 A. From there -- and I don't know the
22 names of all the stops.
23 Q. That's fine.
24 A. From there went back to 285, proceeded
25 west to the truck stop on Bankhead Highway or

Page 70

1  off Bankhead.
2  Q. Okay.
3  A. From there went back on 285 to
4  Interstate 85 South. And I can't tell you the
5  names of them, but any exit that had a diesel
6  display on it, I got off and looked at every
7  one that was within three quarters or a mile of
8  the exit.
9  Q. And that was on 285?
10 A. That was on 85.
11 Q. On 85?
12 A. Yes, sir.
13 Q. How far did you travel, stopping at
14 the diesel stops?
15 A. Probably 40 miles from 285 South. It
16 might have been a little more.
17 Q. Maybe 40 miles from 285 South?
18 A. South on 85.
19 Q. And my memory might serve me wrong,
20 but is that around the Newnan area maybe?
21 A. It's below the Newnan area actually.
22 Q. When you say "below," you mean more
23 south?
24 A. Yes, sir.
25 Q. Would you have made it to the next

Page 71

1  county after Newnan?
2  A. Yes, sir.
3  Q. And what area?
4  A. Close to West Point exits.
5  Q. When you say West Point, you mean West
6  Point-Pepperell?
7  A. West Point, Georgia. There's a city
8  West Point, Georgia.
9  Q. And after you -- so I've gathered so
10 far that sometime between 1:00 and 3:00, you
11 would have left and would have looked at
12 various locations you've told me about?
13 A. Yes, sir.
14 Q. And you traveled about 40 miles south
15 from 285?
16 A. Uh-huh (affirmative).
17 Q. That's right?
18 A. Yes, sir.
19 Q. And I think that's the extent of the
20 distance you traveled south. At that point, I
21 guess what I'm gathering is at that point you
22 were not able to locate him, and then you
23 returned either to work or home?
24 A. Well, that's when -- about that time
25 is when I got the call from Glenn Clark.

Page 72

1  Q. What time was that?
2  A. Sometime in the -- 5:00 to
3  6:00 p.m., if I remember correctly.
4  Q. You would have got a call from
5  Glenn Clark. And what was that call about?
6  What did he say then?
7  A. That one of our drivers had heard from
8  this driver.
9  Q. That Garland had heard from
10 Craig Stephens?
11 A. Yes.
12 Q. Did you know Garland?
13 A. I've seen him, but I don't know him.
14 Q. Did you know Craig Stephens?
15 A. No, sir.
16 Q. Had you seen him?
17 A. No, sir.
18 Q. Garland being a truck driver, you've
19 seen him but didn't personally know him?
20 A. Correct, sir.
21 Q. And what did he tell you that
22 Garland -- what information did Glenn relay to
23 you concerning Craig and Garland's
24 conversation?
25 A. Basically that he had contacted

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 73

1  Garland, and Garland had told him to contact
2  Glenn.
3      Q. Is that all he told you?
4      A. And that he had asked Garland to cover
5  his run.
6      Q. His run on Sunday?
7      A. Yes.
8      Q. So in participating in trying to find
9  Craig Stephens, you were trying to use your
10 best experience as an operations manager to
11 piece together where he may be and to try to
12 locate him?
13         MR. BROCKWELL: Object to the form.
14         THE WITNESS: Yes.
15     Q. (By Mr. Boone) And based on your best
16 experience of truck drivers and trying to piece
17 together where he may be, would you agree with
18 me that it is inconsistent with somebody trying
19 to steal the truck to call in to work and ask
20 somebody to cover their next run?
21         MR. BROCKWELL: Object to the form.
22         If you know.
23         THE WITNESS: I don't know of
24 a -- that's the first I've ever
25 been -- I don't have any background

