# Exhibit 7 to Plaintiff's Response
# To Defendant's Motion for
# Summary Judgment

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE MIDDLE DISTRICT OF ALABAMA
 3                       NORTHERN DIVISION
 4
 5   * * * * * * * * * * * * * * * *
                                    *
 6                                  *
     HAZEL ROBY, as Administratrix  *
 7   of the Estate of RONALD TYRONE *
     ROBY, Deceased,                *
 8                                  *
                  Plaintiff,        *
 9                                  *
     VS.                            * CIVIL ACTION NUMBER
10                                  * 2:05CV494-B
     BENTON EXPRESS, INC., et al.,  *
11                                  *
                  Defendants.       *
12                                  *
     * * * * * * * * * * * * * * * *
13
14
15        The testimony of GLENN E. CLARK, JR.,
16        taken at Bozeman, Jenkins & Matthews, 114
17        East Gregory Street, Pensacola,
18        Florida, on the 5th day of October, 2005,
19        commencing at approximately 2:15, o'clock,
20        p.m.
21
22
23
```

```
 1   A            To the best of my knowledge, no.
 2   Q            Is one of the things -- do y'all ever
 3   talk about the importance of customer satisfaction,
 4   talk about keeping your customers happy, at any of
 5   these meetings?
 6   A            Yes, sir.
 7   Q            Have y'all ever talked about whether or
 8   not it's important to deliver products on time?
 9   A            It's very important.
10   Q            Is that one of Benton's mottos that they
11   have, that they promise good, timely delivery if you
12   choose them?  Is that a selling point of Benton
13   Express, that we are -- will provide you with timely
14   delivery?
15   A            That's correct.
16   Q            And do you know if Benton Express
17   advertises that they have the latest in technology
18   concerning tracking and making sure deliveries are on
19   time?
20   A            Yes, we -- we can track on-time
21   deliveries.
22   Q            Tell me how -- well, tell me what's the
23   latest in technology that you all have in place to
```

```
 1   track deliveries.
 2   A          Just our local computer system with --
 3   the customer provides a freight bill, or if he does
 4   not have that, he provides other information and we
 5   can find the freight bill number for him and can look
 6   that shipment up for him and tell him where it is.
 7   Q          Okay.  Tell me, once -- for example, when
 8   Craig Stephens went to Atlanta and picked up the load
 9   in Atlanta, once he left that terminal, did y'all
10   have any method of tracking his whereabouts through
11   this computer system you're talking about?
12   A          Not this one, no.
13   Q          Did y'all have any method on any computer
14   system that we haven't talked about yet that would
15   allow you all to track the goods on the trailer that
16   Craig Stephens was hauling once he left -- once he
17   picked the load up in Atlanta?
18   A          Would you -- could you state that again?
19   Q          Yes.  Once Craig Stephens picked up the
20   load at the Atlanta terminal and signed out, did
21   y'all have any way to track those goods that he was
22   hauling?
23               MR. BROCKWELL:  You mean prior to them
```

