# Exhibit 8 to Plaintiff's Response
# To Defendant's Motion for
# Summary Judgment

FOSHEE & TURNER COURT REPORTERS

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE MIDDLE DISTRICT OF ALABAMA
 3                        NORTHERN DIVISION
 4
 5    HAZEL M. ROBY, as Administratrix
 6    of the Estate of RONALD TYRONE ROBY,
 7    deceased,                          ORIGINAL
 8              Plaintiff,
 9                                       CIVIL ACTION FILE
10       vs.
11                                       NO. 2:05CV194-T
12    BENTON EXPRESS, INC., et al.,
13              Defendants.
14
15              VIDEOTAPED DEPOSITION OF
16                  GEORGE WILLIAM JONES
17
18                  September 26, 2005
19                      2:22 p.m.
20
21              1180 West Peachtree Street
22                       Suite 900
23                   Atlanta, Georgia
24
25       Lisa Fischer, CCR-B-1277, RPR, CRR
```

FOSHEE & TURNER COURT REPORTERS

Page 24

1  of the policies and procedures, the normal
2  procedure is to make sure they get that
3  document?
4      A.  Correct.
5      Q.  And in that document, it talks about
6  all drivers should be in regular contact with
7  dispatch.  Does that apply to line haul
8  drivers?
9      A.  The part that you're referring to, no.
10     Q.  Let me direct your attention to
11 Plaintiff's Exhibit 2 and the part I'm talking
12 about.  First, why don't you read for the
13 ladies and gentlemen of the jury what it says
14 under "Scope," what this document is about.
15     A.  "The following security guidelines and
16 procedures apply to all work/load assignments.
17 All drivers and nondriving personnel will be
18 expected to be knowledgeable of and adhere to
19 these guidelines and procedures when performing
20 any load-related activity for Benton Express,
21 Incorporated."
22     Q.  And it says "all drivers," right?
23     A.  The following security guidelines --
24 all work/load assignments, all drivers, and
25 nondriving personnel.

FOSHEE & TURNER COURT REPORTERS

Page 25

1   Q.  And that would include line haul
2   drivers?
3   A.  Yes.
4   Q.  And city drivers?
5   A.  Yes.
6   Q.  Your understanding, Mr. Craig
7   Stephens, who we're here about, was a line
8   haul driver?  Craig Stephens, you're familiar
9   with that name?
10  A.  I am.  But you made a statement.
11  Q.  Is he a line haul driver?
12  A.  Yes.
13  Q.  And further in this document, it
14  says -- next-to-last bullet, why don't you read
15  that for us.
16  A.  "Drivers are expected to maintain
17  regular communications with the company while
18  in transit.  Any incident of drivers failing to
19  check in when required shall be assumed to be
20  suspicious and highly irregular.  Immediate
21  action shall be taken in such situations."
22  Q.  And from what you just read, doesn't
23  it say that all drivers are expected to
24  maintain regular communication with the
25  company?

FOSHEE & TURNER COURT REPORTERS

Page 26

1    A. Yes, sir.

2    Q. Do you -- is it your -- in your
3  experience as an operations or regional
4  manager, does that apply to all drivers?

5    A. Yes.

6    Q. And what is considered "regular
7  communication"?

8    A. I don't believe I'm qualified to say
9  regular communications, what that would be.
10  I'd be setting a company policy.

11    Q. Anybody ever told you what is
12  considered regular communication?

13    A. No, sir.

14    Q. Any document ever set out what's
15  considered regular communication, any other
16  document that may have gone with this?

17    A. For line haul?

18    Q. Yes.

19    A. No.

20    Q. Now, as it relates to regular
21  communications, I'll show you what was marked
22  as Plaintiff's Exhibit 1 to Mr. Weems'
23  deposition. Can you tell us what kind of
24  document this is.

25    A. Yes, sir. It's a city trip log.

1    Q.  And tell me what it says on the top.
2    Does it say "Benton" on the top?
3    A.  Yes, sir, it says "Benton."
4    Q.  And on the right-hand corner, it says
5    driver daily log trip?
