# Exhibit 10 to Plaintiff's Response To Defendant's Motion for Summary Judgment

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                   NORTHERN DIVISION

4    CASE NUMBER:  2:05-CV-194-T

5    HAZEL M. ROBY, as Administratrix

6    of the Estate of Ronald Tyrone

7    Roby, Deceased,

8               Plaintiff,

9               vs.

10   BENTON EXPRESS, INC., et al.,

11              Defendants.

12

13           S T I P U L A T I O N

14           IT IS STIPULATED AND AGREED by and

15   between the parties through their respective

16   counsel, that the videotaped deposition of

17   Boyd Don Hammond may be taken before Angela

18   Smith, RPR, CRR, at the offices of Carr,

19   Allison, at 100 Vestavia Parkway, Ste: 200,

20   Birmingham, Alabama 35216, on the 19th day

21   of September, 2005.

22           DEPOSITION OF BOYD DON HAMMOND

23                               42643

Page 25

```
 1          A.     Yes.
 2          Q.     Okay.  Is it important to
 3     Benton Express, as a less-than-truckload
 4     carrier, to have its loads delivered on
 5     time?
 6          A.     Yes.
 7          Q.     And is that one of Benton
 8     Express's mottos or selling points to say
 9     that:  We deliver our loads on a timely
10     basis?
11          A.     Yes.
12          Q.     And does Benton Express also
13     advertise that it has a sophisticated
14     technology to allow it to track its loads?
15          A.     I believe they do.
16          Q.     You believe they have that
17     sophisticated technology or you believe they
18     advertise that?
19          A.     I'm not sure.  That doesn't
20     come under what I'm responsible for.
21          Q.     Okay.
22          A.     Being safety and human
23     resource, the technology end and the radio
```

FOSHEE & TURNER COURT REPORTERS

Page 29

1    instruct our drivers on how they're to

2    conduct themselves from point A to point B.

3    To follow the no-stop policy.  But it's at

4    their discretion on the no-stop.

5         Q.    No-stop policy meaning that if

6    somebody tries to pull up beside them and

7    get them to stop and attempt to steal the

8    cargo, don't stop?

9         A.    Don't stop.

10        Q.    And I think you said:

11   However, though, in their discretion, if

12   they think their safety is on the line,

13   maybe their life, maybe somebody's got a gun

14   at the window, then they have that

15   discretion?

16        A.    Exactly.  It's a judgment call

17   on their part.

18        Q.    Do you all have any tracking

19   devices that will allow you all to track

20   your trailers or tractors in case of theft?

21        A.    No.

22        Q.    Do you know of any more

23   efficient way of tracking cargo trailers or

Page 85

1          Q.      Did Garlin ask Craig any

2    questions, as best you all understand, about

3    what had caused -- where he was on Sunday?

4          A.      No.

5          Q.      Do you know why Garlin was at

6    the terminal, just to take the Tallahassee

7    run?

8          A.      Go to Tallahassee.

9          Q.      So, he just so happened to

10   answer the phone?

11         A.      Yes.

12         Q.      So, he wasn't -- It wasn't

13   generally his responsibility, he just so

14   happened, because he was going to work that

15   day, just so happened to be at the terminal?

16         A.      Yes.

17         Q.      And Mr. Craig Stephens, he

18   just called the terminal and just so

19   happened Garlin answered?

20         A.      To my knowledge.

21         Q.      And it was your understanding

22   that he called the terminal; right?

23         A.      Yes.

Page 86

```
 1          Q.      Where was Mr. Glen Clark at
 2     the time Craig called the terminal?
 3          A.      I don't know where Mr. Clark
 4     was at.
 5          Q.      Is Mr. Clark generally at the
 6     terminal on Sunday?
 7          A.      No.
 8          Q.      Who all is generally at the
 9     terminal on Sunday?
10          A.      No one, other than the drivers
11     that have received dispatches and they're
12     going to be leaving, they would go there and
13     get their unit and leave.
14          Q.      No dispatcher or anything?
15          A.      It's all done prior to Sunday.
16          Q.      Okay.  I take it, then, that
17     based on what you told me is the proper
18     protocol for making contact with a
19     dispatcher with your Nextel phone, that
20     Craig Stephens, if he needed to relay
21     something to the terminal, he did the proper
22     thing by calling the terminal on Sunday?
23          A.      Yes.
```

Page 101

1    reasonable amount of time, in compliance

2    with the Department of Transportation's

3    regulations.

4         Q.    And that's a good key point

5    you just add.  In compliance with the

6    Federal Motor Vehicle -- Well, in compliance

7    with the federal government regulations; is

8    that right?

