# EXHIBIT 1

1

1          COURT REPORTER:  Usual

2     stipulations?

3          MR. BOONE:  Yes.

4          MR. BROCKWELL:  Yes.

5

6          MARY P. STIRLING, of lawful age,

7     having first been duly sworn, testified as

8     follows:

9

10               EXAMINATION

11    BY MR. BROCKWELL:

12 Q.  Could you state your name for the record,

13    please?

14 A.  Mary P. Stirling, S-T-I-R-L-I-N-G.

15 Q.  All right.  And what does the P stand for?

16 A.  Pamela.

17 Q.  Ms. Stirling, have you seen this Notice of

18    Videotape Deposition before?

64

1   Collision Investigation?

2 A.  I haven't seen that.

3 Q.  You have not seen the fatal traffic and

4    collision investigation?

5 A.  All I've seen is the accident report.

6 Q.  So you weren't provided the full report from

7    Mr. Boone's office?

8 A.  Wasn't aware there was another report.

9 Q.  Is that something that you would like to

10    have?

11 A.  Yes.

12 Q.  If you knew that there were witness

13    statements in the report, would that be

14    significant to you?

15 A.  I had the depositions from witnesses.

16 Q.  You had depositions from eyewitnesses to the

17    accident?

18 A.  Yes, I did.

19 Q.  Well, the only eyewitnesses I'm aware of

20    that have been deposed were this afternoon.

21 A.  I gave you this folder.  It had them in

22    there.

23 Q.  Well, I wrote down all the depositions in

65

1    that folder and they were Glen Clark, Don

2    Hammonds, Hazel Roby, Garland McClellan,

3    Mary Means, and David Justice.  Are those

4    the ones you're talking about?

5 A.  I'm sorry.  I did.  I looked at those at

6    this office.  I sure did.  I looked at those

7    depositions at this office and sat and read

8    them and made notes.  That was the first day

9    I worked on the case.  I came by here and

10    read those depositions.

11        MR. BOONE:  I think it's not a

12    deposition.  They hadn't been taken.  You

13    just read my personal summary of what I

14    gathered from my investigator's interview of

15    witnesses.

16        THE WITNESS:  I'm sorry.  My

17    mistake.

18 Q.  Is that something that you reviewed, is

19    Mr. Boone's summaries of --

20 A.  Witness statements, yes.

21 Q.  And is that something that's in your file?

22 A.  No.  I read them here at this office.

23 Q.  Well, that is something, since you have

66

1    reviewed that, that is discoverable in this

2    case.

3         MR. BROCKWELL:  And I'd ask

4    Mr. Boone that he provide those, anything

5    that Ms. Stirling has reviewed, please.

6         MR. BOONE:  Well, I'm -- at this

7    point I object to it, but I'll see if I can

8    recollect what she reviewed.  And we'll try

9    to -- we'll make an issue -- we'll either

10   object to produce it -- and I'll let you

11   know whether I will.

12        MR. BROCKWELL:  Will you do that

13   quickly?

14        MR. BOONE:  Oh, yeah.

15        MR. BROCKWELL:  Do you have any

16   basis for objecting to producing materials

17   that she has reviewed in this case?

18        MR. BOONE:  Yeah.  Other than

19    potentially on the onset is attorney

20    work-product and privilege, my

21    interpretations of what witnesses would say.

22        MR. BROCKWELL:  Well, I -- we can

23    take --

67

1        MR. BOONE:  We don't -- you can

2    file an objection -- if I decide to say I'm

3    not going to give it to you, then you can

4    file an objection and say I should.  We'll

5    deal with it swiftly.

6 Q.  Ms. Stirling, as part of this Montgomery

7    Police Department Fatal Traffic Collision

8    Investigation, there are some thumbnail

9    photos here.  Can you please flip through

10    those and tell me if they're the same as the

11    pictures you believe are from the city

12    engineer's office?

13        (Witness reviews photographs.)

14 A.  No, they aren't.  No, I don't have these

15    photographs.

16 Q.  And so those are not photographs you

17    reviewed prior to today?

18 A.  No.

19 Q.  And so is it fair to say that the police

20     photographs that are part of the police

21     investigation are not something that you

22     have relied on in forming your opinions in

23     this case?

68

1 A.  No.

2 Q.  That is -- that is fair to say or it's not

3     fair to say?

4 A.  That is fair to say.

5 Q.  All right.

6         MR. BROCKWELL:  Well, in that case,

7     then, I don't believe I have these

8     photographs we've been discussing and so

9     what I'll do is mark the CD as Defendants'

10    Exhibit 8 and ask our court reporter to

11    please make a copy of the CD to attach as an

12    exhibit.

13        (Defendants' Exhibit 8 was

14        marked for identification.)

15 Q.  During that line of questioning, I believe

16    we established that there are some other

17    documents you've looked at in this case that

18    are not contained in your file; is that

19     correct?

20 A.  Yes.

21 Q.  And it's your belief that those -- I think

22     you said that they were witness depositions;

23     is that right?

