IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| HAZEL M. ROBY, as Administratrix of the Estate of RONALD TYRONE ROBY, Deceased, § § § § § | | |
| Plaintiff, § § | | |
| v. § § | CIVIL ACTION NO. 2:05cv494-B | |
| BENTON, INC., et al., § § § | | |
| Defendants. § | | |

**PLAINTIFF'S SUPPLEMENTAL OPPOSITION TO DEFENDANT
BENTON, INC.'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Plaintiff in the above styled matter, by and through the undersigned counsel of record, and hereby requests that this Court deny Defendant, Benton Inc.'s ("Benton") Motion for Summary Judgment. Additionally, Plaintiff hereby incorporates her response/opposition to Defendant's "Motion for Partial Dismissal," including all arguments and exhibits, as if fully set out in this Brief.

**I. INTRODUCITON**

Craig Stephens was employed as a truck driver for Benton. Stephens was an over the road driver. His regular run was from Pensacola to Tallahassee and back. However, he routinely worked overtime. On March 8, 2005, Garlin McClellan, Stephens' co-employee asked Stephens if he could handle his weekend trip from Pensacola to Atlanta and back. (Exhibit 1: McClellan dep. p. 118, l. 4-10; Exhibit 2: Stephens dep. p. 18, l. 8-22). Stephens agreed to cover for McClellan. (Exhibit 1: McClellan dep. p. 118, l. 4-10). On the morning of Monday, April 11, 2005, Ronald Roby died when Stephens, on his return trip, drove up and over a guardrail and

collided with the deceased. This collision occurred at the Interstate 85 South and 65 South interchange in Montgomery, Alabama. Prior to reaching the I-85/I-65 interchange, Stephens had been driving in a reckless manner. (Exhibit 3: Warr dep. p. 52, l. 23 – p. 53, l. 3). Defendant Benton owned the vehicle operated by Stephens. At all times material, Stephens was an agent of Benton and was acting within the line and scope of his employment. (Exhibit 10; Hammonds dep. p. 105, l. 3 – p. 106, l. 13; p. 108, l. 8-15; p. 110, l. 6 – p. 111, l. 8; p. 121, l. 22 – p. 123, l. 21).

## II. SUMMARY OF MATERIAL DISPUTED FACTS

There are numerous facts setout in Defendant's brief that are disputed. Benton alleges that Stephens was not in the line and scope of his employment because he did not return directly to Pensacola. (Exhibit 4: Benton brief pg 4-11 #9,11,36). Bill Jones, the regional terminal manager, reported to the Atlanta Police the trip took approximately 6 hours. (Exhibit 5: BOLO report). Requiring Stephens to return on Saturday morning would be a violation of Federal Regulations concerning consecutive hours of service. (Exhibit 6: Federal Motor Carrier Safety Regulation 395.3). Accordingly, Stephens could not be back on Saturday morning, if he complied with the Federal Motor Carrier Safety Regulations. (Exhibit 10; Hammonds dep. p. 101, l. 21 – page 102, l. 1).

Furthermore, the evidence in this case also shows that he had no specified return time, as long as he returned by Monday morning April 11, 2005. (See Exhibit 7; Clark dep. p. 54, l. 9-10; Exhibit 2; Stephens dep. p. 20, l. 22 – p. 21, l. 4; page 29, l. 2-5). Stephens was traveling the route that he normally traveled and driving the Benton tractor trailer with goods that he was dispatched to haul. (See Exhibit 7; Clark dep. p. 81, l. 11 – p. 82, l. 13; Exhibit 2; Stephens dep. p. 47, l. 6-8; Exhibit 10; Hammonds dep. p. 106, l. 1-23; p. 110, l. 14-18). Stephens' wife

testified that he had to return by Monday morning unless he could not get anyone to cover his Sunday run. (Exhibit 2; Stephens' dep. p.20, l. 22 – p. 21, l. 4, p. 29, l. 2-5; Exhibit 7; Clark dep. p. 54, l. 9-10). On Sunday, Stephens called Garlin McClellan and confirmed that Garlin would handle his Sunday run. (Exhibit 10; Hammonds dep. p. 176, l. 13-16).

