# Exhibit 4 to Plaintiff's Supplemental Opposition to Defendant Benton Express, Inc.'s Motion for Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

| | | |
|---|---|---|
| HAZEL M. ROBY, as Administratrix of the Estate of RONALD TYRONE ROBY, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO.: 2:05CV494-T |
| BENTON EXPRESS, INC., et al, | ) ) ) | |
| Defendants. | ) | |

## DEFENDANT'S BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, Benton Express, Inc. and submits the following Brief in

Support of Motion for Summary Judgment:

### I. INTRODUCTION

This case arises from a motor vehicle accident on April 11, 2005, in which a Benton

Express tractor-trailer driven by Craig Stephens collided with a car driven by Ronald Roby.

Both men were killed in the accident. The Plaintiff's original Complaint simply stated a claim for

vicarious liability against Benton Express for the actions of its purported employee, Craig

Stephens. In her "First Amended Complaint," the Plaintiff has also alleged that Benton Express

was negligent and wanton for not having a communication and tracking system in place which

allegedly would have allowed the company to have communicated with and located Mr.

Stephens prior to the accident. Benton Express has denied that Craig Stephens was acting as

its employee at the time of the accident and has denied that it is liable for the accident in any

other way.

1

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a motion for summary judgment, the court must view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. Swain v. Hillsborough County School Bd , 146 F.3d 855, 857 (11th Cir. 1998).

The movant seeking summary judgment has the initial burden of showing that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Once the moving party meets that burden, the non-moving party must set forth specific facts demonstrating that there is a genuine issue of fact for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986). A genuine issue of material fact exists for trial if a reasonable jury could return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

To avoid an adverse ruling on a motion for summary judgment, the non-moving party "may not rest upon the mere allegations or denials of [their] pleadings." Fed. R. Civ. P. 56(e). Nor may the non-moving party defeat a summary judgment motion by simply providing a mere "scintilla" of evidence. Burger King Corp. v. Weaver, 169 F.3d 1310, 1321 (11th Cir. 1999). Instead, there must be a genuine factual conflict in the evidence to support a jury question. Burton v. City of Belle Glade, 178 F.2d 1175, 1187 (11th Cir. 1999).

### III. STATEMENT OF FACTS [1]

1.      Benton Express, Inc., is a less-than-load ("LTL") motor carrier that operates in several southeastern states. The company has numerous terminals located throughout its area of operation. Its operation includes "road" drivers who drive tractor-trailers between the company's terminals. The operation also includes "city" drivers who pick up and deliver goods for customers in the areas around each of the company's terminals. [See Affidavit of Boyd "Don" Hammonds, ¶¶ 3-5, a copy of which is attached hereto as Exhibit 1].

2.      Benton Express gives its drivers an "Employee Handbook." [Exhibit 1, ¶ 6].

3.      Part of the Handbook lists various "Inexcusable Offenses" for which the penalty is "Immediate Discharge." [See Benton Express Employee Handbook, excerpts of which are attached hereto as Exhibit 2]. Some of these offenses are: stealing; drinking and/or being intoxicated at work; allowing unauthorized persons to ride in a company truck; immoral conduct while on the clock; deviation from route to make unauthorized stops; unexcused absence; and taking company property off the premises without permission. [Id.].

4.      Craig Stephens was hired as a truck driver for Benton Express on or about January 26, 2004. [Exhibit 1, ¶ 7]

5.      Near the beginning of his employment, Craig Stephens signed a receipt acknowledging that he received a copy of the Benton Express Employee Handbook. [See Receipt, a copy of which is attached hereto as Exhibit 3].

6.      After his hire, Craig Stephens worked as a "road" driver for Benton Express based out of the company's Pensacola, Florida, terminal. [Exhibit 1, ¶ 8].

---

[1] Defendant presents the facts in a light most favorable to the Plaintiff as required for summary judgment. Defendant adopts this version of the facts only for purposes of summary judgment and specifically denies that Plaintiff's version of the facts is correct or that Defendant is in any way liable in this matter.

7.    Prior to the events that are the subject of this case, Mr. Stephens was considered a good employee by his supervisor, Glenn Clark. [Deposition of Glenn Clark, p. 30:12-13, excerpts of which are attached hereto as Exhibit 4].

8.    As a "road" driver, Craig Stephens made round-trips between the Benton Express terminals in Pensacola, Florida, and Tallahassee, Florida, and between the Benton Express terminals in Pensacola, Florida, and Atlanta, Georgia. [Exhibit 1, ¶ 9].

