# Exhibit 7 to Plaintiff's Supplemental Opposition to Defendant Benton Express, Inc.'s Motion for Summary Judgment

```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF ALABAMA
                          NORTHERN DIVISION
```

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

HAZEL ROBY, as Administratrix
of the Estate of RONALD TYRONE
ROBY, Deceased,

        Plaintiff,

VS.                                      CIVIL ACTION NUMBER
                                        2:05CV494-B

BENTON EXPRESS, INC., et al.,

        Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

       The testimony of GLENN E. CLARK, JR.,
taken at Bozeman, Jenkins & Matthews, 114
East Gregory Street, Pensacola,
Florida, on the 5th day of October, 2005,
commencing at approximately 2:15, o'clock,
p.m.

1   A           To the best of my knowledge, no.

2   Q           Is one of the things -- do y'all ever
3   talk about the importance of customer satisfaction,
4   talk about keeping your customers happy, at any of
5   these meetings?

6   A           Yes, sir.

7   Q           Have y'all ever talked about whether or
8   not it's important to deliver products on time?

9   A           It's very important.

10  Q           Is that one of Benton's mottos that they
11  have, that they promise good, timely delivery if you
12  choose them?  Is that a selling point of Benton
13  Express, that we are -- will provide you with timely
14  delivery?

15  A           That's correct.

16  Q           And do you know if Benton Express
17  advertises that they have the latest in technology
18  concerning tracking and making sure deliveries are on
19  time?

20  A           Yes, we -- we can track on-time
21  deliveries.

22  Q           Tell me how -- well, tell me what's the
23  latest in technology that you all have in place to

1  track deliveries.
2  A          Just our local computer system with --
3  the customer provides a freight bill, or if he does
4  not have that, he provides other information and we
5  can find the freight bill number for him and can look
6  that shipment up for him and tell him where it is.
7  Q          Okay. Tell me, once -- for example, when
8  Craig Stephens went to Atlanta and picked up the load
9  in Atlanta, once he left that terminal, did y'all
10 have any method of tracking his whereabouts through
11 this computer system you're talking about?
12 A          Not this one, no.
13 Q          Did y'all have any method on any computer
14 system that we haven't talked about yet that would
15 allow you all to track the goods on the trailer that
16 Craig Stephens was hauling once he left -- once he
17 picked the load up in Atlanta?
18 A          Would you -- could you state that again?
19 Q          Yes. Once Craig Stephens picked up the
20 load at the Atlanta terminal and signed out, did
21 y'all have any way to track those goods that he was
22 hauling?
23             MR. BROCKWELL: You mean prior to them

```
 1   Q        That Garlin had talked to Craig?
 2   A        Yes.
 3   Q        And that Garlin had told you that Craig
 4   was on his way back?
 5   A        Right.  That's the information at that
 6   time.
 7   Q        And I guess at that time, since Garlin
 8   had relayed to you that Craig was on his way back,
 9   that you -- that you -- were you, would it be fair to
10   say, somewhat relieved knowing that we had located
11   the driver and he had told Garlin he was on his way
12   back?
13   A        Yes, that was -- that was a correct
14   assessment.  It was -- at least I knew where he was,
15   or at least I thought I knew where he was.
16   Q        Right.  And relieved to know, hey, we
17   finally located him, he's alive; is that right?
18   A        That's correct.
19   Q        No harm had come to him?
20   A        That's correct.
21   Q        And that he was on his way back?
22   A        Yes.
23   Q        So, would it be fair to say, then, that
```

1    it's possible you did or are you saying that you
2    recall calling him two or three times?
3    A            I recall trying to call him several
4    times.
5    Q            Okay. And anything else you would have
6    done on that Sunday night?
7    A            Just -- just anticipated his -- seeing
8    him first thing in the morning.
9    Q            Okay. All right. At that point, in
10   light of the good news Garlin had told you, he had
11   been found and was on his way back, I gather you
12   anticipated that his truck and he would be back in
13   Pensacola on Monday morning?
14   A            That's correct.
15   Q            And I'm sure at that time you were glad
16   to know that one of your employees, who you
17   considered a good, reliable employee, was safe?
18   A            Yes.
19   Q            And you were -- I guess you were glad to
20   know that no harm had come to him, for example, like
21   somebody had tried to rob him or something?
22              MR. BROCKWELL:   I object to the form.
23   A            Yes, sir.

1   identification you had on the truck?

