# Exhibit 8 to Plaintiff's Supplemental Opposition to Defendant Benton Express, Inc.'s Motion for Summary Judgment

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE MIDDLE DISTRICT OF ALABAMA
 3                  NORTHERN DIVISION
 4
 5   HAZEL M. ROBY, as Administratrix
 6   of the Estate of RONALD TYRONE ROBY,
 7   deceased,                        ORIGINAL
 8         Plaintiff,
 9                                  CIVIL ACTION FILE
10   vs.
11                                  NO. 2:05CV194-T
12   BENTON EXPRESS, INC., et al.,
13         Defendants.
14
15            VIDEOTAPED DEPOSITION OF
16              GEORGE WILLIAM JONES
17
18              September 26, 2005
19                   2:22 p.m.
20
21            1180 West Peachtree Street
22                   Suite 900
23                Atlanta, Georgia
24
25   Lisa Fischer, CCR-B-1277, RPR, CRR
```

Page 15

1   A. Yes.
2   Q. Did it involve a tractor-trailer?
3   A. No, sir.
4   Q. Tell me, have you ever had a CDL
5   license?
6   A. No, sir.
7   Q. Do you have a valid driver's license?
8   A. Yes, sir.
9   Q. What's your driver's license number?
10  A. I'd have to look and see.
11  Q. Would you also need to look at
12  something for your Social Security number?
13  A. No. I can tell you that. Which one
14  do you want first?
15  Q. Driver's license would be fine.
16  A. 051704418.
17  Q. And Social Security number?
18  A. 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.
19  Q. And have you ever been convicted
20  of -- have you ever been arrested or convicted
21  of a crime?
22  A. Yes.
23  Q. And which one? Arrested --
24  A. Arrested.
25  Q. -- and convicted?

```
 1        A.  No, sir.
 2        Q.  Arrested for what?
 3        A.  DUI.
 4        Q.  And have you been arrested on any
 5   other occasion other than DUI?
 6        A.  No, sir.
 7        Q.  And when did the DUI occur?
 8        A.  When I was 18 years old, which was
 9   nineteen -- 18.
10        Q.  Any other incidents where you may have
11   been arrested or convicted of a crime by --
12        A.  No, sir.
13        Q.  In your time as an operations manager,
14   have you ever had a driver that was delayed?
15        A.  Yes.
16        Q.  Do you have any written rules or
17   policies that apply to your drivers in telling
18   them how much of a delay before they should
19   communicate with you or somebody at the
20   terminal?
21        A.  Concerning line haul or city?
22        Q.  Yeah, line haul.
23        A.  Just if something out of the ordinary
24   occurs.
25        Q.  What's considered "out of the
```

Page 24

1   of the policies and procedures, the normal
2   procedure is to make sure they get that
3   document?
4       A.  Correct.
5       Q.  And in that document, it talks about
6   all drivers should be in regular contact with
7   dispatch.  Does that apply to line haul
8   drivers?
9       A.  The part that you're referring to, no.
10      Q.  Let me direct your attention to
11  Plaintiff's Exhibit 2 and the part I'm talking
12  about.  First, why don't you read for the
13  ladies and gentlemen of the jury what it says
14  under "Scope," what this document is about.
15      A.  "The following security guidelines and
16  procedures apply to all work/load assignments.
17  All drivers and nondriving personnel will be
18  expected to be knowledgeable of and adhere to
19  these guidelines and procedures when performing
20  any load-related activity for Benton Express,
21  Incorporated."
22      Q.  And it says "all drivers," right?
23      A.  The following security guidelines --
24  all work/load assignments, all drivers, and
25  nondriving personnel.

1      Q.   And that would include line haul
2    drivers?
3      A.   Yes.
4      Q.   And city drivers?
5      A.   Yes.
6      Q.   Your understanding, Mr. Craig
7    Stephens, who we're here about, was a line
8    haul driver?  Craig Stephens, you're familiar
9    with that name?
