# Exhibit 10 to Plaintiff's Supplemental Opposition to Defendant Benton Express, Inc.'s Motion for Summary Judgment

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4    CASE NUMBER:  2:05-CV-194-T

5    HAZEL M. ROBY, as Administratrix

6    of the Estate of Ronald Tyrone

7    Roby, Deceased,

8            Plaintiff,

9            vs.

10   BENTON EXPRESS, INC., et al.,

11           Defendants.

12

13         S T I P U L A T I O N

14         IT IS STIPULATED AND AGREED by and

15   between the parties through their respective

16   counsel, that the videotaped deposition of

17   Boyd Don Hammond may be taken before Angela

18   Smith, RPR, CRR, at the offices of Carr,

19   Allison, at 100 Vestavia Parkway, Ste: 200,

20   Birmingham, Alabama 35216, on the 19th day

21   of September, 2005.

22         DEPOSITION OF BOYD DON HAMMOND

23                              42643

1    instruct our drivers on how they're to

2    conduct themselves from point A to point B.

3    To follow the no-stop policy.  But it's at

4    their discretion on the no-stop.

5         Q.    No-stop policy meaning that if

6    somebody tries to pull up beside them and

7    get them to stop and attempt to steal the

8    cargo, don't stop?

9         A.    Don't stop.

10        Q.    And I think you said:

11   However, though, in their discretion, if

12   they think their safety is on the line,

13   maybe their life, maybe somebody's got a gun

14   at the window, then they have that

15   discretion?

16        A.    Exactly.  It's a judgment call

17   on their part.

18        Q.    Do you all have any tracking

19   devices that will allow you all to track

20   your trailers or tractors in case of theft?

21        A.    No.

22        Q.    Do you know of any more

23   efficient way of tracking cargo trailers or

Page 84

1    Sunday night?

2         A.    Sunday afternoon.  I believe

3    it was between four and five o'clock,

4    Central Time.  I'm not sure exactly on the

5    time.

6         Q.    Tell me what Garlin told

7    Mr. Craig Stephens -- what the communication

8    was about.

9         A.    That Craig Stephens had called

10   and talked to Garlin, asking Garlin to take

11   his Tallahassee run because he was not going

12   to get back in time to make the Tallahassee

13   run.

14              Garlin informed him that he

15   was hooking up to the Tallahassee trailer at

16   that time.  He also informed him that he

17   needed to contact Glen Clark immediately.

18        Q.    And Garlin told him that?

19        A.    Garlin told him to contact

20   Glen Clark immediately.

21        Q.    Okay.  And any more

22   information from the telephone conversation?

23        A.    No.

Page 85

1        Q.        Did Garlin ask Craig any

2    questions, as best you all understand, about

3    what had caused -- where he was on Sunday?

4        A.        No.

5        Q.        Do you know why Garlin was at

6    the terminal, just to take the Tallahassee

7    run?

8        A.        Go to Tallahassee.

9        Q.        So, he just so happened to

10   answer the phone?

11       A.        Yes.

12       Q.        So, he wasn't -- It wasn't

13   generally his responsibility, he just so

14   happened, because he was going to work that

15   day, just so happened to be at the terminal?

16       A.        Yes.

17       Q.        And Mr. Craig Stephens, he

18   just called the terminal and just so

19   happened Garlin answered?

20       A.        To my knowledge.

21       Q.        And it was your understanding

22   that he called the terminal; right?

23       A.        Yes.

Page 101

1    reasonable amount of time, in compliance

2    with the Department of Transportation's

3    regulations.

4         Q.    And that's a good key point

5    you just add.  In compliance with the

6    Federal Motor Vehicle -- Well, in compliance

7    with the federal government regulations; is

8    that right?

9         A.    That's correct.

10         Q.    And the federal government

11    regulations require a driver to pull over

12    and stop if he's tired and sleepy and

13    fatigued?

14              MR. BROCKWELL:  Object to the

15    form.

16         A.    Require him to stop?

17         Q.    If he was fatigued and sleepy,

18    would the regulations require that he pull

19    over and stop and get adequate rest?

20         A.    He is required to get ten

21    hours of rest after being on duty no more

22    than fourteen hours, and driving no more

23    than eleven prior, and then taking a

Page 102

1    ten-hour break.

2           Q.     If a Benton Express driver was

3    tired and sleepy, what should he do?

4           A.     If he's tired and sleepy?

5           Q.     Yes.  And he's delivering a

6    load and he's tired and sleepy.

7           A.     Drivers are instructed to get

8    proper rest of at least ten hours prior to

9    being dispatched.

10          Q.     So, if he gets tired and

11   sleepy on the job, what should he do?

