# Exhibit 16 to Plaintiff's Supplemental Opposition to Defendant Benton Express, Inc.'s Motion for Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| HAZEL ROBY, as Administratrix of ) <br> The Estate of RONALD TYRONE ) <br> ROBY, Deceased, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> BENTON EXPRESS, INC., ) <br> ) <br> Defendant. ) | Civil Action No.: 2:05cv194-T |

## PLAINTIFF'S RULE 26(b) SUBMISSIONS

### Initial Preliminary Report of Opinions by Roland B. Brown, CDS

### QUALIFICATIONS OF ROLAND B. BROWN

My name is Roland B. Brown. I reside at 2430 Knotty Pine Drive, Navarre, FL 32566, where I also maintain an office for a transportation consulting business, named National Trucking Safety Consultants, a sole proprietorship organization. The mailing address is P. O. Box 5840, Navarre, FL 32566. Our Fed. I. D. No. is 37-1515105.

I have worked in the trucking industry for over 35 years at all levels of management, including middle management, top management and part-owner of trucking companies. Several of those trucking companies operated a wide variety of equipment, including, dry van, refrigerated van, flatbed and tanker trailers. Some have been exclusive truckload-type carriers; however several of these motor carriers have specialized in less-than-truckload (LTL) operations, as well as full truckload operations. Some of these carriers have operated over-the-road equipment between terminals located in various states - some of them nationwide terminal- to-terminal operations.

I am certified by National Committee for Motor Fleet Safety (now North American Transportation Management Institute (a training division of the American Trucking Association) as Certified Director of Safety, Certified Accident Investigator and Certified Driver Trainer. All of these are achieved through personal experience in those fields of work, as well as meeting high standards of testing and a record of proven full knowledge of the programs and procedures of the Training Institute. I stay currently informed on all motor fleet industry safety regulations and industry standards as well as DOT and state regulatory agency regulations. This is accomplished through membership in American Trucking Association, various state trucking agencies and attendance at industry-recognized high quality seminars and other training courses. Further, I am certified as a seminar leader and instructor for 3 industry-leading organizations that emphasize training and conducting specialized training seminars. I have served as expert witness in over 80 cases and in approximately 20 states and in federal court in various jurisdictions. Presently I serve as President of National Trucking Safety Consultants, a sole-proprietorship motor fleet consulting company. Further qualifications are outlined in my curriculum vitae, which is a part of this report and attached to this report.

My opinions will be based on my professional work background and experience, my formal training and my specialized instruction at seminars, safety conferences and safety meetings. Further, my opinions will be based on the documents listed separately and made a part of this report. Plaintiff reserves the right to supplement these opinions and provide rebuttal testimony to Defendant's experts. Plaintiff further reserves the right to supplement these opinions as additional discovery is obtained.

## APPLICABLE MOTOR CARRIER REGULATIONS

According to information and belief, Defendant Benton Express, Inc., (Benton) held USDOT No. 92694, and ICC MC No. 110410, authorizing transportation of general commodities between points and places in several states and had physical terminal locations in several southeastern cities in the United States. These facts make them subject to various state regulations governing the motor carrier industry and to 49 CFR Code of Federal Regulations - Transportation (DOT regulations). The states in which Benton operates have adopted these federal regulations as state regulations.

## FACTS RELATED TO THE ACCIDENT IN QUESTION

Through information and belief, a driver employee of Benton, Craig Anthony Stephens (Stephens), was dispatched and directed by Benton to take a trailer of freight from their Pensacola, FL, terminal, to their terminal in or near Atlanta, GA. He left Pensacola sometime during the night of Friday, April 8, 2005. He went to the Benton terminal in Atlanta and dropped the trailer of freight he brought from Pensacola. He picked up the trailer of freight he was dispatched by Benton to take back to Pensacola, FL. This is the last report of his whereabouts or his location known to me through information I have reviewed until a violent crash occurred on I-85 southbound ramp, in Montgomery, AL, near I-85 intersection with the southbound lanes of I-65 southbound. At this point, at approximately 6:05 a.m. on Monday, April 11, 2005, Benton's tractor-trailer, driven by employee Stephens, crashed through the guardrail/jersey wall on the right hand side of the exit ramp of I-85 southbound, going through the barrier and falling down onto a car, driven by Ronald Tyrone Roby, traveling in a southbound lane of I-65, which was below the exit ramp from which the Benton truck came through the barrier.

