IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA,
NORTHERN DIVISION

| | |
|---|---|
| HAZEL M. ROBY, as Administratrix of the Estate of RONALD TYRONE ROBY, Deceased, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) CIVIL ACTION NO.: 2:05CV494-T |
| BENTON EXPRESS, INC., et al, | )<br>)<br>) |
| Defendants. | ) |

**DEFENDANT'S BRIEF IN REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Defendant, Benton Express, Inc. and replies to the Plaintiff's Opposition (Doc. No. 45) and Supplemental Opposition (Doc. No. 55) to Defendant's Motion for Summary Judgment (Doc. No. 34) as follows:

**I.  INTRODUCTION**

Despite having ample time and opportunity to oppose Defendant's Motion for Summary Judgment, the Plaintiff has failed to demonstrate that there is a legitimate dispute of any material fact and has failed to show that Defendant is not entitled to judgment as a matter of law.  Nonetheless, to aid the Court in its consideration of Defendant's Motion, Defendant offers clarification on the following issues:

**II.  CRAIG STEPHENS' SCHEDULED ARRIVAL TIME**

Defendant has established that the time Craig Stephens was supposed to arrive back in Pensacola was the early morning of Saturday, April 9, 2005.  In opposition to Defendant's Motion for Summary Judgment, the Plaintiff has attempted to argue that, in reality, Mr. Stephens was not supposed to arrive back in Pensacola until the morning of Monday, April 11,

1

2005. In support of this proposition, the Plaintiff cites the deposition testimony of Craig Stephens' widow, Stephanie Stephens. [See Doc. No. 55, pp. 2-3, 6].

Despite the Plaintiff's assertions to the contrary, Stephanie Stephens' testimony offers no support to the Plaintiff's position. Indeed, Mrs. Stephens testimony is entirely consistent with Defendant's position that Craig Stephens was due back in Pensacola on the morning of April 9.

Mrs. Stephens testified that her husband had never been gone for an entire weekend before. [Deposition of Stephanie Stephens, p. 117:7-15, excerpts of which are attached hereto as Exhibit 1]. In fact, Mrs. Stephens was concerned when her husband had not returned to Pensacola by lunchtime on Saturday, April 9. [Exhibit 1, p. 117:16-20]. She was expecting him home "at least by noon Saturday." [Exhibit 1, p. 118:18-20]. This was because it was Craig Stephens' normal practice to be home by noon on Saturday if he left on Friday evening to go to Atlanta. [Exhibit 1, p. 119:1-3]. According to his widow, Mr. Stephens had never left for Atlanta on a Friday evening and failed to return until Monday – or even Sunday. [Exhibit 1, p. 122:14-20]. Rather, if he left for Atlanta on Friday, he was back in Pensacola on Saturday. [Exhibit 1, p. 122:21 - 124:4]. Likewise, if he left for Atlanta on Saturday, he was back in Pensacola on Sunday. [Id.]. Mrs. Stephens' testimony in this area is best summarized as follows:

> Q. And the whole time your husband was working for Benton Express, was he ever gone for more than one night at a time?
>
> A. No.

[Exhibit 1, p. 124:5-8].

Mrs. Stephens was so concerned that her husband was not home on Saturday, that she and her church's pastor went searching for him. [Exhibit 1, p. 120:2 - 121:17]. They left at approximately 5:00 p.m. on Saturday and searched Mr. Stephens' most likely route all the way from Pensacola to Montgomery and back. [Id.]. Unfortunately, they did not find him.

2

Mrs. Stephens also was so concerned that her husband had not returned by Saturday morning that she attempted to call him on his cell phone almost constantly. She tried to call him "a lot." [Exhibit 1, p. 57:9-11]. There were times that she tried to call him every ten minutes. [Exhibit 1, p. 57:12-15]. Despite these repeated attempts -- and despite the fact that he had his cell phone with him and it was operational -- Craig Stephens never answered his wife's calls. [Exhibit 1, p. 57:16-19, 126:17-127:3].

Mrs. Stephens' testimony is supported by the logs that her husband kept pursuant to the federal DOT regulations. [See Logs, copies of which are attached hereto as Exhibit 2]. These logs indicate that, prior to the subject trip, Craig Stephens made nine (9) trips to Atlanta for Defendant in the six (6) months that preceded his death. [Id.]. Specifically, the trips were as follows:

| Date Departed for Atlanta | Date Returned to Pensacola |
| --- | --- |
| October 1, 2004 | October 2, 2004 |
| October 15, 2004 | October 16, 2004 |
| November 1, 2004 | November 2, 2004 |
| January 28, 2005 | January 29, 2005 |
| February 4, 2005 | February 5, 2005 |
| February 25, 2005 | February 26, 2005 |
| March 10, 2005 | March 11, 2005 |
| March 11, 2005 | March 12, 2005 |
| April 2, 2005 | April 2, 2005 |

[Id.]. Thus, for eight (8) of the trips, Mr. Stephens returned the next day after his departure. He made the last trip all in one day. The logs indicate that the longest time that Mr. Stephens was ever gone on these trips was ten and a half (10.5) hours. [Id.].

