**EXHIBIT 5:**     **EXCERPTS OF DEPOSITION OF BOB TYNES**

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3              NORTHERN DIVISION
 4
 5
 6   HAZEL M. ROBY, as
 7   Administratrix of the
 8   Estate of RONALD
 9   TYRONE ROBY, Deceased,
10
11        Plaintiff,
12
13   v.                          CIVIL ACTION NO:
14                                 2:05CV194-T
15   BENTON EXPRESS, INC.,
16   et al.,
17
18        Defendants.
19
20
21
22           DEPOSITION OF:
23
24        ROBERT C. TYNES
25
```

Page 118

1  Q. Okay. Can you turn to me the section
2  that would talk about hours of service?
3  A. Sure.
4  Q. What section is that?
5  A. 395.
6  Q. .3 or something like that?
7  A. 395 is the whole section that deals
8  with logs and hours of service.
9  Q. Okay. Are you there?
10 A. I'm there.
11 Q. Let me look at it for a second.
12 A. I think the one you are looking for is
13 395.3, the one that was quoted by Mr. Brown.
14 Q. Yes. Is that in here?
15 A. Yes. He claims it was J. J. Keller's
16 interpretation. It is not.
17 Q. Right. It's actually the Federal
18 Government's?
19 A. The Federal Government's
20 interpretation.
21 Q. J. J. simply published it, is your
22 distinction that you're making?
23 A. Right. They get the plates, and they
24 just publish it.
25 Q. Okay. Got you. Were these

Page 119

1  interpretations something you relied on as
2  an enforcement agent and as a consultant
3  since you've left there?
4  A. Yes, sir, that's true.
5  Q. Okay. Sir, moving on. Have you
6  reviewed any fuel records in this case?
7  A. No, I don't believe. I have the logs.
8  I have the trip reports. I don't recall any
9  fuel records.
10 Q. And the trip reports and logs are on
11 the --
12 A. On the CD.
13 Q. -- CD. Have you printed any out?
14 A. No.
15 Q. You just reviewed what was on the CDs?
16 A. Correct.
17 Q. And as you sit here, do you recall any
18 fuel records?
19 A. I don't recall any. There may have
20 been some on the trip reports that indicate
21 where fuel was purchased.
22 Q. Did the fuel records in any way
23 provide you with any information concerning
24 trying to locate Mr. Craig Stephens at
25 various times after he left Pensacola?

Page 120

1  A. No.
2  Q. Do you know if he got any fuel after
3  the time he left Pensacola?
4  A. I don't believe so. I don't recall
5  seeing any.
6  Q. Okay. So if he got any fuel after
7  leaving Pensacola, you just haven't seen it?
8  A. That's right.
9  Q. Would you agree with me according to
10 the regulations that if a truck driver --
11 well, tell me what the hours of service
12 regulations require.
13 A. Currently?
14 Q. Yes.
15 A. They just changed October 1st of this
16 year. Are you talking about at the time
17 that this occurred?
18 Q. Yes. That's even better. Tell me
19 what applied at the time this occurred.
20 A. Okay. The 11-hour rule.
21 Q. And what is the 11-hour rule?
22 A. It states that a driver may not drive
23 more than 11 hours after he's had 10
24 consecutive hours off.
25 Q. I think I understood you. But I'm

Page 121

1  going to restate it to make sure. You said
2  it a little different. He cannot drive --
3  at 11 hours, he must take 10 hours off of
4  driving?
5  A. No. He just may not drive anymore.
6  Q. After 11 hours of driving, he cannot
7  drive anymore?
8  A. Until he has 10 hours off duty.
9  Q. Right. So after 11 hours of driving,
10 he can't drive anymore until he has 10 hours
11 off?
12 A. Correct.
13 Q. And if he drives more than 11 hours
14 without 10 hours off, then he's in violation
15 of the rules?
16 A. That's correct.
17 Q. Do you see any evidence in this case
18 that Mr. Craig Stephens ever violated the
19 11-hour rule when he was making this trip
20 from Pensacola to Atlanta and from Atlanta
21 back to Pensacola?
22 A. No, I didn't see any.
23 Q. You would agree with me though that if
24 he was driving more than 11 consecutive
25 hours, then he was in violation of the rule

Page 122

1  if that was the fact?
2      A. All I can say is that if he drove more
3  than 11 hours since his last 10 hours off,
4  then he would be in violation.
5      Q. That's right. And would you agree
6  with me -- is there any evidence in this
7  case to you that the trip from Pensacola to
8  Atlanta and from Atlanta back would take in
9  excess of 12 hours, which would require 10
10 hours off?
11     A. You mean in excess of 11 hours?
12     Q. Yes, in excess of 11 hours, which
13 would require 10 hours off?
14     A. Is there any evidence in here that
15 that round trip would take more --
16     Q. -- than 11 hours?
17     A. No.
18     Q. You haven't seen any?
19     A. No.
20     Q. None?
21     A. No, sir.
22     Q. Have you looked through the documents
23 to try to determine if there was any?
24     A. Yes. I looked through there. There
25 was no evidence that I would relied on to

Page 123

1  show that the driver took longer than that.
2      Q. Well, for the case of this deposition,
3  tell me any evidence, whether you rely on it
4  or not, because I want to know what you
5  might not be relying on because it could be
6  important. Any evidence that you did not
7  rely on that this trip could take more than
8  11 hours?
9      A. This trip can be turned in probably
10 10, 10 and a half hours.
11        MR. BOONE: Strike that as
12 non-responsive.
13     Q. And at this point I'm not asking your
14 opinion. I'm asking you about evidence in
15 this file. Is there any evidence in this
16 file that this trip would take more than 11
17 hours?
