# Hazel Roby, as Administratrix of the Estate of Ronald Tyrone Roby, Deceased

## v.

# Benton Express, Inc.

## Exhibit C
## Plaintiff's Response to
## Defendant's Reply Brief

## Excerpts from the Deposition
## of Robert Tynes

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA
 3                  NORTHERN DIVISION
 4
 5
 6   HAZEL M. ROBY, as
 7   Administratrix of the
 8   Estate of RONALD
 9   TYRONE ROBY, Deceased,
10
11        Plaintiff,
12
13   v.                          CIVIL ACTION NO:
14                                  2:05CV194-T
15   BENTON EXPRESS, INC.,
16   et al.,
17
18        Defendants.
19
20
21
22              DEPOSITION OF:
23
24              ROBERT C. TYNES
25
```

1   A. I just told you.
2   Q. Yes?
3   A. That I thought that they finally came
4   to the realization it was probably futile.
5   Q. Okay. Do you know of any technology
6   that could have allowed them to locate and
7   pinpoint his location and remove him from
8   the vehicle if they wanted to?
9   A. If they had employed certain
10  technologies, then certainly there's
11  technologies to locate a truck.
12  Q. And what type of technologies is that?
13  A. Well, like Qualcomm or something like
14  that.
15  Q. GPS tracking, not just Qualcomm,
16  because Qualcomm is a particular brand?
17  A. Yeah, Qualcomm is a brand.
18  Q. And what you're talking about is the
19  GPS tracking feature of Qualcomm?
20  A. Well, you have to have a transmitter
21  to go along with the GPS feature. So it
22  takes something like Qualcomm. You know,
23  like I said, GPS is a series of satellites
24  owned by the government. They're not owned
25  by Qualcomm.

1    Q. Right. I'm not trying to get
2  technical with you. All I was saying is:
3  You are talking about the ability to track
4  through the GPS system no matter how it
5  works, whether it's a satellite or whatever
6  you was explaining to me, but you are
7  talking about Qualcomm and other systems
8  would allow you to track tractor-trailers?
9    A. Yeah, if it's on.
10    Q. And some of the trucking companies out
11  there on the roads today have the tracking
12  feature?
13    A. Some of them do, yes.
14    Q. And early on, you named quite a few
15  for me?
16    A. Yeah, there were a few.
17    Q. And if they had Qualcomm and the GPS
18  tracking feature, just like some of the
19  companies you named early on, they could
20  have identified and located Craig Stephens?
21    A. If it was on and was equipped with it,
22  then you could use it to locate him.
23    Q. And you keep saying if it's on,
24  companies that have GPS tracking features
25  through Qualcomm or whatever other service,

1  they have the tracking feature. They don't
2  just normally turn it off, do they?
3      A. Some do.
4      Q. If they are trying to track their
5  vehicles they do that?
6      A. No. It's left to the driver. There's
7  certain companies that use it for DOD. If
8  they're not hauling DOD explosives, then a
9  lot of the drivers want to turn it off and
10 they do.
11     Q. Let's talk about not hypothetically if
12 a driver turns it off. But if you want to
13 track your trucks, you don't turn it off, do
14 you?
15     A. No, not if you want to track them.
16     Q. Okay. The companies who are trying to
17 track their trucks, they could've located
18 Mr. Craig Stephens and found him?
19     A. Yes, if it was equipped with Qualcomm
20 or some other type of system like that.
21     Q. Do you know if any companies you are
22 aware of have policies and procedures of
23 what to specifically if a vehicle comes up
24 missing?
25     A. I don't know of many.

1    the largest insurer of truck carriers?
2        A. I don't know that to be true.
3        Q. Are they big?
4        A. They are a big insurer.
5        Q. You do agree and we talked about this
6    earlier, without saying necessarily
7    communication policy or otherwise, but do
8    you agree that all carriers including Benton
9    has a duty to implement reasonable safety
10   policies and procedures to protect the
11   motoring public?
12       A. Sure.
13       Q. And you agree that they have a duty to
14   enforce safety policies and procedures to
15   make sure drivers are not on the road sleepy
16   and fatigued?
17       A. Yes, sir, I do.
18       Q. And to enforce policies and procedures
19   to make sure they are not violating the
20   hours of service?
21       A. Yes, sir.
22       Q. And to have safety policies and
23   procedures in place to make sure they are
24   not violating any of the Federal Motor
25   Carrier Safety Regulations?

