# DEFENDANT'S MOTION TO EXCLUDE
# PLAINTIFF'S EXPERTS

**EXHIBIT 1:**    **Deposition of M.P. Stirling**

## FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


HAZEL M. ROBY, as Administratrix of the

Estate of RONALD TYRONE ROBY, Deceased,

      Plaintiff,

COPY

vs.            CIVIL ACTION NO.: 2:05CV194-T


BENTON EXPRESS, INC., et al.,

      Defendants.


*   *   *   *   *   *

      DEPOSITION OF MARY P. STIRLING, taken pursuant to notice and stipulation on behalf of the Defendants, at the law offices of Beasley, Allen, Crow, Methvin, Portis & Miles, Montgomery, Alabama, before Bridgette Mitchell, Shorthand Reporter and Notary Public in and for the State of Alabama at Large, on December 13, 2005, commencing at 5:55 p.m.

# FREEDOM COURT REPORTING

1            like, metal has scraped the pavement?

2   A.    Absolutely.   Anything that was caused -- any

3         kind of evidence that was caused by the

4         accident we look for.

5   Q.    Have you done any of those things in this

6         case?

7   A.    No.   I have been to the scene, but all the

8         roadway evidence was gone by the time I went

9         to the scene so I've had to rely on

10        photographs.

11  Q.    When did you go to the scene?

12  A.    I don't know that I have that with me.

13        Let's see.   Early September.   I don't happen

14        to have the exact date with me.   I can get

15        that for you, if you'd like.

16  Q.    That's fine.   It's about, what, five months

17        after the accident?

18  A.    Yes.

19  Q.    And you say the roadway evidence was not

20        there anymore; is that right?

21  A.    That's correct.

22  Q.    Was the scene pretty much as it is today?

23  A.    Yes.   That intersection of 65 and 85 was

# FREEDOM COURT REPORTING

1   Q.   So how do you know that these photographs

2        are ones that the city engineer took versus

3        ones that other people took?

4   A.   Well, there were -- some of their employees

5        were in the scene in some of the

6        photographs, so I believe those are the ones

7        they took.

8   Q.   And these were taken fairly recently after

9        the accident?

10  A.   Yes.

11  Q.   Were they taken on the day of the accident?

12  A.   I don't know.

13  Q.   Do you know whether the CD that we're

14       talking about is the set of photographs that

15       are part of the Montgomery Fatal Traffic

16       Collision Investigation?

17  A.   I haven't seen that.

18  Q.   You have not seen the fatal traffic and

19       collision investigation?

20  A.   All I've seen is the accident report.

21  Q.   So you weren't provided the full report from

22       Mr. Boone's office?

23  A.   Wasn't aware there was another report.

# FREEDOM COURT REPORTING

1    Q.   Is that something that you would like to

2         have?

3    A.   Yes.

4    Q.   If you knew that there were witness

5         statements in the report, would that be

6         significant to you?

7    A.   I had the depositions from witnesses.

8    Q.   You had depositions from eyewitnesses to the

9         accident?

10   A.   Yes, I did.

11   Q.   Well, the only eyewitnesses I'm aware of

12        that have been deposed were this afternoon.

13   A.   I gave you this folder.  It had them in

14        there.

15   Q.   Well, I wrote down all the depositions in

16        that folder and they were Glen Clark, Don

17        Hammonds, Hazel Roby, Garland McClellan,

18        Mary Means, and David Justice.  Are those

19        the ones you're talking about?

