# Hazel Roby
## v.
# Benton Express

# Exhibit 1 to Plaintiff's
# Motion to Exclude Defendant's Expert
# Robert Tynes

# Excerpts from the Deposition of
# Robert Tynes

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA
 3                  NORTHERN DIVISION
 4
 5
 6   HAZEL M. ROBY, as
 7   Administratrix of the
 8   Estate of RONALD
 9   TYRONE ROBY, Deceased,
10
11        Plaintiff,
12
13   v.                          CIVIL ACTION NO:
14                               2:05CV194-T
15   BENTON EXPRESS, INC.,
16   et al.,
17
18        Defendants.
19
20
21
22            DEPOSITION OF:
23
24        ROBERT C. TYNES
25
```

8

1  bring everything that's listed here?
2      A. I have.
3      Q. Anything on this list after looking
4  through it that I have asked for that you
5  either just don't have or just wasn't able
6  to get it by today?
7      A. The articles that I have written, they
8  all go to Trux Magazine to Trux. The
9  publisher of that would have it.
10     Q. Okay. You wouldn't keep a copy of
11 your articles on a computer?
12     A. I don't have it. I had a computer
13 crash some time back and everything was
14 gone.
15     Q. So all the articles you have ever
16 written, you have no way to have a copy of
17 it or reproduce it?
18     A. No, sir.
19     Q. So if you ever wanted to publish it
20 again, how would you go about doing it?
21     A. Rewrite it.
22     Q. From scratch?
23     A. Yes.
24     Q. So if you wanted to produce the same
25 article you would hope you could memorize it

