**DEFENDANT'S MOTION IN LIMINE NUMBER 16**

**EXHIBIT 1:Deposition of Boyd Don Hammonds**

Page 133

1    the clerk in Pensacola.

2        Q.    But, nevertheless, in this

3    case, the person who served as the

4    dispatcher, we're going to say who served

5    that role, was the terminal manager, Glen

6    Clark, who set up this run?

7        A.    Standard run.

8        Q.    This standard run, for

9    Mr. Craig Stephens; is that right?

10        A.    Yes, yes.

11        Q.    And based on the policies and

12    procedure, when Glen Clark is serving as the

13    dispatcher or if there was a separate

14    dispatcher, is there any written policies or

15    procedures on how often the dispatcher

16    should be in contact with the driver?

17        A.    Not a road driver, no.

18        Q.    Not a who driver?

19        A.    Not a road driver.

20        Q.    Is there any rule and

21    procedure about some specific time to be in

22    contact with some other type of driver?

23        A.    City driver.

Page 134

1          Q.      With a city driver?

2          A.      Yes.

3          Q.      So, there's a written

4     procedure about how often to be in contact

5     with a city driver?

6          A.      Yes.

7          Q.      No rule or written procedure

8     about how often to be in contact with a road

9     driver?

10         A.      No.

11         Q.      Okay.  Do you not have any

12    idea why there is a distinction there?

13         A.      The road run is predescribed,

14    where the city driver goes in different

15    directions every day to maybe different

16    customers every day.  And he is the last --

17    He is required to call in every hour on his

18    progress.

19                 On a road run, which is

20    predetermined, the guy leaves a point of

21    origin, and goes the destination and returns

22    to origin.

23         Q.      Okay.  So, with a road run,

Page 135

1    there's no procedure on being in contact?

2         A.    No.

3         Q.    So, there was no procedure or

4    no policy that somebody should have been in

5    contact with Mr. Craig Stephens every hour?

6         A.    No.

7         Q.    Did your investigation turn

8    up, in your mind, that if that policy would

9    have applied to road drivers -- Well, let's

10   assume they don't apply to road drivers.

11   Well, if that policy would have been in

12   effect and applied to road drivers, you all

13   would have more immediately been able to

14   observe and identify a delay that you all

15   considered unreasonable?

16              MR. BROCKWELL:  Object to the

17   form.

18        A.    No.

19        Q.    You don't think so?

20        A.    (Witness shakes head in the

21   negative.)

22        Q.    What would have happened -- If

23   the policy and procedure was that after one

```
1   hour of leaving the -- after he left

2   Pensacola he didn't respond, wouldn't that

3   alert somebody if the policy and procedure

4   was to respond in one hour?

5            MR. BROCKWELL:  Object to the

6   form.  Calls for speculation.

7       A.    It's a predescribed run, as

8   previously said.  There is no reason to

9   discuss where you're at every hour.

10      Q.    I thought the reason for

11  wanting to know where the driver is at is to

12  make sure the load is going to make it and

13  on time?

14      A.    He's dispatched from origin to

15  destination and from destination back to

16  origin.

17      Q.    You all advertise to y'all's

18  customers:  We have technology in place to

19  allow us to track our loads to ensure

20  they're on time.

21      A.    Track the freight.

22      Q.    Yeah.  Track the freight?

23      A.    Uh-huh.
```

FOSHEE & TURNER COURT REPORTERS

Page 137

1    Q.    And in this case, he was

2    carrying freight, wasn't he?

3    A.    Yes.

4    Q.    And you all are not talking --

5    But that don't apply to freight when it's on

6    the road?

7    A.    No.

8    Q.    That just applies to city

9    freight?

10   A.    That applies to freight as for

11   bar scanning and out for delivery.

12   Q.    So, it's your -- There's no

13   communication required between the

14   dispatcher or the terminal manager for an

15   on-the-road driver?

16   A.    No.

17   Q.    Let's talk about what Mr. Glen

18   Clark did.  When you were investigating this

19   matter, did you find out exactly the course

20   or route he took when you say he went and

21   looked for Mr. Stephens?

22   A.    No.  It was the regular

23   standard run, standard route.  I didn't

Page 138

1    discuss the route with him.