Page 74

1  to compare that to.
2      Q. (By Mr. Boone) You wouldn't -- it
3  wouldn't make -- well, you can imagine from
4  general common sense, would you think that a
5  thief who's stealing a truck would call and say
6  hey, man, I'm late, I'm not going to be back
7  with my load on time, will you cover my next
8  load, but he was planning on stealing the load?
9          MR. BROCKWELL: Maybe he needed
10 more time. You never know.
11         THE WITNESS: I don't know what
12 his purpose was.
13     Q. (By Mr. Boone) Maybe you thought like
14 your attorney. Can you tell me if that's what
15 you were thinking?
16     A. What I was thinking?
17     Q. Yeah.
18     A. No. I wasn't thinking --
19     Q. When you heard that he had called
20 Garland and asked somebody to cover his load,
21 what did you do?
22     A. Asked Glenn to make contact with the
23 driver and stop the driver wherever he was.
24     Q. Do you know if Glenn tried to make
25 contact with him?

Page 75

1      A. Yes.
2      Q. Were you and Glenn back in contact
3  with each other again?
4      A. Yes.
5      Q. And what did he tell you?
6      A. That either the cell phone wasn't in
7  service or the battery was dead. I'm not
8  exactly sure which.
9      Q. So from your understanding,
10 Glenn Clark would have tried to contact
11 Craig Stephens, and either the battery was dead
12 or the phone wasn't in service?
13     A. Yes.
14     Q. Just not sure -- you can't remember
15 right now which one he told you?
16     A. No, sir, I can't say.
17     Q. But it was one of the two?
18     A. I believe so.
19     Q. Did he ever give you the number to try
20 to contact Mr. Craig Stephens?
21     A. No, sir.
22     Q. Do you have any idea what the number
23 was?
24     A. No, sir.
25     Q. Do you know if it was a personal cell

Page 76

1  phone number he had on Craig Stephens?
2      A. No, sir, I do not know that.
3      Q. Do you know if he had a NexTel two-way
4  radio?
5      A. No, sir.
6      Q. So right now, as you sit here today,
7  you don't know whether he had a NexTel-issued
8  phone by Benton or a personal cell phone?
9      A. Correct.
10     Q. At any time from Saturday to Sunday,
11 had you asked Glenn Clark, did we have any --
12 did he have a company phone?
13     A. I don't recall asking if he had a
14 company phone.
15     Q. At any time starting from Saturday
16 when you first got word of Craig Stephens, did
17 you ask, does he have a personal cell phone?
18     A. Yes.
19     Q. And what did he tell you?
20     A. Yes.
21     Q. But did you inquire or get the number?
22     A. No.
23     Q. Was that on Saturday, the first time
24 you asked about a personal cell phone?
25     A. Yes. Yes.

19 (Pages 73 to 76)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

FOSHEE & TURNER COURT REPORTERS

Page 77

1    Q. And I think you said you didn't ask
2  for the number?
3    A. No, sir.
4    Q. It was just your understanding that
5  Glenn Clark was going to try to call the
6  number?
7    A. Yes.
8    Q. On Saturday did he ever -- I know we
9  didn't talk about this, but on Saturday did
10  Glenn Clark ever tell you about him trying to
11  call that personal cell phone?
12    A. Yes.
13    Q. And what was he saying on Saturday
14  about it?
15    A. That no one answered.
16    Q. Same things: battery dead, out of
17  service?
18    A. I don't know if the battery was dead
19  or nobody would answer.
20    Q. But on Sunday, you --
21    A. It was either the battery's dead
22  or -- sorry.
23    THE COURT REPORTER: I didn't get your
24  question.
25    Q. (By Mr. Boone) On Sunday you

Page 78

1  specifically recall it was either the battery
2  was dead or it was not in service?
3    A. Correct.
4    Q. On Saturday you don't recall whether
5  or not he had said the same thing?
6    A. I do not.
7    Q. Anything else you did in -- when we
8  cover everything you did, I think that would be
9  a fair time to take a break. I know some
10  people probably need one.
11    So anything else you did -- and before
12  I go to the next area, anything else you did
13  that Sunday after you talked to Glenn Clark
14  about the Garland conversation?
15    A. Other than continued looking for him.
16    Q. Well, I assume -- I gathered you was
17  at your -- as far as you went at the 5:00 or
18  6:00 call. Isn't that what you told me?
19    A. Correct.
20    Q. So you would have been -- would you
21  have headed back and continued going backwards
22  towards Atlanta?
23    A. Two sides of the interstate.
24    Q. Got you.
25    And you checked both sides going back?