```
 1            arriving in Pensacola, Labarron, like in
 2            between the two points?
 3  MR. BOONE:
 4  Q         Yeah.  Once he left Atlanta, did y'all
 5  have any way of tracking the whereabouts of those
 6  goods?
 7  A         No.
 8  Q         So, once he left the Atlanta terminal or
 9  signed out at the Atlanta terminal, how do you all --
10  how, if a customer calls you about your goods, could
11  you tell them precisely where they were?
12  A         As far as the goods are concerned, it
13  would show en route Atlanta to Pensacola, not
14  arriving.
15  Q         Right.  So, any way you all could tell
16  them specifically right now he's in Auburn, Opelika
17  or tell them specifically where the goods are at the
18  time the customer calls once he left Atlanta?
19  A         No, sir.
20            Rephrase that question.  You --
21  Q         Let's say if Craig -- once Craig Stephens
22  signed out with the tractor and trailer, out of the
23  Atlanta terminal, if somebody had called at 1:00
```

1  o'clock A.M. that morning and said, where are our
2  goods, would y'all have had any way to track and tell
3  them specifically where the goods were at that time?
4  A         Specifically, no.
5  Q         All you all could tell them is it was en
6  route to Pensacola?
7  A         That's correct.
8  Q         When Craig left the terminal, which was
9  on 4/8, 11, of 2005, were you present at the
10 terminal?
11 A         Yes, I was.
12 Q         And did you actually -- did you actually
13 have any reason or need to communicate with Craig
14 before he left the terminal on that Friday?
15 A         Just his presence.  When he arrived, I
16 saw him, he spoke, I spoke.  We -- we talked just for
17 a few minutes before he left.
18 Q         Do you recall anything you all talked
19 about before he left?
20 A         No, sir, nothing in particular.
21 Q         Just normal casual chitchat?
22 A         That's correct.
23 Q         Nothing that would have thought anything

```
 1    Q         That Garlin had talked to Craig?
 2    A         Yes.
 3    Q         And that Garlin had told you that Craig
 4    was on his way back?
 5    A         Right.  That's the information at that
 6    time.
 7    Q         And I guess at that time, since Garlin
 8    had relayed to you that Craig was on his way back,
 9    that you -- that you -- were you, would it be fair to
10    say, somewhat relieved knowing that we had located
11    the driver and he had told Garlin he was on his way
12    back?
13    A         Yes, that was -- that was a correct
14    assessment.  It was -- at least I knew where he was,
15    or at least I thought I knew where he was.
16    Q         Right.  And relieved to know, hey, we
17    finally located him, he's alive; is that right?
18    A         That's correct.
19    Q         No harm had come to him?
20    A         That's correct.
21    Q         And that he was on his way back?
22    A         Yes.
23    Q         So, would it be fair to say, then, that
```

1  it was really -- now that you had located him and
2  know he's ultimately on his way back, would it have
3  kind of -- no need for you to do anything else, at
4  least in your mind, at that time since we know he
5  said he's on his way back?
6              MR. BROCKWELL:  Object to the form.
7  MR. BOONE:
8   Q        Is that a fair assessment of what you may
9  have done the rest of the Sunday?
10  A        Could you repeat that question, please,
11  sir?
12  Q        I was just saying, I'm -- I'm trying to
13  gather -- in light of the fact you told me that you
14  were relieved that you knew where he was now, and
15  allegedly was on his way back, would it be fair to
16  say that you were relieved and as a result, you know,
17  you kind of could take a deep breath and were no
18  longer looking for him?
19              MR. BROCKWELL:  Object to form.
20  A        That's not a correct assessment.  I still
21  wanted to see him.
22  MR. BOONE:
23  Q        Okay.  And I don't mean you didn't want

1   it's possible you did or are you saying that you
2   recall calling him two or three times?
3   A            I recall trying to call him several
4   times.
5   Q            Okay.  And anything else you would have
6   done on that Sunday night?
7   A            Just -- just anticipated his -- seeing
8   him first thing in the morning.
9   Q            Okay.  All right.  At that point, in
10  light of the good news Garlin had told you, he had
11  been found and was on his way back, I gather you
12  anticipated that his truck and he would be back in
13  Pensacola on Monday morning?
14  A            That's correct.
15  Q            And I'm sure at that time you were glad
16  to know that one of your employees, who you
17  considered a good, reliable employee, was safe?
18  A            Yes.
19  Q            And you were -- I guess you were glad to
20  know that no harm had come to him, for example, like
21  somebody had tried to rob him or something?
22               MR. BROCKWELL:  I object to the form.
23  A            Yes, sir.