6    A.  "Driver daily trip log."
7    Q.  And under "A," it has some things.
8    It's telling these drivers of how they should
9    communicate with the company?
10   A.  Yes, sir.
11   Q.  And one of them, it says any
12   unexpected delays, you should notify, be in
13   touch with them every 15 minutes?
14   A.  Correct.
15   Q.  And under No. 2, it also said it's
16   expected to be in regular communications every
17   hour?
18   A.  Actually, it says progress report
19   every 60 minutes.
20   Q.  And that's an hour, right?
21   A.  Correct.
22   Q.  And is that expected for city drivers?
23   A.  Every city driver, yes.
24   Q.  Is it expected for line haul drivers?
25   A.  No, sir.

FOSHEE & TURNER COURT REPORTERS

Page 28

1    Q.  Line haul drivers do not have -- does
2  it have anything that governs line haul drivers
3  and how often they should communicate?
4    A.  Not that I'm aware of.
5    Q.  Because this document, from what you
6  told me, applies to city drivers?
7    A.  Correct.
8    Q.  And it tells how often a city driver
9  should be -- it gives specific examples of what
10 regular communication means?
11   A.  Yes, sir.
12   Q.  Anything other than this document here
13 that would shed any light on regular
14 communications as it relates to a line haul
15 driver?
16   A.  None that I'm aware of.
17   Q.  Do some of your line haul drivers also
18 do city work too?
19   A.  No, not in Georgia.
20   Q.  Do you understand that at some other
21 places like Pensacola?
22   A.  No.  I can only speak for Georgia.
23 I'm sorry.
24   Q.  That's right.  I'm going to ask you
25 about what you know.  And in answer to me, I

Page 30

1  drivers -- have any idea how to follow these
2  procedures on communication, frequency of
3  communications?
4      A.  Do I have?
5      Q.  Yes.
6          MR. BROCKWELL:  Object to the form.  I
7  think he just asked you if you know
8  what all your line haul drivers
9  know.  And if you do, please tell
10 us.
11         THE WITNESS:  No, I don't.
12     Q.  (By Mr. Boone)  What I'm asking you,
13 you're responsible for your line haul drivers,
14 right?
15     A.  Yes.
16     Q.  Do you have any idea how they would
17 know?  This just says drivers are expected to
18 fully understand this policy and procedure and
19 make every effort to maintain regular contact
20 with dispatch.
21         My question to you, as the operations
22 manager for the region, is:  Do you have any
23 idea how line haul drivers would know what
24 regular contact with dispatch was?
25     A.  No.

FOSHEE & TURNER COURT REPORTERS

Page 33

1    what to do, right?
2         A.  Well, any unusual situation.
3         Q.  And the specific things that it says
4    on another page -- we can look at that.  It
5    says contact, for example, like David Justice.
6    There's a number if something unusual happens,
7    particularly a breakdown, I guess.
8         A.  Yes, sir.
9         Q.  And what I'm talking about is
10   generally defining what -- it doesn't say here
11   "unusual situations" in this here you read,
12   does it?
13        A.  No, sir.
14        Q.  It says just "maintain regular
15   communications"; is that right?
16        A.  That's what this says, yes, sir.
17        Q.  And I'm asking you:  Is anything set
18   out -- are you aware of anything that sets out
19   what these regular communications are?
20        A.  No, sir.
21        Q.  I've asked a few people here this, and
22   I'm going to be mighty shocked if I get a
23   different answer from you.  Do you know what
24   Qualicom is?
25        A.  No, I don't think I do.  Qualicom?

FOSHEE & TURNER COURT REPORTERS

Page 47

1  A. Yes.
2  Q. Do you know, was he a city driver at
3  the time?
4  A. David Justice?
5  Q. Yes.
6  A. No.
7  Q. Do you know why he had a two-way
8  radio?
9  A. Yes.
10 Q. Being a maintenance guy?
11 A. Yes; breakdown, maintenance.
12 Q. Did I ask you for his number?
13 A. I don't have it.
14 Q. You don't have it?
15 A. No, sir.
16 Q. What about -- at some point in time
17 you talked to a gentleman who, I think, told me
18 that you had him on standby; is that right?  Am
19 I mixing up people?  One of the guys told me
20 that you had him on standby on a Savannah
21 route.