9         A.    That's correct.

10        Q.    And the federal government

11   regulations require a driver to pull over

12   and stop if he's tired and sleepy and

13   fatigued?

14             MR. BROCKWELL:  Object to the

15   form.

16        A.    Require him to stop?

17        Q.    If he was fatigued and sleepy,

18   would the regulations require that he pull

19   over and stop and get adequate rest?

20        A.    He is required to get ten

21   hours of rest after being on duty no more

22   than fourteen hours, and driving no more

23   than eleven prior, and then taking a

Page 102

1    ten-hour break.

2         Q.    If a Benton Express driver was

3    tired and sleepy, what should he do?

4         A.    If he's tired and sleepy?

5         Q.    Yes.  And he's delivering a

6    load and he's tired and sleepy.

7         A.    Drivers are instructed to get

8    proper rest of at least ten hours prior to

9    being dispatched.

10        Q.    So, if he gets tired and

11   sleepy on the job, what should he do?

12        A.    I would definitely want him to

13   take a break, to drink a cup of coffee, to

14   take fifteen minutes, take thirty minutes,

15   but --

16        Q.    Would it be fair to say, take

17   whatever time was adequate to make sure he's

18   not tired and sleepy when he starts back

19   driving?

20        A.    I wouldn't phrase it that way,

21   no.

22        Q.    Okay.

23        A.    Because the driver is supposed

Page 110

```
 1        A.      Yes.

 2        Q.      And isn't it your

 3   understanding that at the time of the wreck,

 4   he was in Montgomery?

 5        A.      Yes.

 6        Q.      He was in the Benton Express

 7   truck, as I said earlier?

 8        A.      Yes.

 9        Q.      With Benton Express goods?

10        A.      Yes.

11        Q.      And he was on the 85/65 South

12   Interchange?

13        A.      Yes.

14        Q.      And based on his normal route,

15   it appears, from everything we know, is that

16   he was on the same route he normally travels

17   back to Pensacola?

18        A.      Normal route, but not in time.

19             MR. BOONE:   Object as

20   nonresponsive.

21        Q.      And all I'm asking you is,

22   based on everything you've seen in your

23   investigation, he was in the Benton Express
```

Page 111

1    truck carrying Benton Express goods on his

2    way -- on his normal route back to

3    Pensacola?

4           A.      He was on the route back to

5    Pensacola.

6           Q.      That's all I was asking you at

7    this point.  Is that correct?

8           A.      Yes.

9           Q.      Okay.  Do you know of anybody

10   at Benton Express that -- Does he have a

11   voice mailbox, like, if you call his phone,

12   will a message be stored?

13          A.      I don't know.

14          Q.      You don't know.  Do you have a

15   Nextel phone issued by Benton Express?

16          A.      Yes.

17          Q.      Does yours have a voice

18   mailbox, if I call you and you don't answer,

19   would it leave a message?

20          A.      Yes.

21          Q.      Do you know if anybody called

22   him and left a message?

23          A.      No.

Page 119

1    is that right?

2            A.      That's correct.

3            Q.      And at that time, on Saturday,

4    which was sometime on Saturday evening?

5            A.      Yes.

6            Q.      And at that time, he had no

7    thought that this truck was stolen, did he?

8            A.      No.

9            Q.      He was simply looking for an

10   employee?

11           A.      An overdue employee.

12           Q.      That's right.  He was looking

13   for an overdue employee.  Would you agree

14   with that?

15           A.      Yes.

16           Q.      He had no reason to believe

17   the truck was stolen?

18           A.      No.

19           Q.      And, in fact, he told the

20   police that Mr. Craig Stephens was a good

21   employee?

22           A.      Yes.

23           Q.      Reliable employee?

Page 120

1          A.      Yes.

2          Q.      A family man?

3          A.      Well, I'm not sure of all the

4    terminology that he used as far as family

5    man or whatever.

6          Q.      But in his story he told him

7    it was an exemplary Benton Express employee?

8          A.      That he was a good employee,

9    yes.

10         Q.      And all he was trying to do

11   was locate him?

12         A.      We're trying to find out where

13   he was at, yes.

14         Q.      And you all, at that point,

15   understood and considered him an employee

16   who just was overdue and you were trying to

17   determine what the delay was?

18                 MR. BROCKWELL:  Object to the

19   form.

20         A.      We were trying to find out the

21   location of Mr. Stephens because of being

22   overdue.

23         Q.      Right.

Page 121

1      A.      And that's the reason the BOLO

2  was put out for three states through the

3  Florida State Highway Patrol.

4      Q.      Right.  And I think that's

5  what I said.  Let me rephrase it.  At that

6  time, on Saturday, when Mr. Glen Clark, his

7  dispatcher, who last saw him in Pensacola,

8  called the police, he was simply calling the

9  police about a good, reliable Benton Express

10  employee who had been delayed and he was

11  trying to locate him?