69

1 A.  I was wrong.  I guess they're witness

2     statements, I guess.

3 Q.  Well, you've -- you're familiar with a

4     deposition, aren't you?

5 A.  Yes.  It had been a while and I worked

6     several cases since.  And I was looking for

7     them and couldn't find them and then I

8     remembered that I had read them here and I

9     just . . .

10 Q.  Well, did they look to you like a

11     transcription of like a recorded statement

12     or something like that?

13 A.  No.  I took notes from them.  I think you

14     saw them, didn't you?

15 Q.  Are your notes -- you took notes that are

16     part of your file today?

17 A.  Yes, I did.  They should be -- I think I

18     labeled it even deposition notes.  I was

19    wrong.  It wasn't a deposition.

20 Q.  I've got it in here.

21 A.  Okay.

22 Q.  Now, this next CD, can you tell me, please,

23    what it is?

19    opinions?

20 A.  Yes.

21 Q.  Do you keep a list of documents that you are

22    provided in a case?

23 A.  Not a list.  I keep them all in the file.

91

1 Q.  You keep them all except for the witness

2     statements that we talked about earlier in

3     the file?

4         MR. BOONE:  Objection to form.

5     She's never had possession of them.

6     Objection to form.

7 A.  I've never had possession of those.  I've

8     read them here in this office and made notes

9     from them.

10 Q.  Okay.  So you don't consider that you've

11    been provided with those?

12        MR. BOONE:  She hasn't been

13    provided with those.  But go ahead.

14 A.  I haven't been provided them, no.

15 Q.  You have been provided access to them, but

16    you have not been allowed to leave this

17    building with copies of them; is that fair

18    to say?

19 A.  That's true.

20 Q.  Are there any other documents like those

21     witness statements that you have been

22     provided access to but that you do not have

23     copies of?

92

1 A.  No.

2       MR. BOONE:  Can I have a continuing

3    objection to -- I don't believe they were

4    witness statements.  I think they were my

5    summaries of ours of what we expected a

6    witness to say from what they told us.  But

7    I don't think a witness statement is a fair

8    characterization.  I want to preserve that.

9    I might be wrong about that.

10       MR. BROCKWELL:  Well, that's fine.

11    I think that Ms. Stirling has called them

12    witness depositions.  I know that you've

13    stated they may not have been that.  All

14    we're asking for is whatever she's looked

15    at.

16       MR. BOONE:  I understand.

17 Q.  And, Ms. Stirling, you are not disputing

18    that Glen Clark did indeed call the Florida

109

1    counsel asked her, I believe I have a right

2    now to ask her.  But go ahead.

3 Q.  Well, tell me this:  What is significant to

4    your expert opinions in this case?

5 A.  I think it's significant that Mr. Stephens

6    ran into the bridge abutment, went off the

7    bridge, and landed on I-65 south and slid

8    into Mr. Roby's car, and as a result

9    Mr. Roby and Mr. Stephens are dead.

10 Q.  And as part of -- part of what you stated

11    here is based on other evidence; right?

12 A.  Yes.

13 Q.  And it's based on photographs you've looked

14    at; is that correct?

15 A.  Yes.

16 Q.  And is it based on anything else that you've

17    done besides look at photographs?

18 A.  Yeah.  It's based on the statements of the

19    eyewitnesses --

20 Q.  All right.

21 A.  -- that I read.

22 Q.  And tell me what else.

23 A.  And the police report.

110

1 Q.  Anything else?

2 A.  Basically, that's it.

3 Q.  Okay.  And so I just want to clear things up

4    here, if we can.  That you are being offered

5    as an expert in accident reconstruction; is

6    that right?

7 A.  Yes.

8 Q.  And you have reached opinions as an expert

9    on how the accident that is the subject of

10    this case occurred; is that correct?

11 A.  Yes.

12 Q.  And those opinions are contained in the

13    disclosure of your opinions that have been

14    filed in this case; is that correct?

15 A.  Yes.

16 Q.  Do you have any opinions that are not

17    contained in these disclosures?

18 A.  No.

119

1        MR. BOONE:  Objection to form.

2 Q.  All right.  I'd like to go through some of

3    these individually, ma'am.  You state --

4 A.  Can we take a break?

5 Q.  That's fine.

6        (Short recess.)

7 Q.  Okay.  Before we took a break, we were

8    starting to go into the individual opinions

9    that you have.  And I had asked you, I

10    think -- I don't know what I asked you to

11    end it off, frankly.  I'll ask you this now:

12    You have an opinion that Mr. Ronald Roby was

13    traveling south on Interstate 65 at the time

14    of the accident.  And I'll ask you what the

15    basis of that opinion is.

16 A.  Mr. Ladon Dansby -- I read these in

17    Mr. Boone's office the first day I worked in

18    this case.  Mr. Ladon Dansby was on I-85

19    also behind Mr. Stephens' truck and

20    witnessed him strike the barrier and fall

21    over.  Mr. Jermale Ayers was traveling on

22    I-85 and going to Day Street and

23    Mr. Stephens' truck was to his left and he

120

1    saw the truck hit the barrier and go over.