Benton also alleges that they reported the vehicle stolen on Sunday. Benton merely filed a missing vehicle report. (See Exhibit 5: Atlanta Police Department BOLO Report). Benton could not report the vehicle stolen since Stephens was given permission to operate the vehicle. (See Exhibit 11; Stapler dep. p. 23, l. 3-7; Exhibit 7; Clark dep. p. 133, l. 5-8). Benton also states that Stephens was still missing on Sunday. (Exhibit 4; Benton's Brief, paragraph 19 of Statement of Facts). This is inaccurate. In fact, Stephens called Garlin McClellan on Sunday and informed him of his whereabouts and asked him to cover his load. (See Exhibit 1; McClellan dep. p. 56, l. 5-15; p. 57, l. 22 – p. 58, l. 7). When Stephens' immediate supervisor was informed of this, he stated he was relieved and was expecting Stephens back Monday. (Exhibit 7; Clark dep. p.49, l. 3-22).

Based on the testimony of Mr. Glenn Clark who filed the BOLO report, the reason for filing the report was concern for Craig's safety, not because he thought Stevens was stealing the truck as alleged by Bill Jones. (Exhibit 7; Clark dep. p. 70, l. 13 – p. 72, l. 4); Exhibit 4; Defendant's brief, paragraph 19). Further, this BOLO report was simply an attempt to locate Stephens; the police had no authority to arrest him. (Exhibit 5; BOLO Report; Exhibit 11; Stapler dep. p. 25, l. 1-13).

Benton also states as an undisputed fact that this was a 5-hour trip. However, Bill Jones, reported to the authorities that is was approximately a 6-hour trip. (Exhibit 5; Jones dep. p. 104, l. 4-7). Plaintiff's expert, Roland Brown, also testified about the length of the trip. (Exhibit 15;

3

Brown dep. p. 243, l. 1-17). This is no insignificant fact because if it was a 6-hour trip, then to return on Saturday morning would have been a violation of the Federal Motor Carrier Safety Regulations. (Exhibit 10: Hammonds dep. p. 101, l. 20 – p. 102, l. 1). Accordingly, every trip Stephens made to Atlanta was in violation of the hours of service rule and the logs were fraudulent. (Exhibit 9; driver trip logs). One of the purposes of the hours of service rules is to reduce fatalities caused by sleepy or drowsy drivers.

### III. STANDARD OF REVIEW

In reviewing a Motion for Summary Judgment, a court must view the evidence in the light most favorable to the non-movant. In order to grant a Motion for Summary Judgment, the trial court, while viewing the evidence in the light most favorable to the non-movant, must determine that there are no genuine issues of material fact and that the moving party is entitled to a Summary Judgment as a matter of law. In other words, the Plaintiff must not be able to prevail under any set of facts presented to the Court before a summary judgment motion can be granted. *Craig v. City of Mobile*, 658 So. 2d 438 (Ala. 1995).

In this case, there are numerous genuine issues of material facts on which Benton relies in support of its motion for summary judgment. Thus, the motion must fail.

### IV. ARGUMENT

The main issue before this court is whether there is *any* evidence that Mr. Stephens was in the line and scope of his employment at the time of the collision. Alabama case law is clear that whether an employee is acting within the line and scope of his employment is a question of fact for the jury. *Shoney's Inc. v. Barnett*, 773 So. 2d 1015, 1027 (Ala. 1999). Since there are numerous disputes of material facts and Benton has not shown it is entitled to a judgment as a matter of law, this Motion for Summary Judgment it due to be DENIED.

4

## A. STEVENS WAS ACTING WITHIN THE LINE AND SCOPE OF HIS EMPLOYMENT AT THE TIME OF THE COLLISION

Defendant Benton has not rebutted the presumption that Stevens was acting within the scope of his employment.

> It is well settled that those presumptions do arise from proof of the defendant's ownership of the vehicle ... [I]n practice their effect is merely to impose upon the defendant the burden of showing that the driver was not his agent, or that, if he was, he was not acting within the scope of his authority or in the course of his employment. If the evidence thereon is in conflict, or leads to doubtful inference only, <u>the issue should go to the jury.</u>

*Pryor v. Brown & Root USA, Inc.*, 674 So. 2d 45, 48-49 (Ala. 1995); *see also Durbin v. B.W. Capps & Son, Inc.*, 522 So. 2d 766, 767 (Ala. 1988). The *Durbin* court added:

> When plaintiff proves such ownership of the [vehicle] by defendant, and thereby brings into being the presumption [that the driver was his agent], *he need not offer further proof that the operator* of the [vehicle] was the agent of defendant, and *[was acting] in the line and scope of his authority*, until and unless defendant has offered proof that he was not acting for defendant in the line and scope of his authority .... But if there is any evidence which reflects upon the credibility of that evidence by defendant on that question, or from which an inference may be drawn to a different result, whether such evidence was produced by defendant or plaintiff, the question of whether the operator of the [vehicle] was defendant's agent acting in the line and scope of his authority *should be submitted to the jury*.