9.    On Friday, April 8, 2005, Craig Stephens was scheduled to make a "run" to Atlanta for Benton Express. [Exhibit 1, ¶ 10]. The point of origin for the trip was Benton Express' Pensacola terminal. [Exhibit 1, ¶ 10; Defendant's Responses to Plaintiff's First Interrogatories, Nos. 24-25, a copy of which is attached hereto as Exhibit 5]. Mr. Stephens was to drive from Pensacola directly to the company's Atlanta terminal. [Exhibit 5, Nos. 24-25]. Once in Atlanta, he was to drop off his trailer, pick up a new trailer, and return directly to the Pensacola terminal. [Id.].

10.    On the April 8 run, Mr. Stephens departed Pensacola at approximately 6:00 p.m. CDT and arrived in Atlanta as expected. [Exhibit 4, p.31, ln 8 -10; Exhibit 1, ¶ 11]. He departed from the Atlanta terminal at 12:40 a.m. EDT on Saturday, April 9, 2005. [Deposition of Don Hammonds, p. 226:9-17, excerpts of which are attached hereto as Exhibit 6]. He was on schedule at this point. [Exhibit 1, ¶ 11].

11.    Upon departing the Atlanta terminal, he was supposed to proceed directly to the Pensacola terminal, and he was expected to arrive there sometime in the early morning of April 9, 2005. [See Defendant's Responses to Plaintiff's Second Requests for Admissions, No. 8, a copy of which is attached hereto as Exhibit 7; Exhibit 1, ¶ 12].

12.    At approximately 12:00 p.m. on April 9, 2005, it was discovered by the manager of Benton Express' Pensacola terminal, Glenn Clark, that Mr. Stephens had not arrived at the Pensacola terminal as expected. [Exhibit 4, p. 63:4 - p. 66:11].

4

13.    At that point, Mr. Clark began attempting to determine whether there were any reasons for Mr. Stephens' delay, such as an accident or maintenance problem. [Exhibit 4, p. 65:2-15]. The company also checked fuel records for Mr. Stephens' tractor to see if he had made any fuel purchases. [Deposition of David Justice, p. 57:10-16, excerpts of which are attached hereto as Exhibit 8].

14.    During the afternoon of April 9, the company contacted the Florida Highway Patrol and reported Mr. Stephens missing. [Exhibit 4, p. 41:19 - p. 42:1, p. 68:3 - p. 70:21].

15.    After speaking with the Florida Highway Patrol initially, the company called the Georgia State Troopers and the Alabama State Troopers to find out if there were any accidents, road closures, detours, etc., that may have explained Craig Stephens' delay. [Exhibit 4, p. 77:16 - p. 78:8, p. 80:8 - p. 81:5].

16.    After learning that there were no explanations for Mr. Stephens' delay, the Florida Highway Patrol issued a Be On the Look Out ("BOLO") report for Mr. Stephens and the missing tractor-trailer, meaning that, if they found it, the law enforcement authorities would stop the truck and detain its driver. [Exhibit 4, p. 70:13-18; see also BOLO Report, a copy of which is attached hereto as Exhibit 9].

17.    Throughout the weekend that he was missing, the company attempted to contact Mr. Stephens on his company-issued Nextel phone or "walkie-talkie." [Exhibit 4, p. 112:16-23].

18.    By the night of Saturday, April 9, Mr. Stephens' supervisor, Glenn Clark, was very concerned that Mr. Stephens was still missing and decided to take matters into his own hands. At approximately 9:00 that night, Mr. Clark got in his car and began searching for Mr. Stephens along his most likely route. [Exhibit 4, p. 86:17 - p. 90:5]. Mr. Clark drove from Pensacola to a point approximately 15 miles beyond Montgomery on I-85, searching every rest stop, truck stop, and purveyor of diesel fuel along the way. [Id.]. Mr. Clark ultimately became fatigued and returned to Pensacola--continuing to search for Mr. Stephens along the way. [Id.].

5

Mr. Clark arrived back in Pensacola at approximately 4:00 a.m. on Sunday, April 10, having made a round-trip of approximately 360 miles. [Id.]. Mr. Clark did not find Mr. Stephens during this search.

19.    Craig Stephens was still missing on Sunday, April 10, 2005.

20.    Bill Jones is Benton Express' Regional Manager for the State of Georgia, and he is based at the company's Atlanta terminal. [Deposition of Bill Jones, p. 13:22-25, excerpts of which are attached hereto as Exhibit 10].

21.    On Sunday, April 10, Mr. Jones reported the missing tractor-trailer as stolen to the Atlanta Police Department. [Exhibit 10, p. 60:15 - p. 61:13, p. 64:2-5; see also Atlanta Police Department "Incident Report," a copy of which is attached hereto as Exhibit 11].