2   A          Yes, sir.

3   Q          And you would have asked them to please

4   -- if they spot him, to please have him immediately

5   contact you, his terminal manager?

6   A          That would have been as a result of the

7   report that they were going to send out, yes.  They

8   would call me.  He would call me.

9   Q          Right.  Do you recall if it was discussed

10  that if you all -- if y'all spot Craig Stephens, I'll

11  -- delay him for you, that if you spot him, stop him

12  and have him immediately call?

13  A          I had a report that was to be sent out.

14  They call it a BOLO report, be on the lookout.  And I

15  asked her, I said, if you pull him over, what do you

16  do?  And the FHP, the Florida Highway Patrol office,

17  said that we will have him call you, we will detain

18  him and have him call you.

19  Q          And is that what -- and isn't that what

20  -- and you wanted that to happen?

21  A          Yes, sir, I did.

22  Q          And you wanted that to happen because you

23  wanted -- you wanted to locate Craig Stephens?

1  A            That's correct.

2  Q            And you wanted to find out if he was

3  harmed, injured or whatever the delay was?

4  A            That's correct.

5  Q            You never said anything like Craig

6  Stephens is a bad employee to the authorities, did

7  you?

8  A            I did not.

9  Q            You never told them anything like he had

10 a history of drug abuse or anything like that, did

11 you?

12 A            I did not.

13 Q            Never told them we had any concerns of

14 him being a bad employee who might try to steal our

15 equipment, did you?

16 A            No.

17 Q            And you never told them to arrest him

18 because we think he has stole our equipment, did you?

19 A            No.

20 Q            And that was no?  Did you say no?  I'm

21 sorry, I didn't hear you.

22 A            No.  You're correct, no.

23 Q            And what your concern was is you wanted

```
1    to locate him to make sure he was safe and that he
2    was ultimately going to come back with the Benton
3    Express equipment and the goods?
4    A         That's correct.
5    Q         Have you ever heard of a trucking company
6    called J.B. Hunt?
7    A         Yes, sir, I have.
8    Q         Swift?  Swift Trucking?
9    A         Yes, sir.
10   Q         Snyder International?
11   A         Yes, sir.
12   Q         Landstar?
13   A         Yes.
14   Q         Roadway?
15   A         Yes.
16   Q         Yellow?
17   A         Yes.
18   Q         Copps?
19   A         I'm sorry?
20   Q         I think it's C-O-P-P-S.  Garlin told me
21   about them.
22   A         I'm unaware of them.
23   Q         Okay.  What about JVL?
```

```
 1   A          No, sir.  He specifically asked me the
 2   route and he said, we have no reports of any
 3   accidents, detours, road closures, or anything that
 4   would be hindering traffic.  The traffic on that lane
 5   was open.
 6   Q          Tell me how -- did you know Craig
 7   Stephens' route at the time you called the Georgia
 8   authorities?
 9   A          Yes, sir, I did.
10   Q          And how did you know his route?
11   A          He would have gone from Pensacola using
12   U.S. Highway 29, he would have gone to Century and
13   taken Highway 113 North to Interstate 65.  He would
14   have got on Interstate 65 at Flomaton, proceeded to
15   Montgomery on 65, where he would have taken
16   Interstate 85 on into Atlanta.
17   Q          And how would you have known that was --
18   that's the route Craig Stephens took?
19   A          That's the most direct route.
20   Q          All right.  I guess is it fair to say
21   that you can't -- you can't specifically sit here
22   today and say you know he went that way, but that's
23   the way you assumed he went because that was the most
```

```
 1   direct route?
 2   A          That's the most -- that's the traveled
 3   pay route.
 4   Q          When you say that's the traveled pay
 5   route, what do you mean by that?
 6   A          That's just the way the miles are
 7   figured, you know, from Pensacola to Atlanta.  That's
 8   the way he -- you know, that's the way he would have
 9   gone.
10   Q          When you say the pay route, that's the
11   amount you all would have paid even if he had took
12   another route that was maybe longer?
13   A          That's correct.
14   Q          And so, you all would have -- who goes
15   about determining the pay route?  How is that
16   determined?
17   A          I'm unfamiliar with who does that.
18   Q          Don't know?
19   A          No, sir.
20   Q          But is there, for example, a pay route
21   from the Pensacola to Tallahassee run that Craig also
22   made?
23   A          Well, there's, you know, just only one
```

```
 1  driver?
 2              MR. BROCKWELL:  I object to the form.
 3              You can answer if you know what anyone
 4         would think.
 5  A         I don't know what -- exactly what you're
 6  trying -- what you're asking me.
 7  MR. BOONE:
 8  Q         Okay.  I'm asking you, does that sentence
 9  you just read apply to a line-haul driver?
10  A         Yes.
11  Q         Okay.  And what do you consider
12  maintaining regular communications?  Is it defined
13  anywhere in this document?
14              MR. BROCKWELL:  I'm going to object to
15         the form.  I think you're just asking two
16         separate questions there.
17  MR. BOONE:
18  Q         Okay.  Let me restate the question again.
19  I think that's right.  Is -- is regular communication
20  defined anywhere in this document?
21  A         I'm unfamiliar with it.
22  Q         Okay.  So, there's nothing you can point
23  to me that defines regular communication, is it?
```