10     A.   I am.  But you made a statement.
11     Q.   Is he a line haul driver?
12     A.   Yes.
13     Q.   And further in this document, it
14   says -- next-to-last bullet, why don't you read
15   that for us.
16     A.   "Drivers are expected to maintain
17   regular communications with the company while
18   in transit.  Any incident of drivers failing to
19   check in when required shall be assumed to be
20   suspicious and highly irregular.  Immediate
21   action shall be taken in such situations."
22     Q.   And from what you just read, doesn't
23   it say that all drivers are expected to
24   maintain regular communication with the
25   company?

Page 26

```
 1         A.  Yes, sir.
 2         Q.  Do you -- is it your -- in your
 3    experience as an operations or regional
 4    manager, does that apply to all drivers?
 5         A.  Yes.
 6         Q.  And what is considered "regular
 7    communication"?
 8         A.  I don't believe I'm qualified to say
 9    regular communications, what that would be.
10    I'd be setting a company policy.
11         Q.  Anybody ever told you what is
12    considered regular communication?
13         A.  No, sir.
14         Q.  Any document ever set out what's
15    considered regular communication, any other
16    document that may have gone with this?
17         A.  For line haul?
18         Q.  Yes.
19         A.  No.
20         Q.  Now, as it relates to regular
21    communications, I'll show you what was marked
22    as Plaintiff's Exhibit 1 to Mr. Weems'
23    deposition.  Can you tell us what kind of
24    document this is.
25         A.  Yes, sir.  It's a city trip log.
```

Page 27

1  Q. And tell me what it says on the top.
2  Does it say "Benton" on the top?
3  A. Yes, sir, it says "Benton."
4  Q. And on the right-hand corner, it says
5  driver daily log trip?
6  A. "Driver daily trip log."
7  Q. And under "A," it has some things.
8  It's telling these drivers of how they should
9  communicate with the company?
10  A. Yes, sir.
11  Q. And one of them, it says any
12  unexpected delays, you should notify, be in
13  touch with them every 15 minutes?
14  A. Correct.
15  Q. And under No. 2, it also said it's
16  expected to be in regular communications every
17  hour?
18  A. Actually, it says progress report
19  every 60 minutes.
20  Q. And that's an hour, right?
21  A. Correct.
22  Q. And is that expected for city drivers?
23  A. Every city driver, yes.
24  Q. Is it expected for line haul drivers?
25  A. No, sir.

1   Q. Line haul drivers do not have -- does
2   it have anything that governs line haul drivers
3   and how often they should communicate?
4   A. Not that I'm aware of.
5   Q. Because this document, from what you
6   told me, applies to city drivers?
7   A. Correct.
8   Q. And it tells how often a city driver
9   should be -- it gives specific examples of what
10  regular communication means?
11  A. Yes, sir.
12  Q. Anything other than this document here
13  that would shed any light on regular
14  communications as it relates to a line haul
15  driver?
16  A. None that I'm aware of.
17  Q. Do some of your line haul drivers also
18  do city work too?
19  A. No, not in Georgia.
20  Q. Do you understand that at some other
21  places like Pensacola?
22  A. No. I can only speak for Georgia.
23  I'm sorry.
24  Q. That's right. I'm going to ask you
25  about what you know. And in answer to me, I

Page 29

1   can't answer nothing but Georgia, that's fine.
2           Do you know of any Benton Express
3   drivers that work out of other terminals such
4   as Pensacola that do line haul driving and city
5   work?
6       A.  I'm not aware of any, no.
7       Q.  And I think you told me you're not
8   aware of anything else that would govern and
9   tell us what is defined as "regular
10  communication" other than what we've looked at
11  in Plaintiff's Exhibit 1?
12      A.  Sorry.  Could you ask me that one
13  more time.
14      Q.  Yeah.  Do you know of any document
15  that would give us any information concerning
16  what is considered regular communications?