12          A.     I would definitely want him to

13   take a break, to drink a cup of coffee, to

14   take fifteen minutes, take thirty minutes,

15   but --

16          Q.     Would it be fair to say, take

17   whatever time was adequate to make sure he's

18   not tired and sleepy when he starts back

19   driving?

20          A.     I wouldn't phrase it that way,

21   no.

22          Q.     Okay.

23          A.     Because the driver is supposed

Page 105

```
 1          A.     It would have been shortly

 2     after six, yes.

 3          Q.     Okay.  Shortly after six.  He

 4     would have been in a Benton Express truck?

 5          A.     Yes.

 6          Q.     He would have been pulling a

 7     Benton Express -- He would have had a

 8     trailer attached to the Benton Express

 9     truck?

10          A.     Yes.

11          Q.     He would have been carrying

12     Benton Express goods?

13          A.     Yes.

14          Q.     To drop off at the Benton

15     Express terminal in Atlanta?

16          A.     Yes.

17          Q.     And he had the permission and

18     consent of Benton Express to leave Pensacola

19     with that Benton Express truck?

20          A.     Yes.

21          Q.     Carrying those Benton Express

22     goods?

23          A.     Yes.
```

Page 106

```
 1        Q.     And he had the consent of

 2   Benton Express to pick up goods in Atlanta?

 3        A.     Yes.

 4        Q.     And he had Benton Express

 5   approval to continue driving that truck once

 6   he picked the goods up in Atlanta?

 7        A.     And to return to Pensacola.

 8        Q.     Yes.  And he had permission

 9   and consent of Benton Express to return to

10   Pensacola?

11        A.     Yes.

12        Q.     With those goods?

13        A.     Yes.

14        Q.     And is it your understanding

15   that he took a route, and that it was his

16   normal route to go from Pensacola, through

17   some back -- some fairly smaller roads, up

18   until he hit 65 North, and from 65 North to

19   Montgomery, and from Montgomery, go 85 North

20   to Atlanta?

21        A.     I'm not exactly sure of the

22   route, but it was Pensacola, as direct as

23   possible, to Atlanta, Georgia.
```

Page 108

```
1          A.     Yes.
2                 MR. BROCKWELL:  Which records
3    are you referring to, if you don't mind my
4    asking?
5                 MR. BOONE:  His log tickets or
6    trips, or whatever you call them.
7                 MR. BROCKWELL:  Okay.
8          Q.     And it is your understanding
9    that he did pick up a load in Atlanta?
10         A.     Yes.
11         Q.     And it's your understanding
12   that Mr. Craig Stephens was in a Benton
13   Express truck when he left the Atlanta
14   terminal?
15         A.     Yes.
16         Q.     It was your understanding, or
17   at least your belief, that when he -- that
18   the wreck occurred from -- after he --
19   sometime after he left Atlanta in
20   Montgomery?
21         A.     Yes.
22         Q.     And at the time the wreck
23   occurred in Montgomery, he was in a Benton
```

Page 109

1    Express truck?

2          A.    Yes.

3          Q.    Carrying Benton Express goods?

4          A.    Yes.

5          Q.    And the route from Atlanta to

6    Montgomery, to ultimately get to Pensacola,

7    was the normal route he would take coming

8    back?

9          A.    Yes.

10         Q.    And he was traveling his

11   normal route in a Benton Express truck

12   carrying Benton Express goods?

13         A.    Had he been within the -- his

14   time frame of returning to Pensacola, I

15   would say yes to that question, but I don't

16   know, due to the circumstances of his

17   disappearance, I have no idea where he was

18   going.

19         Q.    Well, let me just ask you, was

20   his normal route from Atlanta to Montgomery?

21         A.    Yes.

22         Q.    And from Montgomery, he would

23   connect to 65 South?

```
 1          A.      Yes.

 2          Q.      And isn't it your

 3    understanding that at the time of the wreck,

 4    he was in Montgomery?

 5          A.      Yes.

 6          Q.      He was in the Benton Express

 7    truck, as I said earlier?

 8          A.      Yes.

 9          Q.      With Benton Express goods?

10          A.      Yes.

11          Q.      And he was on the 85/65 South

12    Interchange?

13          A.      Yes.

14          Q.      And based on his normal route,

15    it appears, from everything we know, is that

16    he was on the same route he normally travels

17    back to Pensacola?

18          A.      Normal route, but not in time.

19                  MR. BOONE:   Object as

20    nonresponsive.

21          Q.      And all I'm asking you is,

22    based on everything you've seen in your

23    investigation, he was in the Benton Express
```

FOSHEE & TURNER COURT REPORTERS

Page 111

1    truck carrying Benton Express goods on his

2    way -- on his normal route back to

3    Pensacola?

4         A.    He was on the route back to

5    Pensacola.

6         Q.    That's all I was asking you at

7    this point.  Is that correct?