After the tractor-trailer fell onto the vehicle driven by Roby, a fire erupted. All vehicles were heavily damaged and parts of the roadway was damaged as a result of the violent collision that was caused when Benton's tractor-trailer went through the exit ramp barrier and fell onto I-65 south that is located below the exit ramp (I-85/I-65 interchange), on which Stephens was driving Benton's tractor-trailer and onto the vehicle, driven by Roby. As a result of Benton's tractor-trailer going through the barrier and dropping to the lanes of I-65 southbound beneath its original route, and the fire that resulted, both Stephens and Roby were killed.

## OPINIONS OF ROLAND BROWN

- Benton is a general commodities, less-than-truckload motor carrier, operating under operating authority granted by the Interstate Commerce Commission and governed by 49 CFR, Code of Federal Regulations - Transportation, Part Nos. 300-399 (DOT regulations), as well as state regulations. As such, Benton is responsible for the compliance of all the regulations and to assure that all their employees, agents, and representatives comply with the regulations.

- One part of the DOT regulations is Part No. 395, entitled "Hours of Service of Drivers." This part requires drivers to accurately record in a format called "Driver's Daily Log", which is a graph that has a line for "Off Duty"; "Sleeper Berth"; "Driving"; and "On Duty (not driving)." Drivers are required to maintain Driver's Daily Logs for every 24-hour period of the month, while employed by a motor carrier under this regulation. The driver is required to draw a continuous line from the beginning of the 24-hour period until the end of the 24-hour period Such line should be drawn on the line that reflects what his/her activity was for

that time of day. There are other parts of the Driver's Daily Log form that require the driver to complete accurately and completely, as described in DOT Part No. 395. In the case of Stephens' logs, he shows numerous days of activity in which he traveled from Pensacola, FL, to Tallahassee, FL, and return. Based on my research, the total distance for a roundtrip of this type is approximately 390 miles. Stephens shows on several logs the total miles driven on a day when he did a Pensacola-Tallahassee roundtrip to be 378 miles, and he does that trip in 6 hours every time he makes the trip. On many other occasions, Stephens shows the total miles driven when he made that roundtrip to be 184 miles. (Numerous examples of this are evidenced in Stephens' Driver's Daily Logs for January, February and March, 2005) In every case, however, he always shows driving 3 hours in each direction, regardless of the time of day, the day of the week or any other circumstances. It is my opinion that no truck driver can make the same trip each and every time in exactly the same amount of time. Weather, traffic conditions, possible construction zones, etc., will cause variable times to run trips. I have seen no evidence that indicates Benton called this matter to Stephens' attention or warned him in any way. They knew or should have known this was not reasonable and, in all probability, represented a falsification of a Driver's Daily Log. In any event, it should cause suspicion and call for an inquiry. This shows a lack of corporate control and proper monitoring and supervision of the actions and conduct of Benton's drivers Similarly, Stephens would reflect on his Driver's Daily Logs on Pensacola-Atlanta-Pensacola roundtrips that he made that trip in 10 hours every time - 5 hours from Pensacola to Atlanta and 5 hours from

Atlanta to Pensacola, even though he had to drive in traffic getting from the Atlanta terminal to interstate highway where the speed limit is raised and he would have to go through some amount of traffic, even on I-85 interstate near cities, and had to go through the middle of Montgomery, AL, on I-85, to connect with I-65. Further, the Pensacola Benton terminal is off I-65 by approximately 64 miles, on roads where the speed limit is 55 mph or less; yet Benton permitted, allowed and condoned this type driving habits from its driver, Stephens.