There is absolutely nothing in Stephanie Stephens' deposition or in any other deposition that contradicts the fact that Craig Stephens was due back in Pensacola in the early morning of

Saturday, April 9, 2005.  Mrs. Stephens' testimony was abundantly clear that she expected Mr. Stephens to return home at that time.  Her testimony also was abundantly clear that Mr. Stephens had never been gone from home for more than one night at a time while driving for Defendant.  The logs prove both that Mrs. Stephens' testimony is accurate and that Craig Stephens had never been gone from Pensacola for more than 10.5 hours while making the Atlanta "run" for Defendant.

The evidence also is clear that Stephanie Stephens was alarmed by her husband's unusual departure from his schedule.  This departure was so unusual that it caused Mrs. Stephens to call her husband's cell phone almost constantly to find out where he was and what had happened to him.  It was so unusual that it caused Mrs. Stephens to call her pastor for help and, with her pastor to go searching for her husband.

Based on all of the evidence before the Court, there can be no dispute that Craig Stephens should have arrived back in Pensacola on the morning of Saturday, April 9.  As has been earlier demonstrated and as is further supported by the deposition of Stephanie Stephens, his failure to do so was a marked and unusual deviation from his employment for purely personal reasons, and Defendant cannot be liable for his actions under Alabama law.

## II.  STOLEN VEHICLE REPORT v. MISSING MOTORIST REPORT

Defendant has asserted (and still asserts) that it filed a report with the Atlanta Police Department reporting Craig Stephens' tractor-trailer as stolen. [See Defendant's Brief in Support of Motion for Summary Judgment, Statement of Facts ¶ 21].  In opposition to Defendant's Motion for Summary Judgment, the Plaintiff has attempted to argue that, in reality, the "Incident Report" generated by the Atlanta Police Department was merely a report for a missing motorist. [See Doc. No. 55, p. 3].

Whether or not the report was for a stolen vehicle or a missing motorist is immaterial to the issues currently before the Court.  There is no dispute that Defendant contacted both the

4

Florida Highway Patrol and the Atlanta Police Department and filed reports regarding Craig Stephens during the weekend that he was AWOL. Exactly how these reports were characterized by the law enforcement authorities is not currently significant. What is important is that Benton Express filed the reports in the first place. If it was a normal or usual occurrence for Mr. Stephens to disappear from his job for 48 hours or more, then Defendant certainly would not have filed the police reports. The fact that Defendant filed the reports is undisputable evidence of just how marked and unusual Mr. Stephens' deviation from his employment was.

### III.  LENGTH OF THE TRIP FROM ATLANTA TO PENSACOLA

In her opposition to Defendant's Motion for Summary Judgment, the Plaintiff attempts to argue that the trip from Atlanta to Pensacola takes 6 hours or more and, therefore, Craig Stephens would have been required to remain in Atlanta until Sunday, April 10, under the federal DOT regulations. [See Doc. No. 55, pp. 3-4]. In support of this proposition, the Plaintiff cites the speculation of Bill Jones as to approximately how long the trip might take. [Id.]. As Mr. Jones testified in his deposition, he thinks that the trip might take "five to six-and-a-half" hours. [Deposition of Bill Jones, p. 104:4-7, excerpts of which are attached hereto as Exhibit 3]. Although Mr. Jones has driven the route before on a pleasure trip, he does not recall how long it took him to do so. [Exhibit 3, p. 105:2-16]. Because Mr. Jones has no personal knowledge of the length of the trip, his speculation in this area is inadmissible and hardly supports a dispute of a material fact. See Fed. R. Evid. 602.

Craig Stephens' logs clearly indicate that he was able to make the round-trip in 10.5 hours each time – including stopping at the Atlanta terminal to change trailers. [Exhibit 2]. This timing is consistent with that shown by Mapquest, which indicates that the one-way trip between the Atlanta and Pensacola terminals takes 5 hours and 5 minutes. [Mapquest printout, a copy of which is attached hereto as Exhibit 4]. This also is consistent with the time of 5 hours and 10 minutes calculated by Defendant's trucking industry expert, Bob Tynes, using a computer

5

program named "PC Miler." [Deposition of Bob Tynes, p. 123:15 - 126:12, excerpts of which are attached hereto as Exhibit 5]. The time calculated by Mr. Tynes is slightly longer because it is for the route from the Pensacola post office to the Atlanta post office instead of from Defendant's Pensacola terminal to its Atlanta terminal. [Id.].