18     A. No.
19     Q. Have you reviewed the overdue motor
20 report filed by Mr. Bill Jones in this case?
21     A. Yes, I would have.
22     Q. You didn't find any information in
23 there that could suggest that this trip
24 could take more than 11 hours?
25     A. Well, he indicated I think in that

Page 124

1  report that he didn't report back on a trip
2  that he should have been back within six
3  hours.
4      Q. Is it your understanding from that
5  report of overdue motor report filed by
6  Mr. Bill Jones that he told the officer that
7  the trip took approximately six hours?
8      A. I think he indicated to him that he
9  failed to return, that the trip was
10 approximately a six-hour trip.
11     Q. If it was six hours up and six hours
12 back, is that more than 11 hours?
13     A. That would be. Six and six would be
14 12. That doesn't mean it took the driver
15 that long.
16     Q. Mr. Bill Jones at least reported to
17 the police officer that the trip took
18 approximately six hours up, six hours back?
19     A. I think he indicated the trip was
20 approximately six hours.
21     Q. Up; right? Is that what you
22 understood?
23     A. Up and back.
24     Q. Up and back?
25     A. Talking about six hours total, one

Page 125

1  way.
2      Q. One way, meaning six hours up, six
3  hours back?
4      A. Right.
5      Q. Yes?
6      A. That's not proof to me.
7      Q. And my question was: Is there any
8  evidence to support the trip would take over
9  11 hours?
10     A. No.
11     Q. And you don't consider that evidence?
12     A. No, I don't.
13     Q. Even though a terminal manager in
14 Atlanta who works for Benton says it takes
15 six hours each way?
16     A. I worked for DOT. I can't use as
17 evidence something somebody says offhand in
18 a report. I have to rely on other items,
19 other documentation. I ran this particular
20 trip on PC Miler. PC Miler indicates that
21 the trip can be made in five hours and ten
22 minutes. Now, the problem is that PC Miler
23 runs from post office to post office. So
24 you are adding miles and you're adding time
25 as you go into, for example, into the center

Page 126

1   of Atlanta. It chose a post office in the
2   center of Atlanta. Their terminal is on the
3   south side, substantially reducing the time
4   and routes that it had to take to do that.
5       So it's my opinion based on that, that
6   I haven't seen any evidence that indicates
7   that it can't be made in the time the driver
8   logged it on there. Because somebody makes
9   a statement in a police report that it takes
10  about six hours to make that run, that's not
11  proof to me or evidence that it can't be
12  made in the five hours that he logged.
13      Q. Would you agree with me, as an expert,
14  the best way to determine how long this trip
15  would take would be by driving it and having
16  experience on knowing how long it actually
17  takes because of traffic and other factors
18  on that route?
19      A. That would be the best possible way to
20  do it, certainly.
21      Q. And do you believe a terminal manager
22  who sends his drivers day in and day out
23  between Pensacola and Atlanta would be the
24  best person to know how long it takes to
25  make that trip?

Page 127

1       A. I don't know that to be the case, no.
2       Q. Would you expect, as somebody who's
3   here saying they're testifying about
4   industry practices, that a terminal manager
5   would be the person in the best position to
6   testify and say how long it takes his
7   drivers to make a trip?
8       A. Not necessarily, no.
9       Q. You wouldn't expect the terminal
10  manager to be the best person to know how
11  long a particular trip would take?
12      A. No. I think the driver making the run
13  would be the person in the best position to
14  do that.
15      Q. And that person who runs it is
16  supposed to have answered to their terminal
17  manager?
18      A. Sure. I guess he does.
19      Q. And whatever that person does, their
20  terminal manager is expected to manage him
21  and know what he does?
22      A. He's expected to manage him.
23      Q. A terminal manager is expected to know
24  how long their drivers take to make a trip?
25      A. Some do; some don't.

Page 128

1       Q. Do you have any information to suggest
2   that when Mr. Bill Jones gave this
3   information to the police officer that he
4   did not know how long it takes?
5       A. I have no idea.
6       Q. Do you have any reason --
7       A. It was his opinion that it was
8   approximately six hours.
9       Q. And that police report is part of the
10  information that you received?
11      A. On those CDs, yes, sir.
12      Q. And it's information I gather now that
13  you did not rely on in anyway?
14      A. No. I relied on PC Miler. I relied
15  on what I normally did when I was with DOT
16  to try to determine if a log was false or
17  had potential to be false.
18      Q. Despite the testimony of somebody who
19  supervises truck drivers who make that run
20  everyday?
21      A. I'm sure I wouldn't rely on some
22  statement somebody made in the police
23  report. I rely on the other information
24  that I had too and DOT. I could not take
25  that statement that he indicated to the

Page 129

1   police officer it's about a six-hour run and
2   use that as a case to prosecute before an
3   administrative law judge with DOT. I would
4   get laughed out of court.
5       Q. You can undertake an investigation if
6   somebody tells you it takes six hours, which
7   is in violation of the rules, that could
8   trigger you to look at it closely and
9   actually verify whether it does or does not?
10      A. I could take an investigation any time
11  I wanted to. But if I ran it under PC
12  miler, and it shows five hours and ten
13  minutes run, I'm not going to listen to what
14  this guy says and institute an investigation
15  on something a driver is logging for five
16  hours. No, I would not.
17      Q. Let's talk about this PC miler
18  quickly. Which speed -- do you determine
19  what information goes in PC miler as far as
20  speed?
21      A. You do to an extent. You can set the
22  average speed for each of the types of road
23  that it's operating on.
24      Q. And did you do that?
25      A. Yes.