```
 1      A. There was the 70-hour violations that
 2   took place back in March.
 3      Q. Let me be more specific.  For this
 4   trip --
 5      A. For this trip?
 6      Q. -- that ultimately led to this wreck?
 7      A. No, sir.
 8      Q. So would it be fair to say that as an
 9   enforcement officer, which you used to be;
10   correct?
11      A. Correct.
12      Q. And as an expert, why you're here
13   today, that if you had been working at a
14   weigh station or at a random roadside
15   inspection station, there would not have
16   been any reason for you to stop and remove
17   the Benton truck from being out there or
18   take it out of service?
19      A. Not that I am aware of.
20      Q. I know we talked briefly about
21   technological advances.  Have you looked at
22   any documents to try to determine what
23   high-tech systems or technological advances
24   are used at Benton?
25      A. No.
```

```
 1      Q. You would consider GPS a technological
 2   advance in the trucking industry?
 3      A. Sure, it is.
 4      Q. A high-tech system?
 5      A. I would.
 6      Q. That was I would?
 7      A. Yes, sir.
 8      Q. Are cellular telephones more
 9   dependable than two-way walkie-talkie
10   systems?
11      A. I don't know if they're more
12   dependable. I have no idea.
13      Q. What about the range of coverage?
14      A. I think it depends on the supplier and
15   the towers near by. I wouldn't have any
16   opinions on who's reliable and who's not.
17      Q. From looking at the files in this
18   case, do you have any idea what method, if
19   any, Benton had to tell where -- for
20   customers if they called to say where's my
21   load, did Benton have any mechanism in place
22   to tell specifically where a truck was at a
23   specific time?
24      A. Not on a specific highway at a certain
25   time. They would know if the shipment had
```

1    A. Correct. He didn't, no.
2    Q. What do you mean "he," you mean Glenn
3    Clark hadn't terminated him?
4    A. Correct.
5    Q. You do understand Glenn Clark was the
6    one who had the most routine and frequent
7    contact with Craig Stephens?
8    A. I would imagine he was more so than
9    Jones, because he was in Pensacola everyday.
10   Q. And do you remember Jones' testimony
11   that he may not have even ever seen him
12   before?
13   A. Seems like I recall something about
14   that.
15   Q. Do you agree that a company has a duty
16   to do what it advertised to its customers,
17   to do what it says it's going to do?
18   A. A duty?
19   Q. Yeah, to do what it promises its
20   customers it's going to do.
21   A. They have no regulatory duty to do
22   that.
23   Q. I mean, as a person who's experienced
24   in the industry and consults -- I'm not
25   talking about regulatory -- but if a company

1  promises a customer that it's going to do
2  something, should they do it?
3      A. I would think so.
4      Q. And if a company advertises that it
5  has the most current and technological
6  advances, should they have it?
7      A. Yeah, but that's a pretty broad
8  meaning.
9      Q. Right. But you don't advocate a
10 company in lying to customers about what its
11 technological capabilities are, do you?
12     A. No. I wouldn't propose that any
13 company lie to their customers.
14     Q. And you would agree that they have a
15 duty, if they say they are going to do
16 something, to do it?
17     A. Correct.
18     Q. Let me show you what I'm going to mark
19 as Plaintiff's Exhibit 18. You have looked
20 at the police report, I think you told me?
21     A. Yes.
22
23          (Plaintiff's Exhibit No. 18 was marked
24              for identification.)
25