20   A.   I'm sorry.  I did.  I looked at those at

21        this office.  I sure did.  I looked at those

22        depositions at this office and sat and read

23        them and made notes.  That was the first day

# FREEDOM COURT REPORTING

```
1        I worked on the case.  I came by here and
2     read those depositions.
3              MR. BOONE:  I think it's not a
4     deposition.  They hadn't been taken.  You
5     just read my personal summary of what I
6     gathered from my investigator's interview of
7     witnesses.
8              THE WITNESS:  I'm sorry.  My
9     mistake.
10 Q.   Is that something that you reviewed, is
11      Mr. Boone's summaries of --
12 A.   Witness statements, yes.
13 Q.   And is that something that's in your file?
14 A.   No.  I read them here at this office.
15 Q.   Well, that is something, since you have
16      reviewed that, that is discoverable in this
17      case.
18              MR. BROCKWELL:  And I'd ask
19      Mr. Boone that he provide those, anything
20      that Ms. Stirling has reviewed, please.
21              MR. BOONE:  Well, I'm -- at this
22      point I object to it, but I'll see if I can
23      recollect what she reviewed.  And we'll try
```

# FREEDOM COURT REPORTING

1    to -- we'll make an issue -- we'll either

2    object to produce it -- and I'll let you

3    know whether I will.

4           MR. BROCKWELL:  Will you do that

5    quickly?

6           MR. BOONE:  Oh, yeah.

7           MR. BROCKWELL:  Do you have any

8    basis for objecting to producing materials

9    that she has reviewed in this case?

10          MR. BOONE:  Yeah.  Other than

11    potentially on the onset is attorney

12    work-product and privilege, my

13    interpretations of what witnesses would say.

14          MR. BROCKWELL:  Well, I -- we can

15    take --

16          MR. BOONE:  We don't -- you can

17    file an objection -- if I decide to say I'm

18    not going to give it to you, then you can

19    file an objection and say I should.  We'll

20    deal with it swiftly.

21  Q.  Ms. Stirling, as part of this Montgomery

22    Police Department Fatal Traffic Collision

23    Investigation, there are some thumbnail

## FREEDOM COURT REPORTING

1      what I'll do is mark the CD as Defendants'

2      Exhibit 8 and ask our court reporter to

3      please make a copy of the CD to attach as an

4      exhibit.

5             (Defendants' Exhibit 8 was

6             marked for identification.)

7  Q.  During that line of questioning, I believe

8      we established that there are some other

9      documents you've looked at in this case that

10     are not contained in your file; is that

11     correct?

12 A.  Yes.

13 Q.  And it's your belief that those -- I think

14     you said that they were witness depositions;

15     is that right?

16 A.  I was wrong.  I guess they're witness

17     statements, I guess.

18 Q.  Well, you've -- you're familiar with a

19     deposition, aren't you?

20 A.  Yes.  It had been a while and I worked

21     several cases since.  And I was looking for

22     them and couldn't find them and then I

23     remembered that I had read them here and I

# FREEDOM COURT REPORTING

```
 1    A.   Yes.

 2    Q.   Is his testimony anything that would be

 3         significant to you?

 4    A.   Yes.

 5    Q.   I would ask if you are provided

 6         Mr. Stabler's deposition -- or Officer

 7         Stabler's deposition -- or if you're

 8         provided any other information in this case,

 9         if it changes your opinions in any way, will

10         you provide a supplemental report of your

11         opinions?

12    A.   Yes.

13    Q.   Do you keep a list of documents that you are

14         provided in a case?

15    A.   Not a list.  I keep them all in the file.

16    Q.   You keep them all except for the witness

17         statements that we talked about earlier in

18         the file?

19              MR. BOONE:  Objection to form.

20         She's never had possession of them.

21         Objection to form.

22    A.   I've never had possession of those.  I've

23         read them here in this office and made notes
```

# FREEDOM COURT REPORTING

1    from them.

2  Q.  Okay.  So you don't consider that you've

3    been provided with those?

4          MR. BOONE:  She hasn't been

5    provided with those.  But go ahead.

6  A.  I haven't been provided them, no.

7  Q.  You have been provided access to them, but

8    you have not been allowed to leave this

9    building with copies of them; is that fair

10    to say?

11  A.  That's true.

12  Q.  Are there any other documents like those

13    witness statements that you have been

14    provided access to but that you do not have

15    copies of?