```
 1   company designed a communication policy?
 2       A. No, sir.
 3       Q. Ever as an employee of a trucking
 4   company implemented or enforced a
 5   communication policy for that trucking
 6   company?
 7       A. No, sir.
 8       Q. Ever been a safety director for a
 9   trucking company?
10       A. No, sir.
11       Q. Ever been an employee of a trucking
12   company and served as the role as the
13   compliance officer?
14       A. No, sir.
15       Q. Ever been employed in any position as
16   a paid full-time employee or got a W2 from a
17   trucking company in any position?
18       A. No, sir.
19       Q. Now, I noticed in your opinions that
20   one of your opinions in this case involves
21   or touches on whether or not -- let me ask
22   you this way:  Do you have any opinions in
23   this case concerning whether or not
24   Mr. Stephens at the time of this wreck was
25   in the line and scope of his employment?
```

1    A. That's up to the Courts to decide.
2    Q. Okay. Do you have any expert opinion
3 at the time of this wreck -- and that's fine
4 if that's your testimony -- but what I need
5 to know is if you do have a specific opinion
6 I need to hear it. First, I want to know
7 yes or no, so we can move on. But do you
8 have any specific opinion, expert opinion,
9 that he was or was not in the line and scope
10 of his employment at the time of this wreck?
11   A. As far as DOT's concerned, the
12 regulatory requirements, the carrier made
13 the decision to terminate that driver. They
14 just weren't in a position to get ahold of
15 him to tell him he was terminated and take
16 him off the truck. They had made that
17 determination. Things that would happen
18 after that point, DOT would not necessarily
19 require the carrier be held accountable for
20 those issues. They weren't able to get
21 ahold of him and made every attempt to
22 contact that driver and to locate him and
23 get him off the truck. They were
24 unsuccessful. DOT would then not go in and
25 require that driver -- make the carrier

1  how DOT would view it.
2      Q. Okay. And based on DOT, was he in the
3  line and scope of his employment? Or does
4  DOT have anything to do with line and scope
5  and employment? Is that what you're trying
6  to tell me?
7      A. What they do is they apply the
8  regulations to someone who is subject to the
9  regulations, and he would be subject to the
10  regulations when he --
11     Q. When he what?
12     A. When he was dispatched and when he
13  left, the motor carrier would be responsible
14  for his actions at that point as far as DOT
15  is concerned.
16     Q. And while he was driving apparently
17  proceeding to Atlanta, was he in the line
18  and scope of his employment?
19     A. Yes.
20     Q. Once --
21     A. Subject to DOT regulations.
22     Q. Okay. Once he arrived at the terminal
23  in Atlanta, was he in the line and scope of
24  his employment?
25     A. I wish you wouldn't use line and

73

1   scope. I'm taking it as a legal term that
2   the Court decides. Subject to Motor Carrier
3   Safety Regulations, would the carrier be
4   responsible for his actions at these points
5   you're talking about, yes.
6       Q. And you are saying as far as
7   enforcement by DOT, is what you are trying
8   to limit it to?
9       A. Yes.
10      Q. When he left allegedly the terminal at
11  12:40 eastern time, according to DOT, was he
12  in the scope of his employment?
13      A. Yes.
14      Q. Do you have any specific opinion about
15  exactly when, based on your interpretation
16  of DOT regulations, that he was not the
17  responsibility of Benton Express?
18      A. When the carrier made the
19  determination to terminate him.
20      Q. When did you understand that he was
21  allegedly terminated?
22      A. I understand it was after he had -- it
23  was on Sunday.
24      Q. Approximately what time?
25      A. Approximately the time that he

Case 2:05-cv-00494-MHT-VPM   Document 129-2   Filed 03/06/2006   Page 8 of 18

106

1  responsible for this collision.  Show me
2  this stuff we are talking in general about.
3      A. I did not say that.  I said DOT would
4  not prosecute the carrier under the
5  circumstances such as this.  I told you the
6  Courts are going to decide who is
7  responsible for this accident.
8      Q. Okay.  I'm asking you to show --
9      A. Not me.
10     Q. Okay.  I got you.  I understand that.
11 But I'm trying to say:  Show me in here
12 these regulations that would make you
13 conclude that DOT wouldn't hold Benton
14 responsible.
15     A. There's nothing in the regulations.  A
16 part of their field operations training
17 manual is part of their procedures and
18 processes internal.  That is their elements
19 of proof.  And it's not in the regulations.
20 It's in their procedures and practices.
21     Q. Do you have a copy of the procedures
22 and practices I can look at and say --
23     A. No.
24     Q. -- Mr. Tynes is here saying that based
25 on these procedures and practices that DOT

Esquire Deposition Services  (205) 458-1360
Birmingham

1  wouldn't prosecute. And I understand it has
2  nothing to do with what the Court is going
3  to say about this matter or a jury. But
4  since we are here, do you have anything to
5  say, "These are the policies and procedures
6  that I'm relying on to say when the DOT
7  would prosecute"?
8      A. No. I've taught it for 25 years. I
9  don't have a copy of their training manual.
10     Q. Have you ever relied on this training
11 manual before?
12     A. For what?
13     Q. Any opinions you've ever had in any
14 case.
15     A. No. I know what DOT does. I worked
16 for them for all those years, so their
17 training manual is a part of what they do
18 and what they follow when they do it.
19     Q. Right.
20     A. And, yes, many times.
21     Q. Now what I'm saying is: It's a
22 document, a training manual. You used the
23 word training manual. It's a document;
24 right?
25     A. Right.

1    Q. Do you have a copy of this training
2  manual?
3    A. No.
4    Q. And in all the cases in your career
5  that you relied on this training manual,
6  nobody asked you to produce this manual you
7  are allegedly relying on?
8    A. No.
9    Q. No?
10   A. They've asked for, but it's not there.
11   Q. Have you ever tried to bring this
12 training manual with you to say, "Mr. Boone,
13 I'm not just making this up. Here's the
14 training manual that says it." My job as a
15 lawyer, I have to figure out what your basis
16 is. And right now I'm not disputing whether
17 it's in your head or not. But right now I
18 need to see something so I can read it and
19 say, "Okay. Here's the policies and
20 procedures." So I can go read and study up
21 on it and see why you're saying what you're
22 saying.
23   A. Field operations training manual is
24 not subject to Freedom of Information.
25   Q. It is?

1  A. It's not.
2  Q. Okay.
3  A. And that's the reason it's not out
4  there.
5  Q. Not being cute with you, so in other
6  words though, you can say whatever you want
7  to say is in the training manual, there
8  ain't no way I can verify it?
9  A. No.
10 Q. Do you follow what I'm trying to say?
11 I'm trying to figure out any way I can
12 verify what you are telling me is in this
13 training manual.
14 A. Not unless you can get a copy of it
15 somewhere.
16 Q. Can you get me a copy of it?
17 A. It's not subject to Freedom of
18 Information.
19 Q. You was an employee; right?
20 A. Right.
21 Q. Do they have any kind of rule that you
22 cannot keep your training manual?
23 A. I didn't, and it's not supposed to be
24 released.
25 Q. In light of that, it would make me

1   believe knowing a little bit about Federal
2   Government and what can and can't be done,
3   is it permissible then for you to rely on
4   this training manual to give expert
5   opinions?
6       A. I have.
7       Q. Do you know if there's any rules or
8   regulations of the government that you could
9   be violating by testifying to policies and
10  procedures that the government will not
11  release?
12      A. No.
13      Q. No, you don't know?
14      A. No. There isn't any that I'm aware
15  of.
16      Q. Was there any rule or regulation that
17  said you can't keep a copy of your policy
18  and training manual?
19      A. It's an internal document, is the
20  reason they call it a training manual, so
21  they don't have to release it under the
22  Freedom of Information Act.
23      Q. I got that part. I'm passed that
24  part. I'm talking about as an employee, you
25  had one?

1   A. I had one at one point.
2   Q. Was there any rule that said you can't
3   take it with you?
4   A. No, you can't. You are supposed to
5   leave your manuals and those items that are
6   the property of the government there when
7   you leave.
8   Q. Okay. That's the answer, so yes,
9   there was a rule in place that said you
10  can't take it with you?
11  A. Right. It's their property.
12  Q. And do you know why they don't want
13  you to take it with you?
14  A. They don't want it released to the
15  general public, I assume.
16  Q. Is that because they want to keep the
17  policies and procedures confidential?
18  A. I don't know what the justification is
19  or the rationale behind not doing it.
20  Q. Now, you worked with them a long time,
21  didn't you?
22  A. I did for a fact.
23  Q. And have you ever trained anybody on
24  this policy and procedure manual?
25  A. Yes, sir.

112