2         Q.    So, you gathered or assumed

3    that he took the same route that

4    Mr. Stephens took?

5         A.    Yes.

6         Q.    And do you know if anybody

7    other than Mr. Glen Clark went out on the

8    road and tried to locate him, physically, a

9    Benton Express employee?

10        A.    Bill Jones, the regional

11   manager of Georgia.

12        Q.    He went out on the road and

13   tried to locate him, also?

14        A.    Yes.

15        Q.    Mr. Glen Clark went out on

16   Saturday night?

17        A.    Saturday afternoon through

18   early Sunday morning.

19        Q.    And do you know when Mr. Bill

20   Jones went out on the road?

21        A.    He went out on Sunday.

22        Q.    He went out on Sunday.  And do

23   you have any idea what time?

Page 139

1          A.      It was in the neighborhood of

2    one o'clock, and returned somewhere around

3    nine o'clock that night.

4          Q.      Okay.  One o'clock in the

5    evening?

6          A.      One o'clock in the evening.

7          Q.      Returned at nine o'clock that

8    night?

9          A.      That's approximate time.  I'm

10   not exactly sure on the one o'clock.

11         Q.      Did you find out where he

12   went?

13         A.      He went out to 85, and

14   retracing the way that he would have gone on

15   a normal route back to Pensacola.

16         Q.      Do you know how far he went?

17         A.      No, I do not.

18         Q.      Do you know if he made it to

19   Montgomery?

20         A.      No.

21         Q.      Never asked?

22         A.      No.

23         Q.      Did you ask him where he

FOSHEE & TURNER COURT REPORTERS

Page 140

1    stopped?

2        A.      Did I ask him where he

3    stopped?

4        Q.      Yeah.  Places he stopped and

5    looked, or did he just drive the highway?

6        A.      He mentioned that he had

7    stopped off at places where there were stops

8    and exits, to see if he could locate him,

9    unsuccessfully.

10        Q.      If a phone of Benton Express

11    is not working, what, if any, technology --

12    And I think the answer may be simple, but I

13    have to ask it for the Record.  Do y'all

14    have any technology similar to the GPS that

15    would allow you to locate a tractor or

16    trailer if the phone is not working?

17        A.      No.

18        Q.      Cars these days, for awhile

19    now, have these things in them similar to --

20    I call them black boxes, where they record

21    data, like speed a vehicle was going,

22    whether you had your seat belt on.  I call

23    them black boxes.  A more particular name is

FOSHEE & TURNER COURT REPORTERS

Page 141

1    SDM modules in some cars.  Are you familiar

2    with those?

3        A.    Somewhat.

4        Q.    Do your -- Did Benton Express

5    have any modules on their vehicles like

6    that?

7        A.    Yes.

8        Q.    And do you know if this

9    vehicle had such a module on it?

10       A.    Yes.

11       Q.    And have you all ever -- Do

12   you know if you all have taken possession of

13   that module?

14       A.    Yes.

15       Q.    And have you all downloaded

16   and obtained information from that module?

17       A.    No information available.  It

18   was completely destroyed.

19       Q.    You all have the module, but

20   it was completely destroyed?

21       A.    Completely destroyed.

22       Q.    But you have the physical

23   module, it's just the data can't be

FOSHEE & TURNER COURT REPORTERS

Page 142

1    obtained, is that what you're saying?

2            MR. BROCKWELL:  I think it's

3    still part of the tractor, if that makes any

4    sense, LaBarron, what's left of it.

5        Q.    It's still on the tractor,

6    from your understanding?

7        A.    Yes.

8        Q.    Do you know if anybody took

9    the appropriate equipment and tried to hook

10   into it and see if they could get the

11   information out of it?

12       A.    I believe it was Cummings.

13       Q.    Okay.  Do you know when they

14   tried to do that?

15       A.    I don't have the date, no.

16       Q.    Do you know if it was the day

17   of, day after, maybe, or a long time

18   afterwards?

19       A.    It was a short time after, and

20   I do not know a specific date, no.

21       Q.    Just a couple of days after or

22   so, is what you're saying when you say a

23   short time?

Page 143

1      A.     Several weeks.

2      Q.     Several weeks.  Do you know

3  what kind of information would be maintained

4  on this black box?

5      A.     No.

6      Q.     You don't have any idea?

7      A.     Well, I know speed, as far as

8  stops and shifting gears, I'm informed, but

9  other than that, no.