Page 79

1    A. Checked one side going back, one side
2  going down.
3    Q. Got you.
4    And ultimately you would have returned
5  where on your way back that same route? Would
6  you have followed the same route? The same way
7  you went, you came back the same exact way?
8    A. Yes.
9    Q. After you got back to the terminal by
10  retracing your route, what did you do?
11    A. Went home.
12    Q. And what time was that approximately
13  when you went home?
14    A. 8 o'clock, 8:30.
15    Q. After 8 o'clock or 8:30, did anything
16  else occur as it relates to Craig Stephens?
17    MR. BROCKWELL: You're talking that he
18  was involved in?
19    MR. BOONE: Yes.
20    THE WITNESS: No, other than
21  talking to Glenn to see if he'd
22  heard anything else --
23    Q. (By Mr. Boone) So after -- I'm sorry.
24    A. -- from Craig.
25    Q. After 8:30 you would have talked to

Page 80

1  Glenn?
2    A. Yes, sir.
3    Q. Do you have any idea how many more
4  times after 8:30 you would have talked to him?
5    A. I'm guessing. Two, three.
6    Q. And then the latest time being what,
7  if you know?
8    A. I don't. I don't recall.
9    Q. Would it either have been him calling
10  you on your NexTel cell phone --
11    A. It could have been either.
12    Q. -- or you calling him on his NexTel
13  phone?
14    A. It could have been either.
15    Q. Was there any other method of
16  communication other than on you-all's NexTel
17  phones?
18    A. No, sir.
19    Q. Was anybody else involved in the
20  communications between you and -- other than
21  you and Glenn and the conversation you've
22  already told me about, Justice?
23    A. No, sir.
24    MR. BOONE: All right. Let's take a
25  break, and hopefully we're getting

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 81

1  close to finishing.
2      (Whereupon a recess was taken
3  from 3:36 p.m. to 3:50 p.m.)
4      Q. (By Mr. Boone) I talked to, and I
5  believe I'm getting his name right, but
6  Mr. Weems earlier today. I saw another female
7  here. Would that have been Sharon Oaks or
8  somebody else with the company?
9      A. No.
10     Q. Do you know if any other employee with
11 Benton was here, a female I thought might have
12 been waiting on some of the guys?
13     A. No.
14     Q. But nevertheless about Mr. Weems, his
15 understanding and his -- and it will be quick
16 here. Hopefully what he told me is correct and
17 you can verify it. But he told me you called
18 him, put him on standby, and told him you might
19 need him to go to Pensacola. He didn't know
20 anything about the details of why you put him
21 on standby or anything. 45 minutes later you
22 called him and released him to go ahead and run
23 his load to Savannah.
24     And what I'm trying to figure out is:
25 Do you recall anything different or anything

Page 82

1  else that transpired between you and Mr. Weems?
2      A. No.
3      Q. Would he have been told anything about
4  specifically why he was on standby?
5      A. No.
6      Q. You just held him on standby?
7      A. Yes.
8      Q. And would it have been mentioned to
9  him, anything about Craig Stephens specifically
10 being a driver who was late or delayed and
11 you-all were looking for him?
12     A. No.
13     Q. Any reason you put Mr. Weems on
14 standby?
15     A. Yes.
16     Q. What were you considering using him to
17 do?
18     A. To drive the unit to Pensacola.
19     Q. And that was on Sunday, right?
20     A. Correct.
21     Q. And was that before or after you heard
22 that Craig Stephens had called in to his
23 terminal?
24     A. After.
25     Q. That was after you heard that?