```
1    be correct?
2    A           That's correct.
3    Q           And you would have told the authorities
4    that Mr. Craig Stephens was -- when they asked you
5    about Mr. Craig Stephens, you told them that he was a
6    good employee of Benton Express; is that correct?
7    A           Yes.
8    Q           And you would have told the authorities
9    that Mr. Stephens was a reliable employee?
10   A           I don't remember saying that.  I don't
11   think -- I was just answering her questions.
12   Q           Right.  And I understand you would have
13   done that, but you would have shared with them that
14   he was a good employee of Benton Express and was
15   reliable and it was uncharacteristic of him to be
16   delayed?
17   A           Yes, or words to that effect.
18   Q           And you would have asked them if -- and
19   you would have gave them his truck number so they
20   could try to locate him if they -- if they -- so the
21   police officers could locate them if they saw him?
22   A           Yes, sir.
23   Q           You would have gave them any other
```

1    identification you had on the truck?
2    A         Yes, sir.
3    Q         And you would have asked them to please
4    -- if they spot him, to please have him immediately
5    contact you, his terminal manager?
6    A         That would have been as a result of the
7    report that they were going to send out, yes. They
8    would call me. He would call me.
9    Q         Right. Do you recall if it was discussed
10   that if you all -- if y'all spot Craig Stephens, I'll
11   -- delay him for you, that if you spot him, stop him
12   and have him immediately call?
13   A         I had a report that was to be sent out.
14   They call it a BOLO report, be on the lookout. And I
15   asked her, I said, if you pull him over, what do you
16   do? And the FHP, the Florida Highway Patrol office,
17   said that we will have him call you, we will detain
18   him and have him call you.
19   Q         And is that what -- and isn't that what
20   -- and you wanted that to happen?
21   A         Yes, sir, I did.
22   Q         And you wanted that to happen because you
23   wanted -- you wanted to locate Craig Stephens?

```
1    A            That's correct.
2    Q            And you wanted to find out if he was
3    harmed, injured or whatever the delay was?
4    A            That's correct.
5    Q            You never said anything like Craig
6    Stephens is a bad employee to the authorities, did
7    you?
8    A            I did not.
9    Q            You never told them anything like he had
10   a history of drug abuse or anything like that, did
11   you?
12   A            I did not.
13   Q            Never told them we had any concerns of
14   him being a bad employee who might try to steal our
15   equipment, did you?
16   A            No.
17   Q            And you never told them to arrest him
18   because we think he has stole our equipment, did you?
19   A            No.
20   Q            And that was no?  Did you say no?  I'm
21   sorry, I didn't hear you.
22   A            No.  You're correct, no.
23   Q            And what your concern was is you wanted
```

```
1    A            No, sir.  He specifically asked me the
2    route and he said, we have no reports of any
3    accidents, detours, road closures, or anything that
4    would be hindering traffic.  The traffic on that lane
5    was open.
6    Q            Tell me how -- did you know Craig
7    Stephens' route at the time you called the Georgia
8    authorities?
9    A            Yes, sir, I did.
10   Q            And how did you know his route?
11   A            He would have gone from Pensacola using
12   U.S. Highway 29, he would have gone to Century and
13   taken Highway 113 North to Interstate 65.  He would
14   have got on Interstate 65 at Flomaton, proceeded to
15   Montgomery on 65, where he would have taken
16   Interstate 85 on into Atlanta.
17   Q            And how would you have known that was --
18   that's the route Craig Stephens took?
19   A            That's the most direct route.
20   Q            All right.  I guess is it fair to say
21   that you can't -- you can't specifically sit here
22   today and say you know he went that way, but that's
23   the way you assumed he went because that was the most
```