22 A. Correct.
23 Q. And who was that?
24 A. Barry Weems.
25 Q. Mr. Weems.  How did you reach

Page 81

1   close to finishing.
2          (Whereupon a recess was taken
3   from 3:36 p.m. to 3:50 p.m.)
4       Q.  (By Mr. Boone)  I talked to, and I
5   believe I'm getting his name right, but
6   Mr. Weems earlier today.  I saw another female
7   here.  Would that have been Sharon Oaks or
8   somebody else with the company?
9       A.  No.
10      Q.  Do you know if any other employee with
11  Benton was here, a female I thought might have
12  been waiting on some of the guys?
13      A.  No.
14      Q.  But nevertheless about Mr. Weems, his
15  understanding and his -- and it will be quick
16  here.  Hopefully what he told me is correct and
17  you can verify it.  But he told me you called
18  him, put him on standby, and told him you might
19  need him to go to Pensacola.  He didn't know
20  anything about the details of why you put him
21  on standby or anything.  45 minutes later you
22  called him and released him to go ahead and run
23  his load to Savannah.
24          And what I'm trying to figure out is:
25  Do you recall anything different or anything

Page 82

1  else that transpired between you and Mr. Weems?
2  A. No.
3  Q. Would he have been told anything about
4  specifically why he was on standby?
5  A. No.
6  Q. You just held him on standby?
7  A. Yes.
8  Q. And would it have been mentioned to
9  him, anything about Craig Stephens specifically
10 being a driver who was late or delayed and
11 you-all were looking for him?
12 A. No.
13 Q. Any reason you put Mr. Weems on
14 standby?
15 A. Yes.
16 Q. What were you considering using him to
17 do?
18 A. To drive the unit to Pensacola.
19 Q. And that was on Sunday, right?
20 A. Correct.
21 Q. And was that before or after you heard
22 that Craig Stephens had called in to his
23 terminal?
24 A. After.
25 Q. That was after you heard that?

Page 91

1         Q.  (By Mr. Boone)  Right.  You want to be
2    able to locate your tractors?
3         A.  Uh-huh (affirmative).
4         Q.  And the goods they're carrying; is
5    that right?
6         A.  Yes.
7         Q.  And you want to be able to make sure
8    your goods get to the customers who hired
9    you-all to carry them?
10        A.  Yes.
11        Q.  And not only get to them but get to
12   them in a timely manner?
13        A.  Yes.
14        Q.  Do you have any idea of any more
15   efficient way of tracking you-all's drivers
16   than what's presently in place at Benton?
17        A.  No.
18        Q.  Because right now a long haul truck
19   driver who don't have a cell phone, there's no
20   way to track him?
21        A.  That's correct.
22        Q.  Is that correct?
23            MR. BROCKWELL:  Some clarity:  I think
24        he said long haul, like l-o-n-g.  I
25        believe the term that's been used

Page 92

1  throughout all these depositions is
2  "line haul," l-i-n-e.
3     Q.  (By Mr. Boone)  You was answering the
4  question to me using -- the proper phrase
5  should have been "line haul," right?
6     A.  Line haul, right.
7     Q.  That's how you was answering the
8  question --
9     A.  Yes.
10    Q.  -- assuming I meant line haul?
11    A.  Yes.
12    Q.  And my question was that for line haul
13 tractor-trailer drivers, you-all have no way to
14 communicate with them if they don't have a cell
15 phone?
16    A.  That's correct.
17    Q.  Do you have any other more efficient
18 way to -- do you know any more efficient way to
19 be able to track your drivers and the cargo in
20 their tractors if you needed to?
21    A.  No, sir.
22    Q.  Do you know anything -- other trucking
23 companies that are doing that are more
24 efficient at tracking drivers?
25    A.  No, sir.

FOSHEE & TURNER COURT REPORTERS

Page 93

1  Q. Do you-all have any policy in place
2  or -- strike that.
3      Do you-all -- have you-all had any
4  conversation about having GPS tracking put in
5  trucks?