12              MR. BROCKWELL:  Object to the

13  form.

14      A.      Who was well overdue and was

15  missing.

16      Q.      Right.  And he had considered

17  -- And that's why he called the police?

18      A.      Yes.

19      Q.      Because he was looking for his

20  employee?

21      A.      Yes.

22      Q.      Was Benton Express -- I think

23  you told me, and we established that Benton

Page 122

1    Express -- Mr. Stephens was working for

2    Benton Express, delivering a load for Benton

3    Express to Atlanta?

4          A.     He was carrying the Pensacola

5    freight to Atlanta.

6          Q.     That was providing a benefit

7    to Benton Express.  You all were paying

8    Mr. Stephens for his work; right?

9          A.     Correct.

10         Q.     And Mr. Stephens was

11   performing work as a benefit to Benton

12   Express?

13         A.     Yes.

14         Q.     Because you all get paid?

15         A.     Pardon?

16         Q.     Because Benton Express gets

17   paid?

18         A.     Yes.

19         Q.     And he delivered that load in

20   Atlanta?

21         A.     Yes.

22         Q.     And Mr. Stephens had to drop a

23   load back off to Pensacola?  He had to bring

FOSHEE & TURNER COURT REPORTERS

Page 123

1    a load from Atlanta back to Pensacola?

2          A.    Yes.

3          Q.    And at the time of this wreck

4    he had -- he was in that Benton Express

5    truck and he had those goods on that truck

6    in Montgomery?

7          A.    Yes.

8          Q.    And those goods, once received

9    -- or if received by Benton Express, are

10   goods that you all are going to distribute

11   to customers?

12         A.    If received, yes.

13         Q.    And you all get a benefit from

14   loads being brought back to Pensacola,

15   because you all distribute them to your

16   customers; is that correct?

17         A.    That's how we stay in

18   business.

19         Q.    And you all make money by that

20   business?

21         A.    Yes.

22         Q.    Do you know when Mr. Glen

23   Clark first found out Garlin's message?

Page 124

1          A.      No.

2          Q.      And another kind of -- And you

3    may have been referring to this, but another

4    kind of tracking system, that we didn't give

5    a name, is called Qualcomm.  Have you ever

6    heard of that?

7          A.      No.

8          Q.      You've never heard of

9    Qualcomm?

10         A.      No.

11         Q.      Do you know of any trucking

12   companies in the trucking industry who use

13   Qualcomm?

14         A.      I have no idea.

15         Q.      Do you know of any trucking

16   companies -- Other haulers like Benton

17   Express, you follow what I'm asking about,

18   other people other than Benton Express who

19   haul like you all do?

20         A.      Uh-huh.

21         Q.      Do you know if anybody else

22   uses any kind tracking systems?

23         A.      Specific companies, I wouldn't

Page 125

1    know.

2          Q.     So, right now, as you sit

3    here, you don't know what any of the other

4    eighteen-wheeling hauling companies use?

5          A.     As far as that system that you

6    just mentioned, what was the name of it

7    again?

8          Q.     Yeah.  The tracking system.

9    Well, let's just talk about GPS Tracking and

10   forget the name.

11         A.     Oh, okay.

12         Q.     Do you know of any other

13   companies that use GPS Tracking Systems?

14         A.     Not specifically, no.

15         Q.     None of them?  You don't have

16   a clue?

17         A.     I know they operate off a

18   satellite.

19         Q.     No, no.  I'm saying, do you

20   know of any eighteen-wheel trucking

21   companies use those satellite tracking

22   systems?

23         A.     No.

Page 139

1       A.      It was in the neighborhood of

2   one o'clock, and returned somewhere around

3   nine o'clock that night.

4       Q.      Okay.  One o'clock in the

5   evening?

6       A.      One o'clock in the evening.

7       Q.      Returned at nine o'clock that

8   night?

9       A.      That's approximate time.  I'm

10  not exactly sure on the one o'clock.

11      Q.      Did you find out where he

12  went?

13      A.      He went out to 85, and

14  retracing the way that he would have gone on

15  a normal route back to Pensacola.

16      Q.      Do you know how far he went?

17      A.      No, I do not.

18      Q.      Do you know if he made it to

19  Montgomery?

20      A.      No.

21      Q.      Never asked?

22      A.      No.

23      Q.      Did you ask him where he

Page 176

1    That's not consistent with trying to steal a

2    truck, is it?

3              MR. BROCKWELL:  Object to the

4    form.