2    A Ms. Lisa Warr also witnessed the truck

3    strike the barrier and go over.  And none of

4    these people saw Mr. Roby's vehicle.

5    Also --

6 Q.  Do they specifically state that they did not

7    see it or did they just not mention it?

8 A.  Well, they didn't mention it.  Also --

9 Q.  And -- I'm sorry.

10 A.  You asked me what all I based that on.

11 Q.  Please.

12 A.  These photographs that I did print off of

13    the vehicle show no contact damage to the

14    right side of Mr. Roby's vehicle.  And I

15    believe had he been struck by the truck and

16    taken along the retaining wall that there

17    would have been damage to the right side of

18    his truck.  You can also tell by looking at

133

1 Q.  But you have looked at photographs of it as

2    well?

3 A.  Yes.

4 Q.  And, again, those are photographs taken by

5    someone other than you?

6 A.  Yes.

7 Q.  That next opinion I want to ask you about is

8    that you opine that Craig Stephens was

9    operating his vehicle in excess of 59 miles

10    per hour as he went over the barrier guard.

11    What do you base that opinion on?

12 A.  Witnesses who said that he was -- some said

13    he was doing 60 to 65, some said 80.

14 Q.  Was there any reason that you phrased it

15    like that, in excess of 59 miles per hour?

16 A.  Well, the initial critical speed of the

17    curve was 59 when I was using the radius;

18    that was approximate given to me by the city

19    engineer's office.  And then we got the

20    radius of the curve from the Alabama DOT,

21    the actual plans, and it was low.  The

22    radius was a little bit larger, so that

23    lowered the speed for that curve.  But at

134

1    that time, that's what I was basing that on.

2    And the witness statements that said 60 or

3    better.

4 Q.  Okay.  So part of the basis of the 59 miles

5    per hour was the critical speed you

6    determined for that curve; right?

7 A.  Yeah.

8 Q.  And I think we've already determined earlier

9    that the critical speed for that curve is

10    irrelevant to this case; is that right?

11 A.  Yes.

12 Q.  And you have -- I think you also testified

13    that it's impossible to make a calculation

14    as to Mr. Stephens' speed for just going

15    straight over the barrier; is that correct?

16 A.  Yes.

17 Q.  And so removing the critical speed for the

18    curve from the equation, what is the in

19    excess of 59 miles per hour based on?

20 A.  The witnesses.

21 Q.  And are those the witness statements or

22    witness depositions that you read here in

23    Mr. Boone's office but do not have a copy

135

1   of?

2 A.  Yes.

3         MR. BOONE:  Objection to form.

4 Q.  And while we're on that, could you look in

5     your notes that you've referred to a few

6     times today and tell me the names of each

7     eyewitness whose statement or deposition you

8     read?

9         MR. BOONE:  Objection to form.

10 A.  Bridgette Harris, Andrew Davis, Corporal

11     Green, Ladon Dansby, Richard Patterson,

12     Stephen Hornsby, Michael Boozer, Jermale

13     Ayers, Julie Pollard, Johnny Pollard, and

14     Lisa Warr.

15 Q.  There was an actual statement made by

16     Corporal Green in the materials that you

17     read?

18         MR. BOONE:  Objection to form.  For

19    the record, that same objection.  I don't

20    remember if it was my summary, the

21    investigator's summary, or what it was.  You

22    keep using the term, so I'd just like to

23    have a continuing objection, a statement or

136

1  a deposition.

2      MR. BROCKWELL:  And I understand.

3  I'll give you a standing objection to what

4  we call it, because frankly I don't know

5  what they are.

6      MR. BOONE:  I don't recall what it

7  is either.

8      MR. BROCKWELL:  All I know is that

9  she's called it a witness deposition.

10     MR. BOONE:  Right.  I don't have an

11  objection to that.  I just want to make sure

12  we're not agreeing to that just because

13  that's the term you all use.

14     MR. BROCKWELL:  Right.

15 A.  Well, I misspoke when I said deposition.

16     MR. BOONE:  And if it is, then, you

17  know, we're going to give you whatever we

18  give you and we'll know what it is.

19      I think he asked you a question.  I

20    don't remember what it is.

21 A.  I took it at the same time as I took the

22    other notes and between two of the other

23    witnesses, so I'm assuming that it was a

137

1    statement that was in there also.

2 Q.  Okay.  As far as you know from your notes

3    and from your memory, the statement --

4    that's my term -- of Corporal Green was the

5    same format as the statements of the other

6    witnesses?

7 A.  Yes.

8 Q.  Did you ask for copies of these witness

9    statements?

10 A.  I was told -- I asked if there were witness

11    statements and I was told that I could come

12    by here and read them, but I couldn't get a

13    copy.

14        MR. BOONE:  I don't remember.

15 Q.  Now, one of your opinions is that the truck,

16    meaning the truck driven by Craig Stephens,

17    collided with Ronald Roby's vehicle; is that

18    correct?