*Durbin*, 522 So. 2d at 767 (emphasis added). Actually, in this case, the overwhelming evidence is that Stephens was in the line and scope of his employment. (Exhibit 10: Hammonds dep. p. 106, l. 1-23; p. 108, l. 8 – p. 111, l. 5, p. 121, l. 22 – p. 123, l. 18).

In *Williams v. Hughes Moving & Storage Co.*, 578 So. 2d 1281 (Ala. 1991), the Alabama Supreme Court held that the owner of a pickup truck failed to rebut the presumption that an employee was acting within the line and scope of his employment by acting against company policy. In that case the employee brought home the company vehicle despite the company's

5

policy against this. *Id.* at 1282. The company policy stated that employees who took company vehicles home without permission were to be terminated and prosecuted. *Id.* The court held that the mere fact that the employee was acting <u>against</u> company policy did not answer the question of the employee's status at the time of the accident. *Id.* at 1283. Similarly, in this case, even if Stephens deviated from his route, he had returned to the line and scope of his employment when he traveled through Montgomery on his normal and customary route back to Pensacola with Benton's loaded tractor-trailer when this collision occurred.

Based on the facts of this case, Stephens was acting within the line and scope of his employment when he recklessly hit and killed Ronald Tyrone Roby. On Sunday, Stephens called his co-worker and informed him he was delayed in Atlanta and he would be returning to the terminal in Pensacola, Florida with the load. (Exhibit 10; Hammonds dep. p. 84, l. 9-13; p. 85, l. 17-23) This is an undisputable part of his job duties. Stephens was returning the load within the required time limit (Exhibit 2; Stephens' dep. pp. 20, l. 11 – p. 21, l. 4, p. 29, l. 2-5). In fact, he had no specified return time, as long as he returned by Monday morning, April 11, 2005. (Exhibit 7; Clark dep. p. 54, l. 9-10; Exhibit 2: Stephens' dep. pp. 20, l. 11 – p. 21, l. 4, p. 29, l. 2-5). He was traveling the route that he normally traveled and driving the Benton tractor-trailer with goods that he was dispatched to haul. (See Exhibit 7; Clark dep. p. 81, l. 11 – p. 82, l. 13; Exhibit 2: Stephens dep. p. 47, l. 6-8; Exhibit 10, Hammonds dep. p. 106, l. 1-23; p. 110, l. 14-18). Stephens' job duties were to return the loaded tractor-trailer to Pensacola. After a close review of the deposition of Don Hammonds, the V.P. of Safety, the issue concerning whether Stephens was in the line and scope of his employment is essentially conceded. (Exhibit 10; Hammonds dep. p. 105, l. 3 – p. 106, l. 13; p. 108, l. 8-15; p. 110, l. 6-11; p. 121, l. 22 – p. 123, l. 21).

Benton argues Stephens was not in the line and scope of his employment because he did not return directly to the Pensacola terminal. Glenn Clark, Stephens' supervisor said he had no specific time to be back – "just a reasonable time." (Exhibit 7: Clark dep. p. 54, l. 9-10). The wreck occurred on Monday, the day Stevens was due back, and thus Benton's claims are not based on the evidence. (Exhibit 2: Stephens' dep. pp. 20, l. 11 – p. 21, l. 4, p. 29, l. 2-5).