22.    On Sunday, April 10, Mr. Jones also called the State Troopers of Alabama and Georgia to see if there had been any developments in the search for Craig Stephens. [Exhibit 10, p. 63:18 - p. 64:1]. Mr. Jones understood that the state police of Alabama, Georgia, and Florida had been searching for Mr. Stephens since the day before, and he expected to see some results. [Exhibit 10, p. 65:6-10]. Unfortunately, these law enforcement authorities had no results to report. [Exhibit 10, p. 63:25 - p. 64:1].

23.    Around the middle of the day on Sunday, April 10, Bill Jones decided to go searching for Craig Stephens himself. [Exhibit 10, p. 68:6-19]. Sometime between 1:30 p.m. and 3:00 p.m. that day, Mr. Jones began the search in the Atlanta area. [Exhibit 10, p. 68:20-25]. Mr. Jones started the search at Benton Express' Atlanta terminal and then proceeded along Mr. Stephens' most likely route to Pensacola. [Exhibit 10, p. 69:1 - p. 71:18]. He stopped at every truck stop and purveyor of diesel fuel along the way. [Id.].

24.    When Mr. Jones had made it approximately 40 miles south of Atlanta, he received a phone call from Glenn Clark indicating that telephone contact had been made between Craig Stephens and another Benton Express driver, Garlin McLellan. [Exhibit 10, p.

71:14 - p. 72:11; Exhibit 4, p. 46:20 - p. 47:4]

25.    After learning of this contact, Mr. Jones instructed Glenn Clark to call Craig

Stephens and tell him to stop wherever he was. [Exhibit 10, p. 74:19-23, p. 88:8-19]. By the

morning of Sunday, April 10, Bill Jones had made the decision that he would relieve Mr.

Stephens of duty--assuming he could be found and stopped. [Exhibit 10, p. 109:6 - p. 110:3].

Mr. Jones had been considering this decision since Saturday, April 9, and he had

communicated his intentions to Glenn Clark on Saturday evening. [Exhibit 10, p. 110:2-22]. Mr.

Jones had made the decision that Mr. Stephens would be terminated. In his deposition, Mr.

Jones testified:

> Q.    So even without knowing whether or not he was hijacked
> or ill or some very legitimate explanation for what occurred, your
> [sic] saying that you were going to relieve him of duty means you
> were going to investigate further on whether or not you would
> ultimately terminate him, or does it mean you were going to
> terminate him?
>
> A.    I had been investigating for 24 to 48 hours.
>
> Q.    Got you.
>
> A.    The gentlemen would have been terminated. It would
> have been up to somebody else to decide whether he would have
> a job in the future with Benton Express, because I would have
> terminated him.
>
> . . .
>
> Q.    And based on what you were personally doing in your role
> at Benton Express, based on your experience there and obviously
> the position you hold, you would have felt the decision should be
> termination?
>
> A.    Yes.

[Exhibit 10, p. 116:12 - p. 117:3, p. 117:16-21].

26.    Bill Jones was the Benton Express manager in charge of the situation and had

the authority to stop Craig Stephens, relieve him of duty, and terminate him. [Exhibit 10, p.

88:20 - p. 89:19]. It was his "call." [Exhibit 10, p. 110:23 - p. 111:2].

27.    To assist with relieving Craig Stephens of duty, assuming he could be found and stopped, Bill Jones contacted a Benton Express driver in Atlanta named Barry Weems and asked him to "stand by." [Exhibit 10, p. 81:14 - p. 83:20].  Mr. Jones planned to have Mr. Weems take over Craig Stephens' tractor-trailer and drive it to Pensacola. [Id.].  Mr. Weems was on "stand by" for approximately 45 minutes to an hour. [Id.].

28.    Based on Bill Jones' instruction, Glenn Clark attempted to contact Craig Stephens on his company-issued Nextel phone, but he was unsuccessful. [Exhibit 4, p. 51:4-9, p. 53:20 - p. 54:4].  Because they still were unsuccessful in locating Mr. Stephens, Bill Jones contacted Barry Weems and released him from his "stand by" status. [Exhibit 10, p. 83:8-17].

29.    After this activity, Bill Jones turned around and headed back toward Atlanta. [Exhibit 10, p. 78:11 - p. 79:14].  Mr. Jones continued to search for Mr. Stephens on his way back to Atlanta, and he even retraced his route back to the Atlanta terminal. [Id.].  Mr. Jones concluded his search at approximately 8:30 p.m. [Id.].