1   A          Not specifically.

2   Q          Is it anything regular communication
3   means to you?  As the terminal manager, what do you
4   consider regular communication?

5   A          Only on an as-needed problem basis.  If a
6   problem arises, he calls.

7   Q          Do you have any knowledge -- any reason
8   why if that's what was intended by this sentence, it
9   just didn't say in case of emergency?

10  A          I have no knowledge of that.

11  Q          You would agree with me, with basic
12  skills, that clearly don't require a master's degree,
13  as you have, that if you wanted to say in case of an
14  emergency call, that could have easily been stated,
15  couldn't it?

16             MR. BROCKWELL:  Object to the form.

17  A          Possibly so.

18  MR. BOONE:

19  Q          And what -- what in the world leads you
20  to interpret regular communication to mean only in
21  case of emergency?

22             MR. BROCKWELL:  Object to the form.

23  A          Well, the driver would call if he had a

```
 1   do?
 2   A          Yes.
 3   Q          And is that something you enforce?
 4   A          Yes.
 5   Q          But that is not anything that you enforce
 6   as it relates to line-haul drivers?
 7   A          That's correct.
 8   Q          I'm sorry.  You may have answered.  I'm
 9   sorry.  I didn't hear.
10   A          Yeah.
11   Q          You do not require line-haul drivers to
12   call in every hour?
13   A          That's correct.
14   Q          I seen a sheet called a daily log trip.
15   Does line-haul drivers ever fill those sheets out?
16              MR. BROCKWELL:  Hey, do you have a
17        Bates number on that, Labarron?
18              MR. BOONE:  It may be in there.
19        Madam Court Reporter, do you see a
20        sheet in there that's called a daily log
21        trip?
22              THE COURT REPORTER:  Is that it?
23              MR. BOONE:  At the top of it?
```

```
 1   A          Yes, sir.  Yes, sir.  Every day.
 2   Q          And do they have instructions telling
 3   drivers when to call in?
 4   A          This says progress number 2 is progress
 5   report every 60 minutes.
 6   Q          Okay.  And is it your position that
 7   document does or does not apply to line-haul drivers?
 8   A          This document does not apply to line-haul
 9   drivers.
10   Q          That document applies to who?
11   A          City drivers.
12   Q          And would the city drivers be the only
13   driver that would fill that document out?
14   A          Yes.
15   Q          Would it ever be any occasion where a
16   line-haul driver would fill that document out?
17   A          No.
18   Q          And you remember I asked you earlier as
19   it relates to Plaintiff's Exhibit 1 with Bates number
20   86, if there is any document that defines regular
21   communication?  Do you recall that?
22   A          Yes.
23   Q          That document there would define regular
```

```
 1    Q         Did he call you and tell you to call the
 2    authorities back and make them more -- a different
 3    type of report than what you had originally made?
 4    A         No, not to my knowledge.
 5    Q         Did he ever call you and say, well,
 6    everybody you've called so far, the authorities, call
 7    them and tell them the vehicle is stolen?
 8    A         No.
 9    Q         I didn't hear you.  I think you said
10    no --
11    A         No.
12    Q         -- but I wasn't sure.
13    A         Yeah.  No.
14    Q         Okay.  Have you ever been arrested for --
15    arrested before?
16    A         No, sir.
17    Q         You have?
18    A         No, sir.
19    Q         Okay.  You ever been convicted of a
20    crime?
21    A         No.
22    Q         Good.  Good.  Good.  We don't want
23    nothing like that.
```