17      A.  No, sir.
18      Q.  And it also says, the next bullet is,
19  "Drivers are expected to fully understand this
20  procedure and make every effort to maintain
21  regular contact with dispatch."
22          Have you ever seen that sentence
23  before?
24      A.  Yes.
25      Q.  Do you have any idea how line haul

Page 30

1  drivers -- have any idea how to follow these
2  procedures on communication, frequency of
3  communications?
4       A.  Do I have?
5       Q.  Yes.
6           MR. BROCKWELL:  Object to the form.  I
7       think he just asked you if you know
8       what all your line haul drivers
9       know.  And if you do, please tell
10      us.
11          THE WITNESS:  No, I don't.
12      Q.  (By Mr. Boone)  What I'm asking you,
13  you're responsible for your line haul drivers,
14  right?
15      A.  Yes.
16      Q.  Do you have any idea how they would
17  know?  This just says drivers are expected to
18  fully understand this policy and procedure and
19  make every effort to maintain regular contact
20  with dispatch.
21          My question to you, as the operations
22  manager for the region, is:  Do you have any
23  idea how line haul drivers would know what
24  regular contact with dispatch was?
25      A.  No.

Page 81

1    close to finishing.

2            (Whereupon a recess was taken

3    from 3:36 p.m. to 3:50 p.m.)

4        Q.  (By Mr. Boone)  I talked to, and I

5    believe I'm getting his name right, but

6    Mr. Weems earlier today.  I saw another female

7    here.  Would that have been Sharon Oaks or

8    somebody else with the company?

9        A.  No.

10       Q.  Do you know if any other employee with

11   Benton was here, a female I thought might have

12   been waiting on some of the guys?

13       A.  No.

14       Q.  But nevertheless about Mr. Weems, his

15   understanding and his -- and it will be quick

16   here.  Hopefully what he told me is correct and

17   you can verify it.  But he told me you called

18   him, put him on standby, and told him you might

19   need him to go to Pensacola.  He didn't know

20   anything about the details of why you put him

21   on standby or anything.  45 minutes later you

22   called him and released him to go ahead and run

23   his load to Savannah.

24           And what I'm trying to figure out is:

25   Do you recall anything different or anything

FOSHEE & TURNER COURT REPORTERS

Page 82

1  else that transpired between you and Mr. Weems?
2      A.  No.
3      Q.  Would he have been told anything about
4  specifically why he was on standby?
5      A.  No.
6      Q.  You just held him on standby?
7      A.  Yes.
8      Q.  And would it have been mentioned to
9  him, anything about Craig Stephens specifically
10 being a driver who was late or delayed and
11 you-all were looking for him?
12     A.  No.
13     Q.  Any reason you put Mr. Weems on
14 standby?
15     A.  Yes.
16     Q.  What were you considering using him to
17 do?
18     A.  To drive the unit to Pensacola.
19     Q.  And that was on Sunday, right?
20     A.  Correct.
21     Q.  And was that before or after you heard
22 that Craig Stephens had called in to his
23 terminal?
24     A.  After.
25     Q.  That was after you heard that?

Page 91

1    Q.  (By Mr. Boone)  Right.  You want to be
2    able to locate your tractors?
3    A.  Uh-huh (affirmative).
4    Q.  And the goods they're carrying; is
5    that right?
6    A.  Yes.
7    Q.  And you want to be able to make sure
8    your goods get to the customers who hired
9    you-all to carry them?
10   A.  Yes.
11   Q.  And not only get to them but get to
12   them in a timely manner?
13   A.  Yes.
14   Q.  Do you have any idea of any more
15   efficient way of tracking you-all's drivers
16   than what's presently in place at Benton?
17   A.  No.
18   Q.  Because right now a long haul truck
19   driver who don't have a cell phone, there's no
20   way to track him?