8         A.    Yes.

9         Q.    Okay.  Do you know of anybody

10   at Benton Express that -- Does he have a

11   voice mailbox, like, if you call his phone,

12   will a message be stored?

13        A.    I don't know.

14        Q.    You don't know.  Do you have a

15   Nextel phone issued by Benton Express?

16        A.    Yes.

17        Q.    Does yours have a voice

18   mailbox, if I call you and you don't answer,

19   would it leave a message?

20        A.    Yes.

21        Q.    Do you know if anybody called

22   him and left a message?

23        A.    No.

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 119

1    is that right?

2           A.      That's correct.

3           Q.      And at that time, on Saturday,

4    which was sometime on Saturday evening?

5           A.      Yes.

6           Q.      And at that time, he had no

7    thought that this truck was stolen, did he?

8           A.      No.

9           Q.      He was simply looking for an

10   employee?

11          A.      An overdue employee.

12          Q.      That's right.  He was looking

13   for an overdue employee.  Would you agree

14   with that?

15          A.      Yes.

16          Q.      He had no reason to believe

17   the truck was stolen?

18          A.      No.

19          Q.      And, in fact, he told the

20   police that Mr. Craig Stephens was a good

21   employee?

22          A.      Yes.

23          Q.      Reliable employee?

Page 120

1      A.      Yes.

2      Q.      A family man?

3      A.      Well, I'm not sure of all the

4  terminology that he used as far as family

5  man or whatever.

6      Q.      But in his story he told him

7  it was an exemplary Benton Express employee?

8      A.      That he was a good employee,

9  yes.

10      Q.      And all he was trying to do

11  was locate him?

12      A.      We're trying to find out where

13  he was at, yes.

14      Q.      And you all, at that point,

15  understood and considered him an employee

16  who just was overdue and you were trying to

17  determine what the delay was?

18              MR. BROCKWELL:    Object to the

19  form.

20      A.      We were trying to find out the

21  location of Mr. Stephens because of being

22  overdue.

23      Q.      Right.

Page 121

```
 1          A.     And that's the reason the BOLO

 2   was put out for three states through the

 3   Florida State Highway Patrol.

 4          Q.     Right.  And I think that's

 5   what I said.  Let me rephrase it.  At that

 6   time, on Saturday, when Mr. Glen Clark, his

 7   dispatcher, who last saw him in Pensacola,

 8   called the police, he was simply calling the

 9   police about a good, reliable Benton Express

10   employee who had been delayed and he was

11   trying to locate him?

12                 MR. BROCKWELL:  Object to the

13   form.

14          A.     Who was well overdue and was

15   missing.

16          Q.     Right.  And he had considered

17   -- And that's why he called the police?

18          A.     Yes.

19          Q.     Because he was looking for his

20   employee?

21          A.     Yes.

22          Q.     Was Benton Express -- I think

23   you told me, and we established that Benton
```

Page 122

```
 1    Express -- Mr. Stephens was working for

 2    Benton Express, delivering a load for Benton

 3    Express to Atlanta?

 4         A.    He was carrying the Pensacola

 5    freight to Atlanta.

 6         Q.    That was providing a benefit

 7    to Benton Express.  You all were paying

 8    Mr. Stephens for his work; right?

 9         A.    Correct.

10         Q.    And Mr. Stephens was

11    performing work as a benefit to Benton

12    Express?

13         A.    Yes.

14         Q.    Because you all get paid?

15         A.    Pardon?

16         Q.    Because Benton Express gets

17    paid?

18         A.    Yes.

19         Q.    And he delivered that load in

20    Atlanta?

21         A.    Yes.

22         Q.    And Mr. Stephens had to drop a

23    load back off to Pensacola?  He had to bring
```

Page 123

1    a load from Atlanta back to Pensacola?

2         A.    Yes.

3         Q.    And at the time of this wreck

4    he had -- he was in that Benton Express

5    truck and he had those goods on that truck

6    in Montgomery?

7         A.    Yes.

8         Q.    And those goods, once received

9    -- or if received by Benton Express, are

10   goods that you all are going to distribute

11   to customers?

12        A.    If received, yes.

13        Q.    And you all get a benefit from

14   loads being brought back to Pensacola,

15   because you all distribute them to your

16   customers; is that correct?

17        A.    That's how we stay in

18   business.

19        Q.    And you all make money by that

20   business?

21        A.    Yes.

22        Q.    Do you know when Mr. Glen

23   Clark first found out Garlin's message?

Page 136

1    hour of leaving the -- after he left

2    Pensacola he didn't respond, wouldn't that

3    alert somebody if the policy and procedure

4    was to respond in one hour?