- A careful, safe and prudent motor carrier that demonstrates proper attention and emphasis on safety of its drivers monitor actions and activities of their drivers and issue warnings, up to and including disciplinary action against drivers who consistently falsify their records. To allow Stephens to regularly reflect that he is averaging 60 mph or more on many trips shows lack of monitoring and the lack of taking action to assure that Stephens is operating their vehicle at safe speeds at all times and keeps his Driver's Daily Logs properly and accurately. According to studies by the National Safety Council, as well as the National Highway Transportation Safety Board, a commercial motor vehicle driver (truck driver) must regularly travel at speeds 9 - 15 mph faster than what is reflected as "average speed" due to slowdowns in traffic, merging traffic, weather conditions, or other speed-reducing factors. This would reflect that Stephens had a habit of traveling at speeds from 69 - 75 mph. in order to consistently average 60+ mph. on trips, which is impossible if the truck had a governor on it that would prevent the driver from going over 62 miles per hour.

- A part of the website of Benton entitled *"About Us"* <u>*"Welcome to Benton Express!"*</u> emphasizes the "current technological advancements" (it does not identify such technology) of Benton; however, one of the most common technological advancements known in the transportation industry for several years and in other motor vehicles is "global tracking systems." Global tracking systems have been in use for over 20 years and, since 1988, this has been a vital tool used by careful, safe and prudent trucking companies for several reasons. One reason is to have instant contact (communications) with their drivers. This system has a communication, either verbal or written, as a part of it. Another important part of global tracking systems is to have the ability to locate any piece of equipment instantly from the base center. This also provides a carrier with ways to determine at what speeds their trucks are going, by tracking them on the tracking system. For customer service benefit, this system allows customer service representatives to know the whereabouts of any truck that may be hauling a shipment, which is being tracked or traced by a customer. This would have provided Benton a way to determine the location of Stephens' truck at any and all times between the time it left Pensacola on Friday, April 8, and the time they began searching for it and reporting it missing at approximately 2:00 p.m., on Saturday, April 9. It would also have allowed them to have known the truck was not where it was dispatched or directed to be, in that it was just returning through Montgomery on Monday, April 11, at 6:05 a.m. By knowing its whereabouts through commonly used technological systems, such as QualComm, OmniTracs(tm) (which has been used by many carriers similar to Benton,

beginning in 1988), and Benton could have relieved Stephens of duty, prevented him from moving the truck and assigned another driver who would have safely driven the tractor-trailer, something Stephens did not do.

- DOT Part ¶395.3 concerns the driving time for property-carrying vehicles. An interpretation of this regulation by J. J. Keller & Associates, Inc., Neenah, WI, a leading authority on DOT regulations and safety issues of motor carriers, and the company that has been assigned the responsibility of publishing safety and regulatory agency guidelines by the American Trucking Association, has interpreted this part as follows:

    <u>Question</u>: *"Are motor carriers liable for the actions of their employees even though the carrier contends that it did not require or permit the violations to occur?"*

    <u>Guidance</u>: *"Yes. Carriers are liable for the actions of their employees. Neither intent to commit, nor actual knowledge of a violation is a necessary element of that liability. Carriers "permit" violations of the hours of service regulations by their employees if they fail to have in place management systems that effectively prevent such violations."*

- It is my opinion that Benton is responsible for the actions of its driver, Stephens, as long as he is under their dispatch. Stephens was dispatched by Benton to take a Benton trailer of freight from their Pensacola, FL, terminal to Atlanta, GA on Friday night, April 8. He dropped that Benton trailer at the Atlanta terminal, and picked up another Benton trailer of freight to bring back to their Pensacola terminal as instructed by Benton. He was in the process of performing these

duties, and was on and about the business of Benton, when this accident occurred in Montgomery, AL, on Monday, April 11, at approximately 6:05 a.m. He was on his regular route. He had contacted the terminal Sunday, April 10, and informed them that he could not make that run on Sunday. I have seen no evidence to indicate that, at any time during that period of time, Stephens asked to be relieved of duty and at no time did Benton relieve him of duty. All of the above supports my opinion that Craig Stephens was in the line and scope of his employment.