When one considers Craig Stephens' history of driving the route, as reflected in his logs, and the objective evidence of the length of the route, there can be no legitimate question as to how long the route takes to drive. However, even assuming *arguendo* that the Plaintiff is correct in asserting that the route took 6 hours, it is immaterial to the issues before the Court. The so-called "11-hour Rule" in the federal DOT regulations would have required Craig Stephens to have taken 10 hours off after driving for 11 hours. [Exhibit 5, p. 120:21 - 121:16]. Thus, if the route took 12 hours round-trip, Mr. Stephens would have had to have stopped one hour short of Pensacola and refrained from driving for 10 hours to be in DOT compliance. This would have changed absolutely nothing in the case. Mr. Stephens would have passed through Montgomery at approximately 2:00 a.m. (give or take) on Saturday, April 9. He would have continued driving south from Montgomery until the point at which he had been driving for 11 hours. He then would have been required to stop for 10 hours before completing the trip to Pensacola. Thus, if the Plaintiff's unsubstantiated theory is to be believed, Mr. Stephens still would have passed through Montgomery more than 48 hours prior to the time the accident occurred, and he still would have arrived in Pensacola by the evening of Saturday, April 9.

Even assuming that the round-trip took 12 hours as is alleged by the Plaintiff, the accident still would have been prevented if only Craig Stephens had not deviated from his employment. If Mr. Stephens had left Atlanta and driven to Pensacola directly – even with a 10-hour stop along the way – Mr. Stephens would have been home in Pensacola at least thirty-six (36) hours before the accident occurred. Thus, whether the trip took 10 hours or 12 hours or somewhere in between, it is immaterial to the issues before the Court. However long the trip

took, the evidence clearly shows that the only reason Craig Stephens was driving through Montgomery on the morning of Monday, April 11, was because of his marked and unusual deviation from his employment.

### IV. DEFENDANT'S ALLEGED DUTY TO "TRACK" ITS TRUCKS AND COMMUNICATE WITH ITS DRIVERS AND ITS ALLEGED BREACH OF THOSE DUTIES

One of the Plaintiff's contentions is that Defendant should have equipped Craig Stephens' truck with a tracking device and should have communicated with Mr. Stephens while he was on the road. In its Brief in Support of Motion for Summary Judgment, Defendant has demonstrated that there is no legal authority establishing duties for Defendant in these areas.

In opposition to Defendant's Motion for Summary Judgment, the Plaintiff has attempted to demonstrate that there is a duty for trucking companies to track their trucks. In support of this premise, the Plaintiff has offered the testimony of her paid expert (or purported expert), Roland Brown. [See Doc. No. 55, p. 10]. It is important for the Court to read Mr. Brown's testimony closely, for he stops well short of testifying that there is indeed a duty for all trucking companies to track their trucks. Instead, Mr. Brown opines that Defendant should have its trucks equipped with satellite-based tracking systems because Defendant advertises on its website that it has the "latest in technology," and Mr. Brown believes that such tracking systems fall into the category of the "latest in technology." [Deposition of Roland Brown, p. 137:19 - 138:15, 143:17-23, 145:20-22, 147:2-7, excerpts of which are attached hereto as Exhibit 6]. When pushed on the issue of whether satellite-based tracking systems are truly the industry standard, Mr. Brown waffles. He testifies that such systems are "getting to be" the industry standard and that "it may not be totally the industry standard but it's getting closer to it and there's certainly a lot of indication that it is getting to be the trucking – the trucking industry standard, yes." [Exhibit 6, p. 138:16 - 139:3].

As demonstrated above, even the Plaintiff's own hired expert cannot state that Defendant had a duty to equip its trucks with satellite-based tracking devices. Instead, in Mr. Brown's opinion, a trucking company can fulfill whatever obligations he believes it has in this area by supplying its drivers with cell phones. [Exhibit 6, p. 147:23 - 148:6]. It is undisputed that Defendant provided Craig Stephens a Nextel cell phone/radio and that he had it with him during the weekend that he was AWOL. [See Defendant's Brief in Support of Motion for Summary Judgment, Statement of Facts ¶¶ 17, 30]. Thus, according to the Plaintiff's own expert, Defendant fulfilled its alleged duty as a trucking company to provide its driver with a cell phone.

As is revealed when one reads Mr. Brown's testimony closely, the only reason that he believes that Defendant should be required to install satellite-based tracking systems on its trucks is that Defendant purportedly advertises on its website that it uses the "latest in technology." Based on Mr. Brown's testimony, perhaps one of Defendant's customers could sue the company for breach of contract or misrepresentation for failing to use satellite-based tracking systems. However, whatever promises Defendant has made to its customers on its website are immaterial to the issues before the Court. The Plaintiff has made absolutely no showing – nor could she – that Ronald Roby was a third-party beneficiary of any promises made by Defendant to its customers.