16  A.  No.

17          MR. BOONE:  Can I have a continuing

18    objection to -- I don't believe they were

19    witness statements.  I think they were my

20    summaries -- of ours -- of what we expected

21    a witness to say from what they told us.

22    But I don't think a witness statement is a

23    fair characterization.  I want to preserve

# FREEDOM COURT REPORTING

1      that.  I might be wrong about that.

2              MR. BROCKWELL:  Well, that's fine.

3      I think that Ms. Stirling has called them

4      witness depositions.  I know that you've

5      stated they may not have been that.  All

6      we're asking for is whatever she's looked

7      at.

8              MR. BOONE:  I understand.

9   Q.  And, Ms. Stirling, you are not disputing

10     that Glen Clark did indeed call the Florida

11     Highway Patrol and make a report, are you?

12  A.  No.

13  Q.  And when he called the Florida Highway

14     Patrol, was he doing what he should have

15     been doing as a representative of a trucking

16     company?

17              MR. BOONE:  Objection to form.  I

18     don't think I've hired her as an expert to

19     testify on how fast he should have did it,

20     who he should have called first, and

21     corporate policies and procedures on how to

22     report this.

23              So I'll just make you aware, ma'am,

## FREEDOM COURT REPORTING

```
 1        read everything I gave her, so she has

 2        knowledge on a lot of subjects that might

 3        not be covered on her opinion because she

 4        read it all.

 5   Q.   Let's rein this in a little bit.  Okay?  I

 6        really don't care what your interpretation

 7        of Benton Express Company policy is unless

 8        you're an expert in that field.  Are you?

 9   A.   No.

10   Q.   And I really don't care what your opinions

11        are about what Craig Stephens was doing for

12        forty-eight hours that he was missing

13        because you're not an expert in that area,

14        are you?

15   A.   No.

16             MR. BOONE:  Object to the form.

17   Q.   You're an expert -- or at least you're being

18        offered as an expert in accident

19        reconstruction, aren't you?

20   A.   Yes.

21   Q.   And does Benton Express company policy have

22        anything to do with your opinions here

23        today?
```

# FREEDOM COURT REPORTING

1  A.  I've given some opinions, haven't I?  I

2      mean, I don't -- what do you mean?  Say that

3      again.

4  Q.  Your expert opinions here today --

5  A.  No.

6  Q.  -- in accident reconstruction.

7  A.  I've given a lot of opinions on other things

8      that weren't --

9  Q.  But I'm trying to get us back to your field

10     of expertise.

11 A.  Thank you.

12 Q.  Okay.

13         MR. BOONE:  For the record, any

14     opinion -- I don't remember any outside it,

15     but any opinion she already gave because

16     counsel asked her, I believe I have a right

17     now to ask her.  But go ahead.

18 Q.  Well, tell me this:  What is significant to

19     your expert opinions in this case?

20 A.  I think it's significant that Mr. Stephens

21     ran into the bridge abutment, went off the

22     bridge, and landed on I-65 south and slid

23     into Mr. Roby's car, and, as a result

# FREEDOM COURT REPORTING

1      Mr. Roby and Mr. Stephens are dead.

2  Q.  And as part of -- part of what you stated

3      here is based on other evidence; right?

4  A.  Yes.

5  Q.  And it's based on photographs you've looked

6      at; is that correct?

7  A.  Yes.

8  Q.  And is it based on anything else that you've

9      done besides look at photographs?

10  A.  Yeah.  It's based on the statements of the

11      eyewitnesses --

12  Q.  All right.

13  A.  -- that I read.

14  Q.  And tell me what else.

15  A.  And the police report.

16  Q.  Anything else?

17  A.  Basically, that's it.

18  Q.  Okay.  And so I just want to clear things up

19      here, if we can.  That you are being offered

20      as an expert in accident reconstruction; is

21      that right?