```
1       Q. And you don't have any idea whether or
2   not it is -- why they don't want it
3   released?
4       A. It's not released.  It's called a
5   training manual, so they don't have to
6   release it.  It shows the internal workings
7   and processes and procedures of doing
8   compliance reviews, doing enforcement cases
9   and everything else.
10      Q. Now I'm asking you:  Do you have any
11  idea, as somebody who trained others on this
12  manual, why they don't want it released?
13      A. I didn't make the policy not to
14  release it, so I don't know why the persons,
15  whoever it is, or that person has made the
16  decision.
17      Q. As a person who's qualified to train
18  on the manual, you never inquired why the
19  importance or significance of not having it
20  released into the public?
21      A. No.
22      Q. So just to move on, in short, all I
23  can do is trust that you are articulating
24  the policies and procedures and there's no
25  way I can verify it?
```

1    A. True.

2    Q. And what I got so far is: It requires
3    intentional and willful knowledge on behalf
4    of the company and the employee?

5    A. Correct.

6    Q. However, later on you told me that
7    intentional and willful knowledge is the
8    same thing as if you should have known?

9    A. What I said was that if the records
10    are in the possession of the motor carrier,
11    then that's considered to be willful and
12    knowing violations. Just the fact that you
13    say, "Well, I'm not responsible because I
14    didn't compare this record to this record,"
15    doesn't fly. It's that you have it in your
16    possession, so you know that he was here on
17    this time. You have the log in your
18    possession so you know. Failure to do that
19    is willful failure to compare those records
20    and that's false logging. So then that's
21    considered to meet the criteria for a
22    knowing and willful violation.

23    Q. Have you ever tried to write down the
24    policies and procedures as you recollect
25    them to be?

```
 1   whether you would prosecute is because that
 2   would affect whether or not you consider
 3   Benton Express responsible for the wreck?
 4       A. Responsible for violations that might
 5   occur. If the driver is left to his own
 6   devices to come back whenever he chooses,
 7   then he continues to be under the direction
 8   of the carrier.
 9       Q. For violations that may occur, is what
10   you said?
11       A. Uh-huh. Correct.
12       Q. Did any violations occur from the time
13   Craig Stephens left to the point of this
14   wreck?
15       A. Not that I know of.
16       Q. So wouldn't Benton Express be
17   responsible for him if there's no
18   violations?
19       A. There's no violations for the
20   determination as to whether they are or not.
21   I know you are trying to get me to say
22   something about line and scope, and that's a
23   term that is for you guys, for the Courts to
24   decide, not for DOT or anybody else.
25       Q. And not for you?
```

152

1    A. And not for me.
2    Q. But in light of the fact that what you
3 just said though, since there's no violation
4 from the evidence you have in this case,
5 then Benton Express would be responsible
6 from a DOT prospective?
7    A. There's nothing to be responsible for,
8 no violations.
9    Q. Okay. So what you're saying is, you
10 ain't talking about responsibility. Where
11 you just said, DOT wouldn't hold them
12 responsible for any violation of the Federal
13 Motor Carrier Safety Regulations?
14    A. If a violation occurred, he was
15 outside the direction of the motor carrier
16 and the carrier had done everything they
17 could to remove him from the truck, then DOT
18 would not prosecute them under that, because
19 they did everything reasonable to get the
20 driver out of the truck.
21    Q. So I --
22    A. The violation, we don't know if one
23 occurred or not. I was telling you if a
24 violation occurred. You wanted to know what
25 kind of jurisdiction DOT has.

239

1  if they took it out.  It used to be part of
2  the appendix here.  Let me see if I can list
3  them to you.  I haven't done enforcement
4  cases since 1999.  So let me see if I can
5  remember what those factors are.
6      The first one is severity of the
7  violation.  The second factor is is it
8  isolated or is it company wide, the scope of
9  it.  The second one is the enforcement
10 history.  Second one -- the next one is
11 ability to pay.  The fifth consideration is
12 aggravating circumstances.  The next one is
13 time since the last enforcement or, yeah,
14 time since last enforcement.  The seventh
15 one is same or similar violations previously
16 cited.  The last one is hazardous materials.
17     Q.  The last one is hazardous material?
18     A.  Yeah, was hazardous material involved.
19 That's the best I can remember going back
20 six years.
21     MR. ROSS:  Sounds good to me.
22     Q.  You gave it a go.
23     A.  I got eight.  I did.  It's only been
24 six years.
25     Q.  I gather aggravating circumstances,