10     Q.     Have you ever looked at this

11 data before?

12     A.     No.

13     Q.     No other wreck you all --

14 Since you investigate wrecks, no other

15 wrecks you've had to download the data to

16 try to figure out what was going on with the

17 truck when the wreck happened?

18     A.     No.

19     Q.     And your trucks have been in a

20 number of wrecks since you've been there?

21     A.     Yes.

22     Q.     And a number of those wrecks

23 have resulted in lawsuits?

Page 144

1      A.      Some, yes.

2      Q.      A good number of them?  More

3    than ten or twenty you've been involved in

4    or know of that resulted in a lawsuit;

5    right?

6      A.      I don't know that that's a

7    good number, twenty.

8      Q.      How many do you know of?

9      A.      I'd have to look at my loss

10   runs.

11     Q.      Okay.  You'd have to look at

12   your who?

13     A.      Loss runs.

14     Q.      And that's, L-O-S-S, runs,

15   R-U-N-S?

16     A.      Yeah.

17     Q.      That record would just show

18   you the number of wrecks where you all have

19   been involved in lawsuits?

20     A.      It shows what is filed with

21   the insurance company, yes.

22     Q.      Did you help gather documents

23   in this case?

Page 145

1      A.      Did I do what?

2      Q.      Help gather documents in this

3   case to give to the lawyers.

4      A.      Yes.

5      Q.      And did you gather the loss

6   runs documents?

7      A.      I'm not sure if they were

8   asked for or not.

9      Q.      Okay.  Does anybody you know

10   of at Benton Express regularly testify in

11   cases that involve lawsuits, such as

12   yourself?

13      A.      Does anybody else, you say?

14      Q.      Yes.

15      A.      No.

16      Q.      So, mostly -- Any time there

17   is a lawsuit, generally you are the one who

18   testifies for the company?

19      A.      Yes.

20      Q.      Did you talk to anybody who

21   could discuss or say anything about his

22   demeanor at the time he left Atlanta?

23      A.      There was no information

Page 146

1  available to that.

2        Q.    Who all he would have had to

3  come in contact with?  Obviously, the

4  security guard who logged him out or checked

5  him out.  Who else he would have came in

6  contact with?

7        A.    He may have seen someone

8  working on the dock.  Normally his dispatch

9  is put in a location, and he just picks up

10  his dispatch and he sees what trailer he's

11  taking out.

12            The guard has signed him in,

13  and he, in turn, hooks up to that trailer,

14  pretrips, and then he'll depart the

15  terminal, with the guard signing him out.

16        Q.    When you conducted your

17  investigation into this matter, did you look

18  through his logs and things showing his

19  routine runs?

20        A.    Yes.

21        Q.    Did you see anything abnormal,

22  in looking through his logs?

23        A.    No.

FOSHEE & TURNER COURT REPORTERS

Page 147

1      Q.      Did you see anything that
2  would suggest that he was pushing and maybe
3  violating hours of service?
4      A.      No.
5      Q.      Did you see anything that
6  would suggest that he was improperly
7  reporting data on his documents?
8      A.      No.
9      Q.      Did you see any document that
10  had conflicting numbers, for example, one
11  document may show blank miles driven on that
12  day and another document showed another one
13  for the same time frames?  Did you observe
14  anything like that?
15      A.      I did not notice it, no.
16      Q.      You saw anything in the
17  documents -- in his logs, in documents, that
18  would suggest that he -- he was driving at a
19  speed that was not permissible?
20      A.      No.
21      Q.      You all, when you hire
22  drivers, do a drug screen?
23      A.      Yes.

FOSHEE & TURNER COURT REPORTERS

Page 148

1          Q.      That's preemployment drug

2     screen?

3          A.      Yes.

4          Q.      Do you all have a random drug

5     policy that after you start working, that

6     you are randomly tested?

7          A.      Yes.

8          Q.      And do you know if Mr. Craig

9     Stephens was ever randomly tested?

10         A.      No.

11         Q.      No, you don't know or no, he

12     wasn't?

13         A.      No, he never was tested.

14         Q.      And how long had he been in --

15     How long had he been employed by Benton

16     Express?

17         A.      Thirteen months, plus a few

18     days.

19         Q.      Yeah.  Thirteen months, plus a

20     few days up until the time of that wreck?

21         A.      Up until the time of the

22     wreck.