Page 83

1      A. Yes.
2      Q. What was your understanding of the
3  approximate time that Craig Stephens called in
4  to the terminal?
5      A. Around -- between 5:00 and 6:30.
6      Q. P.m.?
7      A. Yes, sir.
8      Q. So you would have said -- after you
9  had got that information from Glenn Clark,
10 that's when you called Mr. Weems and put him on
11 standby?
12     A. Yes.
13     Q. Why did you release him?
14     A. Because we -- release Barry?
15     Q. Yes, Mr. Weems.
16     A. Because we could not locate the other
17 driver.
18     Q. And you held him on standby for about
19 45 minutes?
20     A. 45 minutes to an hour.
21     Q. Do you know how --
22     A. It was a pretty good length of time.
23     Q. Right. Do you know how long it was
24 after Mr. Stephens' call before you actually
25 talked to Mr. Glenn Clark about Mr. Stephens'

Page 84

1  call?
2      A. I'm sorry. Repeat that again.
3      Q. Right. Mr. Stephens actually talked
4  to a Garland -- another truck driver of Benton
5  Express, is that right, from what you
6  understood?
7      A. From what I understand, yes.
8      Q. And he had called, and I think what
9  you told me earlier is he called and told him,
10 I would need somebody -- asked him,
11 Mr. Garland, could he run his Sunday run?
12     A. I believe that's true.
13     Q. And do you have any idea how soon
14 after Craig and Garland talked was it before
15 Mr. Glenn Clark learned of that conversation?
16     A. I do not know how long that was, no.
17     Q. For example, do you know if Garland
18 had talked to Craig maybe at 1:00 or so,
19 1:00 p.m., or do you have any idea?
20     A. No idea.
21     Q. You don't?
22     A. I would be assuming.
23     Q. Right. Right now you don't have any
24 idea what time he talked to Craig, Garland?
25     A. Yes. Somewhere in the time limit that

21 (Pages 81 to 84)

Page 85

1  he notified me, he had, because he did not
2  delay that information to me.
3      Q. Who didn't delay?
4      A. Glenn.
5      Q. Glenn?
6      A. Yes, sir.
7      Q. Right. So what I'm saying is: Do you
8  know how soon after Garland and
9  Craig Stephens talked that Mr. Glenn Clark even
10 found out about the conversation?
11     A. No. I don't know specifically, no.
12     Q. Because it's my understanding that
13 Garland left a note either in the office for
14 Glenn or possibly on Craig's car. So do you
15 have any idea --
16     A. I don't know anything about a note.
17     Q. You don't know anything about the
18 note?
19     A. No, sir.
20     Q. Did Glenn tell you how he found out
21 about the call?
22     A. About Garland's call?
23     Q. Yes.
24     A. I believe he told me that Garland had
25 called him.

Page 86

1      Q. So it was your understanding that
2  Garland actually called him and told him?
3      A. Yes.
4      Q. And do you believe that's what Glenn
5  told you?
6      A. I don't think he ever told me that
7  Garland had called him, per se.
8      Q. You assumed --
9      A. Yeah.
10     Q. -- from the circumstances?
11     A. Yes, sir.
12     Q. Why I'm asking is because I know a
13 note was potentially or allegedly left, and I'm
14 just trying to figure out if potentially
15 Glenn Clark learned of Craig and Garland's
16 conversation when he got the note, and I'm
17 trying to figure out if you can verify for sure
18 whether or not he received that note or if it
19 was verbal communication with Garland.
20     A. I don't know anything about a note,
21 but there was not a long delay between that
22 phone call and Glenn's phone call to me.
23     Q. So your understanding is whenever
24 Craig and Garland talked, there wasn't much
25 time between that call and when Glenn found out

Page 87

1  and ultimately called you?
2      A. Yes.
3      Q. Any reason you believe that, that
4  there wasn't much time between Craig and
5  Garland's conversation before Glenn learned
6  about it?
7      I know I'm asking a bad question.
8  But, for example, I'm wondering if it's
9  possible that Craig could have called Garland
10 at about 2 o'clock p.m. and Glenn finds out not
11 until 6 o'clock. Is that possible, or have you
12 learned something to make you say, well, I know
13 that ain't what happened?
14     A. I do not know that's what happened,
15 but I don't believe that's what happened,
16 because we were in contact all afternoon.
17     Q. And so I guess when Glenn called you
18 about it, he told you he was going to try to
19 call Craig; is that right? When Glenn called
20 you and told you he had learned about the
21 Garland and Craig conversation, did he tell you
22 he was going to try to call him, or had he
23 already tried calling him?
24     A. No.
25     Q. "No" what?