```
 1   driver?
 2              MR. BROCKWELL:  I object to the form.
 3              You can answer if you know what anyone
 4        would think.
 5   A        I don't know what -- exactly what you're
 6   trying -- what you're asking me.
 7   MR. BOONE:
 8   Q        Okay.  I'm asking you, does that sentence
 9   you just read apply to a line-haul driver?
10   A        Yes.
11   Q        Okay.  And what do you consider
12   maintaining regular communications?  Is it defined
13   anywhere in this document?
14              MR. BROCKWELL:  I'm going to object to
15        the form.  I think you're just asking two
16        separate questions there.
17   MR. BOONE:
18   Q        Okay.  Let me restate the question again.
19   I think that's right.  Is -- is regular communication
20   defined anywhere in this document?
21   A        I'm unfamiliar with it.
22   Q        Okay.  So, there's nothing you can point
23   to me that defines regular communication, is it?
```

1  A          Not specifically.

2  Q          Is it anything regular communication
3  means to you?  As the terminal manager, what do you
4  consider regular communication?

5  A          Only on an as-needed problem basis.  If a
6  problem arises, he calls.

7  Q          Do you have any knowledge -- any reason
8  why if that's what was intended by this sentence, it
9  just didn't say in case of emergency?

10 A          I have no knowledge of that.

11 Q          You would agree with me, with basic
12 skills, that clearly don't require a master's degree,
13 as you have, that if you wanted to say in case of an
14 emergency call, that could have easily been stated,
15 couldn't it?

16             MR. BROCKWELL:  Object to the form.

17 A          Possibly so.

18 MR. BOONE:

19 Q          And what -- what in the world leads you
20 to interpret regular communication to mean only in
21 case of emergency?

22             MR. BROCKWELL:  Object to the form.

23 A          Well, the driver would call if he had a

```
 1   do?
 2   A          Yes.
 3   Q          And is that something you enforce?
 4   A          Yes.
 5   Q          But that is not anything that you enforce
 6   as it relates to line-haul drivers?
 7   A          That's correct.
 8   Q          I'm sorry.  You may have answered.  I'm
 9   sorry.  I didn't hear.
10   A          Yeah.
11   Q          You do not require line-haul drivers to
12   call in every hour?
13   A          That's correct.
14   Q          I seen a sheet called a daily log trip.
15   Does line-haul drivers ever fill those sheets out?
16              MR. BROCKWELL:  Hey, do you have a
17         Bates number on that, Labarron?
18              MR. BOONE:  It may be in there.
19              Madam Court Reporter, do you see a
20         sheet in there that's called a daily log
21         trip?
22              THE COURT REPORTER:  Is that it?
23              MR. BOONE:  At the top of it?
```

1  A         Yes, sir. Yes, sir. Every day.
2  Q         And do they have instructions telling
3  drivers when to call in?
4  A         This says progress number 2 is progress
5  report every 60 minutes.
6  Q         Okay. And is it your position that
7  document does or does not apply to line-haul drivers?
8  A         This document does not apply to line-haul
9  drivers.
10 Q         That document applies to who?
11 A         City drivers.
12 Q         And would the city drivers be the only
13 driver that would fill that document out?
14 A         Yes.
15 Q         Would it ever be any occasion where a
16 line-haul driver would fill that document out?
17 A         No.
18 Q         And you remember I asked you earlier as
19 it relates to Plaintiff's Exhibit 1 with Bates number
20 86, if there is any document that defines regular
21 communication? Do you recall that?
22 A         Yes.
23 Q         That document there would define regular

```
 1    Q         Did he call you and tell you to call the
 2    authorities back and make them more -- a different
 3    type of report than what you had originally made?
 4    A         No, not to my knowledge.
 5    Q         Did he ever call you and say, well,
 6    everybody you've called so far, the authorities, call
 7    them and tell them the vehicle is stolen?
 8    A         No.
 9    Q         I didn't hear you.  I think you said
10    no --
11    A         No.
12    Q         -- but I wasn't sure.
13    A         Yeah.  No.
14    Q         Okay.  Have you ever been arrested for --
15    arrested before?
16    A         No, sir.
17    Q         You have?
18    A         No, sir.
19    Q         Okay.  You ever been convicted of a
20    crime?
21    A         No.
22    Q         Good.  Good.  Good.  We don't want
23    nothing like that.
```