6  A. No, sir.
7  Q. You never heard anything like that?
8  A. No, sir.
9  Q. Do you know Ms. Sharon Oaks?
10 A. I do.
11 Q. Has she ever told you you-all have to
12 start talking about possibly using some form of
13 GPS in you-all's vehicles?
14 A. No, sir.
15 Q. If that was happening, would that be
16 something you might be involved in, the
17 discussions on that, being a regional manager?
18 A. Possibly.
19 Q. Would you expect to be involved in it?
20 A. Yes.
21 Q. And as of today, you've not heard
22 anything like that?
23 A. As of today, no.
24 Q. As of today, have you talked to
25 anybody about changing the policies and

Page 94

1    procedures and requiring all line haul drivers
2    to be issued a Benton Express phone?
3        A.  No, sir.
4        Q.  What about requiring them to have a
5    personal phone?
6        A.  No, sir.
7        Q.  It's important at Benton Express to
8    deliver its products on time, isn't it?
9        A.  Yes, sir.
10       Q.  One of you-all's mottoes is we deliver
11   our products on time, and you-all are taught
12   efficiency?
13       A.  I don't know about it being a motto.
14       Q.  One of the things you-all market or
15   advertise is the ability to deliver loads on
16   time?
17       A.  Yes.
18       Q.  And have you ever seen any documents
19   that say you-all have the latest in technology
20   that allow you-all to track you-all's drivers
21   and the loads?
22       A.  No, sir.
23       Q.  Have you ever looked at you-all's Web
24   site before?
25       A.  I have.

Page 95

1    Q.  Have you ever seen anything on it like
2    that?
3    A.  Not pertaining to that exact phrase.
4    Q.  Have you ever heard any phrase
5    that -- I may misquote it.  Do you-all have any
6    phrase marketing to your customers that you-all
7    have technology or equipment to effectively
8    track and locate loads to ensure they are
9    timely?
10   A.  No, not exactly like that.
11   Q.  Do you-all have any phrases on that
12   subject area?
13   A.  As far as efficiently tracking our
14   shipments?
15   Q.  Yes.
16   A.  Yes.
17   Q.  And what are you-all meaning on how
18   you-all do that?
19   A.  By keeping our computers updated.
20   Q.  And what computers are you talking
21   about?
22   A.  Our computers in the terminals.
23   Q.  And that computer in the terminal,
24   will it tell you the specific location of a
25   truck?

Page 96

1     A.   No.
2     Q.   What does it tell you?
3     A.   It will if the truck is in a terminal.
4     Q.   Right.  But when it's not in the
5  terminal?
6     A.   No, sir.
7     Q.   Once it leaves the terminal, do
8  you-all have any way to track the loads to make
9  sure they're on time?
10    A.   No.
11    Q.   I may have asked you this.  Strike
12  that.
13         And Benton earns money by picking up
14  their goods and delivering goods to customers?
15    A.   Yes.
16    Q.   And you-all charge a certain fee for a
17  certain amount of goods?
18    A.   Yes.
19    Q.   Is it based on anything like weight or
20  anything like that?
21    A.   Yes.
22    Q.   You-all charge relative to the weight
23  of the goods you're hauling?
24    A.   That's one of the factors.
25    Q.   And tell me some of the other factors.

Page 104

1      A.   No.

2      Q.   Became aware they did that?

3      A.   No.

4      Q.   Do you have any idea the normal time
5   it takes for one of your drivers to go from
6   Atlanta to Pensacola?

7      A.   Five to six-and-a-half hours.

8      Q.   What kind of things will vary the
9   length of a route like that?  Just say
10  sometimes it's five to six and a half.  I know
11  that's a simple question; but for laypeople who
12  may not know, can you tell me some of the
13  factors that would vary on a route like that,
14  that you may be able to drive it one time in
15  five, and six and a half the next time?

16     A.   The traffic, fueling, mechanical
17  situations, weather.

18     Q.   And when you meant (sic) "fueling,"
19  you meant like if you have to stop versus not
20  stopping?

21     A.   Yes, sir.

22     Q.   Does the typical truck have enough
23  fuel in it that they can go from Atlanta to
24  Pensacola and Pensacola back to Atlanta without
25  fueling, if it's full?