5         Q.    Would you agree with that?

6         A.    It's not consistent with

7    trying to steal a truck?

8         Q.    Because if I was trying to

9    steal your truck, I wouldn't call you and

10   tell you -- and call you and try to talk to

11   you, would I?  That's not normal, though, is

12   it?  You would agree with that, that

13   somebody trying to steal your truck, it

14   wouldn't be consistent with me to call you

15   at the terminal?

16             MR. BROCKWELL:  Object to the

17   form.

18        A.    That's correct.

19        Q.    And what's consistent with

20   calling an employee of Benton Express or

21   calling the terminal, is to let them know

22   what may have caused the delay or where they

23   were?

Page 193

1    an ultimate written document of conclusions

2    you got?

3         A.    No.

4         Q.    So, when you were saying this

5    stack of documents, you weren't talking

6    about a big stack of documents you have?

7         A.    Well, part of it would be

8    interrogatories, discovery, those kind of

9    papers that you generated.

10             MR. BOONE:  Let's take a quick

11   break and hopefully we'll be close to

12   finishing.

13             VIDEOGRAPHER:  This ends

14   videotape number two of the deposition of

15   Don Hammond.  The time is now 1:13 p.m.

16                  (Recess taken.)

17             VIDEOGRAPHER:  This marks the

18   beginning of videotape number three of the

19   deposition of Don Hammond.  The time is now

20   1:22 p.m.

21        Q.    I'll show you a document with

22   Bates number 083 through 099.  Could you

23   look at that document and tell me what it

Page 194

1    is.

2         A.    It's the Driver's Cargo and

3    Security Policy as mandated by the

4    Department of Transportation.

5         Q.    Is that something that applied

6    to -- that applied to Mr. Stephens?

7         A.    Yes.

8         Q.    Or is that something that

9    applied to just over-the-road haulers or

10   city drivers, too?

11        A.    Both.

12        Q.    Both?

13        A.    Yes.

14        Q.    Okay.  Let me look at it for a

15   second.  On page 08 -- with Bates number

16   086, I will direct your attention to the

17   next-to-the-last dot, right here

18   (indicating).  Why don't you read that for

19   me.

20        A.    Drivers are expected to

21   maintain regular communication with the

22   company while in transit.  Any incident of

23   drivers failing to check in when required

Page 195

1    shall be assumed to be suspicious and highly

2    irregular.  Immediate action shall be taken

3    in such situations.

4         Q.    And what's that word, drivers

5    should be in what kind of communication

6    again?

7         A.     Regular communication.

8         Q.    Do you know what regular

9    communication is for Mr. Stephens that you

10   say this applies to?

11        A.     It says that he should be in

12   regular communication with the company while

13   in transit.

14        Q.    Right.  Do you know what

15   regular communication means, as it applies

16   to Mr. Stephens, which you told me this

17   document applied to?

18        A.     Regular would mean if you have

19   a breakdown, you're to call in.  If you're

20   involved in an accident, you're to call in

21   to the eight-hundred number.

22        Q.    So, regular in your words

23   means don't call in if nothing is wrong?

Page 196

1       A.      Exactly.

2       Q.      So, regular communication

3    means, in your opinion, don't call in unless

4    something is going wrong?

5               MR. BROCKWELL:   Asked and

6    answered.

7       A.      That's correct.

8       Q.      Okay.  Let me look at it

9    again.  And this is part of a document that

10   Benton provides to its employees?

11      A.      Yes.

12      Q.      And its employees are supposed

13   to follow those directions?

14      A.      Yes.

15      Q.      And those employees include

16   yourself?

17      A.      Yes.

18      Q.      Mr. Glen Clark?

19      A.      Yes.

20      Q.      Bill Jones?

21      A.      Yes.

22      Q.      Craig Stephens?

23      A.      Yes.

Page 197

1              Q.     And you don't see anywhere in

2      that statement that says:  Maintain --

3      drivers are expected to maintain regular

4      communications with the company while in

5      transit?  That's what it says.

6                     You didn't see anywhere in

7      there where it says:  Drivers are expected

8      to maintain regular communication if an

9      emergency arise, did you?  Or if there's a

10     mechanical failure, you didn't see anything

11     like that in that statement, did you?

12             A.     Not in that particular

13     statement, but it is within the context of

14     that policy.

15             Q.     Okay.  Is there anything in

16     this policy that says only -- to maintain

17     regular communication with the company while

18     in transit, anything in here further says:

19     Well, what we really mean is only when

20     something happens such as a maintenance

21     breakdown or emergency or something?

22             A.     Regular communication is not

23     time specific.  You are dispatched on a run,