In *Pryor v. Brown & Root USA, Inc.*, 674 So. 2d 45 (Ala. 1995), the Alabama Supreme Court held that whether an employee was in the line and scope of his employment was a **question of fact**. In that case, the employee had deviated from his route home to go sailing with friends while driving a company vehicle. *Id.* at 47. That employee was involved in an accident on the way home, after sailing. *Id.* The court held that questions of fact existed as to whether the employee was acting within the scope of his employment. *Id.* In our case, there are much stronger facts in the plaintiff's favor. Mr. Stephens had permission to be in the truck. (Exhibit 7: Clark dep. p. 133, l. 5-8; Plaintiff's disputed facts; ; Exhibit 2; Stephens' dep. pp. 20, l. 11 – p. 21, l. 4, p. 29, l. 2-5; Exhibit 10; Hammonds dep. p. 105, l. 17 – p. 106, l. 13). He was dispatched to Atlanta to drop a load and pickup another load to bring back to Pensacola. (Exhibit 1: McClellan dep. p. 118, l. 4-10). He was on that route at the time of the collision. (Exhibit 2; Stephens dep. pp. 47, l. 6-8; Exhibit 7, Clark dep. p. 81, l. 11 – p. 82, l. 13). He told a Benton employee that he would be returning with the load and to ask him to cover his next run. (Exhibit 1; McClellan dep. p. 56, l. 5-15; p. 57, l. 22 – p. 58, l. 7; Exhibit 10; Hammonds dep. p. 173, l. 13-16). He was not required back until Monday April 11, 2005, the day of the subject wreck. (Exhibit 2: Stephens' dep. pp. 20, l. 11 – p. 21, l. 4, p. 29, l. 2-5; Exhibit 7, Clark dep. p. 54, l. 9-10).

In *Patterson v. Whitten*, 328 So. 2d 301 (Ala. Civ. App. 1975), the Alabama Court of Civil Appeals held that the death of an employee occurred in the course of his employment. The employee was instructed to pick up a company vehicle, drive it home, and take it to the car lot on the next work day. *Id.* at 304. The company argued that the employee *deviated* from his course of work since he intended to drive it to his son's football game before he went home. *Id.* at 300. The court held:

> Accidents occurring during such journeys arise out of and *in the course of employment if the trip involves performance of a service for the employer which would have necessitated a trip by someone if the employee had been unable to perform that service* in connection with his personal journey.... Accordingly, if the journey were considered as having both a business and a personal purpose, we find the business purpose to be such that the accident arose out of and in the course of employment.

*Id.* at 304 (emphasis added). Here, if Stevens had been unable to return the load, another driver would have to be called. In fact, Benton had another driver ready to pick up the load if Stephens was unable to return. (Exhibit 8: Jones dep. p. 81, l. 14 – 82, l. 20). Furthermore, nothing about Stephens' trip through Montgomery was personal. The only reason for him to be at the point where the wreck occurred was to get back to Pensacola.

Assuming arguendo, that Mr. Stephens left the line and scope of his employment, he had returned to the line and scope of his employment at the time of the wreck. The Alabama Supreme Court held in *Scott v. Birmingham Electric*, 33 So. 2d 344 (Ala. 1948), that whether a truck driver had deviated from and returned to the scope of his employment was a **question for the jury**. *see also Blacmon v. Starling*, 130 So. 782 (Ala. 1930) (holding where there has been a deviation or departure from the master's business and the agent is in the process of returning to the sphere of his employer's business the question as to whether he is acting within the line and

scope of his employment is a jury question). There is no evidence to suggest that Stephens was doing anything other than returning the load to Pensacola.

At the very least, whether Stevens was acting within the line and scope of his employment is a disputed, material fact for the jury:

> An act is within an employee's scope of employment if the act is done as part of the duties the employee was hired to perform or if the act confers a benefit on his employer... The rule ... for determining whether certain conduct of an employee is within the line and scope of his employment ... is if an employee is engaged to perform a certain service, whatever he does to that end, or in furtherance of the employment, is deemed by law to be an act done within the scope of the employment.

*Hulbert v. State Farm Mutual Automobile Ins. Co.*, 723 So. 2d 22, 23 (Ala. 1998). Accordingly, Defendant's motion is due to be Denied

### B. DEFENDANT BENTON HAD A DUTY TO SUPERVISE, TRAIN, MONITOR, ENFORCE SAFETY POLICES AND PROCEDUURES

Alabama courts have looked at the following factors to determine whether a duty exits: (1) forseeability of the harm (2) industry custom and (3) voluntary undertaking of a duty by Benton. Benton does not dispute it had a duty to supervise, train, and enforce safety polices and procedures. Benton only argues that it did not have a duty to have a communication or tracking system.

The ultimate test of Benton's duty is forseeablity of harm that would result if due care is not exercised. *Pope v. McCrory*, 575 So. 2d 1097 (Ala. 1991). Based on the disputed facts set out previously and the law of this State, Benton's Motion for Partial Summary Judgment is due to be Denied.