30.    In his deposition, Garlin McLellan was asked about his conversation with Craig Stephens that occurred at approximately 5:00 p.m. on Sunday, April 10, 2005. [Deposition of Garlin McLellan, p. 56:5-10, excerpts of which are attached hereto as Exhibit 12].  Mr. Stephens called Mr. McLellan on his "walkie-talkie." [Exhibit 12, p. 57:12-16].  Mr. McLellan recalls their conversation as follows:

> A.    He wanted to know if I could run the Tallahassee run, which was his regular run.
>
> ...
>
> Q.    All right.  Anything else you and Craig talked about?
>
> ...
>
> A.    Yes.  I asked him where he was at.  And he said he was still hung up in Atlanta.

8

...

Q.    And did y'all talk about anything else other than the fact he told you he was still in Atlanta?

A.    Yes.

Q.    And what else did y'all talk about?

A.    I asked him what did he mean by being hung up in Atlanta. And he said that him and his wife had a big argument and he just wanted to show her that he could leave her. And I asked him, well – well, I told him, I said, well, it kind of backfired on you because she has been over here looking for you and she got the terminal manager involved and he had to call the terminal manager in Atlanta and then they had to contact the police to put out a BOLO on him.

Q.    And that's what you told Craig?

A.    Yeah, I told him that and I told him he needed to call Glenn right away and to call his wife and let her know he was all right, and he said that he was staying at his aunt's house in Atlanta.

...

Q.    Okay.

A.    And I told him, well, he needed to call Glenn and he needed to call his wife, because didn't nobody know where he was at. And he said, yeah, okay, I'm going to do that right away. And I said, okay. He said, but my phone's about dead. I said, well, call them right now. And that was the end of our conversation.

[Exhibit 12, p. 58:1 - p. 59:17, p. 62:17 - p. 63:1]. Mr. Stephens used his company-issued

Nextel phone to initiate this conversation with Mr. McLellan. [Exhibit 12, p. 60:1-22].

31.    From his conversation with Mr. Stephens, it was Mr. McLellan's understanding

that the only reason for Mr. Stephens' delay was a dispute with his wife. Mr. McLellan testified

as follows:

Q.    So, the only reason – your understanding of the only reason Craig was delayed was simply because he was trying to make a point to his wife, who you had gathered he was in a dispute with?

9

A.    Yes.

Q    And he was just trying to show her that – you know, that – well, he was just trying to make a point to her, I guess is what you said?

A.    Yes.

Q.    And you – from your communication with him, it had nothing to do with being mad at Benton Express?  From your conversation with Craig, you would agree that it had nothing to do with being mad with Benton Express?

A.    No.

Q.    And from you conversation with Craig, he said nothing bad about Benton Express, did he?

A.    No, he never said anything bad.

[Exhibit 12, p. 64:21 - p. 65:16].

32.    The "run" between Pensacola and Atlanta generally takes about five hours. [Exhibit 12, p. 95:18-23].  Thus, if Craig Stephens had departed Atlanta after his phone conversation with Garlin McLellan, he would have arrived in Pensacola well before midnight on Sunday, April 10.  However, when Mr. McLellan returned to the Pensacola terminal from Tallahassee at approximately 1:00 a.m. on Monday, April 11, Mr. Stephens still had not returned. [Exhibit 12, p. 84:8-12, p. 85:11-14].

33.    Even if Craig Stephens' company-issued Nextel phone was dying or dead, Mr. Stephens had a personal cell phone with coverage through Cingular. [See Phone Records, copies of which are attached hereto as Exhibit 13].  Mr. Stephens made numerous phone calls with his personal cell phone during the 48 hours that he was missing, including one call only an hour prior to the accident that is the subject of this case. [Id.].  However, none of these calls were made to anyone affiliated with Benton Express. [Id.].

34.     Unfortunately, neither Benton Express nor law enforcement authorities were able to find Craig Stephens. On the morning of Monday, April 11, 2005, at approximately 6:05 a.m., Craig Stephens was involved in an accident with a vehicle driven by Ronald Roby. [First Amended Complaint, ¶¶ 11, 12, 18]. The accident occurred at the intersection of Interstates 85 and 65 in Montgomery, Alabama. [Id.].

35.     Both Mr. Stephens and Mr. Roby were killed in the accident.

36.     The accident occurred approximately 48 hours after Mr. Stephens should have arrived at the Benton Express terminal in Pensacola. [Exhibit 1, ¶ 12].

37.     Like all motorists, truck drivers have minor delays sometimes, for reasons such as illness, traffic jams, and maintenance problems. [Exhibit 6, p. 114:8 - p. 116:20]. However, as stated by Don Hammonds, "There's a lot of difference in two days' delay and a couple hours' delay." [Exhibit 6, p. 177:18-19].