21   A.  That's correct.
22   Q.  Is that correct?
23   MR. BROCKWELL:  Some clarity:  I think
24   he said long haul, like l-o-n-g.  I
25   believe the term that's been used

Page 92

1    throughout all these depositions is
2    "line haul," l-i-n-e.
3        Q.  (By Mr. Boone)  You was answering the
4    question to me using -- the proper phrase
5    should have been "line haul," right?
6        A.  Line haul, right.
7        Q.  That's how you was answering the
8    question --
9        A.  Yes.
10       Q.  -- assuming I meant line haul?
11       A.  Yes.
12       Q.  And my question was that for line haul
13   tractor-trailer drivers, you-all have no way to
14   communicate with them if they don't have a cell
15   phone?
16       A.  That's correct.
17       Q.  Do you have any other more efficient
18   way to -- do you know any more efficient way to
19   be able to track your drivers and the cargo in
20   their tractors if you needed to?
21       A.  No, sir.
22       Q.  Do you know anything -- other trucking
23   companies that are doing that are more
24   efficient at tracking drivers?
25       A.  No, sir.

Page 104

1   A.  No.

2   Q.  Became aware they did that?

3   A.  No.

4   Q.  Do you have any idea the normal time
5   it takes for one of your drivers to go from
6   Atlanta to Pensacola?

7   A.  Five to six-and-a-half hours.

8   Q.  What kind of things will vary the
9   length of a route like that?  Just say
10  sometimes it's five to six and a half.  I know
11  that's a simple question; but for laypeople who
12  may not know, can you tell me some of the
13  factors that would vary on a route like that,
14  that you may be able to drive it one time in
15  five, and six and a half the next time?

16  A.  The traffic, fueling, mechanical
17  situations, weather.

18  Q.  And when you meant (sic) "fueling,"
19  you meant like if you have to stop versus not
20  stopping?

21  A.  Yes, sir.

22  Q.  Does the typical truck have enough
23  fuel in it that they can go from Atlanta to
24  Pensacola and Pensacola back to Atlanta without
25  fueling, if it's full?

FOSHEE & TURNER COURT REPORTERS

Page 116

1   physically inoperable because it may have
2   broke?
3       A.  No, sir.
4       Q.  So you don't know specifically
5   anything about what caused this delay?
6       A.  No, sir.
7       Q.  Anybody at Benton Express that's told
8   you about specifically what was going on with
9   Craig Stephens in his employ that caused this
10  delay?
11      A.  No, sir.
12      Q.  So even without knowing whether or not
13  he was hijacked or ill or some very legitimate
14  explanation for what occurred, your saying that
15  you were going to relieve him of duty means you
16  were going to investigate further on whether or
17  not you would ultimately terminate him, or does
18  it mean you were going to terminate him?
19      A.  I had been --
20          MR. BROCKWELL:  Object to the form.
21          THE WITNESS:  I had been
22  investigating for 24 to 48 hours.
23      Q.  (By Mr. Boone)  Got you.
24      A.  The gentleman would have been
25  terminated.  It would have been up to somebody

Page 117

1   else to decide whether he would have a job in
2   the future with Benton Express, because I would
3   have terminated him.
4       Q.  And my question to you is:  What
5   information, other than the fact that you
6   couldn't locate him, did you discover in this
7   investigation?
8       A.  None.
9       Q.  So you don't have a clue what
10  happened?
11      A.  Not a clue, except for my tractor, our
12  tractor and our trailer and our customer's
13  product couldn't be found.  It was not at the
14  destination it should have been six and a half,
15  five hours later.
16      Q.  And based on what you were personally
17  doing in your role at Benton Express, based on
18  your experience there and obviously the
19  position you hold, you would have felt the
20  decision should be termination?
21      A.  Yes.
22      Q.  And the only thing I'm trying to
23  do -- and I hate to repeat the question, but a
24  couple of depositions, every time -- if I asked
25  a question of was there some more information,