5              MR. BROCKWELL:  Object to the

6    form.  Calls for speculation.

7         A.    It's a predescribed run, as

8    previously said.  There is no reason to

9    discuss where you're at every hour.

10         Q.    I thought the reason for

11   wanting to know where the driver is at is to

12   make sure the load is going to make it and

13   on time?

14         A.    He's dispatched from origin to

15   destination and from destination back to

16   origin.

17         Q.    You all advertise to y'all's

18   customers:  We have technology in place to

19   allow us to track our loads to ensure

20   they're on time.

21         A.    Track the freight.

22         Q.    Yeah.  Track the freight?

23         A.    Uh-huh.

Page 173

1          A.      Correct.

2          Q.      But in this case, he was in

3    the Benton Express truck, carrying a Benton

4    Express load, on the 85/65 South Interchange

5    would be the direction he would be going to

6    get to Pensacola?

7          A.      Correct.

8          Q.      And you would agree with me

9    that the goods that he was carrying was in

10   that trailer?

11         A.      Correct.  Forty-eight hours or

12   two days late.

13         Q.      And you would agree with me

14   that he had called Benton Express on Sunday?

15         A.      He had called and spoke with

16   Garlin on Sunday afternoon to cover a load.

17         Q.      And he had called the number

18   given to him to call when he got the report

19   -- information to Benton Express?

20                 That's what he was supposed to

21   do, right, if something had happened, he had

22   been delayed, or anything happened that he

23   needed to update you on, that was at least

Page 176

```
 1    That's not consistent with trying to steal a

 2    truck, is it?

 3                    MR. BROCKWELL:  Object to the

 4    form.

 5         Q.     Would you agree with that?

 6         A.     It's not consistent with

 7    trying to steal a truck?

 8         Q.     Because if I was trying to

 9    steal your truck, I wouldn't call you and

10    tell you -- and call you and try to talk to

11    you, would I?  That's not normal, though, is

12    it?  You would agree with that, that

13    somebody trying to steal your truck, it

14    wouldn't be consistent with me to call you

15    at the terminal?

16                    MR. BROCKWELL:  Object to the

17    form.

18         A.     That's correct.

19         Q.     And what's consistent with

20    calling an employee of Benton Express or

21    calling the terminal, is to let them know

22    what may have caused the delay or where they

23    were?
```

Page 194

1    is.

2          A.     It's the Driver's Cargo and

3    Security Policy as mandated by the

4    Department of Transportation.

5          Q.     Is that something that applied

6    to -- that applied to Mr. Stephens?

7          A.     Yes.

8          Q.     Or is that something that

9    applied to just over-the-road haulers or

10   city drivers, too?

11         A.     Both.

12         Q.     Both?

13         A.     Yes.

14         Q.     Okay.  Let me look at it for a

15   second.  On page 08 -- with Bates number

16   086, I will direct your attention to the

17   next-to-the-last dot, right here

18   (indicating).  Why don't you read that for

19   me.

20         A.     Drivers are expected to

21   maintain regular communication with the

22   company while in transit.  Any incident of

23   drivers failing to check in when required

FOSHEE & TURNER COURT REPORTERS

Page 195

1    shall be assumed to be suspicious and highly

2    irregular.   Immediate action shall be taken

3    in such situations.

4          Q.      And what's that word, drivers

5    should be in what kind of communication

6    again?

7          A.      Regular communication.

8          Q.      Do you know what regular

9    communication is for Mr. Stephens that you

10   say this applies to?

11         A.      It says that he should be in

12   regular communication with the company while

13   in transit.

14         Q.      Right.  Do you know what

15   regular communication means, as it applies

16   to Mr. Stephens, which you told me this

17   document applied to?

18         A.      Regular would mean if you have

19   a breakdown, you're to call in.  If you're

20   involved in an accident, you're to call in

21   to the eight-hundred number.

22         Q.      So, regular in your words

23   means don't call in if nothing is wrong?

FOSHEE & TURNER COURT REPORTERS

Page 196

```
 1          A.      Exactly.

 2          Q.      So, regular communication

 3   means, in your opinion, don't call in unless

 4   something is going wrong?

 5              MR. BROCKWELL:  Asked and

 6   answered.

 7          A.      That's correct.

 8          Q.      Okay.  Let me look at it

 9   again.  And this is part of a document that

10   Benton provides to its employees?

11          A.      Yes.

12          Q.      And its employees are supposed

13   to follow those directions?

14          A.      Yes.

15          Q.      And those employees include

16   yourself?

17          A.      Yes.

18          Q.      Mr. Glen Clark?

19          A.      Yes.

20          Q.      Bill Jones?

21          A.      Yes.

22          Q.      Craig Stephens?

23          A.      Yes.
```