- *Benton Driver & Cargo Security Policy* (beginning with Bates Benton Stamp #083), Scope states, *"The following security guidelines and procedures apply to all work/load assignments. All drivers and non-driving personnel will be expected to be knowledgeable of, and adhere to, these guidelines and procedures when performing any load-related activity for Benton Express, Inc."* Page 3 of that same document outlines specific duties of drivers while in transit. Bullet point No. 7 of Page 3 states, *"Drivers are expected to maintain regular communications with the company while in transit. Any incident of drivers failing to check in when required shall be assumed to be suspicious and highly irregular. Immediate action shall be taken in such situations."* Additional instructions are given to drivers on the Driver Daily Trip Log, which are entitled "Operating Policies." The first item is "CALL YOUR SUPERVISOR" and gives instructions for calling in. In spite of these policies and procedures, I have seen no evidence where Benton had required Stephens to report in during any of these trips, especially these roundtrips from Pensacola to Atlanta and return. I have seen no evidence that Benton required, instructed or

expected Stephens to report into his supervisor over this 10-hour period, which, in my opinion, is a falsification of records, to report this run can be made within 10 hours every time and at all times of the day, night or whatever the day of the week the trip may have been made. In keeping with Benton's policy, which is a good requirement and in keeping with industry standards, Stephens was required to check in, but Benton did not enforce this policy or requirement. It is common practice and normal operating procedure for a driver to report into his domicile or his central dispatch at regular and specified periods of time. That is a good business practice and one that assures the company of knowing the whereabouts of its drivers while in transit. Benton had not set a scheduled time for Stephens to return to Pensacola. A good, safe, prudent trucking company would have scheduled times for departure and arrival at any point - not just leave it up to a driver with whom they do not enforce a policy or procedure for the driver checking in. Benton should have had a procedure and policy in place for scheduled times.

- Benton Express should have had policies and procedures that would have identified specific actions to take, such as, to contact authorities at the last known location of the employee, in each city or location along the employee's route who is missing, late, sick, lost, abandoned the job, or was stealing its equipment. Mr Brown will also opine that if Benton Express had followed its own written policies and procedures, Mr. Stephens would have been relieved of his duties once he reached the Atlanta terminal; thus this wreck with multiple fatalities and substantial property damage would have been prevented.

- Since Benton did not follow good, sound and safe industry policies and their own policies of reporting in at regular intervals, Benton knew nothing of the whereabouts of Stephens from the time the guard signed him out of the Atlanta terminal until the time of this accident, which was over 50 hours. Benton did not within a reasonable time initiate any type search or research for a missing driver, tractor and trailer. Benton knew 10-12 hours after Stephens left Pensacola that he was missing or delayed, since he was already expected back in Pensacola Saturday morning. After all, he always drives that trip in 5 hours, according to all their paperwork. Benton failed to follow its own policies and procedures on this trip and on other trips. Stephens had not been properly trained and had not been sufficiently instructed in the necessity of regular and systematic call-in procedures; otherwise, he would have been calling in on all these other roundtrips he made to Atlanta. Based on Benton's policies and procedures, Mr. Stephens should have been relieved once he arrived at the Atlanta terminal because he was not in regular communication with his dispatcher or terminal manager.

- Benton should have made contact first with police authorities in the location of his last known whereabouts - Atlanta, GA. At approximately 2:00 p.m. on Saturday, April 9, Glen Clark (Clark) had communication with the Florida Highway Patrol Communications Center in Tallahassee, FL. The spokesperson for the Florida Highway Patrol instructed Clark to contact the Georgia State Police and the Alabama Highway Patrol, which Clark should have known to do. He then had a later telephone conversation with the Florida Highway Patrol Communications Center and was advised they would put out a bulletin,

concerning the missing driver, tractor & trailer. It was not until Sunday, April 10, that any report was made to the Atlanta Police, when an incident report was made. Atlanta was his last known whereabouts. A question is why did Benton personnel not begin at that point.