The Plaintiff also attempts to show that Defendant had a duty to equip its trucks with satellite-based tracking systems by citing a survey conducted by Liberty Mutual Insurance Company. [See Doc. No. 55, p. 11-12]. First, this document constitutes inadmissible hearsay and cannot be considered by the Court. Second, the Plaintiff has made no demonstration that the survey is in any way reliable or otherwise scientifically sound. Third, even if considered by the Court, the document indicates only that "<u>almost half</u> of the companies" responding to the survey have "GPS" (Global Positioning Systems) installed on their trucks. Thus, according to the survey, Defendant falls into the <u>majority</u> of all trucking companies that do <u>not</u> have GPS

tracking on their trucks.  It is incomprehensible how this survey – even if admissible and reliable– constitutes any evidence of a trucking company's duty to install GPS tracking systems.

The Plaintiff also argues that Defendant voluntarily undertook a duty to install tracking systems on its trucks because the company searched for Craig Stephens after he went AWOL. [<u>See</u> Doc. No. 55, pp. 12-14].  The Plaintiff's argument in this area is confusing, at best. However, the Plaintiff appears to be stating that, if Defendant had not searched for Mr. Stephens after he went AWOL, then Defendant would have had no duty to "track" Mr. Stephens.  However, because Defendant acted responsibly by searching for Mr. Stephens, Defendant had a duty to install a tracking device retroactively on Mr. Stephens' truck before he went AWOL.  This argument is unfounded, illogical, and even nonsensical.

Finally, the Plaintiff offers snippets of testimony by Defendant's accident reconstruction expert, Tony Stephens, to attempt to show that Defendant voluntarily undertook a duty to track its trucks.  It is unclear how Mr. Stephens' testimony is supposed to support the Plaintiff's contentions.  However, in any event it should be noted that Mr. Stephens is an accident reconstruction and law enforcement expert.  He is not a trucking industry expert (unlike Defendant's expert in that area, Bob Tynes) and has no expertise with trucking companies except what he has learned in his experience as a law enforcement officer.  Relevant to this case, the extent of that knowledge is that Defendant acted reasonably when it reported Craig Stephens missing to the law enforcement authorities and that the Alabama State Troopers do not require trucking companies to have GPS tracking. [Report of Opinions of Tony Stephens, a copy of which is attached hereto as Exhibit 7; Deposition of Tony Stephens, p. 232:11-24].  Any other testimony by Mr. Stephens is outside of his area of expertise.

As Defendant has previously shown, the law in this Court is clear that "the plaintiff bears the burden of proving the existence of a duty," and that "the duty may derive from statutory law or the common law." <u>Prickett v. United States</u>, 111 F.Supp. 2d 1191, 1195 (M.D. Ala. 2000);

Prettyman v. Goodwin, 114 F.Supp. 2d 1188, 1189 (M.D. Ala. 2000).  Despite ample opportunity, the Plaintiff still has not provided the Court with a single regulation, statute, or case that places a duty on trucking companies to track their trucks.  The best the Plaintiff has offered are the opinions of its expert and an inadmissible survey by an insurance company – both of which fall woefully short of placing any duties on Defendant.  The Plaintiff has not carried her burden of proving a duty in this area, and her claims for Defendant's alleged failure to track its trucks and communicate with its drivers must be dismissed.

## V.  CONCLUSION

The Plaintiff has failed to demonstrate a genuine issue of material fact or to show that Defendant is not entitled to judgment as a matter of law.  Accordingly, summary judgment is due to be entered on all of the Plaintiff's claims in favor of Defendant.

Respectfully submitted,

 s/ Gregory A. Brockwell
BRETT A. ROSS (ASB-6771-O76B)
GREGORY A. BROCKWELL (ASB-9949-R49B)

Attorneys for Defendant Benton Express, Inc.

**OF COUNSEL:**

CARR ALLISON
100 Vestavia Parkway
Birmingham, AL 35216
(205) 822-2006
(205) 822-4058 (Direct Facsimile)
E-mail: bar@carrallison.com
         gab@carrallison.com

**CERTIFICATE OF SERVICE**

      I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following on this the 31st day of January, 2006:

Jere L. Beasley
Labarron N. Boone
Julia A. Beasley
BEASLEY, ALLEN, CROW,
   METHVIN, PORTIS & MILES, P.C.
218 Commerce Street
P.O. Box 4160
Montgomery, AL 36103-4160

                                                _s/ Gregory A. Brockwell_
                                                Of Counsel