22  A.  Yes.

23  Q.  And you have reached opinions as an expert

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

1    on how the accident that is the subject of

2    this case occurred; is that correct?

3  A.  Yes.

4  Q.  And those opinions are contained in the

5    disclosure of your opinions that have been

6    filed in this case; is that correct?

7  A.  Yes.

8  Q.  Do you have any opinions that are not

9    contained in these disclosures?

10  A.  No.

11  Q.  And I will go ahead and mark them for us so

12    that we know what we're talking about.

13  A.  Do I have any opinions?

14  Q.  Any expert opinions.

15  A.  No.

16  Q.  I don't want to know what you think about my

17    tie or my haircut or anything else.  We're

18    going to talk about accident reconstruction.

19    Okay?

20  A.  Thank you.

21  Q.  All right, ma'am.  I'm going to mark what is

22    entitled the Initial Preliminary Report of

23    Opinions by M.P. Stirling as Defendants'

## FREEDOM COURT REPORTING

```
 1        of tire marks, and there just -- there were

 2        none.

 3   Q.   Is there anything else you base your opinion

 4        that Mr. Roby was on I-65?

 5   A.   Also the officer's police report.  They were

 6        on the scene there when everything was

 7        fresh.

 8   Q.   What part of their police report are you

 9        relying upon?

10   A.   Upon the fact that they looked at all the

11        evidence and they determined that Mr. Roby

12        was on I-65 south.

13   Q.   So you're talking about the conclusions they

14        reached?

15   A.   (Witness nods head.)

16   Q.   If you could answer out loud, please.

17   A.   Yes.

18   Q.   But you have not seen the full police

19        report, have you?

20   A.   No, I haven't.

21   Q.   And so you have not seen all of the evidence

22        that was part of the police investigation?

23   A.   My conclusions are based on what I was
```

# FREEDOM COURT REPORTING

1     given, the materials that I was given.

2  Q.  And specifically, your conclusions, as it

3     relates to those based upon the police

4     report, are that you based your opinions on

5     the opinions of the investigating police

6     officers; is that correct?

7  A.  Yes.

8          MR. BOONE:  Let me object to form.

9     I think she said she's reviewed the police

10     report, not just his opinions.

11          MR. BROCKWELL:  Well, I'll

12     respectfully disagree with you and ask you

13     again please not try and testify for your

14     witness.

15  Q.  Would it be significant to you that there

16     are a number of witness statements in the

17     full police report?

18  A.  It may be.

19  Q.  Was that -- are those witness statements

20     something that you would have liked to have

21     read when forming your own opinions?

22  A.  Yes.

23  Q.  And in cases where you have disagreed with

# FREEDOM COURT REPORTING

Page 132

1        the conclusions reached by the investigating

2        police officers, have you looked at all of

3        the evidence?

4    A.   Yes.

5    Q.   For instance, you haven't just read the

6        police officer's opinions and concluded that

7        they're wrong without looking at any more

8        evidence, have you?

9    A.   No.

10   Q.   It's important for you to look at all the

11       evidence the police officer looked at, isn't

12       it?

13   A.   If I can have access to it, yes.

14   Q.   Right.  And that's the only way that you

15       know that you can understand everything that

16       the police officer may be basing his or her

17       opinions on?

18   A.   Well, this is -- to me, this is a very

19       clear-cut case.  The photographs show

20       absolutely no evidence of an impact

21       occurring prior to the truck hitting that

22       bridge.  And the damage to Mr. Roby's

23       vehicle is just, to me, very, very plain

# FREEDOM COURT REPORTING

1         MR. BOONE: And I'll reiterate --

2    and for the record, I don't know if you want

3    to mark that, but I would like her to have

4    everything. I would have thought you had.

5    And we must -- Dora must not have it. I

6    would like -- are you going to mark that?

7    Because --

8         MR. BROCKWELL: We've already given

9    it to you.

10        MR. BOONE: No. I said, are you

11   going to mark that, is what I said.