23         Q.      And never had been randomly

FOSHEE & TURNER COURT REPORTERS

Page 149

1    drug tested?

2         A.      Never had been selected.

3         Q.      Do you know how the random

4    selection process works?

5         A.      We have a clinic and it's a

6    consortium, where they tell us who to send

7    for a drug test at the rate of fifty-two

8    percent a year.

9         Q.      Fifty-two percent of your

10   employees --

11        A.      Fifty-two percent of the

12   truckers.

13        Q.      Okay.  And when you say

14   consortium, you mean with all the trucking

15   companies, or did you just mean all of your

16   employees?

17        A.      All of my employees.

18        Q.      And a private company handles

19   that?

20        A.      Yes.

21        Q.      And they just send you all who

22   needs to be tested and you all just tell

23   them to go report?

Page 150

1      A.      Yes.

2      Q.      So, when Mr. Stephens got to

3   Atlanta, there wouldn't have been a specific

4   live person or dispatcher -- I mean, live,

5   physical person, his load was preset, all he

6   had to do was pick up the ticket, connect to

7   that trailer, and keep on going about his

8   business?

9      A.      That's correct.

10     Q.      Have you all gained -- not

11  speculation, but any evidence to confirm any

12  delays that Mr. Craig Stephens had

13  encountered?

14     A.      Have we gained any evidence?

15     Q.      Yeah.  Have you all said:

16  Hey, after we checked with the police, we

17  realize there was a wreck.  Do you all have

18  any evidence to support that he encountered

19  some delay?

20     A.      No.

21     Q.      Have you ever -- Have anybody

22  ever told you anything, whether you consider

23  -- you may have not considered that

Page 151

1    evidence, and I didn't want to limit the

2    word, but told you, Bill Jones, Glen Clark,

3    anybody that said:  Hey, there was a big

4    traffic jam, there was some problem, I heard

5    a hijacking had occurred, anything that

6    could -- that would lead y'all to believe

7    that he was delayed somewhat?

8         A.     No.

9         Q.     I know you told me that Glen

10   Clark in Atlanta was the terminal manager.

11        A.     Glen Clark is the terminal

12   manager in Pensacola.

13        Q.     I apologize.  And Bill Jones

14   was the terminal manager in Atlanta?

15        A.     Terminal manager/regional

16   manager.

17        Q.     Regional manager.  Exactly.

18   Meaning he's over all the terminal managers?

19        A.     Only in Georgia.

20        Q.     Okay.  Regional.  So, his

21   region is just Georgia?

22        A.     Georgia.

23        Q.     So, any terminal in Georgia,

FOSHEE & TURNER COURT REPORTERS

1    he's over?

2         A.    Yes.

3         Q.    Glen Clark is just over the

4    Pensacola terminal?

5         A.    Correct.

6         Q.    Who all -- Who is the -- Any

7    other person who is at that terminal that he

8    has to answer to?

9         A.    Which terminal?

10        Q.    Glen Clark in Pensacola.

11        A.    He has to answer to the

12   regional manager of the state of Florida.

13        Q.    The regional manager of the

14   state of Florida.  And where is he located?

15        A.    West Palm Beach.

16        Q.    And who is that?

17        A.    Steve Sturgin.

18        Q.    Steve Sturgin.  Have you

19   communicated with Mr. Steve Sturgin at all

20   about -- about this incident?

21        A.    He's not involved.

22        Q.    Okay.  And that's what I was

23   trying to find out.  Do you know if Glen

Page 153

1    Clark ever communicated to the regional

2    manager when he first was starting to be

3    concerned about the delay of Mr. Craig

4    Stephens?

5         A.    No.

6         Q.    So, best you know, he hadn't

7    been involved in it at all?

8         A.    Correct.

9         Q.    And the involvement would be

10   limited, then, from what I gather, is to

11   Glen Clark, Bill Jones and yourself?

12        A.    Correct.

13        Q.    As far as the men who played a

14   role in investigating this wreck?

15        A.    Correct.

16        Q.    How does Benton Express handle

17   lost goods?

18        A.    Beg pardon?

19        Q.    How does Benton Express handle

20   lost goods?  In this case, this truck was

21   involved in a wreck, burst into flame and

22   was involved in a wreck with another vehicle

23   that Mr. Roby was in.  Was the goods out of

FOSHEE & TURNER COURT REPORTERS

Page 154

1    that vehicle recovered?