Page 88

1      A. No, he didn't tell me he was going to
2  try to call Mr. Stephens at that time.
3      Q. Had he said anything to you to make
4  you believe he had already tried to call him?
5      A. Yes, all during the whole weekend. At
6  that time I requested that someone call
7  Mr. Stephens and stop him wherever he was.
8      Q. So at that time, when Glenn called you
9  about 6:00 p.m., I think you told me, you told
10 Glenn to call Craig at that point?
11     A. I told Glenn to -- either he or
12 Garland to call Craig Stephens at that point.
13     Q. And later when he returned the call to
14 you or you called him back, you learned that he
15 was unable to reach him?
16     A. Glenn called me back almost within
17 minutes and said that they were unable to reach
18 him, because I wanted him stopped right there
19 where he was.
20     Q. Being that Glenn was his terminal
21 manager, wouldn't that have been his call
22 whether or not to stop him or allow him to come
23 on back to Pensacola?
24     A. No. I'm a regional manager. I'll
25 make the call on that.

22 (Pages 85 to 88)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 89

1  Q. Being a regional manager, are you over
2  the Pensacola region?
3  A. At this point I am.
4  Q. I mean at that point, at the time.
5  A. Yes, sir. At that point, yes, sir, I
6  was in charge of that situation at that time.
7  I made that decision on my own to stop the
8  driver to relieve him of duty.
9  Q. Right. And what you're saying by that
10 point -- your actual territory is Atlanta,
11 right?
12 A. Georgia.
13 Q. Georgia?
14 A. Yes, sir.
15 Q. But being that you're in a higher
16 position than Glenn Clark, you made the
17 personal call to make the call in that
18 situation?
19 A. Yes, sir.
20 Q. Have you had an opportunity to go back
21 and look into any of the records concerning
22 when he first checked in and when he checked
23 out at the Atlanta terminal?
24 A. Yes.
25 Q. Were any records -- were all the

Page 90

1  records properly filled out?
2  A. No.
3  Q. Was there any particular violation to
4  the policy and procedures of Benton Express the
5  way the records were filled out?
6  A. Yes. The records were not complete.
7  Q. Have you ever -- is that something
8  unusual with Benton, for the records to be
9  filled out the way it was, or do those kind of
10 errors happen routinely?
11 A. No, they do not happen routinely.
12 Q. And would you say that Benton Express
13 has policies and procedures in place to ensure
14 that those kind of errors don't happen
15 routinely?
16 A. Yes.
17 Q. And the purpose of having policies and
18 procedures in place is so you can properly
19 always track your drivers and your equipment?
20    MR. BROCKWELL: Object to the form.
21 All policies or specific ones?
22    MR. BOONE: As it relates to filling
23 paperwork out properly.
24    THE WITNESS: To maintain a
25 record of our equipment, yes.

Page 91

1  Q. (By Mr. Boone) Right. You want to be
2  able to locate your tractors?
3  A. Uh-huh (affirmative).
4  Q. And the goods they're carrying; is
5  that right?
6  A. Yes.
7  Q. And you want to be able to make sure
8  your goods get to the customers who hired
9  you-all to carry them?
10 A. Yes.
11 Q. And not only get to them but get to
12 them in a timely manner?
13 A. Yes.
14 Q. Do you have any idea of any more
15 efficient way of tracking you-all's drivers
16 than what's presently in place at Benton?
17 A. No.
18 Q. Because right now a long haul truck
19 driver who don't have a cell phone, there's no
20 way to track him?
21 A. That's correct.
22 Q. Is that correct?
23    MR. BROCKWELL: Some clarity: I think
24 he said long haul, like l-o-n-g. I
25 believe the term that's been used