1.   Forseeability

Under Alabama law, a party's duty of care arises when it is foreseeable that harm may result if care is not exercised. *Lance, Inc. v. Ramanauskas*, 731 So. 2d 1204 (Ala. 1999). It has long been recognized that foreseeability is the touchstone of liability for negligence. *Id.* The ultimate test of Benton's duty is forseeablity of harm that would result if due care were not exercised. *Pope v. McCrory*, 575 So. 2d 1097 (Ala. 1991).

In this case, Benton could not locate an 80,000-pound tractor-trailer and its employee for over two days. Tractor-trailers cause approximately 3,600 deaths on the road each year, even though tractor-trailers make up only a small fraction of the total vehicles on the road. (See Exhibit 12; Insurance Institute for Highway Safety article). Benton knows that trucks can be used as a weapon of mass destruction similar to the attack by terrorist using planes to attack the World Trade Centers. This is referenced in Benton's Driver & Cargo Security Policy. (See Exhibit 13; Benton Driver & Cargo Security Policy). Nevertheless, Benton has no reliable method in place to track/locate its employees and equipment, contrary to Benton's advertising. (See Exhibit 8; Jones dep. p. 91, l. 18-21; p. 92, l. 12-21; Exhibit 10; Hammonds dep. p. 29, l. 18-21; p. 136, l. 17-23; Exhibit 7; Clark dep. p. 27, l. 7 – p. 29, l. 4).

Plaintiff's expert, who works as consultant to trucking companies similar to Benton, opined that any reasonable trucking company should have methods in place to track and communicate with its vehicles/employees. (Exhibit 15; Brown dep. p. 137, l. 19 – p. 139, l. 9; p. 143, l. 4 – p. 145, l. 1Exhibit 16; Report of Roland Brown). More specifically, Plaintiffs expert opined that Benton should equip its trucks with tracking equipment, i.e., GPS. *Id.* This ability to track is particularly important in this case since Benton could not locate its employee or its truck for over 48 hours. To have lost an employee and an 80,000-pound tractor-trailer loaded with its

customers' goods for two days is negligent and/or wanton. A jury could hold Benton liable for its failure to implement reasonable measures and procedures to locate its missing equipment and employee and thus avoid foreseeable harm.

It is uncontroverted that Benton undertook a duty to track and locate its vehicle/employee, albeit negligently. (Exhibit 4; Defendant's brief, ¶18). Benton's employees and its corporate representative have testified that one of Benton's employees left Pensacola heading toward Montgomery and another left Atlanta heading toward Montgomery. Id. However, their search areas did not cover the entire route. Stephens could have been at the next exit. A jury could conclude that Benton's failure to have tracking equipment or a communication system that would allow it to track its employees and vehicle is negligent and/or wanton. In light of the gravity and foreseeability of the harm, a jury could find that Benton had a duty to implement reasonable methods or polices and procedures to locate its vehicles/employees.

2.    Industry Custom

Because the negligence standard is that of a reasonable man, evidence of custom and practice is accepted as bearing on the extent of Defendant Benton's duty to the motoring public. *Collis v. City of Decatur*, 533 So. 2d 1127 (Ala. 1988); *see also Hobart Corp. v. Scoggins*, 776 So. 2d 56 (Ala. 2000) (holding industry custom admissible to show warning practices regarding comparable saw products). A reasonable trucking company should have methods in place to track its vehicles and drivers, such as GPS technology. (Exhibit 17; Liberty Mutual Survey; Exhibit 15; Brown dep. p. 123, l. 1 – p. 127, l. 4; p. 137, l. 19 – p. 140, l. 1; page 143, l. 4 – p. 145, l. 1; p. 241, l. 1 – p. 242, l. 23).

GPS tracking devices are used throughout the industry for tracking tractor-trailers. Approximately 50% of all trucking companies use GPS to track its vehicles. (See Exhibit 17;

Liberty Mutual Study). A study conducted by Liberty Mutual shows that companies who equip their vehicles with tracking systems reduces accidents by 30%. That reduction is very significant when tractor trailers cause 63% of the traffic related deaths on the road each year. (See Exhibit 12; Insurance Institute for Highway Safety article). Evidence of this trucking industry custom is relevant to the existence of a duty and creates an issue of fact for the jury regarding the existence of such a duty.