38.     Prior to the accident, Benton Express had no indication or reason to believe that an accident was going to occur. [Exhibit 6, p. 40:10 - p. 41:18].

39.     The Plaintiff alleges that Craig Stephens negligently and wantonly caused the accident. [First Amended Complaint, ¶¶ 18, 23].

40.     The Plaintiff alleges that Craig Stephens was an agent of Benton Express and was acting within the line and scope of his employment. [First Amended Complaint, ¶ 15].

41.     The Plaintiff alleges that Benton Express "negligently and wantonly failed to enforce, train, supervise, monitor, implement policies and procedures that would allow it to communicate with its driver/employee, Craig Anthony Stephens." [First Amended Complaint, ¶ 26]

42.     The Plaintiff alleges that Benton Express was "negligent and wanton for failing to equip its vehicles with equipment that would allow it to track or locate its tractor-trailers or drivers." [First Amended Complaint, ¶ 27].

## IV.  ARGUMENT

The Plaintiff has attempted to state three claims against Benton Express for the accident between Craig Stephens and Ronald Roby occurring on April 11, 2005.  Although the claims stated by the Plaintiff are far from clear, it appears these claims are: (1) Benton Express is vicariously liable under the doctrine of *respondeat superior* for the alleged negligence and wantonness of its purported agent, Craig Stephens; (2) Benton Express was negligent and wanton for not having a communication system in place which allegedly would have allowed the company to have communicated with Mr. Stephens; and (3) Benton Express was negligent and wanton for failing to have tracking systems on its trucks that allegedly would have allowed the company to have located Mr. Stephens prior to the accident.  Regardless of whether Craig Stephens caused the accident that is the subject of this case, all of the Plaintiff's claims against Benton Express are due to be dismissed via summary judgment.

**A.     BENTON EXPRESS IS NOT LIABLE FOR THE ACTIONS OF CRAIG STEPHENS DUE TO MR. STEPHENS' DEVIATION FROM AND ABANDONMENT OF HIS EMPLOYMENT.**

To recover against a defendant under the theory of *respondeat superior*, the plaintiff has the burden to "establish the status of employer and employee—master and servant—and to establish that the act was done within the scope of the employee's employment." Hendley v. Springhill Memorial Hospital, 575 So. 2d 547, 550 (Ala. 1990).  Accordingly, the "determinative question becomes whether the act committed by the employee was done while acting within the line and scope of his employment." Id.  The Alabama Supreme Court has articulated a test by which to determine whether an employer should be held liable for the actions of an employee:

> The test is the service in which the employee is engaged.  The rule which has been approved for determining whether certain conduct of an employee is within the line and scope of his employment is substantially that if an employee is engaged to perform a certain service, whatever he does to that end, or in furtherance of that employment, is deemed by law to be an act done within the scope of the employment.

> The conduct of the employee, to come within the rule, must not be
> impelled by motives that are wholly personal, or to gratify his own
> feelings or resentment, but should be in promotion of the business
> of his employment.

East Alabama Behavioral Medicine, P.C. v. Chancey, 883 So. 2d 162, 167 (Ala. 2003)(quoting

Solmica of Gulf Coast, Inc. v. Braggs, 285 Ala. 396, 401, 232 So. 2d 638, 642-43 (1970)). The

Court stated that, "under Alabama law, an employer is not liable under the doctrine of

respondeat superior when the employee acts for his or her own personal gain and not in

furtherance of the employer's business." Id. (citations omitted). This is "an exception to

vicarious liability that precludes recovery from an employer when the employee acts on wholly

personal motives that would not 'reasonably further' the employer's business." Id. at 168

(citations omitted).

The fact that an employee's deviation or abandonment of his employment is only

temporary is not dispositive. The Alabama Supreme Court has held:

> when a servant has abandoned his employment by the master,
> the mere fact that he is returning thereto does not of itself
> reinstate the servant in the master's employment and establish
> the engaging in the master's business so as to engage the master
> to liability and for damages resulting after the abandonment and
> before return is an accomplished fact.

Land v. Shaffer Trucking, Inc., 290 Ala. 243, 247, 275 So. 2d 671, 675 (1973).

Alabama law in this area is perhaps best explained by the Alabama Supreme Court in

the case of Bell v. Martin, 241 Ala. 182, 1 So. 2d 906 (1941), in which the Court analyzed and

discussed numerous cases from both Alabama and other jurisdictions in reaching its holding.