- According to Stephens' Driver's Daily Logs and the recap of parts of February and March, 2005, Stephens violated the 70-hour rule (DOT Part ¶395.3 (b) for 3 consecutive days - March 2, 3 and 4, 2005. These 3 days of 70-hour rule violations occurred the 4 days after Stephens had done a weekend Atlanta roundtrip. It is my opinion Stephens was pushing too hard and pressing his hours of service too close and Benton allowed him to do so. He has other examples where he was very close to the allowed number of hours (February 5, February 26, January 7, and January 21, 2005). The February dates reflect days in which Stephens did the Atlanta turnarounds. All of this is predicated on whether or not the hours shown are correct, in light of the mileages he traveled, which, in my opinion, are not possible in many cases.

- Stephens was on and about the business of Benton at the time of this accident. As stated earlier, he had not requested to be relieved of duty and Benton had not relieved him of duty. Further, after the occurrence of this horrible accident and the death of Mr. Stephens and Mr. Roby, Benton filed a Workmen's Compensation Claim on behalf of their employee, Stephens' survivors, which was the proper action to take. Worker's compensation payments are made only if the employee is determined to be in the line and scope of employment. Stephens had taken Benton's load of freight to Atlanta, as instructed by Benton, and Stephens

was en route back to Pensacola with Benton's load of freight when this accident occurred.

The opinions expressed herein are expressed with a reasonable degree of professional certainty within the trucking industry.

I have caused this report of my opinions to be prepared and it is true and correct to the best of my knowledge. I reserve the right to amend, append or revise this report when other materials are provided to me through further discovery.

## INITIAL PRELIMINARY REPORT OF OPINIONS BY M. P. STIRLING

Ms. M. P. Stirling, 9 Crestwood Court, Millbrook, Alabama, 36054. Ms. Stirling may be called to testify as an accident reconstructionist at the trial of this matter. Ms. Stirling was a State Trooper for the State of Alabama for sixteen (16) years and investigated numerous accidents during this time. Ms. Stirling has completed over 1000 hours of specialized education in the field of accident reconstruction. Ms. Stirling's expert opinions will also be based on her work experience as an Alabama State Trooper as well as her educational background which are set out more fully in the attached CV. Plaintiff reserves the right to supplement these opinions and provide rebuttal testimony to Defendant's experts. Plaintiff further reserves the right to supplement these opinions as additional discovery is obtained.

Ms Stirling will offer opinions concerning accident reconstruction in this matter. Ms. Stirling may testify further concerning the speed, direction, and path of the truck and its final point of rest. Ms. Stirling will also discuss other elements of accident reconstruction, such as perception and reaction time or the lack thereof of a driver such as Mr. Roby or Craig Anthony Stephens based on the circumstances of the wreck. Ms.

Stirling will also give opinions concerning the direction and location of Mr. Roby at the time of the wreck and the direction and location of Benton Express' employee Craig Anthony Stephens immediately before the wreck. Ms. Stirling may also opine about Benton's contact with authorities and the timing of that contact and what authorities can do based on the reports made by Benton.

/s/ L. Bone
_____
LABARRON N. BOONE (BOO029)
Attorney for Plaintiffs

OF COUNSEL:

BEASLEY, ALLEN, CROW,
 METHVIN, PORTIS, & MILES, P.C.
218 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103-4160
(334) 269-2343

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following on this the 30th day of September 2005.

/s/ L. Bell
_____
OF COUNSEL

Brett A. Ross
Gregory A. Brockwell
*Carr, Allison, Pugh, Howard,*
 *Oliver & Sisson, P.C.*
100 Vestavia Parkway, Suite 200
Birmingham, Alabama 35216