12        MR. BROCKWELL: No.

13        MR. BOONE: I didn't ask you

14   whether you gave it to me or not.

15        MR. BROCKWELL: No.

16   Q. I'm just asking if you had received

17   everything that's in the Montgomery Police

18   Department Fatal Traffic Collision

19   Investigation. I think we've established

20   that you did not, ma'am; is that correct?

21   A. That's correct.

22   Q. And the only portion of it, as far as you

23   know, that you have received is the accident

# FREEDOM COURT REPORTING

Page 135

1      report part of it; is that correct?

2   A.   That's correct.

3   Q.   And when we were talking about accident

4      report, that's the Alabama Uniform Traffic

5      Accident Report; is that correct?

6   A.   Yes.

7   Q.   Now, state troopers, when there's a fatality

8      involving motor vehicles, complete a traffic

9      homicide report, don't they?

10  A.   If it fits the criteria.

11  Q.   Do you have any estimate as to the

12     percentage of cases that they will complete

13     a traffic homicide report in?

14  A.   No.

15  Q.   What criteria is it for -- what sort of

16     triggers them doing a traffic homicide

17     report?

18  A.   The criteria is if someone dies through no

19     fault of their own, if there are three or

20     more fatalities involved in the accident, or

21     if there's a school bus with injuries or

22     fatalities.  It may be more now, but that's

23     what it was four years ago.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

```
 1   Q.   And when you worked for the state troopers,
 2        at any point did you perform traffic
 3        homicide investigations?
 4   A.   Yes.
 5   Q.   And did you generate traffic homicide
 6        reports for the Alabama State Troopers while
 7        you were doing that?
 8   A.   Yes.
 9   Q.   What all was involved in creating those
10        reports, the traffic homicide reports?
11   A.   Well, investigating the accident scene,
12        documenting all the evidence at the scene,
13        documenting the vehicles and the evidence on
14        the vehicles, background checks on the
15        drivers for prior violations or histories,
16        particularly DUI histories where someone
17        died as a result of a DUI death.
18        Whatever -- you know, each investigation
19        leads you down a different road, so you just
20        gather all the information you can gather.
21   Q.   And would talking to witnesses to the
22        accident be part of that?
23   A.   Oh, absolutely.
```

## FREEDOM COURT REPORTING

```
 1    Q.    Would inspecting the vehicles involved in

 2          the accident be part of the investigation?

 3    A.    Yes.

 4    Q.    Have you actually inspected Mr. Ronald

 5          Roby's car that was involved in this

 6          accident?

 7    A.    No.

 8    Q.    You only looked at photographs?

 9    A.    Yes.

10    Q.    And those were photographs taken by someone

11          other than you; is that correct?

12    A.    Yes.

13    Q.    Have you inspected the tractor-trailer that

14          Craig Stephens was driving?

15    A.    No.

16    Q.    But you have looked at photographs of it as

17          well?

18    A.    Yes.

19    Q.    And, again, those are photographs taken by

20          someone other than you?

21    A.    Yes.

22    Q.    That next opinion I want to ask you about is

23          that you opine that Craig Stephens was
```

# FREEDOM COURT REPORTING

1     operating his vehicle in excess of 59 miles

2     per hour as he went over the barrier guard.

3     What do you base that opinion on?

4  A.  Witnesses who said that he was -- some said

5     he was doing 60 to 65, some said 80.

6  Q.  Was there any reason that you phrased it

7     like that, in excess of 59 miles per hour?

8  A.  Well, the initial critical speed of the

9     curve was 59 when I was using the radius;

10    that was approximate given to me by the city

11    engineer's office.  And then we got the

12    radius of the curve from the Alabama DOT,

13    the actual plans, and it was low.  The

14    radius was a little bit larger, so that

15    lowered the speed for that curve.  But at

16    that time, that's what I was basing that on.

17    And the witness statements that said 60 or

18    better.