2         A.    They were destroyed.

3         Q.    And how did you all handle

4    those lost goods?

5         A.    We have a seventy-five

6    thousand dollar deductible on cargo losses.

7         Q.    Okay.

8         A.    We assumed the claims.  We

9    self-insured the load.  And we have paid on

10   thirteen claims, approximately between

11   twenty-five and twenty-six thousand.

12        Q.    And you mean when you say you

13   paid on thirteen claims, you all paid the

14   customers who were waiting on their goods?

15        A.    We paid the shipper that

16   shipped the goods.

17        Q.    Okay.  You all paid the

18   shipper who was shipping the goods to some

19   particular company?

20        A.    Right.

21        Q.    And the shipper would have

22   been people you all -- And the shippers of

23   the goods would have been companies,

FOSHEE & TURNER COURT REPORTERS

Page 155

1    generally to say, in and around Atlanta who

2    had -- who y'all picked those goods up,

3    brought them to the Atlanta terminal for

4    Mr. Craig Stephens to bring to the Pensacola

5    terminal to be sent out to some customers?

6         A.     Correct.

7         Q.     And the people that you all

8    paid, those thirteen claims you all paid,

9    were claims of the people who had sent their

10   goods to the Atlanta terminal which

11   Mr. Craig Stephens picked up?

12        A.     Correct.

13        Q.     And they ultimately, after

14   they were given notice that the Benton

15   Express vehicle was in a wreck, filed

16   claims?

17        A.     Correct.

18        Q.     And you all have paid on

19   thirteen of those claims?

20        A.     Correct.

21        Q.     Do you all have any written

22   policies and procedures concerning what, if

23   -- what claims are covered and what claims

Page 156

1    you all will pay?

2        A.    It's covered by the claims

3    department.

4        Q.    And you told me your

5    understanding was thirteen claims have been

6    paid in this case.

7        A.    Correct.

8        Q.    Is that the total number of

9    shippers involved?

10        A.    No.

11        Q.    How many shippers had goods on

12    that truck?

13        A.    Eighteen.

14        Q.    Do you have any idea why those

15    claims hadn't been paid yet?

16        A.    They haven't been filed.

17        Q.    Meaning the shipper hadn't

18    filed a formal claim with you?

19        A.    Right.

20        Q.    Have y'all been in

21    communication with the other five who hasn't

22    yet and know whether or not they're going to

23    file a claim?

FOSHEE & TURNER COURT REPORTERS

Page 157

1          A.      I'm not in the claims

2   department.  I wouldn't know the answer to

3   that.

4          Q.      Do you all, best you know,

5   have any guidelines on when you all will pay

6   claims?  Like, for example, is there certain

7   times some claims might not be paid?

8          A.      I'm not in the claims

9   department.  I would have no knowledge of

10  that.

11         Q.      Okay.  All right.  And that's

12  a fair answer.  I'm going to ask you a

13  couple more questions.  Not trying to be

14  repetitive, but since you've been there so

15  long you may know of something, even though

16  it's not your duty.  Do you follow what I

17  mean?

18         A.      I understand.

19         Q.      Like I know a lot of things at

20  my law firm that are not my duty, but I

21  understand how certain things work.  Like

22  the accounting department is not my duty,

23  I'm a lawyer, but I understand how they pay

Page 158

1    the checks because I've seen that happen.

2              So I'm going to ask you a few

3    more questions, and you may not know, and

4    that's fair.  But if you do -- Do you know,

5    for example, like, if acts of God or

6    terrorism or something like that might be

7    claims that wouldn't be paid?  Is it in the

8    guidelines that, say, certain things might

9    not be paid?

10        A.     Claims department has their

11   own policy.

12        Q.     Okay.  I know a lot of

13   companies have people who they call load

14   planners, dispatchers, and things like that.

15   Would, as it relates to Craig Stephens,

16   would Glen Clark play that role as the load

17   planner and dispatcher?

18        A.     Repeat the question.

19        Q.     I know certain companies have

20   what I call load planners.  And I think you

21   even used that word.

22        A.     No, I did not.

23        Q.     Okay.  Well, let me use that

Page 159

1    word.  Load planners.  Does Benton Express

2    have load planners at any of its terminals?