Page 92

1  throughout all these depositions is
2  "line haul," l-i-n-e.
3  Q. (By Mr. Boone) You was answering the
4  question to me using -- the proper phrase
5  should have been "line haul," right?
6  A. Line haul, right.
7  Q. That's how you was answering the
8  question --
9  A. Yes.
10 Q. -- assuming I meant line haul?
11 A. Yes.
12 Q. And my question was that for line haul
13 tractor-trailer drivers, you-all have no way to
14 communicate with them if they don't have a cell
15 phone?
16 A. That's correct.
17 Q. Do you have any other more efficient
18 way to -- do you know any more efficient way to
19 be able to track your drivers and the cargo in
20 their tractors if you needed to?
21 A. No, sir.
22 Q. Do you know anything -- other trucking
23 companies that are doing that are more
24 efficient at tracking drivers?
25 A. No, sir.

23 (Pages 89 to 92)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 109

1  you know, I think it would be fair to you, only
2  fair to you, Mr. Boone, if I tell you about how
3  we made blank decision or a conversation that
4  we may have not discussed earlier? Anything
5  you can think of?
6      A. The only conversation that we did not
7  bring up here was my decision to relieve the
8  driver of duty with Benton Express.
9      Q. And that was a conversation -- that
10 was a decision you made on your own, or was
11 it --
12     A. Yes, sir.
13     Q. -- in conjunction with anybody?
14     A. No, sir. It was my decision.
15     Q. And I gathered from what you told me,
16 even though we didn't talk about it, you
17 gathered -- I gather from what you told me that
18 you made it sometime after that 6 o'clock call
19 on Sunday and whatever time it was you talked
20 to Glenn Clark and the day after Mr. Weems?
21     A. Barry Weems.
22     Q. Is that about the time frame you made
23 it?
24     A. No, sir.
25     Q. What time frame did you make that

Page 110

1  decision?
2      A. I had considered it on Saturday,
3  definitely Sunday morning.
4      Q. And what time -- did you relate it to
5  anybody, that decision to relieve the driver?
6      A. I don't recall when exactly.
7      Q. Do you recall you relayed it to
8  anybody at any time?
9      A. Certainly to Glenn Clark.
10     Q. And you don't know when you may have
11 relayed to him?
12     A. No, sir. I'm sorry.
13     Q. Would it have been after that
14 6 o'clock hour or before, you think?
15     A. No. Probably Saturday evening.
16     Q. And when you say "evening," I think we
17 noted I wrote "evening" by where I tracked your
18 calls. Two or three type conversations you may
19 have had, in that range?
20     A. Yes. It was probably sometime after
21 4:00 p.m.
22     Q. Okay. After 4:00 p.m.
23         Did anything specific go into that
24 ultimate decision, like a call from some other
25 corporate officer, or just you, after thinking

Page 111

1  about it all, that's just the call you made?
2      A. It was my call, my decision, yes, sir.
3      Q. And all I'm trying to figure out:
4  Other than thinking about it, did anything go
5  into, factor into that ultimate decision that
6  you think happened sometime after 4 o'clock?
7  For example, did you read a policy and say,
8  man, based on reading this policy, I need to
9  relieve this driver?
10     A. No, I did not read a policy. But I
11 felt that that was the correct thing to do at
12 that time.
13     Q. And I understand that drivers can be
14 relieved for, for example, violating federal
15 motor safety regulations; is that right?
16     A. Relieved?
17     Q. Yes. You have to relieve a driver,
18 like you was considering with
19 Mr. Craig Stephens? It can happen?
20     A. Well, okay. When I say "relieved of
21 duty," I basically mean termination.
22     Q. And could that happen for things such
23 as violating hours of service?
24     A. Yes, it could.
25     Q. And it's a discretionary call?