 3. Benton undertook a duty

Whether Benton undertook a duty is a **question of fact for the jury**. *Turner v. C.E. Minerals, Inc.*, 75 F. Supp. 2d 1303 (M.D. Ala. 1995) (emphasis added). Even where a party did not originally have a duty of care, by undertaking to act that party assumes such a duty. *Walden v. U.S. Steel Corp.*, 759 F.2d 834 (11th Cir. 1985). Even if Benton did not have a duty to implement reasonable means to track its employees and vehicles, Benton undertook that duty based on its advertising and its futile search attempt. (Exhibit 18; Benton Express, Inc. advertising; Exhibit 4; defendant's brief, ¶18).

Benton's expert testified that Benton has a duty to ensure that its tractor-trailers are operated safely on the highways of the United States of America. (Tynes dep. p. 33, l. 5-21). Benton's expert further testified Benton has a duty to protect the motoring public and the responsibility to ensure that they have adequate safety policies and procedures in place to ensure its tractor-trailers are operated safely. (Tynes dep. p. 203, l. 8-20). In this case, Benton negligently and wantonly failed to plan for a missing, stolen, or hi-jacked vehicle. In fact, Defendant's expert, Steven Stephens acknowledged that if you fail to plan then you plan to fail. (S. Stephens dep. p. 173, l. 7-16). Defendant Benton's failure to implement or enforce a reasonable communication or tracking system resulted in the death of Mr. Roby. Benton's expert

further testified that Benton has the responsibility/ duty to have a reasonably safety policy in place, communication policy in place, and tracking system. (S. Stephens dep. p. 152, l. 17-22; p. 153, l. 13- p. 154, l. 5.). Stephens testified as follows:

> Q. Do you have any opinion whether a reasonable prudent company should enforce it's safety policy?
> A. Should they enforce safety policies? Yes, they should.
>
> Q. [D]o you have any opinion whether a reasonable, prudent trucking company should have a method in place to track it's trucks?
> A. There could be any number of ways to do that. It's obviously -- it would be beneficial.
> Q. Do you believe that a reasonable trucking company should have a method to track its trucks?
> A. Well, there is a number of way to track. So obviously you want to be able to get in touch with your trucks, yes.

Defendant's expert also acknowledged that Benton tried to locate its tractor-trailer. When asked about Benton's voluntarily undertaking a duty to locate its vehicle, Mr. Stephens stated as follows:

> Q. Well, I am just asking you. Would they have done anything else other than what you say Benton did?
> A. They have started the process here by trying to locate it by using additional personnel. Of course, obviously they are were trying to get law enforcement to try to help locate. It's my understanding that one of the company personnel in Pensacola attempted to drive part of the route to locate the vehicle.

(Exhibit 22; S.Stephens dep. p. 184, l. 13-22). Based on the above testimony, it is undisputed that Benton undertook a duty to track/locate its vehicle/employee. (Exhibit 22; S.Stephens dep. p. 185, l. 8-18). In Alabama, the law is even if you did not have a legal duty to do something, you can voluntarily undertake duty. *Turner v. C. E. Minerals, Inc.*, 759 F. Supp. 2d 1303 (M.D. Ala. 1995; *Walden v. U.S. Steel Corp.*, 759 F.2d 834(11th Cir. 1985). Based on their expert's testimony, Benton had a duty to locate Craig Anthony Stephens and even if they did not have a

duty, they undertook it. (Stephens dep. p. 183, l. 1-7; . 185, l. 8-18); *Turner v. C. E. Minerals, Inc.*, 759 F. Supp. 2d 1303 (M.D. Ala. 1995; *Walden v. U.S. Steel Corp.*, 759 F.2d 834(11th Cir. 1985).

Benton's attempt to locate its employee was woefully inadequate since the search areas did not overlap. (Exhibit 4: Defendant's Brief; ¶¶ 18, 23, 24). Defendant Benton represents in its advertising that it had the latest technology available, in place, to allow it to track its equipment. (See Exhibit 18; Benton Express advertising). The latest technology is GPS tracking. In light of Benton's advertising, industry custom and failed attempt to locate Stephens, a jury could find Benton negligent or wanton in failing to have tracking equipment in its tractor-trailers.