In that case, the Court wrote as follows:

> [W]here there is an abandonment of the master's business for
> personal reasons of the servant or agent in question, the
> employment is suspended and the master is not liable for the
> negligence of such agent or servant during such suspended
> employment and during the time of his departure from the
> master's business. Each case must be ruled from its own peculiar

13

> or particular facts, and when a servant has abandoned his
> employment by the master, the mere fact that he is returning
> thereto, does not of itself reinstate the servant, agent or agency in
> his master's employment and establish the engaging in the
> master's business so as to subject the master to liability and for
> damages resulting after the departure and before the return is
> accomplished as of fact.
>
> ...
>
> In cases where the deviation is slight and not unusual, the court
> may, and often will, as matter of law, determine that the servant
> was still executing his master's business. So, too, where the
> deviation is very marked and unusual, the court in like manner
> may determine that the servant was not on the master's business
> at all, but on his own.
>
> ...
>
> Of course a servant is not required to return by air line from an
> errand performed, nor must he adopt the shortest practicable
> route. A detour in reason does not change his status, but an
> abrupt and unmistakable departure for some purpose of his own
> does.

Bell v. Martin, 241 Ala. 182, 184-87, 1 So. 2d 906, 907-10 (1941)(internal citations and

quotations omitted). The Court adopted the Texas case of Southwest Dairy Products Co. v. De

Frates, quoting it as follows:

> The [servant] owed the duty to his master of returning the car and
> resuming his employment and, while returning to the zone of his
> employment, he was discharging that duty, but that fact does not
> fix liability against the master. It was the [servant's] own wrong in
> driving away that created the duty to return, and in returning he
> was but undoing that wrong. The return was referable to, and an
> incident of the departure. He was no more engaged in his
> master's business while returning to, than while departing from his
> path of duty.

Id. at 187, 1 So. 2d at 909-10. The Court further stated:

> The line of reasoning that goes through the cases is that when the
> action of the driver is in execution of a contract of hire, although
> he executes the same by methods or ways of his own and
> although he adopts a different or circuitous route, then the acts
> are in the line and scope of his authority, but where there has
> been an abandonment and the driver must return to the place of

> such abandonment before he can commence carrying out what
> he was hired to do, then to such extent the employment is
> suspended, *both on the outgoing and return trip*. Such is the
> result in this case, because the duty to return the truck with the
> freight thereon is an incident to the wrong of abandoning the path
> of duty in the first place.

Id. at 186, 1 So. 2d at 909.

The question of *respondeat superior* is generally one for the jury. Land, 275 So. 2d at

674-75. However, where there is a "marked and unusual deviation" from the scope of

employment, the issue is one for the court to decide. Id. at 674; Hendley, 575 So. 2d at 550.

There can be no legitimate question that Craig Stephens abandoned and deviated from

his employment during the weekend prior to the accident that is the subject of this case. The

undisputed evidence shows that he should have arrived in Pensacola at approximately 6:00

a.m. on Saturday, April 9, 2005. The undisputed evidence further shows that, rather than

performing his job duties as he should have, Mr. Stephens stopped in Atlanta for 48 hours. In

making this unauthorized delay, Mr. Stephens' sole motivation was to prove a point to his wife.

Specifically, he wanted to prove to his wife that he could leave her because of a "big argument"

they had before the trip began. Clearly, Mr. Stephens' reasons for the abandonment of his

employment were entirely personal.

Mr. Stephens' deviation from his route was a violation of company policy. In the Benton

Express Employee Handbook, one of the "Inexcusable Offenses" for which a driver may be

immediately discharged is "deviation from route to make unauthorized stops." The evidence is

undisputed that Mr. Stephens stopped (or did something other than run his route) for 48 hours

without authorization. As demonstrated by the testimony of Bill Jones, the decision had been

made to terminate Mr. Stephens because of this deviation at least 24 hours prior to the

accident. In addition to his unauthorized stop of 48 hours, Mr. Stephens also had an

unexcused absence. He was scheduled to make the Tallahassee run on Sunday, April 10.

15

However, due to his unexcused absence, Garlin McLellan was required to cover the run. This, too, was an inexcusable offense for which immediate discharge would have been an appropriate remedy.

Mr. Stephens' deviation from his route was extremely unusual. It was so unusual that it caused Benton Express to have the Atlanta Police Department, the Florida Highway Patrol, the Georgia State Troopers, and the Alabama State Troopers all search for Mr. Stephens and the missing tractor-trailer. The deviation was so unusual that it caused two Benton Express managers, Glenn Clark and Bill Jones, to spend a combined approximate 13 hours actively searching for Mr. Stephens and the missing truck. The deviation was so unusual that it caused Benton Express to have another of its drivers, Barry Weems, to "stand by" and be ready to take over the truck in the event that Mr. Stephens was found and stopped. Finally, the deviation was so unusual that it caused Benton Express to decide to terminate Mr. Stephens' employment if he was ever found and stopped.