19  Q.  Okay.  So part of the basis of the 59 miles

20    per hour was the critical speed you

21    determined for that curve; right?

22  A.  Yeah.

23  Q.  And I think we've already determined earlier

## FREEDOM COURT REPORTING

1    that the critical speed for that curve is

2    irrelevant to this case; is that right?

3  A.  Yes.

4  Q.  And you have -- I think you also testified

5    that it's impossible to make a calculation

6    as to Mr. Stephens' speed for just going

7    straight over the barrier; is that correct?

8  A.  Yes.

9  Q.  And so removing the critical speed for the

10    curve from the equation, what is the in

11    excess of 59 miles per hour based on?

12  A.  The witnesses.

13  Q.  And are those the witness statements or

14    witness depositions that you read here in

15    Mr. Boone's office but do not have a copy

16    of?

17  A.  Yes.

18        MR. BOONE:  Objection to form.

19  Q.  And while we're on that, could you look in

20    your notes that you've referred to a few

21    times today and tell me the names of each

22    eyewitness whose statement or deposition you

23    read?

# FREEDOM COURT REPORTING

```
1              MR. BOONE:  Objection to form.

2    A.   Bridgette Harris, Andrew Davis, Corporal

3         Green, Ladon Dansby, Richard Patterson,

4         Stephen Hornsby, Michael Boozer, Jermale

5         Ayers, Julie Pollard, Johnny Pollard, and

6         Lisa Warr.

7    Q.   There was an actual statement made by

8         Corporal Green in the materials that you

9         read?

10             MR. BOONE:  Objection to form.  For

11        the record, that same objection.  I don't

12        remember if it was my summary, the

13        investigator's summary, or what it was.  You

14        keep using the term, so I'd just like to

15        have a continuing objection, a statement or

16        a deposition.

17             MR. BROCKWELL:  And I understand.

18        I'll give you a standing objection to what

19        we call it, because frankly I don't know

20        what they are.

21             MR. BOONE:  I don't recall what it

22        is either.

23             MR. BROCKWELL:  All I know is that
```

# FREEDOM COURT REPORTING

Page 141

1     she's called it a witness deposition.

2             MR. BOONE:  Right.  I don't have an

3     objection to that.  I just want to make sure

4     we're not agreeing to that just because

5     that's the term you all use.

6             MR. BROCKWELL:  Right.

7  A.  Well, I misspoke when I said deposition.

8             MR. BOONE:  And if it is, then, you

9     know, we're going to give you whatever we

10    give you and we'll know what it is.

11            I think he asked you a question.  I

12    don't remember what it is.

13 A.  I took it at the same time as I took the

14    other notes and between two of the other

15    witnesses, so I'm assuming that it was a

16    statement that was in there also.

17 Q.  Okay.  As far as you know from your notes

18    and from your memory, the statement --

19    that's my term -- of Corporal Green was the

20    same format as the statements of the other

21    witnesses?

22 A.  Yes.

23 Q.  Did you ask for copies of these witness

# FREEDOM COURT REPORTING

Page 142

1    statements?

2  A.  I was told -- I asked if there were witness

3      statements and I was told that I could come

4      by here and read them, but I couldn't get a

5      copy.

6          MR. BOONE:  I don't remember.

7  Q.  Now, one of your opinions is that the truck,

8      meaning the truck driven by Craig Stephens,

9      collided with Ronald Roby's vehicle; is that

10      correct?

11  A.  Yes.

12  Q.  I don't think there's any dispute that there

13      was a collision between the two vehicles.  I

14      think that's pretty clear from all the

15      evidence here.  But my question about your

16      opinion is, do you mean anything other than

17      that the two vehicles collided with each

18      other by that opinion?

19  A.  Well, there had been some speculation that

20      it fell on top of Mr. Roby, but it collided

21      into -- they collided into one another.

22  Q.  So by stating that opinion, it is your

23      opinion that rather than Craig Stephens'