3         A.     Load or low?

4         Q.     Yeah.  Load.  Like a load,

5    planners.  Somebody who plans loads.  You

6    know, the picking up and delivering of

7    loads.

8         A.     Central dispatch.

9         Q.     That's who handles that,

10   central dispatch?

11        A.     Yeah.  Central dispatch.

12        Q.     Okay.  And since the Pensacola

13   terminal is small, Mr. Glen Clark, as the

14   terminal manager, handles that?

15        A.     The runs are preset, correct.

16        Q.     Who presets them?  Does he do

17   that or somebody else?

18        A.     The runs are preset by --

19   through central dispatch as a -- as what is

20   called a lane.  And the trucks run cargo on

21   those lanes.

22        Q.     Do you know who is Mr. Bill

23   Jones' immediate supervisor?

FOSHEE & TURNER COURT REPORTERS

Page 160

1          A.      Who is his immediate

2    supervisor?

3          Q.      Yes.  Anybody he has to answer

4    to.

5          A.      The senior vice president of

6    the company.

7          Q.      And that was who?

8          A.      Benny Cadarow.

9          Q.      Do you know if he contacted

10   Mr. Cadarow involving anything before y'all

11   learned out about the wreck?

12         A.      I understand he did call him

13   and inform him that the massive hunt was on

14   for Stephens.

15         Q.      Has Benny Cadarow played any

16   role?  And I've been asking this in trying

17   to make sure.  And I think you may have just

18   told me some just general information.  But

19   has Mr. Benny Cadarow played any role in the

20   investigation of this wreck that I thought

21   you said was limited to Bill Jones, Glen

22   Clark and yourself?

23         A.      That's correct.

FOSHEE & TURNER COURT REPORTERS

Page 161

1    Q.    Has Benny Cadarow played any

2    role in the investigation, though?

3    A.    Not to my knowledge.

4    Q.    And all you were saying is

5    that you think that Bill Jones notified him

6    that a driver was delayed and y'all were

7    looking for him?

8    A.    Correct.

9    Q.    Did your investigation lead

10   you to any information concerning whether he

11   had any personal cell phone?

12   A.    No.

13   Q.    Did you ask did he have any --

14   A.    We've got the telephone

15   records.  And I -- Like I said earlier, as

16   far as interpreting those records, as far as

17   what's a company phone or his personal cell

18   phone or whatever of that nature, I haven't

19   been able to determine that.

20   Q.    Okay.  And just to -- And I

21   think you're telling me about the records.

22   But do you know if he had a personal cell

23   phone, like Glen Clark said:  I know he had

Page 162

1    a personal cell phone, but I didn't know the

2    number, or something?  Did anybody tell you

3    he had a personal cell phone?

4            A.    I think he did, but I'm not

5    sure.

6            Q.    Do you know if Glen Clark or

7    anyone knew the personal cell phone number?

8            A.    You'd have to ask Glen Clark.

9            Q.    And that's something you

10   hadn't asked him?

11           A.    Right.

12           Q.    Did anybody tell you whether

13   or not they thought the Nextel phone was

14   broke or not operating properly when they

15   were trying to contact Mr. Stephens?

16           A.    No.

17           Q.    Did they appear to believe

18   that it was working properly, just no

19   response?

20           A.    No response, to my knowledge.

21           Q.    So, what you gathered was, it

22   would ring or whatever -- Does it ring like

23   a regular telephone, ring, ring, you just

FOSHEE & TURNER COURT REPORTERS

Page 163

1    pick it up and somebody answers it?

2         A.    Some rings, some beeps.

3    Depends on what you set your phone on.

4         Q.    Okay.  So, it was their

5    understanding that the phone was ringing,

6    they got a dial tone and it rung, but just

7    nobody ever picked it up?

8         A.    If you're speaking of Glen

9    Clark, you would have to ask him that

10   question.  I don't know.

11        Q.    But you didn't ask him that?

12        A.    Did not.

13        Q.    What about Bill Jones?

14        A.    I don't know.  You'd have to

15   ask Bill Jones.

16        Q.    Okay.  Now, you were

17   conducting the investigation; right?

18        A.    That's correct.

19        Q.    But that's just something you

20   just hadn't asked him?

21        A.    Right.

22        Q.    And just so you know, and not

23   me trying to pick on you, I was asking you