Page 112

1      A. Some are discretionary. Some are
2  pretty clear.
3      Q. Which ones would be pretty clear?
4      A. Stealing, immoral conduct, failure to
5  report an accident, off route. Sorry. I can't
6  remember them all.
7      Q. That's fine.
8         But off route, for example, off route,
9  if there's an error by the driver, a mistake,
10 it wouldn't cause -- even if he could be
11 written up for being off route by mistake, but
12 that generally wouldn't relieve (sic) in
13 termination, would it, if he unintentionally
14 got off route?
15         MR. BROCKWELL: If you've ever
16     encountered that situation.
17         THE WITNESS: I've never
18     encountered that situation where
19     they were accidentally on the wrong
20     road.
21     Q. (By Mr. Boone) For example, do you
22 ever recall a situation where a driver tried to
23 avoid or there was a wreck and he tried to go
24 around it and take some route to avoid the
25 traffic and ultimately got temporarily lost and

28 (Pages 109 to 112)

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 113

1  got off route?
2      A. I don't know of a situation that's
3  happened like that.
4      Q. Would a driver be terminated for that,
5  if they got lost off route because they were
6  trying to avoid traffic, say, or a wreck in
7  traffic?
8      A. It would have to be investigated.
9      Q. So a lot of these things, I gather
10 from what I read in the regulations and
11 you-all's procedures and from, I guess, what
12 I'm hearing, it would be on a case-by-case
13 basis?
14     MR. BROCKWELL: Object to the form.
15 That's not what he just said.
16     MR. BOONE: He can correct me if
17 that's not --
18     THE WITNESS: Repeat the
19 question one more time. Sorry.
20     Q. (By Mr. Boone) Will a lot of those
21 decisions be based on a case-by-case analysis
22 of what occurred?
23     MR. BROCKWELL: Same objection.
24     THE WITNESS: It would be
25 investigated.

Page 114

1      Q. (By Mr. Boone) Right. Before you
2  ultimately would make that decision, you'd look
3  into what really happened?
4      A. Yes, in some cases.
5      Q. Now, now talking about termination,
6  tell me specifically what all -- strike that.
7  Let me start over.
8      Tell me specifically what all you know
9  about what specifically caused the delay to
10 Craig Stephens.
11     A. I don't have any information why he
12 was delayed.
13     Q. You don't have any idea?
14     A. I have no idea.
15     Q. You-all have a policy on being
16 hijacked, don't you?
17     A. A policy on being hijacked? I'm
18 sorry, I --
19     Q. Well, good loads being stolen. Do
20 you-all have any policy on a vehicle being --
21 or a tractor-trailer being hijacked by people
22 trying to steal it?
23     A. You mean do we --
24     Q. And I'm not asking --
25     A. I'm misunderstanding this because I'm

Page 115

1  not sure how you can have a policy on how your
2  load is being hijacked.
3      Q. Maybe that's right. Maybe I can ask
4  it a better way.
5      Do you-all have any policies
6  concerning what a line haul driver should do in
7  case of an attempted hijack?
8      A. We have -- in this paper here, we have
9  guidelines.
10     Q. You have guidelines on what they
11 should do?
12     A. Yes.
13     Q. And just, for example, do you have any
14 idea whether or not an attempted hijack
15 occurred in this case?
16     A. I do not.
17     Q. Do you have any idea if he fell
18 deathly ill, is why he wasn't proceeding on?
19     A. No.
20     Q. Do you have any idea if something
21 happened to him physically that maybe put him
22 in a position where he couldn't communicate
23 with anybody?
24     A. No, sir.
25     Q. Do you know if his cell phone was

Page 116

1  physically inoperable because it may have
2  broke?
3      A. No, sir.
4      Q. So you don't know specifically
5  anything about what caused this delay?
6      A. No, sir.
7      Q. Anybody at Benton Express that's told
8  you about specifically what was going on with
9  Craig Stephens in his employ that caused this
10 delay?
11     A. No, sir.
12     Q. So even without knowing whether or not
13 he was hijacked or ill or some very legitimate
14 explanation for what occurred, your saying that
15 you were going to relieve him of duty means you
16 were going to investigate further on whether or
17 not you would ultimately terminate him, or does
18 it mean you were going to terminate him?
19     A. I had been --
20     MR. BROCKWELL: Object to the form.
21     THE WITNESS: I had been
22 investigating for 24 to 48 hours.
23     Q. (By Mr. Boone) Got you.
24     A. The gentleman would have been
25 terminated. It would have been up to somebody