## C. BREACH/PROXIMATE CAUSE

A Benton employee erratically drove his tractor trailer past downtown Montgomery during morning rush hour traffic into and over the guardrail of the I-85/ I-65 South Interchange and fell into the traffic below killing Mr. Roby. (Exhibit 20: Alabama Uniform Traffic Incident Report). Benton does not argue that it is entitled to summary judgment on Plaintiff's negligent supervision or training claims, instead Benton argues that it did not breach its duty to have a communication/tracking system and if it did, it did not make a difference (proximate cause). This position flies in the face of logic for anyone who understands the purpose of a communication or tracking system. In fact, Benton's expert, Tynes, confirms that GPS would have allowed Benton to locate the tractor-trailer and its driver, Stephens. (Exhibit 21; Tynes dep. p. 148, l. 20 p. 149, l.1).

Communication and GPS tracking systems are the industry standard. (Exhibit 15; Brown dep. p. 123, l. 1 – p. 127, l. 4; p. 133, l. 1 – p. 136, l. 11; Exhibit 16; Opinion of Roland Brown). One purpose of a communication system is to ensure the safety of Benton's drivers, the motoring

14

public, and timely delivery of customers' goods. (Exhibit 15; Brown dep. p. 143, l. 4 – p. 145, l. 1; p. 150, l. 23 – p. 151, l. 7; p. 184, l. 6 – p. 185, l. 17; Exhibit 17; Liberty Mutual Survey; Exhibit 7; Clark dep. p. 26, l. 2 – p. 27, l. 6; Exhibit 16; Opinion of Roland Brown; Exhibit 13; Benton Driver & Cargo Security Policy). Benton created manuals or policies and procedures discussing numerous safety issues and rules and regulations to be followed. In one document, Benton specifically requires its drivers to stay in "regular communication with dispatch". (Exhibit 13: Benton Driver & Cargo Security Policy). A companion document states the long haul driver should contact Benton every hour. (Exhibit 19: Benton trip manifests). When Plaintiff questioned Benton's V.P. of Safety, regional manager, terminal manager and truck drivers about this policy, nobody could explain why the phrase "regular communication" did not apply to all drivers. (Exhibit 14; Weems dep. p. 98, l. 1-9; Exhibit 8; Jones dep. p. 24, l. 1 – p. 30, l. 23; Exhibit 10; Hammonds dep. p. 194, l. 14-21; Exhibit 7; Clark dep. p.101, l. 19 – p. 102, l. 6; Exhibit 1; McClellan dep. p. 38, l. 14 – p. 39, l. 18):

Weems dep., p. 98

> Q. Nobody at Benton ever told you that?
> A. No.
> Q. That you ought to be in regular communication in transit?
> A. No.
> Q. And that if you wasn't [sic] in regular communication in transit, that that would be considered suspicious and highly irregular?
> A. No.

Jones dep., p. 26

> Q. And what is considered "regular communication?
> A. I don't believe I'm qualified to say regular communications, what that would be. I'd be setting a company policy.
> Q. Anybody ever told you what is considered regular communication?
> A. No, sir.

Hammonds dep., p. 195:

> Q. Right. Do you know what regular communication means, as it applies to Mr. Stephens, which you told me this document applied to?
> A. Regular would mean if you have a breakdown, you're to call in. If you're involved in an accident, you're to call in to the eight-hundred number.

Clark dep., p. 101

> Q. Is regular communication defined anywhere in this documents.
> A. I'm unfamiliar with it.
> Q. So, there's nothing you can point to me that defines regular communication, is it?
> A. Not specifically.
> Q. Is it anything regular communication means to you? As the terminal manager, what do you consider regular communication?
> A. Only on an as-needed problem basis. If a problem arises, he calls.

McClellan dep. p. 38-40:

> Q. Do you ever recall reading this here: Drivers are expected to maintain regular communication with the company while in transit?
> A. Yes, I remember reading that.
> Q. And as a line-haul driver, have you ever -- as a line-haul driver, do you maintain regular communication with the company while in transit?
> A No, I do not.
> Q Any reason why you don't?
> A. We're not -- line-haul drivers are not required to do that. The city drivers are.
> Q. Anything you recall reading that says that, that it does not apply to line-haul drivers?
> A. No, I can't remember.
> Q Well, let me ask you this. Do you remember, as you -- whether you can point it to me since it's not in front of you, but -- and your attorney, the attorney there, may have a copy, but if he doesn't, what I'm trying to figure out, do you remember if there is anything specifically in there that says regular communication does not apply -- this regular communication paragraph I read does not apply to line-haul drivers?
> A I can't -- no, I don't.

      Q    Did anybody tell you it doesn't apply to line-haul drivers?
      A    I can't remember anyone telling me that.