It is expected that the Plaintiff will argue that, although he had deviated from his employment, Mr. Stephens had returned to the scope of his employment at the time of the accident because he was driving along the customary route between Atlanta and Pensacola. Under the clearly established law of the State of Alabama, this argument must fail. Viewing the facts in a light most favorable to the Plaintiff, and therefore assuming that Mr. Stephens was returning the truck and freight to Pensacola at the time of the accident, Benton Express still cannot be liable under *respondeat superior*. As established in the case of <u>Bell v. Martin</u>, the mere fact that a servant is returning to his employment after abandoning it does not reinstate the employment and subject the master to liability. At the time of the accident, Mr. Stephens was in possession of the property of Benton Express and its customers. He had a duty to return that property to Benton Express. The fact that he was attempting to return the property 48 hours late was solely the result of his deviation from employment for personal reasons. As

established by Bell v. Martin, "It was [his] own wrong in driving away that created the duty to return, and in returning he was but undoing that wrong." As a matter of law, Craig Stephens was "no more engaged in his master's business while returning to, than while departing from his path of duty" because "the duty to return the truck with the freight thereon is an incident to the wrong of abandoning the path of duty in the first place."

Craig Stephens abandoned and deviated from his employment for purely personal reasons and in clear violation of Benton Express' policy. This deviation was marked and unusual. Even if Mr. Stephens was attempting to return Benton Express' truck and freight at the time of the accident, the fact that he was doing so 48 hours late was the result of his own wrongdoing. Under the law of Alabama established in Bell v. Martin and the other cases cited above, Benton Express cannot be liable for Mr. Stephens' actions as a matter of law. This matter is ripe for decision on summary judgment, and the Plaintiff's claims for *respondeat superior* liability are due to be dismissed.

**B.    BENTON EXPRESS IS NOT LIABLE TO THE PLAINTIFF ON HER CLAIMS FOR THE COMPANY'S ALLEGED NEGLIGENT AND WANTON FAILURE TO HAVE A COMMUNICATIONS SYSTEM AND FAILURE TO HAVE A TRACKING SYSTEM.**

In her First Amended Complaint, the Plaintiff has alleged that Benton Express was negligent and wanton for (1) not having a communication system in place which allegedly would have allowed the company to have communicated with Craig Stephens[2], and (2) failing to have tracking systems on its trucks that allegedly would have allowed the company to have located Mr. Stephens prior to the accident.

---

[2] This is a paraphrase of all claims the Plaintiff attempts to state in Paragraph 26 of her First Amended Complaint by alleging that Benton Express "negligently and wantonly failed to enforce, train, supervise, monitor, implement policies and procedures that would allow it to communicate with its driver/employee, Craig Anthony Stephens."

1.    Benton Express Was Under No Legal Duty To Have A Communications
      System Or A Tracking System.

On November 11, 2005, Defendant filed its "Motion for Partial Dismissal" (Doc. No. 27)

regarding these claims.  This motion is still pending before the Court, and Defendant hereby

incorporates the motion, including its arguments and exhibits, as if fully set out in this Brief in

Support of Motion for Summary Judgment.

2.    Assuming, *Arguendo,* That Benton Express Had A Legal Duty To Have A
      Communications System, There Is No Evidence That The Company
      Breached That Duty.

It has long been established under Alabama law that there can be no actionable

negligence without the breach of a legal duty.  Harris v. Brewer, 487 So. 2d 252, 254 (Ala.

1986); Bryant v. Morley, 406 So. 2d 394, 396 (Ala. 1981); Alabama G.S. R.R. v. Green, 276

Ala. 120, 127, 159 So. 2d 823, 830 (1964); Southern R. Co. v. Quillen, 250 Ala. 536, 541, 35

So. 2d 193 (1948); Eades v. American Cast Iron Pipe Co., 208 Ala. 556, 559, 94 So. 593, 594

(1922).  Because the Plaintiff has failed to produce any evidence that Benton Express failed to

have a system in place to communicate with Craig Stephens, summary judgment is due to be

entered against the Plaintiff on this claim.

It is undisputed that Craig Stephens had a company-issued Nextel cell phone or "walkie-

talkie" with him during the time that he was missing prior to the accident.  In fact, it is with that

phone that Mr. Stephens made contact with Garlin McLellan on the evening of Sunday, April 10,

2005.  However, despite the company's best efforts, Mr. Stephens would not answer the

numerous calls made to him by the company at all other times that he was missing.  It is

commonly understood that telephones, CB radios, and walkie-talkies require at least two willing

participants to allow two-way conversation.  A person cannot be forced to answer a call.