29 (Pages 113 to 116)

Page 117

1  else to decide whether he would have a job in
2  the future with Benton Express, because I would
3  have terminated him.
4      Q. And my question to you is: What
5  information, other than the fact that you
6  couldn't locate him, did you discover in this
7  investigation?
8      A. None.
9      Q. So you don't have a clue what
10 happened?
11     A. Not a clue, except for my tractor, our
12 tractor and our trailer and our customer's
13 product couldn't be found. It was not at the
14 destination it should have been six and a half,
15 five hours later.
16     Q. And based on what you were personally
17 doing in your role at Benton Express, based on
18 your experience there and obviously the
19 position you hold, you would have felt the
20 decision should be termination?
21     A. Yes.
22     Q. And the only thing I'm trying to
23 do -- and I hate to repeat the question, but a
24 couple of depositions, every time -- if I asked
25 a question of was there some more information,

Page 118

1  sometimes it will spark people's mind and say,
2  oh. For example, I asked him, was there
3  anything else that transpired, and he said no.
4  And then later, I think he remembered another
5  conversation. I forgot the content, but he
6  remembered another conversation. And I think
7  that happened with both.
8      And nothing's wrong with that; but I'm
9  trying to figure out before I leave here, in
10 case you say, wow, I should have told him that,
11 was there anything other than the fact that he
12 had been delayed for that time and nobody could
13 locate him when it would go into a decision to
14 terminate him? Anything else you knew about
15 the situation other than the fact we can't find
16 him?
17     A. Other than the fact that the Georgia
18 State Patrol, the Florida State Patrol, the
19 Alabama Police, and the Atlanta Police
20 Department could not locate our equipment, no.
21     Q. And as of today, nobody's ever been
22 able to shed any more light for you on what may
23 have happened to him?
24     A. No, sir. I'd love to know.
25     Q. And with that, let's say he was found

Page 119

1  deathly ill. Would that affect your decision
2  on whether or not you would terminate him?
3      A. Not at that time.
4      Q. At this time, after, say you
5  investigated it later, and you found out the
6  reason why is the guy was deathly ill and
7  couldn't call us?
8          MR. BROCKWELL: Object to the form,
9      calls for speculation.
10         THE WITNESS: But that's not
11     what happened.
12     Q. (By Mr. Boone) Was the goods actually
13 late? Say, for example, if they had arrived
14 there on Sunday sometime, my understanding is
15 they was going to be starting to be delivered
16 by city deliverers starting Monday. Is that
17 what your understanding is?
18         MR. BROCKWELL: If you know what the
19     Pensacola operation was planning to
20     do with that.
21         THE WITNESS: I do not know what
22     the Pensacola operation --
23     Q. (By Mr. Boone) Do you have any idea
24 when these goods were going to need to be
25 delivered to the customers?

Page 120

1      A. No, sir.
2      Q. The reason why I'm asking, you
3  said -- part of your statement is, I knew one
4  thing, I couldn't find my truck and our
5  customer's goods.
6      A. Correct.
7      Q. Do you know, if he would have reached
8  the terminal on, say, for example, Sunday,
9  would he have been -- were the goods late at
10 that point?
11     A. I can't answer that question.
12     Q. Were they late by Monday?
13     A. I don't know what was the appointment
14 on the trailer, the schedule for delivery,
15 honestly.
16     Q. Okay. I got you.
17        Have you handled Workers' Compensation
18 claims before?
19     A. Yes, sir.
20     Q. And are you the one in the office who
21 approves, if an employee is injured, their
22 Workers' Compensation?
23     A. Do I approve the bills?
24     Q. For example, if an employee gets hurt
25 on the job and files a Workers' Comp claim, do

30 (Pages 117 to 120)