All of Benton's long haul drivers acknowledged they never followed this policy. If Benton would have trained its supervisors, supervised its employees or enforced this communication policy, Stephens, who was in violation of this policy, should have been taken out of service when he reached Atlanta. Thus, this wreck would not have happened. Defendant Benton's supervisors admit they had no contact at all with Stephens for over 48 hours. (Exhibit 4: Benton Brief). Defendant's conduct is even more culpable because after extensive questioning, Benton's long haul drivers state this communication policy requiring regular communication did not apply to them. (Exhibit 8: Jones dep. p. 16, l. 16-21; p. 15, l. 14-20; Weems dep. p. 30, l. 24 – p. 31, l. 14; p. 97, l. 15 – p. 98, l. 9; Exhibit 10; Hammonds dep. p. 194, l. 20 – p. 196, l. 4; Exhibit 7; Clark dep. p. 107, l. 11-13; Exhibit 1; McClellan dep. p. 31, l. 18 – p. 32, l. 1; p. 38, l. 14 – p. 39, l. 18). Benton's spin on the document is that long haul drivers do not have to follow the communication policy. (Exhibit 8; Jones dep. p. 27, l. 24 – p. 28, l. 1; Exhibit 7; Clark dep. p. 109, l. 6-9). It is clear that a jury could conclude that Benton breached is duty to implement, train, supervise or enforce its safety procedure (communication system) and if the communication system/procedures were enforced or if employees were properly supervised or trained concerning the communication system this needless tragedy would not have happened.

      Similarly, this tragedy could have been prevented if Defendant Benton would have had tracking equipment on board. Plaintiff's expert opines that that GPS tracking is the industry standard. (Exhibit 16; Opinions of Roland Brown; Exhibit 15; Brown dep. p. 123, l. 1 – p. 127, l. 4; p. 133, l. 1 – p. 136, l. 11). This position is supported by the annual survey done by Liberty Mutual for trucking companies. (Exhibit 17; Liberty Mutual Survey). "The survey provides . . .

details about fleet safety programs. . ." Id. In that survey, Liberty Mutual states the industry standard is GPS tracing. Id. GPS tracking would have allowed the Benton to locate Stephens immediately once he was considered missing. Then Benton could have taken him out of service, as its policy requires. (Exhibit 13; Benton Driver & Cargo Security Policy). In fact, Benton's Regional manager Bill Jones stated the following:

> Q. So even without knowing whether or not he was hijacked or ill or some very legitimate explanation for what occurred, your saying that you were going to relieve him of duty means you were going to investigate further on whether or not you would ultimately terminate him, or does it mean you were going to terminate him?
> A. The gentleman would have been terminated. It would have been up to somebody else to decide whether he would have a job in the future with Benton, because I would have terminated him.

(Exhibit 8; Jones dep. p. 116, l. 12 -117, l. 3).

Based on Bill Jones' own testimony this wreck would not have occurred if GPS tracking were installed in the subject vehicle because Stephens would have been located and removed from the vehicle. (Exhibit 8; Jones dep. p. 116, l. 24 – p. 117, l. 3). Accordingly, if a jury decides Benton should have had a tracking system (GPS) then this breach is the proximate cause of this wreck.

## CONCLUSION

Defendant's Motion for Summary Judgment is due to be denied because disputed issues of material facts exist and the issues before this court creates a jury question. Further, Plaintiff has shown that Stevens was acting within the line and scope of his duties. Plaintiff has further shown that Benton had a duty to train, supervise, enforce, implement, enforce or install a communication or tracking system. Consequently, Defendant Benton negligence and wantonness caused or contributed to the tragic death of Ronald Roby.

When viewing the evidence in the light most favorable to the Plaintiff, Defendant Benton's Motion for Partial Summary Judgment is due to be denied on all grounds.

/s/ L. Boone
_____
LABARRON N. BOONE
Attorney for Plaintiff

OF COUNSEL:

BEASLEY, ALLEN, CROW, METHVIN,
  PORTIS & MILES, P.C.
218 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103-4160
(334) 269-2343 (Telephone)
(334) 954-7555 (Facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to all counsel of record as shown below on this the 3rd day of January 2006.

/s/ L. Boone
_____
OF COUNSEL

Gregory A. Brockwell
Brett A. Ross
Carr, Allison, Pugh, Howard, Oliver & Sisson, P.C.
100 Vestavia Parkway, Suite 200
Birmingham, AL 35216