Assuming that Benton Express had a duty to provide Mr. Stephens with a means of

communication, it fulfilled that duty by providing him with the Nextel phone.  The company

18

cannot be blamed for Mr. Stephens' apparent refusal to respond to the calls the company made to that phone.

3.    **Assuming, *Arguendo*, That Benton Express Breached Legal Duties To Have A Communications System And To Track Its Trucks, There Is No Evidence That Such Breaches Were The Proximate Cause Of The Accident.**

There is no evidence that either the failure of Benton Express to have a communications system or the failure of Benton Express to "track" its trucks was the proximate cause of the accident that is the subject of this case. The Alabama Supreme Court has repeatedly held that a negligent act or omission is the proximate cause of an injury if the injury "is a natural and probable consequence of the negligent act or omission which an ordinarily prudent person ought reasonably to foresee would result in injury." Jones v. BP Oil Co., Inc., 632 So. 2d 435, 441 (Ala. 1993)(quoting Vines v. Plantation Motor Lodge, 336 So. 2d 1338, 1339 (Ala. 1976)). Stated another way, proximate cause is "an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred." Ex parte Wild Wild West Social Club, Inc., 806 So. 2d 1235, 1240 (Ala. 2001)(quoting Thetford v. City of Clanton, 605 So. 2d 835, 840 (Ala. 1992)); Dillard v. Pittway Corp., 719 So. 2d 188, 192 (Ala. 1998); Jamison, Money, Farmer & Co., P.C. v. Standeffer, 678 So. 2d 1061, 1066 (Ala. 1996); Byrd v. Commercial Credit Corp., 675 So. 2d 392, 393 (Ala. 1996). Proximate cause is an essential element of both negligence and wantonness claims. Martin v. Arnold, 643 So. 2d 564, 567 (Ala. 1994). Although the question of proximate cause is generally one for the jury, in cases such as this, where "the facts are such that all reasonable men must draw the same conclusion, the question of proximate cause then becomes one for the courts." Thompson v. Gaier, 512 So. 2d 775, 776 (Ala. 1987). Thus, the issue of proximate cause is ripe for decision by the Court at this time.

If the Plaintiff's claims are to be believed, this accident was caused by the bad--even reckless--driving of Craig Stephens. Yet, in Count Three of the First Amended Complaint, the

19

Plaintiff also alleges that the accident was caused by Benton Express' failure to have a communications and tracking system. Assuming that Benton Express did not have such systems, and assuming that its failure to have such systems was negligent and wanton, the Plaintiff's claims still must fail.

Craig Stephens drove trucks for Benton Express for more than a year prior to the accident that is the subject of this case. In that time, he had no accidents--despite the fact that, according to the Plaintiff's allegations, he apparently was driving without a communications or tracking system. As Don Hammonds testified, the company had no reason to believe that an accident was going to happen on this trip. It is beyond comprehension how the absence of those systems could be said to be the proximate cause of an accident. Even if a trucking company was in constant communication with its drivers, and even if it tracked every move of its trucks, accidents would still happen. Motor vehicle accidents can be the result of several factors, including driver error, mechanical failure, and road conditions. However, they cannot be said to be the result of satellites and radios.

The Plaintiff has produced no evidence to show that the accident was a "natural and probable consequence" of Benton Express' alleged failure to have communication and tracking systems. The Plaintiff also has produced no evidence to show that Benton Express "ought reasonably to have foreseen" that the absence of communication and tracking systems would result in this accident. There simply is no evidence of proximate cause, and summary judgment is due to be entered against the Plaintiff on these claims.

## V. CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Defendant Benton Express moves the Court to enter a summary judgment in Defendant's favor on all of the Plaintiff's claims.

Respectfully submitted,

s/ Gregory A. Brockwell
BRETT A. ROSS (ASB-6771-O76B)
GREGORY A. BROCKWELL (ASB-9949-R49B)

Attorneys for Defendant Benton Express, Inc.

**OF COUNSEL:**

CARR ALLISON
100 Vestavia Parkway
Birmingham, AL 35216
(205) 822-2006
(205) 822-4058 (Direct Facsimile)
E-mail: bar@carrallison.com
        gab@carrallison.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following on this the 23rd day of November, 2005:

Jere L. Beasley
Labarron N. Boone
Julia A. Beasley
BEASLEY, ALLEN, CROW,
  METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
P.O. Box 4160
Montgomery, AL 36103-4160

s/ Gregory A. Brockwell
Of Counsel